# EXHIBIT A

**Corporate Chart of NextPoint Group**



**Public**

**NextPoint Financial, Inc.**
Canada - British Columbia
**January 16, 2020**

Community Tax Puerto Rico LLC
DE - November 2, 2021

Community Tax LLC
IL - March 29, 2010

CTAX Acquisition LLC
DE - December 14, 2021

**NPI Holdco LLC**
DE - June 17, 2021

**NPLM Holdco LLC**
DE - February 17, 2021

MMS Servicing LLC
DE - February 22, 2022

LoanMe Funding, LLC
DE - July 7, 2019

**LT Holdco, LLC**
DE - July 2, 2019

**LoanMe, LLC**
DE - June 29, 2021

InsightsLogic LLC
DE - November 18, 2019

JTH Tax Office Properties, LLC
VA - April 17, 2014

Wefile LLC
VA - July 10, 2019

**LT Intermediate Holdco, LLC**
DE - July 2, 2019

SiempreTax+ LLC
VA - April 18, 2014

LoanMe Stores LLC
DE - April 28, 2022

LM BP Holdings, LLC
DE - November 10, 2016

**Not a Debtor, Not a Petitioner

Liberty Credit Repair, LLC
VA - November 13, 2019

**JTH Tax LLC**
DE - July 9, 2019

JTH Financial, LLC
VA - August 27, 2009

LM 2020 CM I SPE, LLC
DE - May 29, 2020

LTS Software LLC
VA - July 10, 2019

60%

JTH Properties 1632, LLC
VA - September 18, 2012

LM Retention Holdings, LLC
DE - May 9, 2019

JTH Court Plaza, LLC
VA - Sept. 19, 2014

**Liberty Tax Holding Corporation**
(Canada - Ontario)

360 Accounting Solutions, LLC
VA - May 5, 2016

27.65%

40%

LoanMe Trust Prime 2018-1
DE - April 26, 2018

LoanMe Trust SBL 2019-1
July 19, 2019

LTS Properties, LLC
VA - June 14, 2006

**Liberty Tax Service Inc.**
(Canada - Ontario)

*Structure does not reflect entity classifications for U.S. federal income tax purposes.

## EXHIBIT B

## Restructuring Support Agreement

## <u>RESTRUCTURING SUPPORT AGREEMENT</u>

This RESTRUCTURING SUPPORT AGREEMENT (this "**Agreement**") is made and entered into as of July 25, 2023, by and among:

(a)     NextPoint Financial Inc. ("**NextPoint Parent**"); NPI Holdco LLC ("**BP NP Borrower**"); LT Holdco, LLC ("**BP Liberty Borrower**"); LT Intermediate Holdco, LLC; SiempreTax+ LLC; JTH Tax LLC; JTH Financial, LLC; JTH Properties 1632, LLC; JTH Tax Office Properties, LLC; Wefile LLC; Liberty Credit Repair, LLC; LTS Properties, LLC; 360 Accounting Solutions, LLC; JTH Court Plaza, LLC; LTS Software LLC; CTAX Acquisition LLC ("**CTAX Borrower**"); Community Tax LLC ("**CTAX LLC**"); Community Tax Puerto Rico LLC ("**CTAX Puerto Rico**," and together with CTAX Borrower and CTAX LLC, collectively, the "**CTAX Entities**," and each a "**CTAX Entity**"); NPLM Holdco LLC; LoanMe, LLC ("**LoanMe**"); and InsightsLogic LLC (collectively, the "**NextPoint Entities**" or the "**Company**");

(b)     the undersigned entities constituting all the lenders under the BP NP-Liberty Credit Agreement (as defined below) (such lenders in such capacity, the "**Consenting BP NP-Liberty Lenders**" and the agent for such lenders, the "**BP NP-Liberty Credit Facility Agent**"); and

(c)     the undersigned entities constituting all the lenders under the BP CTAX Term Loan Credit Agreement (as defined below) (such lenders in such capacity, the "**Consenting BP CTAX Lenders**" and the agent for such lenders, in such capacity, the "**BP CTAX Credit Facility Agent**" and the Consenting BP CTAX Lenders together with the BP NP-Liberty Lenders, the "**Consenting BP Lenders**" and the BP CTAX Credit Facility Agent together with the BP NP-Liberty Credit Facility Agent, collectively, the "**Credit Facility Agents**" and each, a "**Credit Facility Agent**").

The NextPoint Entities, the Consenting BP Lenders, and any other Person (as defined in the Bankruptcy Code (as defined below)) that becomes a party hereto in accordance with the terms hereof are referred to herein collectively, as the "**Parties**" and individually, as a "**Party**."

## <u>RECITALS</u>

**WHEREAS**, reference is made to that certain Revolving Credit Agreement, dated as of July 2, 2021, by and among BP NP Borrower, BP Liberty Borrower, NextPoint Parent, the subsidiary guarantors from time to time party thereto, the BP NP-Liberty Credit Facility Agent and the lenders from time to time party thereto (as amended restated, supplemented, or otherwise modified from time to time, the "**BP NP-Liberty Credit Agreement**," and any claims arising thereunder the BP NP-Liberty Credit Agreement, collectively the "**BP NP-Liberty Claims**");

**WHEREAS**, reference is made to that certain Credit Agreement dated as of June 29, 2022, among CTAX Borrower, as borrower, CTAX LLC and CTAX Puerto Rico as borrower guarantors, the lenders party thereto from time to time, and the BP CTAX Credit Facility Agent, as administrative agent (as amended, restated, supplemented, or otherwise modified from time to

time, the "**BP CTAX Term Loan Credit Agreement**," and any claims arising thereunder, collectively the "**BP CTAX Term Loan Claims**" and together with BP NP-Liberty Claims, collectively, the "**Claims**" and each a "**Claim**");

**WHEREAS**, the Parties have engaged in good faith, arm's-length negotiations regarding a restructuring and certain related transactions concerning the Company (as described in this Agreement, including all exhibits hereto, the "**Restructuring**"), a sale and investment solicitation process to be implemented in the CCAA Proceedings, the terms of which are attached hereto as **Exhibit A** (as may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof and this Agreement, the "**SISP**"),including a stalking horse transaction concerning certain assets of and equity interests in the Company (the "**Stalking-Horse Bid**"), the material terms of which shall be consistent with the restructuring term sheet attached hereto as **Exhibit B** (as may be amended, restated, supplemented, or otherwise modified from time to time in accordance with this Agreement and in connection with the SISP, the "**Restructuring Term Sheet**") and shall be recognized in cases (the "**Chapter 15 Cases**") under chapter 15 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**US Bankruptcy Court**");

**WHEREAS**, the NextPoint Entities require approximately $18 million of liquidity to maintain ordinary course operations and fund the administrative costs of the Restructuring, which the Consenting BP Lenders have agreed to provide in the short term through (a) a $25 million debtor-in-possession financing facility on the terms contained in the term sheet attached hereto as **Exhibit C** (as may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof and this Agreement, the "**DIP Term Sheet**" and such financing, the "**DIP Financing**") and (b) a deferral of certain interest obligations that were due on July 1, 2023 under the BP NP-Liberty Credit Agreement and the BP CTAX Term Loan Credit Agreement, as documented in those certain Forbearance Agreements dated June 30, 2023 between the applicable NextPoint Entities, the applicable Consenting BP Lenders, and the Credit Facility Agents (the "**Forbearance Agreements**");

**WHEREAS**, absent the relief provided by the Forbearance Agreements, the failure to remit the interest due under the BP NP-Liberty Credit Agreement and the BP CTAX Term Loan Credit Agreement would constitute an Event of Default (as defined therein) under each agreement; and

**WHEREAS**, simultaneously herewith, as consideration for entry into this Agreement to support the Restructuring and provide financing on the terms contained in the DIP Term Sheet and as consideration for entry into the Forbearance Agreements, the Parties are entering into the Mutual Release Agreement attached hereto as **Exhibit D** (the "**Mutual Release Agreement**"), to be effective upon the RSA Effective Date.

**NOW, THEREFORE**, in consideration of the promises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and

sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

<u>**AGREEMENT**</u>

1.   <u>**RSA Effective Date**</u>.  This Agreement shall become effective and binding on each of the Parties on the date and time on which the following has occurred (such date, the "**RSA Effective Date**"):

(a)   counterpart signature pages to this Agreement shall have been executed and delivered by (i) each of the NextPoint Entities, (ii) Consenting BP NP-Liberty Lenders holding 100% of all outstanding BP NP-Liberty Claims; and (iii) Consenting BP CTAX Lenders holding 100% of all outstanding BP CTAX Term Loan Claims;

(b)   all counterpart signature pages to the Mutual Release Agreement shall have been executed and delivered as provided therein, and the Mutual Release Agreement shall be effective in accordance with its terms;

(c)   the Company shall have executed a letter agreement providing that the Company will pay for the services of Triple P RTS, LLC and Triple P Securities, LLC ("<u>Portage Point</u>") as financial advisor to the Consenting BP Lenders;

(d)   the Company shall have paid, or caused to be paid, all undisputed, reasonable and documented fees, out of pocket expenses, and unpaid professional retainer amounts of the Consenting BP Lenders (and the Credit Facility Agents) for which an invoice has been received by the Company before the anticipated RSA Effective Date (including, for the avoidance of doubt, Portage Point);

(e)   the Company shall have delivered a 13-week cash flow in form and substance satisfactory to the Required Consenting BP Lenders[1];

(f)   the Company shall have appointed Peter Kravitz as Chief Restructuring Officers of the NextPoint Entities (the "**Chief Restructuring Officer**"); and

(g)   counsel to the Company shall have given notice to counsel to the Consenting BP Lender in the manner set forth in <u>Section 21</u> hereof (by e-mail or otherwise) that the other conditions to the RSA Effective Date set forth in this <u>Section 1</u> have occurred.

2.   <u>**Exhibits and Schedules Incorporated by Reference**</u>.  The Restructuring Term Sheet and any other exhibits attached to the Restructuring Term Sheet or this Agreement (and any schedules to such exhibits) (collectively, the "**Exhibits and Schedules**") are expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall be deemed to include the Restructuring Term Sheet and any Exhibits and Schedules.  In the event

---

[1]   "**Required Consenting BP Lenders**" refers to (i) Consenting BP NP-Liberty Lenders holding at least 50.1 percent of the BP NP-Liberty Claims that are held by Consenting BP NP-Liberty Lenders at the relevant time and (ii) Consenting BP CTAX Lenders holding at least 50.1 percent of the BP CTAX Term Loan Claims that are held by Consenting BP CTAX Lenders at the relevant time.

of any inconsistency between this Agreement (without reference to the Exhibits and Schedules) and the Exhibits and Schedules, this Agreement (without reference to the Exhibits and Schedules) shall govern.  In the case of a conflict of the provisions contained in the text of this Agreement and the Restructuring Term Sheet, the text of this Agreement shall govern.  Notwithstanding the foregoing or anything to the contrary herein, the Mutual Release Agreement is attached hereto solely for reference of the complete terms of the Restructuring and is not included within the definition of Exhibits and Schedules or otherwise incorporated herein and shall be treated and interpreted as a standalone agreement.

3.    **Definitive Documents**.

(a)    The definitive documents and agreements governing the Restructuring (the "**Definitive Documents**") shall consist of all material customary documents necessary to implement the Restructuring, including:  (i) the Restructuring Term Sheet; (ii) the Exhibits and Schedules, (iii) any documents concerning preferred or common equity in any of the reorganized NextPoint Entities (including the CTAX Entities); (iv) the SISP and any documents related thereto; (v) the stalking horse purchase agreement that sets out the definitive terms and conditions of the Stalking-Horse Bid substantially in form attached as **Exhibit E** hereto (the "**Stalking Horse Purchase Agreement**"), (vi) the SISP Order; (vii) the SISP Recognition Order; (viii) the Vesting Order, (ix) the Vesting Recognition Order (as such terms are defined in the Stalking Horse Purchase Agreement), (v) all Orders issued in the CCAA Proceedings or Chapter 15 Cases, (vi) such other definitive documentation relating to the Restructuring as is necessary or desirable to consummate the Restructuring and the SISP; and (vii) any officer's employment or consulting agreements, any documents related to any management incentive plan, and any other key employee retention plan or key employee incentive plan.

(b)    The Definitive Documents not executed or in a form attached to this Agreement remain subject to negotiation and completion.  Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter, or instrument related to the Restructuring shall contain terms, conditions, representations, warranties, and covenants consistent in all material respects with the terms of this Agreement, as they may be modified, amended, or supplemented in accordance with this Agreement, and shall be subject to the approval requirements set forth herein.

(c)    Any document that is included within the definition of Definitive Documents, including any amendment, supplement, or modification thereof, shall be in form and substance reasonably acceptable to the (a) NextPoint Entities and (b) Required Consenting BP Lenders.

4.    **Milestones**. The Restructuring shall be implemented on the following timeline with the following deadlines (each, a "**Milestone**"), each of which may be extended in accordance with this Agreement:

(a)    On or before August 10, 2023, the NextPoint Entities and the Required Consenting BP Lenders shall have agreed to a wind-down strategy for LoanMe.

(b)    In connection with the CCAA Proceedings:

(i)     On or before July 26, 2023, (a) the NextPoint Entities shall have commenced proceedings (the "**CCAA Proceedings**") under the *Companies' Creditors Arrangement Act* (as amended, the "**CCAA**") in the Supreme Court of British Columbia (the "**CCAA Court**") and (b) and have obtained an Initial Order in form and substance satisfactory to the Consenting BP Lenders, acting reasonably (the "**Initial Order**");

(ii)    On or before July 27, 2023, the NextPoint Entities shall serve the SISP Application;

(iii)   On or before August 4, 2023, the NextPoint Entities shall obtain the SISP Order, subject to Court availability;

(iv)    The NextPoint Entities shall, subject to Court availability, obtain the Vesting Order

a.      on or before September 15, 2023, if no LOIs are received by the LOI Deadline;

b.      on or before October 6, 2023, if no Qualified Bids are received by the Qualified Bid Deadline; or

c.      no later than 9 days after the competition of the Auction, in the event of an Auction.

(c)     On or before July 26, 2023, the NextPoint Entities shall seek a temporary restraining order in the US Bankruptcy Court to provide "stay" relief pending entry of the Initial Order Recognition Order (defined below);

(d)     In connection with the Chapter 15 Cases:

(i)     On or before July 26, 2023, the foreign representative of the NextPoint Entities (the "**Foreign Representative**") shall have commenced the Chapter 15 Cases in the US Bankruptcy Court;

(ii)    within two (2) business days after the entry of the Initial Order, the Foreign Representative shall file a motion with the US Bankruptcy Court for entry of an order recognizing and enforcing the Initial Order (the "**Initial Order Recognition Motion**");

(iii)   Within two (2) business days after the entry of the SISP Order, the Foreign Representative shall file a motion with the US Bankruptcy Court for entry of an order recognizing and enforcing the SISP Order (the "**SISP Order Recognition Motion**");

(iv)    On or before August 25, 2023, the Foreign Representative shall obtain an order approving the Initial Order Recognition Motion (the "**Initial Order Recognition Order**");

(v)     On or before August 28, 2023, the Foreign Representative shall obtain the SISP Recognition Order;

(vi)     Within two (2) business days after the entry of the Vesting Order, the Foreign Representative shall file with the US Bankruptcy Court the Vesting Recognition Motion; and

(vii)     Within fourteen (14) days after the entry of the Vesting Order, the Foreign Representative shall obtain the Vesting Recognition Order;

(e)     No later than 14 days after the date that the Foreign Representative obtains the Vesting Recognition Order (the "**Initial Outside Date**"), or such later date or dates as may be determined by the Required Consenting BP Lenders on written notice to the other Parties (the "**Outside Date**"), the Restructuring shall close; *provided*, *however*, in the event the Initial Outside Date is not extended, the Initial Outside Date shall be the Outside Date.

The Required Consenting BP Lenders may extend a Milestone on written notice to the NextPoint Entities and the other Parties (which may be delivered by e-mail), acting reasonably.

5.     **Commitments of the Consenting BP Lenders**.  Subject to the terms and conditions hereof and to carrying out the SISP in accordance with the SISP Order, unless inconsistent with the Consenting BP Lenders' obligations or rights under any debtor in possession financing arrangements, each Consenting BP Lender shall, from the RSA Effective Date until the occurrence of the RSA Termination Date (as defined below):

(a)     support the Restructuring and exercise any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process requiring voting or approval to which it is legally entitled to participate) in each case in favor of any matter requiring approval to the extent necessary to implement the Restructuring; *provided*, *however*, that the foregoing shall not require any BP Lender to take or refrain from taking any action that would materially change the terms of the Restructuring or impair its rights under this Agreement or any other Definitive Document and in no circumstance shall there be an obligation to amend, modify, or waive any provision of the Stalking Horse Purchase Agreement;

(b)     use commercially reasonable efforts to cooperate with and assist the NextPoint Entities in obtaining additional support for the Restructuring from the NextPoint Entities' other stakeholders;

(c)     act in good faith and take (and cause its agents, representatives, and employees to take) all actions that are reasonably necessary or appropriate, and all actions required by the CCAA Court and/or the US Bankruptcy Court, to support and achieve the consummation of the Restructuring; *provided* that the foregoing shall not require any BP Lender to take or refrain from taking any action that would materially change the terms of the Restructuring or impair its rights under this Agreement or any other Definitive Document;

(d)     not object to, delay, impede, or take any other action to interfere with the consummation or implementation of the Restructuring contemplated by this Agreement; provided that the exercise of any rights under the Stalking Horse Purchase Agreement shall not be considered a breach of this Agreement;

(e)     not directly or indirectly take any action that could reasonably be expected to or would interfere with, delay, impede, or postpone the transactions contemplated by the Restructuring or this Agreement;

(f)     not file any application, motion, pleading, or other document with the US Bankruptcy Court, the CCAA Court, or any other court (including any modifications or amendments thereof) that, in whole or in part, is materially inconsistent with the Restructuring;

(g)     not initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to the CCAA Proceedings, the Chapter 15 Cases, this Agreement, or the Restructuring contemplated herein against the NextPoint Entities or the other Parties hereto, other than to enforce this Agreement or any Definitive Document; *provided, however*, for the avoidance of doubt, as set forth above in this Section, the foregoing shall not affect any Consenting BP Lender's ability to take any action permitted under the DIP Term Sheet or in connection with the DIP Financing;

(h)     not exercise, or direct any other person to exercise, any right or remedy for the enforcement, collection, or recovery of any Claims or interests in the NextPoint Entities, other than as set forth in this Agreement; *provided, however*, for the avoidance of doubt, as set forth above in this Section, the foregoing shall not affect any Consenting BP Lender's ability to take any action permitted under the DIP Term Sheet or in connection with the DIP Financing;

(i)     not initiate, or have initiated on its behalf, not object to, delay, impede, or take any other action to interfere with the NextPoint Entities' ownership and possession of their assets, wherever located, or interfere with the stay imposed by the CCAA Court and the US Bankruptcy Court; *provided, however*, for the avoidance of doubt, as set forth above in this Section, the foregoing shall not affect any Consenting BP Lender's ability to take any action permitted under the DIP Term Sheet or in connection with the DIP Financing, or in connection with the Transaction; and

(j)     between the date hereof and the RSA Termination Date, provide reasonably prompt written notice to the other Parties, to the extent known by such BP Lender, as the case may be, of (i) the occurrence, or failure to occur, of any event of which the occurrence or failure to occur would be reasonably likely to cause (A) any representation or warranty of the BP Lender contained in this Agreement to be untrue or inaccurate in any material respect, (B) any covenant of the BP Lender contained in this Agreement not to be satisfied in any material respect, or (C) any condition precedent contained in the Stalking Horse Purchase Agreement, this Agreement, or a Definitive Document not to occur or become impossible to satisfy; or (ii) the receipt of written notice from any third party alleging that the consent of such party is or may be required as a condition precedent to consummation of the transactions contemplated by the Restructuring.

Notwithstanding the foregoing, nothing in this Agreement shall (i) be construed to prohibit any Consenting BP Lender from appearing as a party-in-interest in any matter to be adjudicated in the CCAA Proceedings or the Chapter 15 Cases, so long as, from the RSA Effective Date until the occurrence of the applicable RSA Termination Date, such appearance and the positions advocated in connection therewith are consistent with this Agreement and are not for the purpose of hindering, delaying, or preventing the consummation of the Restructuring; (ii) prevent

any Consenting BP Lender from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of this Agreement; (iii) affect, modify, or change in any way any right of any Consenting BP Lender under the DIP Term Sheet and any related documents; (iv) except as otherwise expressly provided in this Agreement, be construed to limit any Consenting BP Lender's rights under any applicable credit agreement, including the DIP Term Sheet, other loan document, instrument, and/or applicable law; (v) affect the rights of any Consenting BP Lender to consult with the NextPoint Entities, the Credit Facility Agents, or any other creditor or stakeholder of the NextPoint Entities or any other party in interest in the CCAA Proceedings or the Chapter 15 Cases; *provided* that, without the written consent (which may be delivered via e-mail and shall not be unreasonably withheld) of the NextPoint Entities, the Consenting BP Lenders shall not consult with any party whom the NextPoint Entities have informed the Consenting BP Lenders has made an Alternative Restructuring Proposal (as defined below); (vi) impair or waive the rights of any Consenting BP Lender to assert or raise any objection permitted under this Agreement in connection with any hearing in the CCAA Court or the US Bankruptcy Court or prevent any Consenting BP Lender from enforcing this Agreement against any Party; and (vii) prevent any Consenting BP Lender from taking any action that is required, or require any Consenting BP Lender to take any action that is prohibited, by applicable law or that would result in the waiver or foregoing of any applicable legal privilege; *provided*, *however*, that if any Consenting BP Lender proposes to take or refrain from taking any action that is otherwise inconsistent with this Agreement to comply with applicable law or maintain a legal privilege, such Consenting BP Lender shall provide advance notice to the other Parties at that time if permitted by applicable law; *provided*, *further*, that, as of the date hereof, each Consenting BP Lender represents and warrants to each other Party that such Consenting BP Lender is unaware of any such action; (ix) waive or forego the benefit of any applicable legal privilege based on advice of counsel; or (x) except as otherwise provided in, or envisioned by, this Agreement, require the Consenting BP Lenders or the related Credit Facility Agents to incur any expenses, liabilities, or other obligations, or to agree to any commitments, undertakings, concessions, indemnities, or other arrangements that could result in expenses, liabilities, or other obligations.

6. **Commitments of the Company**. Subject to the terms and conditions hereof, and except as the Required Consenting BP Lenders may expressly release the NextPoint Entities in writing (which writing may be via e-mail) from any of the following obligations (which release may be withheld, conditioned, or delayed by the Required Consenting BP Lenders in their sole discretion) (each such release, a "**Section 6 Waiver**"):

(a) each of the NextPoint Entities (i) agrees to (x) support and use commercially reasonable efforts to complete the Restructuring as set forth in the Stalking Horse Purchase Agreement and this Agreement; (y) negotiate in good faith and execute and deliver the Definitive Documents and take any and all steps reasonably necessary and appropriate in furtherance of the Restructuring, the Stalking Horse Purchase Agreement, and this Agreement; and (z) take commercially reasonable efforts to complete the Restructuring in accordance with each Milestone set forth in Section 4; and (ii) shall not (x) file any application, motion, pleading, or Definitive Documents with the CCAA Court, the US Bankruptcy Court, or any other court (including any modifications or amendments thereof) that, in whole or in part, are inconsistent with this Agreement or the Restructuring (including the consent rights of the other Parties set forth herein as to the form and substance of such motion, pleading, or Definitive Document); or (y) undertake any action that is inconsistent with, or is intended to frustrate or impede approval, implementation,

and/or consummation of the Restructuring described in this Agreement or the Restructuring Term Sheet;

(b)      each of the NextPoint Entities agrees to use commercially reasonable efforts to cure, vacate, reverse, set aside, or have overruled any ruling or order of the CCAA Court, the US Bankruptcy Court, any regulatory authority, or any other court of competent jurisdiction (including any appellate court) enjoining or rendering impossible the consummation or substantial consummation of the Restructuring;

(c)      each of the NextPoint Entities agrees to provide prompt written notice to the other Parties between the date hereof and the RSA Termination Date of (i) the occurrence, or failure to occur, of any event of which the occurrence or failure to occur would be reasonably likely to cause (x) any representation or warranty of the NextPoint Entities contained in this Agreement to be untrue or inaccurate in any material respect, (y) any covenant of the NextPoint Entities contained in this Agreement not to be satisfied in any material respect, or (z) any condition precedent contained in the Stalking Horse Purchase Agreement, this Agreement, or a Definitive Document not to occur or become impossible to satisfy; (ii) receipt of any written notice from any third party alleging that the consent of such party is or may be required as a condition precedent to consummation of the transactions contemplated by the Restructuring; (iii) receipt of any written notice from any governmental body that is material to the consummation of the transactions contemplated by the Restructuring; and (iv) to the extent involving the Company, any material governmental or third party complaints, litigations, investigations, or hearings (or communications indicating that the same is contemplated or threatened);

(d)      the NextPoint Entities agree to take commercially reasonable efforts to ensure that all consents and approvals necessary for the implementation of the Restructuring (including, without limitation, regulatory, court, and other approvals) shall have been obtained to the reasonable satisfaction of the Required Consenting BP Lenders, the Credit Facility Agents, and the NextPoint Entities, and that all necessary filings and notifications and similar actions shall have been taken to the satisfaction of the Required Consenting BP Lenders, the Credit Facility Agents, and the NextPoint Entities prior to the Effective Date;

(e)      the NextPoint Entities shall pay the reasonable and documented fees and expenses of the Consenting BP Lenders and the Credit Facility Agents incurred in connection with the Restructuring, including, without limitation, the reasonable and documented fees and expenses of such parties' legal, financial, and other advisors, as and when they come due after receipt of applicable invoices and in accordance with the arrangements in place as of the date of this Agreement (including, for the avoidance of doubt, the DIP Term Sheet, the BP NP-Liberty Credit Agreement, and the BP CTAX Term Loan Credit Agreement);

(f)      the NextPoint Entities shall (i) operate the business of the NextPoint Entities in the ordinary course in a manner that is consistent with this Agreement, and use commercially reasonable efforts to preserve intact the NextPoint Entities' business organization and relationships with third parties and its employees (which shall not prohibit the NextPoint Entities from taking actions outside of the ordinary course of business to the extent approved by the CCAA Court and the US Bankruptcy Court, as applicable); (ii) keep the Consenting BP Lenders informed about the operations of the NextPoint Entities; and (iii) provide the Consenting BP Lenders with any

material information reasonably requested regarding the NextPoint Entities and the CTAX Entities and provide, and direct the Company's employees, officers, advisors, and other representatives to provide, to the Consenting BP Lenders' legal, financial, and other advisors, (x) reasonable access during normal business hours to the Company's books, records, and facilities, and (y) reasonable access to the management and advisors of the Company for the purposes of evaluating the Company's assets, liabilities, operations, businesses, finances, strategies, prospects, and affairs (on a confidential basis in each case);

(g)      the NextPoint Entities agree (i) to prepare or cause to be prepared the applicable Definitive Documents within the NextPoint Entities' control (including all relevant motions, applications, proposed orders, and agreements); (ii) to provide draft copies of all documents, including the Definitive Documents within the NextPoint Entities' control, that the NextPoint Entities intend to file with the CCAA Court or the US Bankruptcy Court, in each case, to counsel to the Consenting BP Lenders and Credit Facility Agents at least three (3) calendar days before such documents are to be filed with the CCAA Court and/or the US Bankruptcy Court or as soon as practicable thereafter; *provided* that each such pleading or document shall be acceptable to the Required Consenting BP Lenders, acting reasonably, and consistent with, and shall otherwise contain, the terms and conditions set forth in this Agreement (including the consent rights of any Party, as may be applicable, set forth herein as to the form and substance of such pleading or document), and (iii) without limiting any approval rights set forth herein, consult in good faith with the advisors to the Required Consenting BP Lenders and Credit Facility Agents regarding the form and substance and timing of service and filing of any of the foregoing documents[2] in advance of the filing, execution, distribution, or use (as applicable) thereof;

(h)      each of the NextPoint Entities agrees to provide the Consenting BP Lenders with a list of contracts they propose to disclaim within the CCAA Proceedings within ten (10) calendar days hereof (the "**Disclaimer List**").  The Disclaimer List shall be satisfactory to the Consenting BP Lenders, acting reasonably, and the NextPoint Entities shall remove or add such contracts to the Disclaimer List as reasonably requested by the Consenting BP Lenders.  Subject to prior written confirmation from the Consenting BP Lenders that the Disclaimer List is satisfactory, all contracts included therein shall be disclaimed effective thirty-one (31) days after entry of the Vesting Order.  In the event that the Consenting BP Lenders reasonably request in writing the addition of any contract to the Disclaimer List from time to time thereafter, the NextPoint Entities shall so add any such contract and disclaim it within thirty-one (31) days after such request is made by the Consenting BP Lenders.  Notwithstanding the foregoing, in the event that the Consenting BP Lenders request in writing that the NextPoint Entities immediately disclaim any contract on the Disclaimer List after receipt thereof, the NextPoint Entities shall have three (3) days to respond to such written request and, absent disagreement, shall disclaim such contract effective thirty-one (31) days thereafter.  In the event of a disagreement regarding any request for immediate disclaimer, the Consenting BP Lenders and the NextPoint Entities shall work in good faith to resolve such disagreement, including through consultation with the Monitor.

---

[2]     For the avoidance of doubt, the documents to be provided do not include certificates of service and notices of appearance.

(i)     the NextPoint Entities agree to file timely a formal objection to any application or motion filed with the CCAA Court or the US Bankruptcy Court, as applicable, which seeks an order that would undermine the Restructuring or any relief sought in connection therewith; and

(j)     the NextPoint Entities agree to file timely a formal objection to any application or motion filed with the CCAA Court or the US Bankruptcy Court, as applicable, by any Person seeking the entry of an order (i) lifting the stay of proceedings in the CCAA Proceedings or the Chapter 15 Cases; (ii) terminating the CCAA Proceedings or converting the CCAA Proceedings to proceedings under the Bankruptcy and Insolvency Act (Canada); (iii) directing the appointment of an examiner; or (iv) dismissing any of the Chapter 15 Cases or commencing any other insolvency proceedings in the United States not contemplated by this Agreement.

7.     **Additional Provisions Regarding the NextPoint Entities**.  The NextPoint Entities shall provide on a confidential basis (A) to the legal counsel and financial advisors of the Monitor copies (or if not provided to the NextPoint Entities in writing, a detailed description) of any bona fide unsolicited written proposal for the sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, liquidation, tender offer, recapitalization, plan of reorganization, share exchange, business combination, or similar transaction involving any one or more NextPoint Entity, one or more NextPoint Entity's material assets, or the debt, equity, or other interests in any one or more NextPoint Entity that is an alternative to or otherwise inconsistent with the Restructuring (a "**Alternative Restructuring Proposal**") no later than two (2) calendar days following receipt thereof by the NextPoint Entities or their advisors; (B) to the legal counsel and financial advisors of the Consenting BP Lenders, any Alternative Restructuring Proposal that does not exceed $281 million (the total amount of secured debt owed to the Supporting Creditors by the NextPoint Entities as of the date hereof) no later than two (2) calendar days following receipt of such Alternative Restructuring Proposal by the NextPoint Entities or their advisors; and (C) such other information as reasonably requested by the Consenting BP Lenders' and Monitor's legal counsel and financial advisors or as necessary to keep the Consenting BP Lenders and Monitor informed no later than two (2) calendar days after any such request or, as applicable and subject to the limitations of subsection (B) hereof, any material change to the proposed terms of any Alternative Restructuring Proposal and the status and substance of discussions related thereto.

8.     **Termination**.

(a)     <u>Required Consenting BP Lenders Termination Events</u>.  The Required Consenting BP Lenders shall have the right, but not the obligation, to terminate this Agreement with respect to the Required Consenting BP Lenders upon delivery of written notice to the other Parties at any time after the occurrence of or during the continuation of any of the following events, unless waived in writing on a prospective or retroactive basis by the Required Consenting BP Lenders:

(i)     the failure to meet any of the Milestones in <u>Section 4</u> (as they may be extended in accordance with <u>Section 4</u>) unless such failure is the result of any act, omission, or delay on the part of the Required Consenting BP Lenders or their Credit Facility Agent;

(ii)        upon the termination of the Stalking Horse Purchase Agreement for any reason in accordance with its terms;

(iii)        if the CCAA Proceedings are dismissed, terminated, stayed, modified, or converted to a proceeding under the Bankruptcy and Insolvency Act (Canada) or Winding-Up and Restructuring Act (Canada);

(iv)        if the US Bankruptcy Court enters an order (a) dismissing any of the Chapter 15 Cases, or (b) appointing a trustee or an examiner with expanded powers pursuant to the Bankruptcy Code in any of the Chapter 15 Cases;

(v)        if the NextPoint Entities file any motion or any request for relief seeking to (x) dismiss any of the Chapter 15 Cases, or (y) appoint a trustee or examiner with expanded powers  pursuant to the Bankruptcy Code  in any of the Chapter 15 Cases;

(vi)        upon the NextPoint Entities' withdrawal, waiver, amendment, or modification of, or the filing of (or announced intention to file) a pleading seeking to withdraw, waive, amend, or modify any of the Definitive Documents, including motions, notices, exhibits, appendices and proposed orders, that is both not consistent in all material respects with this Agreement and not done with the consent of the Required Consenting BP Lenders;

(vii)        any condition precedent contained in this Agreement or any of the Definitive Documents becomes incapable of being satisfied;

(viii)        the issuance by any governmental authority, including the CCAA Court or the US Bankruptcy Court, any regulatory authority, or any other court of competent jurisdiction, of any ruling or order the effect of which would be materially inconsistent with the purpose or intention of this Agreement or the Restructuring or enjoining or otherwise impeding the substantial consummation of the Restructuring on the terms and conditions set forth in this Agreement; *provided*, *however*, that the Required Consenting BP Lenders shall not have the right to terminate under this clause if the NextPoint Entities are using commercially reasonable efforts to cure, vacate, reserve, set aside, or have overruled as quickly as possible such ruling or order to obtain relief that would allow consummation of the Restructuring in a manner that (x) does not prevent or diminish in a material way compliance with the terms of this Agreement and (y) is reasonably acceptable to the Required Consenting BP Lenders;

(ix)        either (a) the Company requests or (b) the CCAA Court approves any amendments or modifications to the SISP Order that are not acceptable to the Required Consenting BP Lenders, acting reasonably;

(x)        any of the milestone dates set out in the SISP (prior to any extension thereof in accordance with the terms of the SISP) are not met, unless such extension is consented to by the Required Consenting BP Lenders;

(xi)        the Company or the Monitor waives or seeks authority to waive any of the requirements under the SISP that the Company is not permitted to waive in accordance with the terms thereof;

(xii)    a material breach by any NextPoint Entity of any representation, warranty, or covenant of such NextPoint Entity set forth in this Agreement that (to the extent curable) remains uncured for a period of ten (10) days after the receipt by the NextPoint Entities of written notice detailing such breach;

(xiii)    the NextPoint Entities file, propose, or otherwise support any plan of liquidation, share or asset sale of all or any material portion of any of the NextPoint Entities' material assets, liquidation transaction, or plan other than (A) as contemplated by this Agreement or (B) with the consent of the Required Consenting BP Lenders;

(xiv)    an order is entered by the CCAA Court or the US Bankruptcy Court authorizing any party to proceed against any material asset of any of the NextPoint Entities or any assets that would materially and adversely affect the NextPoint Entities' ability to operate their business in the ordinary course or ability to implement the transactions contemplated in this Agreement;

(xv)    a failure by the NextPoint Entities to pay the fees and expenses of the Consenting BP Lenders, including but not limited to the Consenting BP Lenders' legal, financial, and any other advisors, as and when due pursuant to the terms of this Agreement, any applicable engagement letters and any applicable orders of the CCAA Court or the US Bankruptcy Court;

(xvi)    the entry of an order by any court of competent jurisdiction granting the relief sought in an involuntary proceeding against any entity constituting the NextPoint Entities seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization, or other relief in respect of any entity comprising the NextPoint Entities or the NextPoint Entities' debts, or of a substantial part of the NextPoint Entities' assets, under any federal, state, or foreign bankruptcy, insolvency, administrative, receivership, or similar law now or hereafter in effect (provided that such involuntary proceeding is not dismissed within a period of thirty (30) days after the filing thereof);

(xvii)    if any of the NextPoint Entities, without the consent of the Required Consenting BP Lenders, (A) consents to the institution of, or fails to contest in a timely and appropriate manner, any involuntary proceeding or petition described above, (B) applies for or consents to the appointment of a receiver, administrator, administrative receiver, trustee, custodian, sequestrator, conservator, or similar official for the NextPoint Entities or for a substantial part of the NextPoint Entities' assets, (C) files an answer admitting the material allegations of a petition filed against it in any such proceeding, (D) makes a general assignment or arrangement for the benefit of creditors, or (E) takes any corporate action for the purpose of authorizing any of the foregoing;

(xviii)    upon (a) a filing by any of the NextPoint Entities of any motion, objection, application, or adversary proceeding challenging the validity, enforceability, perfection or priority of, or seeking avoidance, subordination, or characterization of, any portion of the Consenting BP Lenders' or any of their affiliates' claims against any of the NextPoint Entities, and/or the liens securing any such claims or asserting any other claim or cause of action against and/or with respect to any such claims, liens, the Consenting BP Lenders, or the agent under any

of the relevant facilities (or if any NextPoint Entity files a pleading supporting any such motion, application, or adversary proceeding commenced by any third party) or (b) the entry of an order by the CCAA Court or the US Bankruptcy Court providing relief adverse to the interests of the Consenting BP Lenders or any of their affiliates or the agent under any relevant facility with respect to any of the foregoing claims, causes of action, or proceedings, but excluding preliminary or final relief granting standing to any other party to prosecute such claims, causes of action, or proceeding;

(xix)    if the board of directors, board of managers, or such similar governing body of any NextPoint Entity makes the determination to proceed with, and accept, a definitive Alternative Restructuring Proposal or a definitive Superior Proposal (as defined in the SISP);

(xx)    if the Chief Restructuring Officer resigns or is removed from his position for any reason, in each case unless a replacement reasonably acceptable to the Required Consenting BP Lenders is appointed within seven (7) business days after such resignation or removal;

(xxi)    any NextPoint Entity terminates its obligations under this Agreement;

(xxii)    subject to the terms of the SISP, the Stalking-Horse Bid is not the successful bid under the SISP; or

(xxiii) the obligations of the Company under the DIP Term Sheet are accelerated or the commitments under the DIP Term Sheet are terminated.

(b)    <u>Company Termination Events</u>.  The NextPoint Entities may terminate this Agreement, in each case, upon delivery of written notice to the other Parties upon the occurrence of any of the following events:

(i)    a material breach by of one or more BP Lenders of any representation, warranty, or covenant set forth in this Agreement that (to the extent curable) remains uncured for a period of ten (10) days after the receipt by the applicable BP Lenders of written notice detailing such breach that results in the nonbreaching Consenting BP Lenders holding less than 50.1% of the outstanding BP NP-Liberty Claims;

(ii)    the failure to meet any of the Milestones in <u>Section 4</u> unless (x) such failure is the result of any act, omission, or delay on the part of the NextPoint Entities or (y) such Milestone is extended in accordance with <u>Section 4</u>;

(iii)    the determination, upon the advice of outside legal counsel and financial advisors, by the board of directors, board of managers, or such similar governing body of any NextPoint Entity, that proceeding with the Restructuring would be inconsistent with the exercise of its fiduciary duties or applicable law; *provided* that the NextPoint Entities shall not have the right to terminate this Agreement under this <u>Section 8(b)(iii)</u> if either (x) no Qualified Bids, other than the Stalking Horse Transaction, are received by the Qualified Bid Deadline (as

such terms are defined in the SISP) or (y) the Stalking Horse Transaction is declared the Successful Bid (as such terms are defined in the SISP);

(iv)    the issuance by any governmental authority, including the CCAA Court or the US Bankruptcy Court, any regulatory authority, or any other court of competent jurisdiction, of any final ruling or Final Order[3] enjoining or otherwise impeding the substantial consummation of the Restructuring on the terms and conditions set forth in this Agreement; *provided*, *however*, that the NextPoint Entities have made commercially reasonable efforts to cure, vacate, reserve, set aside, or have overruled as quickly as possible such final ruling or Final Order prior to terminating this Agreement; or

(v)    any other Party terminates its obligations under this Agreement and such termination either (A) renders the Restructuring incapable of consummation or (B) materially changes the overall economic terms of the Restructuring in a manner that is adverse to the NextPoint Entities.

(c)    <u>Mutual Termination/Automatic Termination</u>.  This Agreement and the obligations of the Parties hereunder may be terminated by mutual written agreement by the NextPoint Entities and the Required Consenting BP Lenders.  Notwithstanding anything in this Agreement to the contrary, this Agreement shall terminate automatically in respect of all Parties upon termination by the Company under <u>Section 8(b)(iii)</u> or upon the occurrence of the completion of the Restructuring.

(d)    <u>Termination Generally</u>.  The earliest date on which termination of this Agreement as to a Party is effective in accordance with this <u>Section 8</u> shall be referred to, with respect to such Party, as an "**RSA Termination Date**."  Upon the occurrence of an RSA Termination Date, the applicable Party's obligations (as set forth herein) under this Agreement shall be terminated effective immediately, and such Parties or Party hereto shall be released from all commitments, undertakings, and agreements hereunder; *provided* that any claim for breach of this Agreement that occurs prior to such RSA Termination Date shall survive such termination, and all rights and remedies with respect to such claims shall not be prejudiced in any way.  For the avoidance of doubt, the automatic stay arising pursuant to Bankruptcy Code section 362 or the stay of proceedings provided for in the CCAA Proceedings or in other applicable Canadian laws

---

[3]    "**Final Order**" means any order or judgment of the CCAA Court or the US Bankruptcy Court, or any other court of competent jurisdiction, with respect to the subject matter addressed in the CCAA Proceedings or the Chapter 15 Cases or the docket of any court of competent jurisdiction, that has not been vacated, set aside, reversed, stayed, modified or amended, and as to which the applicable periods to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired and no appeal, leave to appeal, or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken or filed, or as to which any appeal has been taken or any petition for certiorari or leave to appeal that has been timely filed has been withdrawn or resolved in a manner acceptable to the NextPoint Entities and the Consenting BP Lenders, each acting reasonably, by the highest court to which the order or judgment was appealed or from which leave to appeal or certiorari was sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice; *provided, however*, that the possibility that a motion under Rule 60 of the United States Federal Rules of Civil Procedure, or any analogous rule under the United States Federal Rules of Bankruptcy Procedures, may be filed relating to such order shall not cause such order to not be a Final Order.

shall be deemed waived or modified for purposes of providing notice or exercising rights hereunder.

9. **Transfers**.

(a) Each of the Parties other than the NextPoint Entities (the "**Supporting Creditors**"), solely with respect to itself (as expressly identified and limited on its signature page to this Agreement or Joinder Agreement (as defined below), as applicable), shall not sell, transfer, assign, pledge, hypothecate, participate, donate, or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales, or other transactions in which any Person receives the right to own or acquire any current or future interest in) (each, a "**Transfer**"), or permit a Transfer of, directly or indirectly, in whole or in part, any of its Claims or, in each case, any option thereon or any right or interest therein or any other claims against the Company (including grant any proxies, deposit any Claims into a voting trust, or enter into a voting agreement with respect to any such Claims), unless the transferee thereof either (i) is a Supporting Creditor or (ii) before or contemporaneously with such Transfer, agrees in writing for the benefit of the Parties to become a Party and to be bound by all of the terms of this Agreement applicable to the Supporting Creditor who is a transferor (such Supporting Creditor, the "**Transferor**"), by executing a joinder agreement substantially in the form attached hereto as **Exhibit F** (a "**Joinder Agreement**"), and delivering an executed copy thereof within two (2) business days after such Transfer to the Parties set forth in <u>Section 21</u> of this Agreement (collectively, the "**Transfer Notice Parties**"), in which event (x) the transferee shall be deemed to be a Party in the same manner as the Transferor to the extent of such transferred rights and obligations and (y) the Transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of such transferred rights and obligations; *provided*, that, failure to deliver such Joinder Agreement on a timely basis shall not by itself affect the applicable Transferor's or transferee's obligations under this Agreement with respect to such Claims or render the Transfer *void ab initio* with respect to such Claims; *provided*, that the failure by the Transferor to comply with the procedures set forth in this <u>Section 9(a)</u> with respect to a Transfer to any entity that, as of the date of such Transfer controls, is controlled by, or is under common control with the Transferor shall not, without more, constitute a breach of this Agreement if (i) the transferee provides notice of such Transfer to the Transfer Notice Parties (which may be delivered by email) promptly after such Transfer and (ii) the transferee shall be bound by all terms of this Agreement applicable to the Transferor, and deemed to be a Consenting BP NP-Liberty Lender or Consenting BP CTAX Lender, as applicable. Each of the Consenting BP NP-Liberty Lenders and Consenting BP CTAX Lenders agrees that any Transfer of any Claims that does not comply with the terms and procedures set forth herein shall be deemed *void ab initio*, and the NextPoint Entities shall have the right to enforce the voiding of such Transfer. This Agreement shall in no way be construed to preclude any of the Supporting Creditors from acquiring additional Claims against the NextPoint Entities; *provided* that (i) any such additional Claims automatically shall be subject to all of the terms of this Agreement and (ii) such Supporting Creditor agrees (A) that such additional Claims shall be subject to this Agreement (except as expressly provided below), and (B) to notify the Transfer Notice Parties within three (3) business days following such acquisition of the aggregate amount.

10. **Definitive Documents; Good Faith Cooperation; Further Assurances**.

Each Party hereby covenants and agrees to cooperate with each other in good faith in connection with, and shall exercise commercially reasonable efforts with respect to, the pursuit, approval, implementation, and consummation of the transactions contemplated by this Agreement and the Restructuring as well as the negotiation, drafting, execution, and delivery of the Definitive Documents. Furthermore, subject to the terms hereof, each of the Parties shall take such action as may be reasonably necessary or reasonably requested by the other Parties to carry out the purposes and intent of this Agreement and shall refrain from taking any action that would frustrate the purposes and intent of this Agreement subject in each case to the terms and conditions of the applicable agreements.

11. **Representations and Warranties**.

(a)     Each of the Parties (severally, and not jointly and severally) represents and warrants to each other Party that the following statements are true, correct, and complete as of the date hereof (or, if later, the date that such Party first became or becomes a Party):

(i)     it is validly existing and in good standing under the laws of the state or province of its incorporation or organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(ii)     no material consent or approval of, or any registration or filing with, any governmental authority or regulatory body is required for it to carry out and perform its obligations under this Agreement;

(iii)     it has all requisite organizational power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its obligations under, this Agreement;

(iv)     the execution and delivery by it of this Agreement, and the performance of its obligations hereunder, have been duly authorized by all necessary organizational action on its part;

(v)     it has been represented by counsel in connection with this Agreement and the transactions contemplated by this Agreement; and

(vi)     the execution, delivery, and performance by such Party of this Agreement does not and will not (x) violate any provision of law, rule, or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries, (y) except as the Restructuring may constitute a "Change of Control" (as may be defined in the applicable loan documents) or any equivalent concept under the applicable loan documents, conflict with, result in a breach of, or constitute (with or without notice or lapse of time or both) a default under any material debt for borrowed money to which it or any of its subsidiaries is a party, or (z) violate any order, writ, injunction, decree, statute, rule, or regulation.

(b)     Each Consenting BP Lender (severally, and not jointly and severally) represents and warrants to the NextPoint Entities that, as of the date hereof (or as of the date such Consenting BP Lender becomes a Party hereto), such Consenting BP Lender is the beneficial owner of its applicable Claims, has (x) sole investment or voting discretion with respect to such Consenting BP Lender's Claims, and (y) full power and authority to vote on and consent to matters concerning such Consenting BP Lender's Claims or to exchange, assign, and Transfer such Consenting BP Lender's Claims.

12.     **Amendments**.  Except as otherwise expressly set forth herein, this Agreement (including any Exhibits and Schedules and the Restructuring Term Sheet) may not be waived, modified, amended, or supplemented except in a writing signed by (x) the NextPoint Entities and (y) the Required Consenting BP Lenders; *provided* that any waiver, modification, amendment, or supplement that amends the rights or obligations, or adversely impacts the treatment or interests of, any Consenting BP Lender under or as contemplated by this Agreement (including the Exhibits and Schedules) or requires any Consenting BP Lender to incur any expenses, liabilities, or other obligations, or agree to any commitments, undertakings, concessions, indemnities, or other arrangements that could result in expenses, liabilities, or other obligations, shall require the consent of such Consenting BP Lender; *provided, further* that, if any Consenting BP Lender whose consent is required does not consent to such waiver, change, modification, or amendment (a "**Non-Supporting Creditor**"), this Agreement may be terminated by such Non-Supporting Creditor (as applicable to it) upon written notice to the other Parties, but this Agreement shall continue in full force and effect in respect to all other Parties whose consent is not required or whose consent is required and was provided.

13.     **Governing Law; Jurisdiction; Waiver of Jury Trial**.

(a)     This Agreement shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the internal laws of the Province of British Columbia and the federal laws of Canada applicable therein, without giving effect to the conflicts of law principles thereof.

(b)     Each Party irrevocably agrees that any legal action, suit, or proceeding arising out of or relating to this Agreement brought by any party or its successors or assigns shall be brought and determined in the Supreme Court of British Columbia (the "**BC Court**") and each Party hereby irrevocably submits to the exclusive jurisdiction of the BC Court and, if the BC Court does not have (or abstains from) jurisdiction, Courts of British Columbia, and any appellate court from any thereof, for itself and with respect to its property, generally and unconditionally, with regard to any such proceeding arising out of or relating to this Agreement.  Each Party further agrees that notice as provided herein shall constitute sufficient service of process and the Parties further waive any argument that such service is insufficient.  Each Party hereby irrevocably and unconditionally waives, and agrees not to assert, by way of motion or as a defense, counterclaim, or otherwise, in any proceeding arising out of or relating to this Agreement, (i) any claim that it is not personally subject to the jurisdiction of the BC Court as described herein for any reason, (ii) that it or its property is exempt or immune from jurisdiction of such court or from any legal process commenced in such court (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise), and (iii) that (x) the proceeding in such court is brought in an inconvenient forum, (y) the venue of such

proceeding is improper, or (z) this Agreement, or the subject matter hereof, may not be enforced in or by such court.

(c) **EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY). EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT, OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.**

14. **Specific Performance/Remedies**. The Parties understand and agree that money damages would be an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (including attorneys' fees and costs) as a remedy of any such breach, without the necessity of proving the inadequacy of money damages as a remedy. Each Party hereby waives any requirement for the security or posting of any bond in connection with such remedies.

15. **Survival**. Notwithstanding the termination of this Agreement pursuant to Section 8 hereof, Sections 8(c) and 13-17 shall survive such termination and shall continue in full force and effect in accordance with the terms hereof; *provided*, that any liability of a Party for failure to comply with the terms of this Agreement shall survive such termination. For the avoidance of doubt, the termination of this Agreement shall not terminate or otherwise have any effect on the Mutual Release Agreement, which shall remain effective in accordance with its terms.

16. **Headings**. The headings of the sections, paragraphs, and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement.

17. **Successors and Assigns; Third Parties**. This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, permitted assigns, heirs, executors, administrators, and representatives. There are no third-party beneficiaries under this Agreement and, except as set forth in Section 9, the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other Person.

18. **Relationship Among Parties**. Notwithstanding anything herein to the contrary, the duties and obligations of the Supporting Creditors under this Agreement shall be several, not joint and several. None of the Supporting Creditors shall have any fiduciary duty, any duty of trust or confidence in any form, or other duties or responsibilities to each other, the NextPoint Entities, or any of the NextPoint Entities' creditors, stockholders, or other stakeholders, and there are no commitments among or between the Parties other than those set forth herein. It is understood and agreed that any Supporting Creditor may trade in any debt or equity securities of

the NextPoint Entities without the consent of any other Party, subject to applicable securities laws and the terms of <u>Section 9</u> of this Agreement.  No prior history, pattern, or practice of sharing confidences among or between the Parties shall in any way affect or negate this understanding and agreement.  The Parties have no agreement, arrangement, or understanding with respect to acting together for the purpose of acquiring, holding, voting, or disposing of any equity securities of the NextPoint Entities and do not constitute a "group" within the meaning of Rule 13d-5 under the Securities Act of 1933, as amended.  The NextPoint Entities understand that each of the Supporting Creditors are engaged in a wide range of financial services and businesses, and, in furtherance of the foregoing, the NextPoint Entities acknowledge and agree that the obligations set forth in this Agreement (including <u>Section 9</u> hereof) shall only apply to the trading desk(s) and/or business group(s) that principally manage and/or supervise such Supporting Creditor's investment in and relations with the NextPoint Entities and shall not apply to any other trading desk, business group, or affiliate of such Supporting Creditor so long as they are not acting at the direction or for the benefit of such Supporting Creditor and so long as confidentiality is maintained consistent with any applicable confidentiality agreement.

19. **<u>Prior Negotiations; Entire Agreement</u>**.  This Agreement, including the Exhibits and Schedules (including the Restructuring Term Sheet), the Forbearance Agreements, and the Mutual Release Agreement constitute the entire agreement of the Parties, and supersede all other prior negotiations, with respect to the subject matter hereof and thereof.

20. **<u>Counterparts</u>**.  This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement.  Execution copies of this Agreement delivered by facsimile or PDF shall be deemed to be an original for the purposes of this paragraph.

21. **<u>Notices</u>**.  All notices hereunder shall be deemed given if in writing and delivered to the following:

(a) If to the NextPoint Entities, to:

DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York 10020-1104
United States of America
Attention:  Rachel Ehrlich Albanese and Jamila Justine Willis
Email: rachel.albanese@us.dlapiper.com; jamila.willis@us.dlapiper.com

-and-

DLA Piper (Canada) LLP
Suite 2800, Park Place
666 Burrard St.
Vancouver, British Columbia
V6C 2Z7

Canada
Attention:  Colin Brousson and Russel Drew
Email: colin.brousson@dlapiper.com; russel.drew@dlapiper.com

(b)　　　If to a Consenting BP Lender, to:

BP Commercial Funding Trust, Series SPL-X, a statutory series of BP
Commercial Funding Trust, a Delaware statutory trust, for itself and for no
other series of BP Commercial Funding Trust
c/o BasePoint Capital LLC
75 Rockefeller Plaza, 25th Floor
New York, NY 10019
Attention: Michael Petronio
Email: mpetronio@basepointcapital.com

　　　With a copy to:

BasePoint Capital LLC
75 Rockefeller Plaza, 25th Floor
New York, NY 10019
Attention: General Counsel
Email: BPG-LegalNotices@basepointcapital.com

　　　With a copy to:

counsel to the Consenting BP Lenders
Kirkland & Ellis LLP
Kirkland & Ellis International LLP
601 Lexington Avenue
New York, New York 10022
Attention:  Brian Schartz, P.C. (brian.schartz@kirkland.com) and Allyson
B. Smith (allyson.smith@kirkland.com)

　　　and

300 N. LaSalle
Chicago, Illinois 60654
Attention:  Gabriela Zamfir Hensley
(gabriela.hensley@kirkland.com)

　　　and

Osler, Hoskin & Harcourt LLP
155 West Hastings Street
Suite 1700, The Guinness Tower

Vancouver, British Columbia
V6E 2E9
Canada
Attention: Mary Buttery, KC (mbuttery@osler.com)

and

100 King Street West
1 First Canadian Place
Suite 6200, P.O. Box 50
Toronto, Ontario
M5X 1B8
Canada
Attention: Marc Wasserman (mwasserman@osler.com) and David
Rosenblat (drosenblat@osler.com)

Any notice given by overnight delivery, mail, or courier shall be effective when received. Any notice given by electronic mail shall be effective upon confirmation of transmission.

22. **No Solicitation; Adequate Information**. This Agreement does not constitute an offer to issue or sell securities to any Person, or the solicitation of an offer to acquire or buy securities, in any jurisdiction where such offer or solicitation would be unlawful.

23. **Severability**. If any provision of this Agreement, or the application of any such provision to any Person or circumstance, shall be held invalid or unenforceable in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement shall continue in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party.

24. **Interpretation; Rules of Construction; Representation by Counsel**. When a reference is made in this Agreement to a Section, Exhibit, or Schedule, such reference shall be to a Section, Exhibit, or Schedule, respectively, of or attached to this Agreement unless otherwise indicated. Unless the context of this Agreement otherwise requires, (a) words using the singular or plural number also include the plural or singular number, respectively, (b) the terms "hereof," "herein," "hereby," and derivative or similar words refer to this entire Agreement, (c) the words "include," "includes," and "including" when used herein shall be deemed in each case to be followed by the words "without limitation," and (d) the word "or" shall not be exclusive and shall be read to mean "and/or." The Parties agree that they have been represented by legal counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any law, regulation, holding, or rule of construction providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document.

25. **Reliance and Authority**.

(a)    NextPoint Entities.  With respect to any provision of this Agreement that requires or contemplates the approval, agreement, consent, or waiver of the NextPoint Entities, each Party shall be entitled to rely on written confirmation (including by e-mail) from counsel to the NextPoint Entities that the NextPoint Entities have approved, agreed, consent to, or waived a particular matter.

(b)    Consenting BP Lenders.  With respect to any provision of this Agreement that requires or contemplates the approval, agreement, consent, or waiver of any of the Consenting BP Lenders, each Party shall be entitled to rely on written confirmation (including by e-mail) from the applicable Credit Facility Agent or counsel to the Consenting BP Lenders that the Required Consenting BP Lenders have approved, agreed, consent to, or waived a particular matter.

26.    **Settlement Discussions**.  This Agreement is part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties.  Nothing in this Agreement shall be deemed an admission of any kind.  Pursuant to Federal Rule of Evidence 408 and any Canadian law equivalent, any applicable state rules of evidence, and any other applicable law, foreign or domestic, this Agreement, and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than to prove the existence of this Agreement or in a proceeding to enforce the terms of this Agreement.

[*Signature pages follow.*]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacities as officers of the undersigned and not in any other capacity, as of the date first set forth above.

**NEXTPOINT ENTITIES:**

**NEXTPOINT FINANCIAL INC.**
**NPI HOLDCO LLC**
**LT HOLDCO, LLC**
**NPLM HOLDCO LLC**
**LT HOLDCO, LLC**
**JTH TAX LLC**
**LT INTERMEDIATE HOLDCO, LLC**
**SIEMPRE TAX+ LLC**
**JTH FINANCIAL, LLC**
**JTH PROPERTIES 1632, LLC**
**LTS PROPERTIES, LLC**
**360 ACCOUNTING SOLUTIONS LLC**
**JTH COURT PLAZA, LLC**
**JTH TAX OFFICE PROPERTIES, LLC**
**LIBERTY CREDIT REPAIR, LLC**
**LOANME, LLC**
**INSIGHTSLOGIC, LLC**
**LTS SOFTWARE LLC**
**WEFILE LLC**
**CTAX ACQUISITION LLC**
**COMMUNITY TAX LLC**
**COMMUNITY TAX PUERTO RICO LLC**

By: _____
DocuSigned by:
6B0C54C8C556450
Name: Peter Kravitz
Title:   Chief Restructuring Officer

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING BP NP-LIBERTY LENDERS:**

**BP COMMERCIAL FUNDING TRUST, SERIES SPL-X,**
a statutory series of BP Commercial Funding Trust, a Delaware statutory trust, for itself and for no other series of BP Commercial Funding Trust, in its capacity as holder of Revolving Credit Promissory Note B-1-1 under the BP NP-Liberty Credit Agreement

By: BasePoint Capital II, LLC,
not in its individual capacity but solely as Administrator of BP Commercial Funding Trust

By: *Michael C Petronio*
Name: Michael Petronio
Title:   Authorized Signatory

**BP COMMERCIAL FUNDING TRUST, SERIES SPL-X,**
a statutory series of BP Commercial Funding Trust, a Delaware statutory trust, for itself and for no other series of BP Commercial Funding Trust, in its capacity as holder of Revolving Credit Promissory Note B-1-2 under the BP NP-Liberty Credit Agreement

By: BasePoint Capital II, LLC,
not in its individual capacity but solely as Administrator of BP Commercial Funding Trust

By: *Michael C Petronio*
Name: Michael Petronio
Title:   Authorized Signatory

**BP SLL TRUST, SERIES SPL-III,**
a statutory series of BP SLL Trust, a Delaware statutory trust, for itself and for no other series of BP SLL Trust, in its capacity as holder of Promissory Note B-2 under the BP NP-Liberty Credit Agreement

By: BasePoint Administrative, LLC,
not in its individual capacity but solely as Administrator of BP SLL Trust

By: *Michael C Petronio*
Name: Michael Petronio
Title:   Authorized Signatory

**BP COMMERCIAL FUNDING TRUST, SERIES SPL-X,**
a statutory series of BP Commercial Funding Trust, a Delaware statutory trust, for itself and for no other series of BP Commercial Funding Trust, in its capacity as holder of Term Loan Promissory Note A under the BP NP-Liberty Credit Agreement

By: BasePoint Capital II, LLC,
not in its individual capacity but solely as Administrator of BP Commercial Funding Trust

By: *Michael C Petronio*
Name: Michael Petronio
Title:   Authorized Signatory

*As of July 24, 2023:*

| | |
|---|---|
| **Principal Amount of Term Loans under the BP NP-Liberty Credit Agreement:** | $75,414,884.31 |
| **Interest due on Term Loans under the BP NP-Liberty Credit Agreement:** | $654,639.47 |
| **Principal Amount of Revolving Credit Loans under the BP NP-Liberty Credit Agreement:** | $125,653,079.03 |
| **Interest due on Revolving Credit Loans under the BP NP-Liberty Credit Agreement:** | $2,145,396.48 |
| **Principal amount of Other Claims:** | $_____ |
| **Interests:** | $_____ |
| **Total of BP NP-Liberty Claims:** | $_____ |

**CONSENTING BP CTAX LENDERS:**

**BP COMMERCIAL FUNDING TRUST II, SERIES SPL-I**,
a statutory series of BP Commercial Funding Trust II, a
Delaware series trust, for itself and for no other series of BP
Commercial Funding Trust II

By: BasePoint Capital II, LLC,
not in its individual capacity but solely as
Administrator of BP Commercial Funding Trust II

By: *Michael C Petronio*
Name: Michael Petronio
Title:   Authorized Signatory

*As of July 24, 2023:*

| | |
|---|---|
| **Principal Amount of Term Loans under the BP CTAX Credit Facility:** | $10,000,000.00 |
| **Interest due on Term Loans under the BP CTAX Credit Facility:** | $253,150.68 |
| **Principal amount of Other Claims:** | $_____ |
| **Interests:** | $_____ |
| **Total of BP CTAX Term Loan Claims:** | $_____ |

# Joinder Agreement

This Joinder Agreement to the Restructuring Support Agreement, dated as of July 25, 2023 (as amended, supplemented, or otherwise modified from time to time, the "**Agreement**"), between (i) NextPoint Financial Inc.; NPI Holdco LLC.; LT Holdco, LLC; LT Intermediate Holdco, LLC; SiempreTax+ LLC; JTH Tax LLC; JTH Financial, LLC; JTH Properties 1632, LLC; JTH Tax Office Properties, LLC; Wefile LLC; Liberty Credit Repair, LLC; LTS Properties, LLC; 360 Accounting Solutions, LLC; JTH Court Plaza, LLC; LTS Software LLC; CTAX Acquisition LLC; Community Tax LLC; Community Tax Puerto Rico LLC; NPLM Holdco LLC; and LoanMe, LLC; and (ii) the Consenting BP Lenders (as defined therein) is executed and delivered by Drake Enterprises Ltd. (the "**Joining Party**") as of July 25, 2023. Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Agreement.

1. <u>**Agreement to Be Bound**</u>. The Joining Party hereby agrees to be bound by all of the terms of, and have all the rights and benefits under, the Agreement, a copy of which is attached to this Joinder Agreement as <u>Exhibit 1</u> (as the same has been or may be hereafter amended, restated, or otherwise modified from time to time in accordance with the provisions hereof). The Joining Party shall hereafter be deemed to be a "Supporting Creditor," and "Party" for all purposes under the Agreement and with respect to any and all Claims held by such Joining Party.

2. <u>**Representations and Warranties**</u>. With respect to the aggregate principal amount of the Claims set forth below its name on the signature page hereto, the Joining Party hereby makes the representations and warranties of a Supporting Creditor, as applicable, as set forth in <u>Section 11</u> of the Agreement to each other Party to the Agreement.

3. <u>**Governing Law**</u>. This Joinder Agreement shall be governed by and construed in accordance with the internal laws of the Province of British Columbia and the federal laws of Canada applicable therein, without regard to any conflict of law provisions which would require the application of the law of any other jurisdiction.

*[Signature page follows]*

**DRAKE ENTERPRISES LTD**

By: _____

Name: Jamie Stiles

Title: Chief Executive Officer

Notice Address:

Principal Amount of the term loan claims outstanding under that certain Credit Agreement dated as of June 29, 2022 among CTAX Acquisition LLC, as borrower, CTAX LLC and Community Tax Puerto Rico LLC, as borrow guarantors, the lenders party thereto from time to time, and Drake Enterprises Ltd.: $45,000,000.00 (plus $1,012,500.00 in unpaid interest)

Principal Amount of Other Claims: $_____

Interests: _____

**<u>EXHIBIT A</u>**

# Restructuring Term Sheet

## NEXTPOINT FINANCIAL INC.
## RESTRUCTURING TERM SHEET

This summary of terms and conditions (the "**Term Sheet**") is not exhaustive or definitive as to the terms and conditions which would govern any transactions referred to herein. This Term Sheet does not give rise to any legally binding obligations, and no term or condition provided herein shall be effective except as may be specifically provided in definitive written agreements entered into by the applicable parties that have become effective in accordance with their terms ("**Definitive Documents**").

Capitalized terms used herein but not otherwise defined herein have the meaning given to them in the Restructuring Support Agreement dated July 24, 2023 (the "**RSA**") to which this Term Sheet is attached as **Exhibit A**.

In the event of a conflict between the terms of this Term Sheet and the RSA, the terms of the RSA shall govern. In the event of a conflict between the terms of this Term Sheet and the Stalking Horse Purchase Agreement (as defined below), the Stalking Horse Purchase Agreement shall govern.

### TRANSACTION OVERVIEW

| | |
|---|---|
| **Filing Entities and Jurisdiction** | NextPoint Financial, Inc., NPI Holdco LLC ("**HoldCo**"), LT Holdco LLC ("**LT Holdco**") and its direct and indirect subsidiaries (collectively, "**Liberty Tax**"), CTAX Acquisition LLC and its subsidiaries (collectively, "**CTAX**"), NPLM Holdco LLC and its direct and indirect subsidiaries other than LM BP Holdings, LLC (collectively, "**LoanMe**") (collectively, the "**Filing Entities**") shall commence proceedings ("**CCAA Proceedings**") under the *Companies' Creditors Arrangement Act* (the "**CCAA**"), which proceedings shall be recognized under chapter 15 of title 11 of the United States Bankruptcy Code ("**Chapter 15**") with a view to facilitating the transactions set forth herein. |
| **Stalking Horse Purchase Agreement** | Prior to the commencement of the CCAA Proceedings, the applicable Filing Entities will agree to the form of a stalking horse purchase agreement (the "**Stalking Horse Purchase Agreement**") with the revolving lenders (or their assignee(s), in each case collectively, the "**Bidder**") under that certain Revolving Credit Agreement, dated as of July 2, 2021 (as amended, restated, supplemented, or otherwise revised from time to time the "**Credit Agreement**") by and among HoldCo, LT Holdco, the borrower guarantors party thereto and the lenders from time to time thereunder. |

| | |
|---|---|
| **SISP** | The SISP shall be commenced within 10 days of commencing the CCAA Proceedings and include the following milestones:<br><br>    a. Letter of intent deadline: 30 days after commencement of the SISP, provided, however, that if no letters of intent are received that reflect a reasonable prospect of culminating in a superior bid, as determined by the Filing Entities in consultation with the Court-appointed Monitor in the CCAA Proceedings, the SISP shall be terminated and the Stalking Horse Purchase Agreement transaction shall be deemed to be the successful bid.<br><br>    b. Qualified bid deadline: 51 days after commencement of SISP.<br><br>    c. Auction (if applicable): 52 days after commencement of SISP;<br><br>    d. Motion for Approval & Vesting Order (as defined below): 9 days after selection of successful bid.<br><br>The SISP shall provide that a "superior transaction" must provide for, among other things: (i) cash payment in full of the DIP Loan, the expense reimbursement, and the break fee, plus cash consideration equal to at least $1,000,000; plus, (ii) cash payment in full of the revolving loans outstanding under the Credit Agreement (along with any related interest, fees or other obligations) (the "**Revolving Loan**") or assumption of the Revolving Loan on terms satisfactory to the Revolving Loan lenders, and (iii) cash payment in full of the LT Holdco term loan (the "**Term Loan**") or assumption of the Term Loan on terms satisfactory to the Term Loan lenders. |
| **DIP Loan** | The CCAA Proceedings and applicable operational costs during such proceedings shall be funded from the Filing Entities' cash on hand and by and through a debtor in possession financing in the amount of up to $25 million (the "**DIP Loan**") to be provided by the Bidder, its affiliates, Drake, and/or certain other participants, if any, on the terms contained in the DIP Term Sheet attached to the RSA as <u>Exhibit C</u> and otherwise in accordance with the RSA. |
| **LoanMe Wind-Down** | In the event that a purchaser of LoanMe is not identified within the sale and investment solicitation process ("**SISP**"), it will be wound-down within the CCAA Proceedings on terms consistent with the RSA and otherwise reasonably satisfactory to the Bidder. |

| | |
|---|---|
| **Conditions Precedent** | Without limiting the conditions precedent set out in the RSA, the transaction set forth herein shall be subject to standard and customary conditions precedent for a transaction of this nature, as shall be set forth in the Stalking Horse Purchase Agreement, including, among other things:<br><br>    a.  Entry by the CCAA Court of an Order approving the SISP, in the form attached to the RSA (the "**SISP Order**"), which SISP Order shall be a final order;<br><br>    b.  Entry by the CCAA Court of an Approval and Vesting Order, in the form attached to the RSA (the "**Approval & Vesting Order**"), which Approval & Vesting Order shall be a final order;<br><br>    c.  Entry of Recognition Orders of the SISP Order and the Approval & Vesting Order pursuant to Chapter 15, in form and substance reasonably satisfactory to the Bidder, and which shall each be a final order;<br><br>    d.  The RSA shall not have been terminated;<br><br>    e.  Accuracy of the respective parties' representations and warranties brought down on closing;<br><br>    f.  Compliance with covenants; and<br><br>    g.  Customary closing deliverables. |
| **Corporate Governance** | The new board of post-Restructuring NextPoint Parent (*i.e.*, the reorganized parent company of the current NextPoint Entities) (the "**New Board**") shall consist of a number of members determined by the Bidder (or such other entity that has its bid selected as the Successful Bid in the event that the Stalking Horse Transaction is not consummated) in its sole discretion (subject to any other agreements with Drake Enterprises Ltd. ("**Drake**")), which shall consist of members appointed in a manner determined by the Bidder (or such other entity as described above) in its sole discretion, subject to any other agreements with Drake. |
| **Management Incentive Plan** | Following the Restructuring, the New Board shall adopt an equity incentive plan (the "**Management Incentive Plan**") that provides for the issuance of equity and equity-based awards ("**Awards**") to employees, consultants, and directors/managers of post-Restructuring NextPoint Parent and/or any of the post- |

| | Restructuring NextPoint Entities. The form of the Awards (*i.e.*, options, restricted units, appreciation rights, etc.), the participants in the Management Incentive Plan, the allocations of the Awards to such participants (including the amount of allocations and the timing of the grant of the Awards), and the terms and conditions of the Awards (including vesting, exercise prices, base values, hurdles, forfeiture, repurchase rights and transferability) shall be determined by the New Board in its sole discretion. |
|---|---|
| **Tax Matters** | The applicable Filing Entities and the Bidder shall determine a structure to implement the transactions set forth herein in a tax-efficient manner and consistent with the terms set forth herein. |
| **Definitive Documentation:** | The advisors to the Filing Entities and the Bidder shall work cooperatively to prepare and finalize all documentation to effect the transactions set forth herein (including, without limitation and as applicable, all definitive documents and court documents) through the closing of same, which in each case shall be consistent with the terms set forth herein and in form and substance reasonably acceptable to such parties, subject to the terms set forth herein, in the RSA and in the Stalking Horse Purchase Agreement. |
| **Releases** | The Approval & Vesting Order will provide for customary releases, including a release of the Bidder and its affiliates, with respect to the transaction and the business and affairs of the Filing Entities. |

# EXHIBIT B

## SISP

## Sale and Investment Solicitation Process

1. On [●], 2023, the Supreme Court of British Columbia (the "**Court**") granted an order (the "**SISP Order**") that, among other things, (a) authorized the NextPoint Entities to implement a sale and investment solicitation process ("**SISP**") in accordance with the terms hereof, (b) approved the Support Agreement, (c) authorized and directed ● to enter into the Stalking Horse Purchase Agreement, and (d) approved the Break-Up Fee. Capitalized terms that are not defined herein have the meanings ascribed thereto in the Amended & Restated Initial Order granted by the Court in the NextPoint Entities' proceedings under the *Companies' Creditors Arrangement Act* on [●], 2023, as amended, restated or supplemented from time to time, or the SISP Order, as applicable.

2. This SISP sets out the manner in which (i) binding bids for executable transaction alternatives that are superior to the sale transaction to be provided for in the Stalking Horse Purchase Agreement involving the shares and/or the business and assets of the NextPoint Entities will be solicited from interested parties, (ii) any such bids received will be addressed, (iii) any Successful Bid (as defined below) will be selected, and (iv) Court approval of any Successful Bid will be sought. Such transaction alternatives may include, among other things, a sale of some or all of the NextPoint Entities shares, assets and/or business and/or an investment in the NextPoint Entities, each of which shall be subject to all terms set forth in this SISP.

3. The SISP shall be conducted by the NextPoint Entities under the oversight of FTI Consulting Canada Inc., in its capacity as court-appointed monitor (the "**Monitor**").

4. Parties who wish to have their bids considered shall participate in the SISP in accordance with the terms herein.

5. The SISP will be conducted such that the NextPoint Entities will (under the oversight of the Monitor):

   a) prepare marketing materials and a process letter;
   b) prepare and provide applicable parties with access to a data room containing diligence information;
   c) solicit interest from parties to enter into non-disclosure agreements (parties shall only obtain access to the data room and be permitted to participate in the SISP if they execute a non-disclosure agreement that is in form and substance satisfactory to the NextPoint Entities); and
   d) request that such parties (other than the Stalking Horse Bidder or its designee) submit (i) a letter of intent to bid that identifies the potential bidder (which, for the avoidance of doubt, may be a purchaser or an investor) and a general description of the assets and/or business(es) of the NextPoint Entities that would be the subject of the bid and that reflects a reasonable prospect of culminating in a Qualified Bid (as defined below), as determined by the NextPoint Entities in consultation with the Monitor and the Consenting BP NP-Liberty Lenders (as defined in the Support Agreement) (subject to the confidentiality requirements set forth in Section 14

below) (a "**LOI**") by the LOI Deadline (as defined below) and, if applicable, (ii) a binding offer meeting at least the requirements set forth in Section 7 below, as determined by the NextPoint Entities in consultation with the Monitor (a "**Qualified Bid**") by the Qualified Bid Deadline (as defined below).

6. The SISP shall be conducted subject to the terms hereof and the following key milestones:

   a) Court approval of SISP and authorizing the applicable NextPoint Entities to enter into the Stalking Horse Purchase Agreement, and commencement by NextPoint Entities of solicitation process – August 4, 2023, subject to Court availability;

   b) Deadline to submit LOI – 11:59 p.m. Eastern Daylight Time on September 4, 2023 (the "**LOI Deadline**");

   c) Deadline to submit a Qualified Bid – 11:59 p.m. Eastern Daylight Time on September 25, 2023 (the "**Qualified Bid Deadline**");

   d) Deadline to determine whether a bid is a Qualified Bid and, if applicable, to notify those parties who submitted a Qualified Bid of the Auction (as defined below) – 5:00 p.m. Eastern Daylight Time on September 26, 2023;

   e) The NextPoint Entities to hold Auction (if applicable) – 10:00 a.m. Eastern Daylight Time on September 27, 2023; and

   f) Implementation Order (as defined below) hearing:

      o (if no LOI is submitted) – by no later than September 15, 2023, subject to Court availability.

      o (if there is no Auction) – by no later than October 6, 2023, subject to Court availability.

      o (if there is an Auction) – by no later than 9 days after completion of the Auction, subject to Court availability.

7. In order to constitute a Qualified Bid, a bid must comply with the following:

   a. it provides for (i) the payment in full in cash on closing of the DIP Financing (as defined in the Support Agreement), the Expense Reimbursement, and the Break-up Fee, plus cash consideration equal to at least $1,000,000; (ii) the payment in full in cash on closing of the BP NP-Liberty Claims (as defined in the Support Agreement), along with any related interest, fees or other obligations, or the assumption of the BP NP-Liberty Claims (or portion thereof) on terms satisfactory to the Consenting BP NP-Liberty Lenders in their sole discretion; (iii) the payment in full in cash on closing the sum of all amounts secured by each Intercompany Charge in favour of each Intercompany Lender that is not acquired pursuant to the bid; and (iv) the payment in full in cash on closing of any claims ranking in priority to the claims set forth in subparagraphs (i) - (iii), including any claims secured by Court-ordered charges, unless otherwise agreed to by the applicable holders thereof in their sole discretion.

   b. it provides a detailed sources and uses schedule that identifies, with specificity, the amount of cash consideration (the "**Cash Consideration Value**") and any assumptions that could reduce the net consideration payable.

    c.  it is reasonably capable of being consummated within 30 days after completion of the Auction if selected as the Successful Bid;

    d.  it contains:

        i.  duly executed binding transaction document(s);

        ii.  the legal name and identity (including jurisdiction of existence) and contact information of the bidder, full disclosure of its direct and indirect principals, and the name(s) of its controlling equityholder(s);

        iii.  a redline to the Stalking Horse Purchase Agreement, unless the bid is in the form of a plan of arrangement, in which case copies of the plan of arrangement and all documentation that is contemplated to be executed in connection therewith shall be provided;

        iv.  evidence of authorization and approval from the bidder's board of directors (or comparable governing body) and, if necessary to complete the transaction, the bidder's equityholder(s);

        v.  disclosure of any connections or agreements with the NextPoint Entities or any of its affiliates, any known, potential, prospective bidder, or any officer, manager, director, or known equity security holder of the NextPoint Entities or any of its affiliates; and

        vi.  such other information reasonably requested by the NextPoint Entities or the Monitor;

    e.  it includes a letter stating that the bid is submitted in good faith, is binding and is irrevocable until the selection of the Successful Bid; provided, however, that if such bid is selected as the Successful Bid, it shall remain irrevocable until the closing of the Successful Bid;

    f.  it provides written evidence of a bidder's ability to fully fund and consummate the transaction and satisfy its obligations under the transaction documents, including binding equity/debt commitment letters and/or guarantees covering the full value of all cash consideration and the additional items (in scope and amount) covered by the guarantees provided by affiliates of the Purchaser in connection with the Stalking Horse Purchase Agreement;

    g.  it does not include any request for or entitlement to any break fee, expense reimbursement or similar type of payment;

    h.  it is not conditional upon:

        i.  approval from the bidder's board of directors (or comparable governing body) or equityholder(s);

        ii.  the outcome of any due diligence by the bidder; or

        iii.  the bidder obtaining financing;

    i.  it includes an acknowledgment and representation that the bidder has had an opportunity to conduct any and all required due diligence prior to making its bid;

    j.  it specifies any regulatory or other third-party approvals the party anticipates would be required to complete the transaction (including the anticipated timing necessary to obtain such approvals);

    k.  it includes full details of the bidder's intended treatment of the NextPoint Entities' employees under the proposed bid;

    l.  it is accompanied by a cash deposit (the "**Deposit**") by wire transfer of immediately available funds equal to 10% of the Cash Consideration Value, which Deposit shall

be retained by the Monitor in a non-interest bearing trust account in accordance with this SISP;

m. a statement that the bidder will bear its own costs and expenses (including legal and advisor fees) in connection with the proposed transaction, and by submitting its bid is agreeing to refrain from and waive any assertion or request for reimbursement on any basis; and

n. it is received by the Qualified Bid Deadline.

8. The NextPoint Entities, in consultation with the Monitor, may waive compliance with any one or more of the requirements specified in Section 7 above and deem a non-compliant bid to be a Qualified Bid, provided that the NextPoint Entities shall not waive compliance with the requirements specified in Subsections 7(a), (b), (d), (e), (f), (g), (i) or (l) without the prior written consent of the Stalking Horse Bidder and Consenting BP NP-Liberty Lenders.

9. Notwithstanding the requirements specified in Section 7 above, the transaction contemplated by the Stalking Horse Purchase Agreement (the "**Stalking Horse Transaction**"), is deemed to be a Qualified Bid, provided that, for greater certainty, no Deposit shall be required to be submitted in connection with the Stalking Horse Transaction.

10. If one or more Qualified Bids (other than the Stalking Horse Transaction) has been received by the NextPoint Entities on or before the Qualified Bid Deadline, the NextPoint Entities may proceed with an auction process to determine the successful bid(s) (the "**Auction**"), which Auction shall be administered in accordance with Schedule "A" hereto. The successful bid(s) selected within the Auction shall constitute the "**Successful Bid**". Forthwith upon determining to proceed with an Auction, the NextPoint Entities shall provide written notice to each party that submitted a Qualified Bid (including the Stalking Horse Transaction), along with copies of all Qualified Bids and a statement by the NextPoint Entities specifying which Qualified Bid is the leading bid.

11. If, by the LOI Deadline no LOI has been received, then the SISP shall be deemed to be terminated and the Stalking Horse Transaction shall be the Successful Bid and shall be consummated in accordance with and subject to the terms of the Support Agreement and the Stalking Horse Purchase Agreement. If no Qualified Bid (other than the Stalking Horse Transaction) has been received by the NextPoint Entities on or before the Qualified Bid Deadline, then the Stalking Horse Transaction shall be the Successful Bid and shall be consummated in accordance with and subject to the terms of the Support Agreement and the Stalking Horse Purchase Agreement.

12. Following selection of a Successful Bid, the NextPoint Entities, with the assistance of its advisors, shall seek to finalize any remaining necessary definitive agreement(s) with respect to the Successful Bid in accordance with the key milestones set out in Section 6. Once the necessary definitive agreement(s) with respect to a Successful Bid have been finalized, as determined by the NextPoint Entities, in consultation with the Monitor, the NextPoint Entities shall apply to the Court for an order or orders approving such Successful

Bid and/or the mechanics to authorize the NextPoint Entities to complete the transactions contemplated thereby, as applicable, and authorizing the NextPoint Entities to (i) enter into any and all necessary agreements and related documentation with respect to the Successful Bid, (ii) undertake such other actions as may be necessary to give effect to such Successful Bid, and (iii) implement the transaction(s) contemplated in such Successful Bid (each, an "**Implementation Order**").

13. All Deposits shall be retained by the Monitor in a non-interest bearing trust account. If a Successful Bid is selected and an Implementation Order authorizing the consummation of the transaction contemplated thereunder is granted, any Deposit paid in connection with such Successful Bid will be non-refundable and shall, upon closing of the transaction contemplated by such Successful Bid, be applied to the cash consideration to be paid in connection with such Successful Bid or be dealt with as otherwise set out in the definitive agreement(s) entered into in connection with such Successful Bid. Any Deposit delivered with a Qualified Bid that is not selected as a Successful Bid, will be returned to the applicable bidder as soon as reasonably practicable (but not later than ten (10) business days) after the date upon which the Successful Bid is approved pursuant to an Implementation Order or such earlier date as may be determined by the NextPoint Entities, in consultation with the Monitor.

14. The NextPoint Entities shall provide information in respect of the SISP to the Consenting BP NP-Liberty Lenders on a confidential basis, including (A) copies of any LOI and any bid received, including any Qualified Bid, no later than one (1) calendar day following receipt thereof by the NextPoint Entities or their advisors, and (B) such other information as reasonably requested by the Consenting BP NP-Liberty Lenders or their legal counsel or financial advisors or as necessary to keep the Consenting BP NP-Liberty Lenders informed no later than two (2) calendar days after any such request or any material change to the proposed terms of any bid received, including any Qualified Bid, as to the terms of any bid, including any Qualified Bid, (including any changes to the proposed terms thereof) and the status and substance of discussions related thereto.

15. Any amendments to this SISP may only be made by: (a) the NextPoint Entities with the written consent of the Monitor and after consultation with the Consenting BP NP-Liberty Lenders, provided that the NextPoint Entities shall not amend Subsections 7(a), (b), (d), (e), (f), (g), (i) or (l) or Section 13 without the prior written consent of the Stalking Horse Bidder and the Consenting BP NP-Liberty Lenders.

## SCHEDULE "A": AUCTION PROCEDURES

1.    **Auction.**  If the NextPoint Entities receive at least one Qualified Bid (other than the Stalking Horse Transaction), the NextPoint Entities will conduct and administer the Auction in accordance with the terms of the SISP. Instructions to participate in the Auction, which will take place via video conferencing, will be provided to Qualified Parties (as defined below) not less than 24 hours prior to the Auction.

2.    **Participation.**  Only parties that provided a Qualified Bid by the Qualified Bid Deadline, including the Stalking Horse Transaction (collectively, the "**Qualified Parties**"), shall be eligible to participate in the Auction. No later than 5:00 p.m. Eastern Daylight Time on the day prior to the Auction, each Qualified Party (other than the Stalking Horse Bidder) must inform the NextPoint Entities whether it intends to participate in the Auction. The NextPoint Entities will promptly thereafter inform in writing each Qualified Party who has expressed its intent to participate in the Auction of the identity of all other Qualified Parties that have indicated their intent to participate in the Auction. If no Qualified Party provides such expression of intent, the Stalking Horse Transaction shall be the Successful Bid.

3.    **Auction Procedures.**  The Auction shall be governed by the following procedures:

    a.    **Attendance.** Only the NextPoint Entities, the Qualified Parties, the Monitor and each of their respective advisors will be entitled to attend the Auction, and only the Qualified Parties will be entitled to make any subsequent Overbids (as defined below) at the Auction;

    b.    **Minimum Overbid.** The Auction shall begin with the Qualified Bid that represents the highest or otherwise best Qualified Bid as determined by the NextPoint Entities, in consultation with the Monitor (the "**Initial Bid**"), and any bid made at the Auction by a Qualified Party subsequent to the NextPoint Entities' announcement of the Initial Bid (each, an "**Overbid**"), must proceed in minimum additional cash increments of $[●];

    c.    **Bidding Disclosure.** The Auction shall be conducted such that all bids will be made and received in one group video-conference, on an open basis, and all Qualified Parties will be entitled to be present for all bidding with the understanding that the true identity of each Qualified Party will be fully disclosed to all other Qualified Parties and that all material terms of each subsequent bid will be fully disclosed to all other Qualified Parties throughout the entire Auction; provided, however, that the NextPoint Entities, in their discretion, may establish separate video conference rooms to permit interim discussions between the NextPoint Entities and individual Qualified Parties with the understanding that all formal bids will be delivered in one group video conference, on an open basis;

    d.    **Bidding Conclusion.** The Auction shall continue in one or more rounds and will conclude after each participating Qualified Party has had the

opportunity to submit one or more additional bids with full knowledge and written confirmation of the then-existing highest bid(s); and

e. **No Post-Auction Bids**. No bids will be considered for any purpose after the Auction has concluded.

4. **Selection.** Before the conclusion of the Auction, the NextPoint Entities, in consultation with the Monitor, will: (a) review each Qualified Bid, considering the factors set out in Section 7 of the SISP and, among other things, (i) the amount of consideration being offered and, if applicable, the proposed form, composition and allocation of same, (ii) the value of any assumption of liabilities or waiver of liabilities not otherwise accounted for in prong (i) above; (iii) the likelihood of the Qualified Party's ability to close a transaction by thirty (30) days after completion of the Auction and the timing thereof (including factors such as the transaction structure and execution risk, including conditions to, timing of, and certainty of closing; termination provisions; availability of financing and financial wherewithal to meet all commitments; and required governmental or other approvals), (iv) the likelihood of the Court's approval of the Successful Bid, and (v) any other factors the NextPoint Entities may, consistent with its fiduciary duties, reasonably deem relevant; and (b) identify the highest or otherwise best bid received at the Auction (the "**Successful Bid**" and the Qualified Party making such bid, the "**Successful Party**").

5. **Acknowledgement.** The Successful Party shall complete and execute all agreements, contracts, instruments or other documents evidencing and containing the terms and conditions upon which the Successful Bid was made within one business day of the Successful Bid being selected as such, unless extended by the NextPoint Entities in their sole discretion, subject to the milestones set forth in Section 6 of the SISP.

## EXHIBIT C

## DIP Term Sheet

## <u>INTERIM FINANCING TERM SHEET</u>

Dated as of July 25, 2023

WHEREAS the Borrower has requested that the Interim Lenders provide financing to the Borrower during the pendency of the proceedings (the "**CCAA Proceedings**") under the *Companies' Creditors Arrangement Act* (Canada) (the "**CCAA**") to be commenced before the Supreme Court of British Columbia (the "**Court**") in accordance with the terms and conditions set out herein;

AND WHEREAS the Borrower and the other Credit Parties intend to commence ancillary proceedings under Chapter 15 of the Bankruptcy Code (the "**Chapter 15 Proceedings**") in the U.S. Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**");

AND WHEREAS, the Interim Lenders have agreed to provide financing in order to fund certain obligations of the Credit Parties in order for the Credit Parties to (i) pursue and implement a Permitted Restructuring Transaction pursuant to and in accordance with the SISP and (ii) provide for the ongoing working capital and general corporate and operating purposes of the Borrower and the Guarantors during the pendency of the Restructuring Proceedings;

NOW THEREFORE, the parties, in consideration of the foregoing and the mutual agreements contained herein (the receipt and sufficiency of which are hereby acknowledged), agree as follows:

| | | |
|---|---|---|
| 1. | **BORROWER:** | NPI Holdco LLC (the "**Borrower**"). |
| 2. | **AGENT** | An entity appointed by the BP Commercial Funding Trust, Series SPL-X (the "**Basepoint Lender**") as administrative agent (in such capacity, the "**Interim Agent**"). |
| 3. | **INTERIM LENDERS** | The Basepoint Lender shall have an initial commitment of $15.8 million and Drake Enterprises Limited (the "**Drake Lender**") shall have an initial commitment of $9.2 million (each is referred to as a "**Interim Lender**" and collectively, as the "**Interim Lenders**") |
| 4. | **GUARANTORS:** | Each party that guarantees (collectively, the "**Guarantors**", and together with the Borrower, the "**Credit Parties**") the obligations of the Credit Parties under this Term Sheet (the "**Interim Financing Obligations**"), which parties are set forth on Schedule "C" hereof. |
| | | It is intended that the Credit Parties will be applicants in the CCAA Proceedings and they are sometimes collectively referred to herein as the "**CCAA Applicants**". |
| 5. | **DEFINED TERMS:** | Unless otherwise defined herein, capitalized words and phrases used in this Term Sheet have the meanings given thereto in Schedule "A". |

<table>
<tr><td>6.</td><td>**INTERIM FACILITY; DRAWDOWNS:**</td><td>A senior secured, superpriority, debtor-in-possession, interim, non-revolving credit facility (the "**Interim Facility**") up to a maximum principal amount of US $25 million (as such amount may be reduced from time to time pursuant to the terms hereof, the "**Facility Amount**"), subject to the terms and conditions contained herein.</td></tr>
</table>

The Interim Facility shall be a fully-funded non-revolving term loan facility, which shall be deposited into a deposit account under the exclusive dominion and control of the Interim Agent and may be drawn by way of multiple advances (each an, "**Advance**") which, in the aggregate, shall not exceed the Facility Amount. The timing for each Advance shall be determined based on the funding needs of the Borrower as set forth in the DIP Budget and as agreed among the Interim Lenders and the Credit Parties. Each Advance shall be in a principal amount of not less than US$500,000 and shall be advanced by each Interim Lender on a pro rata basis based on their initial commitments set forth in Section 3 hereof.

Each Advance shall be deposited by the Interim Agent into the Operating Account within two (2) Business Days of the date on which the Borrower delivers to the Interim Lenders an Advance request in writing, provided that, in the determination of the Interim Agent on behalf of the Interim Lenders, the Advance Conditions are satisfied as of the date on which such Advance Request Certificate is delivered and remain satisfied on the date of such Advance.

The Advance Request Certificate shall certify that (i) all representations and warranties of the Credit Parties contained in this Term Sheet remain true and correct in all material respects both before and after giving effect to the use of such proceeds and (ii) no Default or Event of Default then exists and is continuing or would result therefrom.

Each Advance Request Certificate shall be deemed to be acceptable and shall be honoured by the Interim Agent unless the Interim Lender Majority has objected thereto in writing, providing reasons for the objection, by no later than 1:00 p.m. Eastern Time on the second Business Day following the delivery of such Advance Request Certificate. A copy of each Advance Request Certificate shall be concurrently provided to Interim Agent and the Monitor.

<table>
<tr><td>7.</td><td>**PURPOSE AND PERMITTED PAYMENTS:**</td><td>The Credit Parties shall use proceeds of the Interim Facility solely for the following purposes and in the following order, in each case in accordance with the DIP Budget and for the purpose of advancing and implementing a Permitted Restructuring Transaction pursuant to and in accordance with the SISP:</td></tr>
</table>

    (a)    to pay the reasonable and documented legal and financial advisory fees and expenses of (i) the Credit Parties, subject to the DIP Budget (ii) the Monitor (i.e. the Monitor's fees and those of its legal counsel), subject to the DIP Budget, and (iii) the Interim Agent and the Interim Lenders, in each case pursuant to the terms hereof;

(b)    to pay the interest, fees and other amounts owing to the Interim Agent and the Interim Lenders under this Term Sheet; and

(c)    to fund, in accordance with the DIP Budget, the Credit Parties' operating expenditures during the Restructuring Proceedings in pursuit of a Permitted Restructuring Transaction pursuant to and in accordance with the SISP, including the working capital and other general corporate funding requirements of the Credit Parties during such period.

For greater certainty, the Credit Parties may not use the proceeds of the Interim Facility to pay any obligations of the Credit Parties arising or relating to the period prior to the Filing Date without the prior written consent of the Interim Lender Majority unless the payment of such pre-Filing Date obligations are specifically identified in the approved DIP Budget and authorized pursuant to the Amended Initial Order or any subsequent Court Order.

8.  **ADVANCE CONDITIONS**

The Interim Lenders' agreement to make the Facility Amount available to the Borrower and to advance any Advance to the Borrower is subject to the satisfaction, as determined by the Interim Lender Majority, of each of the following conditions precedent (collectively, the "**Advance Conditions**"), each of which is for the benefit of the Interim Lender Majority and may be waived by the Interim Lender Majority in their sole and absolute discretion:

(a)    The Court shall have issued an initial order (the "**Initial Order**") in form and substance acceptable to the Interim Lender Majority, in their reasonable discretion which shall have remained in effect until the issuance of the Amended Initial Order;

(b)    The Credit Parties shall have executed and delivered this Term Sheet, the Guarantees and such other Credit Documents as the Interim Lender Majority may reasonably request.

(c)    Other than with respect to the Interim Advance, the Court shall have issued an amended and restated version of the Initial Order or a further amended and restated version of the Initial Order (as it may be amended, the "**Amended Initial Order**"), and the Bankruptcy Court shall have issued an order recognizing the Amended Initial Order, each in form and substance acceptable to the Interim Lenders, in their reasonable discretion; *provided*, *however*, the Interim Lender Majority must be satisfied with any provision of the Amended Initial Order (or any subsequent Court Order) relating to the Interim Facility, the SISP or the Stalking Horse Transaction, in its sole and absolute discretion. The Amended Initial Order shall, without limitation, (i) approve this Term Sheet (subject only to such modifications as may be acceptable to the Interim Lender Majority in their sole and absolute discretion), (ii) authorize the Borrower to borrow up to the Facility Amount under the Interim Facility, (iii) grant the Interim Agent a priority charge (the "**Interim Agent's Charge**") on the CCAA Applicants' Collateral as security for all

3

Interim Financing Obligations, which Interim Agent's Charge shall have priority over all Liens on the CCAA Applicants' Collateral other than the Permitted Priority Liens, and (iv) approve the SISP.

(d) The Credit Parties shall be acting in accordance with the SISP.

(e) No Order in the CCAA Proceedings or the Chapter 15 Proceedings, shall have been stayed, vacated or otherwise amended, restated or modified in respect of any amendment, relating to the Interim Facility, the SISP, the Stalking Horse Transaction or any other matter that affects the Interim Lender Majority, without the written consent of the Interim Lender Majority in their sole and absolute discretion.

(f) There shall be no Liens ranking in priority to or *pari passu* with the Interim Agent's Charge over the CCAA Applicants' Collateral other than the Permitted Priority Liens.

(g) No Default or Event of Default shall have occurred or will occur as a result of the requested Advance.

(h) The Borrower shall have delivered a request for the Advance in writing.

(i) Payment of all Interim Lender Expenses (as defined below) incurred to the date of Advance.

(j) Each of the RSA and the Stalking Horse Purchase Agreement is entered into, in full force and effect, and is enforceable against the parties thereto.

(k) The Borrower shall have executed a letter agreement providing that the Borrower will pay for the services of Triple P RTS, LLC and Triple P Securities, LLC ("**Portage Point**") as financial advisor to the Consenting BP Lenders (as defined in the RSA), which letter shall not have been terminated.

(l) The Borrower shall have paid, or caused to be paid, all reasonable and documented fees, out of pocket expenses, and unpaid professional retainer amounts of the Consenting BP Lenders (as defined in the RSA) and the Credit Facility Agents (as defined in the RSA) for which an invoice has been delivered to the Borrower prior to the RSA Effective Date (as defined in the RSA) (including, for the avoidance of doubt, all amounts payable to Portage Point).

9. **INTERIM ADVANCE; ESTABLISHMENT OF ESCROW ACCOUNT**

Upon entry of the Initial Order, the Interim Agent shall make an initial Advance to the Borrower, to be deposited in a segregated escrow bank account, in amount equal to $4 million (such Advance, the "**Interim Advance**").

Upon entry of the Amended Initial Order, the Interim Agent shall make an Advance to the Borrower, to be deposited in a segregated escrow bank account, in amount equal to $13,933,654, for the total amount of the professional fees set forth in the DIP Budget; provided that such amount shall not be construed as a limit or cap on the amount of such professional fees.

Any and all amounts in such escrow account shall be held in trust for the benefit of professional persons included in the DIP Budget. The Credit Parties shall use funds held in such escrow account exclusively to pay professional fees included in the DIP Budget and incurred through the Maturity Date. Any funds remaining in such escrow account after all professional fees included in the DIP Budget and incurred through the Maturity Date shall revert to the Borrower for use in a matter consistent with the DIP Term Sheet and the Amended Initial Order or any subsequent Court Order.

| 10. | **COSTS AND EXPENSES** | The Borrower shall reimburse the Interim Agent and the Interim Lenders for all reasonable fees and expenses incurred (including legal, financial advisory and professional fees and expenses on a full indemnity basis) (the "**Interim Lender Expenses**") by the Interim Agent and the Interim Lenders or any of their affiliates in connection with the negotiation, development, and implementation of Interim Facility (including the administration of the Interim Facility) and in connection with the Restructuring Proceedings, including pre-petition expenses and restructuring costs. The Interim Lender Expenses shall form part of the Interim Financing Obligations secured by the Interim Agent's Charge. Professionals for the Agent and the Lenders shall not be required to file applications or motions with, or obtain approval of, the Court for compensation and reimbursement of fees and expenses. |
| --- | --- | --- |
| | | All accrued and unpaid Interim Lender Expenses as at the date of any Advance shall be paid in full through deduction from such Advance. All accrued and unpaid Interim Lender Expenses incurred prior to the first Advance (including those incurred prior to the Filing Date) shall be paid in full through deduction from the first Advance. |
| 11. | **INTERIM FACILITY SECURITY:** | All Interim Financing Obligations shall be secured by the Interim Agent's Charge. The Interim Agent may, in its reasonable discretion (i) require the execution, filing or recording of any mortgages, security agreements, pledge agreements, control agreements, financing statements or other documents or instruments, or (ii) take possession or control of any Collateral of the Credit Parties, to the extent it is necessary to do so, to obtain and/or perfect its senior secured, superpriority Lien on such Collateral. |
| 12. | **INTER-COMPANY ADVANCES:** | Other than advances by a Credit Party to another Credit Party, no intercompany advances may be made unless provided for in the DIP Budget or consented to by the Interim Lender Majority, in their sole and absolute discretion. Notwithstanding anything else contained herein, no advances by a Credit Party may be made to NPLM Holdco LLC or any of its direct or indirect subsidiaries unless expressly provided for in the DIP Budget or |

consented to by the Interim Lender Majority, in their sole and absolute discretion.

| | | |
|---|---|---|
| 13. | **PERMITTED LIENS AND PRIORITY:** | All of the Credit Parties' Collateral and the property of the Credit Parties' subsidiaries will be free and clear of all Liens except for Permitted Liens. |
| 14. | **MONITOR:** | The monitor in the CCAA Proceedings shall be and remain FTI Consulting Canada Inc. (the "**Monitor**"). |
| 15. | **REPAYMENT:** | The Interim Facility and the Interim Financing Obligations shall be due and repayable in full on the earlier of: (i) the occurrence of any Event of Default which is continuing and has not been cured, (ii) the completion of a Restructuring Transaction, (iii) the closing of a Successful Bid (as defined in the SISP), (iv) the sale of all or substantially all of the CCAA Applicants' collateral, and (v) the Outside Date (the earliest of such dates being the "**Maturity Date**"). LoanMe shall be wound down as part of the CCAA Proceedings on terms consistent with the RSA. The Maturity Date may be extended from time to time at the request of the Borrower and with the prior written consent of the Interim Lender Majority for such period and on such terms and conditions as the Interim Lender Majority may agree in their sole and absolute discretion. All repayments of the Advances, interest, fees, premium and other amounts owing hereunder shall be made to each Interim Lender on a pro rata basis based on their initial commitments set forth in Section 3 hereof. The Interim Lenders agree to effect the pro rata sharing intended by this Agreement through sharing any repayments or other payments received in contravention of the immediately preceding sentence. |
| 16. | **DIP BUDGET AND VARIANCE REPORTING:** | Attached hereto as Schedule "B" is a copy of the agreed summary DIP Budget (excluding the supporting documentation provided to the Interim Lenders in connection therewith) as in effect on the date hereof (the "**Initial DIP Budget**"), which the Interim Lender Majority acknowledge and agree is in form and substance satisfactory to the Interim Lender Majority. Such DIP Budget shall be the DIP Budget referenced in this Term Sheet unless and until such time as a revised DIP Budget has been approved by the Interim Lender Majority in accordance with this Section 16. |

Every month, and also upon (A) the election of the Borrower, or (B) a material change, or a material change reasonably anticipated by the Borrower, to any item set forth in the DIP Budget, the Borrower shall update and propose a revised 13-week DIP Budget to the Interim Lenders (the "**Updated DIP Budget**"). Such Updated DIP Budget shall have been reviewed and approved by the Monitor, prior to submission to the Interim Lenders. If the Interim Lender Majority, in their sole and absolute discretion, determines that the Updated DIP Budget is not acceptable, it shall, within three (3) Business Days of receipt thereof, provide written notice to the Borrower and the Monitor stating that the Updated DIP Budget is not acceptable, and until the Borrower has delivered a revised Updated DIP Budget acceptable to the Interim Lender Majority, in their sole and absolute discretion, the prior DIP Budget shall remain in effect.

At any time, the Updated DIP Budget is accepted by the Interim Lender Majority, such Updated Budget shall be the DIP Budget for the purpose of this Term Sheet.

On or before 3:00 p.m. Eastern Time on the Friday of every second week, (provided that such day is a Business Day and, if not, on the next Business Day) the Borrower shall deliver to the Monitor and the Interim Agent and their legal and financial advisors a variance calculation (the "**Variance Report**") setting forth actual receipts and disbursements for the preceding two-weeks (each a "**Testing Period**") as against the then-current DIP Budget, and setting forth all the variances, on a line item and aggregate basis in comparison to the amounts set forth in respect thereof for such Testing Period in the DIP Budget; each such Variance Report to be promptly discussed with the Interim Lenders and their legal and financial advisors, if so requested. Each Variance Report shall include reasonably detailed explanations for any material variances during the relevant Testing Period.

17. **EVIDENCE OF INDEBTEDNESS:**    The Interim Agent's accounts and records constitute, in the absence of manifest error, *prima facie* evidence of the indebtedness of the Borrower to the Interim Lenders pursuant to the Interim Facility.

18. **INTEREST RATE:**    Interest shall be payable on the Facility Amount at a rate equal to the SOFR rate then in effect on such day plus 6.5% *per annum*, compounded monthly and payable monthly in arrears in cash on the last Business Day of each month, with the first such payment being made on July 31, 2023. Upon the occurrence and during the continuation of an Event of Default, all overdue amounts shall bear interest at the applicable interest rate plus 2% *per annum* payable on demand in arrears in cash. All interest shall be computed on the basis of a 360-day year of twelve 30-day months, provided that, whenever any interest is calculated on the basis of a period of time other than a calendar year, the annual rate of interest to which each rate of interest determined pursuant to such calculation is equivalent for the purposes of the *Interest Act* (Canada) is such rate as so determined multiplied by the actual number of days in the calendar year in which the same is to be ascertained and divided by the number of days used in the basis for such determination.

The parties shall comply with the following provisions to ensure that the receipt by the Interim Lenders of any payments under this Term Sheet does not result in a breach of section 347 of the *Criminal Code* (Canada):

(a)    If any provision of this Term Sheet would obligate the Credit Parties to make any payment to the Interim Lenders of an amount that constitutes "interest", as such term is defined in the *Criminal Code* (Canada) and referred to in this section as "**Criminal Code Interest**", during any one-year period after the date of the funding of the Facility Amount in an amount or calculated at a rate which would result in the receipt by the Interim Lenders of Criminal Code Interest at a criminal rate (as defined in the *Criminal Code* (Canada) and referred to in this section as a "**Criminal Rate**"), then, notwithstanding such provision, that amount or rate during such one-

year period shall be deemed to have been adjusted with retroactive effect to the maximum amount or rate of interest, as the case may be, as would not result in the receipt by the Interim Lenders during such one-year period of Criminal Code Interest at a Criminal Rate, and the adjustment shall be effected, to the extent necessary, as follows:

(i) *first*, by reducing the amount or rate of interest required to be paid to the Interim Lenders during such one-year period; and

(ii) *thereafter*, by reducing any other amounts (other than costs and expenses) (if any) required to be paid to the Interim Lenders during such one-year period which would constitute Criminal Code Interest.

(b) Any amount or rate of Criminal Code Interest referred to in this section shall be calculated and determined in accordance with generally accepted actuarial practices and principles as an effective annual rate of interest over the term that any portion of the Interim Facility remains outstanding on the assumption that any charges, fees or expenses that constitute Criminal Code Interest shall be *pro-rated* over the period commencing on the date of the advance of the Facility Amount and ending on the relevant Maturity Date (as may be extended by the Interim Lender Majority from time to time under this Term Sheet) and, in the event of a dispute, a certificate of a Fellow of the Canadian Institute of Actuaries appointed by the Interim Lender Majority shall be conclusive for the purposes of such calculation and determination.

| | | |
|---|---|---|
| 19. | **COMMITMENT FEE:** | Each Interim Lender shall receive a commitment fee in the amount of 1% of its commitments under the Interim Facility, payable in full in cash on the date of the initial Advance; provided, that such commitment fee may be structured as original issue discount and for the avoidance of doubt, may be net funded out of the initial Advance to account therefor. |
| 20. | **EXIT FEE** | When the Interim Facility is fully repaid and terminated, whether on the Maturity Date or otherwise, the Borrower shall pay to each DIP Lender an amount equal to 1% of the Lender's original commitments immediately prior to the initial funding on the date of the first Advance as an exit fee (the "**Exit Fee**"), earned upon acceptance by the Borrower of this Term Sheet. |
| 21. | **CURRENCY:** | Unless otherwise stated, all monetary denominations shall be in lawful currency of the United States of America and all payments made by the Credit Parties under this Term Sheet shall be in United States dollars. If any payment is received by the Interim Agent hereunder in a currency other than United States dollars, or, if for the purposes of obtaining judgment in any court it is necessary to convert a sum due hereunder in any currency (the "**Original Currency**") into another currency (the "**Other Currency**"), the parties hereby agree, to the fullest extent permitted by Applicable Law, that the rate of exchange used shall be the rate at which the Interim Agent is able to purchase the Original Currency with the Other Currency after any |

premium and costs of exchange on the Business Day preceding that on which such payment is made or final judgment is given.

| | | |
|---|---|---|
| 22. | **MANDATORY REPAYMENTS:** | Unless otherwise consented to in writing by the Interim Lender Majority, the Interim Facility shall be promptly repaid and the Facility Amount shall be permanently reduced upon a sale, realization or disposition of or with respect to any assets or property of the Credit Parties or any of their subsidiaries (including obsolete, excess or worn-out Collateral) (a) out of the ordinary course of business, including any sale or disposition of working capital assets, equipment, machinery and other operating or fixed assets and realizations of accounts receivable in an amount equal to the net cash proceeds of such sale, realization or disposition. Any amount so repaid may not be reborrowed. |
| 23. | **REPS AND WARRANTIES:** | Each of the Credit Parties represents and warrants to the Interim Agent and the Interim Lenders, on a joint and several basis, upon which the Interim Agent and the Interim Lenders are relying in entering into this Term Sheet that: |

(a) The transactions contemplated by this Term Sheet and the other Credit Documents, upon the granting of the Amended Initial Order:

(i) are within the powers of such Credit Party;

(ii) have been duly executed and delivered by or on behalf of such Credit Party;

(iii) constitute legal, valid and binding obligations of the Credit Parties, enforceable against the Credit Parties in accordance with their terms;

(iv) do not require any material authorization from, the consent or approval of, registration or filing with, or any other action by, any governmental authority or any third party; and

(v) will not violate the charter documents, articles by-laws or other constating documents of such Credit Party or any Applicable Law relating to such Credit Party;

(b) The business operations of the Credit Parties have been and will continue to be conducted in material compliance with all laws of each jurisdiction in which the business has been or is carried out;

(c) The Credit Parties own their assets and undertaking free and clear of all Liens other than Permitted Liens;

(d) Each Credit Party has been duly formed and is validly existing under the law of its jurisdiction of incorporation;

(e) The properties of each Credit Party are insured with financially sound and reputable insurance companies that are not affiliates of any of the Credit Parties, in such amounts, with such deductibles and covering such risks as are customarily carried by companies engaged

in similar businesses and owning similar properties in localities where such Credit Party operates.

(f)    There are no agreements of any kind between any Credit Party and any other third party or any holder of debt or equity securities of any Credit Party with respect to any Restructuring Transaction (i) as at the date hereof except for (A) this Term Sheet, (B) the Stalking Horse Purchase Agreement, and (C) the RSA, and (ii) as at any subsequent date, except for (A) any agreement effecting a replacement stalking horse bid, and (B) any agreement effecting a Successful Bid (other than the Stalking Horse Transaction) each as defined in the SISP and disclosed to the Interim Lender;

(g)    No Default or Event of Default has occurred and is continuing;

(h)    No Credit Party is required to be registered as an "investment company" under the Investment Company Act of 1940 of the United States; and

(i)    No part of the proceeds of the Interim Facility will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, for any purpose that results in a violation of the provisions of Regulation U and Regulation X of the Board of Governors of the Federal Reserve System of the United States; and

(j)    The Liens perfecting the security interests granted in connection with the Existing Credit Agreement are valid and enforceable Liens and are in first priority over the assets of the "Credit Parties" (as that term is defined in the Existing Credit Agreement).

24. **AFFIRMATIVE COVENANTS:**    Each Credit Party agrees to do, or cause to be done, with respect to itself and each of its subsidiaries, the following:

(a)    (i) Allow representatives or advisors of the Interim Agent reasonable access to the books, records, financial information and electronic data rooms of or maintained by the Credit Parties, and (ii) cause management, the financial advisor and/or legal counsel of each Credit Party to cooperate with reasonable requests for information by the Interim Lenders and their legal and financial advisors, in each case subject to solicitor-client privilege, all Court Orders and applicable privacy laws, in connection with matters reasonably related to the Interim Facility, the Restructuring Proceedings or compliance of the Credit Parties with their obligations pursuant to this Term Sheet;

(b)    Deliver to the Interim Agent all financial statements of the Borrower and the reporting and other information from time to time reasonably requested by them (or any of them) and as set out in this Term Sheet including, without limitation: (i) monthly operating reports; and (ii) quarterly management prepared financial statements.

(c)     the Variance Reports at the times set out herein;;

(d)     Cause the Borrower's senior management and legal and financial advisors to be available to conduct a telephonic conference at least once per week during normal business hours and upon reasonable notice to discuss the DIP Budget, the Variance Report, the Restructuring Proceedings and the financial condition, performance and business affairs of the Borrower;

(e)     Use the proceeds of the Interim Facility only in accordance with the restrictions set out in this Term Sheet and pursuant to the DIP Budget and the CCAA Orders;

(f)     Preserve, renew and keep in full force its corporate existence;

(g)     Comply with the provisions of (i) the Amended Initial Order, the SISP and all other orders of the Court entered in connection with the CCAA Proceedings (each a "**CCAA Order**") and (ii) all orders of the Bankruptcy Court entered in connection with the Chapter 15 Proceedings (each a "**Bankruptcy Court Order**");

(h)     Conduct its business in accordance with and otherwise comply with the DIP Budget, subject to the Permitted Variance;

(i)     Promptly notify the Interim Agent of any event or circumstance that may materially affect the DIP Budget, including any material change in its contractual arrangements or relationships with third parties;

(j)     Comply, in all material respects, with Applicable Law, except to the extent not required to do so pursuant to any Court Order;

(k)     Provide the Interim Agent and its counsel draft copies of all motions, applications, proposed Court Orders and other materials or documents that any of Credit Parties intend to file in the Restructuring Proceedings at least five (5) Business Days prior to any such filing or, where it is not practically possible to do so within such time, as soon as possible and in any event not less than two (2) days prior to the date on which such motion, application, proposed order or other materials or documents are served on the service list in respect of the applicable Restructuring Proceeding; *provided* that motion materials and similar pleadings that affect the Interim Lenders, the Stalking Horse Transaction or the SISP shall be reasonably satisfactory to the Interim Lender Majority;

(l)     Execute and deliver, or cause each Credit Party (as applicable) to execute and deliver, loan and collateral security documentation (including any guarantees in respect of the Interim Financing Obligations) including, without limitation, such security agreements, financing statements, discharges, opinions or other

documents and information, in form and substance satisfactory to the Interim Agent and its counsel;

(m)     Take all actions necessary or available to defend the Court Orders that affect the Interim Lenders, the Stalking Horse Transaction, the Collateral or the SISP from any appeal, reversal, modifications, amendment, stay or vacating, unless expressly agreed to in writing in advance by the Interim Lender Majority in their reasonable discretion;

(n)     Complete all necessary Lien and other searches against the Credit Parties, together with all registrations, filings and recordings wherever the Interim Agent deems appropriate, to satisfy the Interim Agent that there are no Liens affecting the Credit Parties' Collateral except Permitted Liens;

(o)     At all times maintain adequate insurance coverage of such kind and in such amounts and against such risks as is customary for the business of the Credit Parties with financially sound and reputable insurers in coverage and scope acceptable to the Interim Lender Majority and cause the Interim Agent to be listed as the loss payee or additional insured (as applicable) on such insurance policies;

(p)     Pay all Interim Lender Expenses no less frequently than every four (4) weeks;

(q)     Promptly upon becoming aware thereof, provide details of the following to the Interim Agent:

   (i)      any pending, or threatened claims, potential claims, litigation, actions, suits, arbitrations, other proceedings or notices received in respect of same, against any Credit Party, by or before any court, tribunal, Governmental Authority or regulatory body, which are not stayed by the Amended Initial Order and would be reasonably likely to result, individually or in the aggregate, in a judgment in excess of CDN$100,000, and

   (ii)     any existing (or threatened in writing) default or dispute with respect to any of the Material Contracts which are not stayed by the Amended Initial Order;

(r)     Strictly comply with the terms of the SISP;

(s)    Deliver the Budgets and Variance Reports required under Section 16; and

(t)    Take all actions necessary or available to defend the subsidiaries of the Credit Parties and their property from any and all material pending and threatened litigation or claims.

25. **NEGATIVE COVENANTS:**     The Credit Parties covenant and agree not to do, or cause not to be done, with respect to itself and each of its subsidiaries, the following, other than with the prior written consent of the Interim Lender Majority or with the express consent required as outlined below

(a)    Transfer, lease or otherwise dispose of all or any part of their property, assets or undertaking outside of the ordinary course of business, except (x) the sale of common stock in Xero Limited or (y) for the disposition of obsolete or worn out equipment or assets consistent with past practice, or assets of nominal value and in accordance with the Amended Initial Order and this Term Sheet;

(b)    Make any payment, including, without limitation, any payment of principal, interest or fees, in respect of pre-filing indebtedness, or in respect of any other pre-filing liabilities, including payments with respect to pre-filing trade or other liabilities of the Credit Parties, other than in accordance with the Amended Initial Order or any subsequent Court Order and the DIP Budget provided that the Credit Parties shall pay the Interim Lender Expenses pursuant to the terms of this Term Sheet.

(c)    (i) Create or permit to exist any indebtedness other than (A) the indebtedness existing as of the date of this Term Sheet, (B) the Interim Financing Obligations, and (C) post-filing trade payables or other unsecured obligations incurred in the ordinary course of business on or following the Filing Date in accordance with the DIP Budget and the Amended Initial Order, or (ii) make or give any financial assurances, in the form of bonds, letter of credit, financial guarantees or otherwise to any Person or Governmental Authority other than with the prior written consent of the Interim Lender Majority in their sole and absolute discretion;

(d)    Make any investments or acquisitions of any kind, direct or indirect, in any business or otherwise other than in accordance with the DIP Budget other than with the prior written consent of the Interim Lender Majority in their sole and absolute discretion;

(e)    Make (i) any distribution, dividend, return of capital or other distribution in respect of equity securities (in cash, securities or other property or otherwise); or (ii) a retirement, redemption, purchase or repayment or other acquisition of equity securities or indebtedness (including any payment of principal, interest, fees or any other

13

payments thereon) other than with the prior written consent of the Interim Lender Majority in its sole and absolute discretion;

(f) Pay, incur any obligation to pay, or establish any retainer with respect to the fees, expenses or disbursements of a legal, financial or other advisor of any party, other than (i) the Monitor and its legal counsel, and (ii) the respective legal, financial and other advisors of the Credit Parties and the Interim Agent and the Interim Lenders, in each case engaged as of the date hereof, unless such fees, expenses or disbursements, as applicable, are reviewed and confirmed in advance by the Interim Lender Majority;

(g) Create or permit to exist any Liens on any of its properties or assets other than the Permitted Liens;

(h) Challenge or fail to support the Liens and claims of the Interim Agent and the Interim Lenders;

(i) Challenge or fail to support any Lien or loan document arising from or entered into in connection with the Existing Credit Agreement;

(j) Create or establish any employee retention plan or similar benefit plan for any employees of any of the Credit Parties, except as reflected in the approved DIP Budget;

(k) Make any payments or expenditures (including capital expenditures) other than in accordance with the DIP Budget, subject to the Permitted Variance;

(l) Seek to obtain, or consent to or fail to oppose a motion brought by any other Person for, approval by the Court or the Bankruptcy Court of any Restructuring Transaction other than a Permitted Restructuring Transaction without the prior written consent of the Interim Lender Majority in their sole and absolute discretion;

(m) Amalgamate, consolidate with or merge into or sell all or substantially all of their assets to another entity, or change their corporate or capital structure (including their organizational documents) or enter into any agreement committing to such actions except pursuant to (i) a Permitted Restructuring Transaction, or (ii) a Restructuring Transaction other than a Permitted Restructuring Transaction with the prior written consent of the Interim Lender Majority;

(n) Make an announcement in respect of, enter into any agreement or letter of intent with respect to, or attempt to consummate, or support an attempt to consummate by another party, any transaction or agreement outside the ordinary course of business except for a Permitted Restructuring Transaction;

(o) Enter into, extend, renew, waive or otherwise modify in any material respect the terms of any existing operational arrangement, provided that, where this Term Sheet otherwise contains express provisions or restrictions with respect to particular operational arrangements or categories of operational arrangements, such express provisions or restrictions shall apply;

(p) Seek, obtain, support, make or permit to be made any Court Order or any change, amendment or modification to any Court Order in respect of any amendment relating to the Interim Facility, the SISP or any other matter that affects the Interim Lenders, except with the prior written consent of the Interim Lender Majority in their sole and absolute discretion or as contemplated by the SISP;

(q) Enter into any settlement agreement or agree to any settlement arrangements with any Governmental Authority or regulatory authority in connection with any litigation, arbitration, other investigations, proceedings or disputes or other similar proceedings which are threatened or pending against any one of them without the prior written consent of the Interim Lender Majority, or make any payments or repayments to customers outside the ordinary course of business, other than those set out in the DIP Budget;

(r) Without the prior written consent of the Interim Lender Majority in their sole and absolute discretion, cease to carry on their business or activities or any material component thereof as currently being conducted or modify or alter in any material manner the nature and type of their operations or business;

(s) Seek, or consent to the appointment of, a receiver or licensed insolvency trustee or any similar official in any jurisdiction; or

(t) Use, whether directly or indirectly, and whether immediately, incidentally or ultimately, any proceeds of the Interim Facility for any purpose that results in a violation of the provisions of Regulation U of the Board of Governors of the Federal Reserve System of the United States.

26. **EVENTS OF DEFAULT:**     The occurrence of any one or more of the following events shall constitute an event of default (each an "**Event of Default**") under this Term Sheet:

(a) Failure of the Borrower to pay principal, interest or other amounts when due pursuant to this Term Sheet or any other Credit Documents;

(b) Failure of any Credit Party to perform or comply with any term, condition, covenant or obligation pursuant to this Term Sheet or any other Credit Document and such failure remains unremedied for more than three (3) Business Days, *provided that*, where another provision in this Section 26 provides for a shorter or no cure period

in respect of a particular Event of Default, such other provision shall apply;

(c)    Any representation or warranty by a Credit Party made or deemed to be made in this Term Sheet or any other Credit Document is or proves to be incorrect or misleading as of the date made or deemed to be made;

(d)    Issuance of any Court Order (i) dismissing the Restructuring Proceedings or lifting the stay of proceedings therein to permit the enforcement of any security against any Credit Party or their Collateral, the appointment of a receiver, interim receiver or similar official, an assignment in bankruptcy, or the making of a bankruptcy order or receivership order against or in respect of any Credit Party, in each case which order is not stayed pending appeal thereof, and other than in respect of a non-material asset not required for the operations of any Credit Party's business and which is subject to a Permitted Priority Lien; (ii) granting any other Lien in respect of the CCAA Applicants' Collateral that is in priority to or *pari passu* with the Interim Agent's Charge other than as permitted pursuant to this Term Sheet, (iii) modifying this Term Sheet or any other Credit Document without the prior written consent of the Interim Lender Majority in their sole and absolute discretion; (iv) commencing any proceedings in respect of the Credit Parties pursuant to Chapter 7 or Chapter 11 of the Bankruptcy Code; (v) approving a Restructuring Transaction, other than a Permitted Restructuring Transaction, that has not been previously consented to in writing by the Interim Lender Majority, (vi) staying, reversing, vacating or otherwise modifying any Court Order relating to the Interim Facility, the SISP or any other matter that affects the Interim Agent or the Interim Lenders without the prior written consent of the Interim Lender Majority, in their sole and absolute discretion (except as contemplated by the SISP itself) or (vii) limiting or conditioning the right of the Interim Lenders to credit bid pursuant to Section 34 hereof;

(e)    Unless consented to in writing by the Interim Lender Majority, the expiry without further extension of the stay of proceedings provided for in the Amended Initial Order;

(f)    (i) a Variance Report or Updated DIP Budget is not delivered when due under this Term Sheet or (ii) in respect of any Testing Period, there shall exist a variance in excess of the Permitted Variance for the period for which the Variance Report is prepared;

(g)    Unless the Interim Lender Majority has consented thereto in writing, the filing by any of the Credit Parties of any motion or proceeding that (i) is not consistent with any provision of this Term Sheet, the Credit Documents, the Amended Initial Order, the RSA, or the SISP, as applicable, (ii) could otherwise be expected to have a material adverse effect on the interests of the Interim Agent or the Interim

Lenders, (iii) seeks to continue the CCAA Proceedings under the jurisdiction of a court other than the Court, (iv) seeks to dismiss or convert the Chapter 15 Proceedings, or (v) seeks to initiate any restructuring or insolvency proceedings other than the Restructuring Proceedings in any court or jurisdiction;

(h) Any proceeding, motion or application shall be commenced or filed by any Credit Party, or if commenced by another party, supported, remain unopposed or otherwise consented to by any Credit Party, seeking approval of any Restructuring Transaction other than a Permitted Restructuring Transaction without the prior written consent of the Interim Lenders;

(i) The making by any Credit Party of a payment of any kind that is not permitted by this Term Sheet or the Credit Documents or is not in accordance with the DIP Budget, subject to the Permitted Variance;

(j) Except as stayed by order of the Court or the Bankruptcy Court or consented to by the Interim Lender Majority, a default under, revocation or cancellation of, any Material Contract;

(k) The denial or repudiation by any Credit Party of the legality, validity, binding nature or enforceability of this Term Sheet or any other Credit Documents;

(l) Except as stayed by order of the Court, the entry of one or more final judgements, writs of execution, garnishment or attachment against any Collateral, any Credit Party or any Credit Party's subsidiaries or such subsidiaries' property that is not released, bonded, satisfied, discharged, vacated, stayed or accepted for payment by an insurer within 30 days after their entry, commencement or levy;

(m) Failure of any Credit Party to meet any Milestone (as defined in the RSA); or

(n) Termination of the RSA by the Basepoint Lender or any Credit Party in accordance with the terms of the RSA, unless such termination is due to the Stalking Horse Transaction not being identified as the successful bid pursuant to and in accordance with the SISP.

27. **REMEDIES:**      (x) Upon the occurrence of an Event of Default, and subject to the Court Orders, at any time, the Interim Lender Majority may, in their sole and absolute discretion and (y) upon the occurrence of an Event of Default that remains uncured and continuing for thirty (30) consecutive days, and subject to the Court Orders and the Interim Majority Lenders failing to exercise any remedies as a result of such Event of Default, the Drake Lender may, in its sole and absolute discretion, elect to terminate the commitments hereunder and declare the Interim Financing Obligations to be immediately due and payable and refuse to permit further Advances. In addition, (x) upon the occurrence of an Event of Default, at any time, the Interim Lender Majority may, in their sole and absolute discretion, and (y) upon the occurrence of an

Event of Default that remains uncured and continuing for thirty (30) consecutive days, and subject to the Interim Majority Lenders failing to exercise any remedies as a result of such Event of Default, the Drake Lender may, in its sole and absolute discretion, and, in each case, subject to the Court Orders including any notice provision contained therein:

(a) apply to a court for the appointment of a receiver, an interim receiver or a receiver and manager over the CCAA Applicants or their Collateral, or for the appointment of a trustee in bankruptcy of the Borrower or any of the other Credit Parties;

(b) set-off or combine any amounts then owing by the Interim Lenders to the Credit Parties against the obligations of any of the Credit Parties to the Interim Lenders hereunder;

(c) exercise the powers and rights of a secured party under the Personal Property Security Act (British Columbia), or any federal, provincial, territorial or state legislation of similar effect; and

(d) exercise all such other rights and remedies under this Term Sheet, the Court Orders and Applicable Law.

28. **INDEMNITY AND RELEASE:** The Credit Parties agree, on a joint and several basis, to indemnify and hold harmless the Interim Agent and the Interim Lenders and their respective directors, officers, employees, agents, attorneys, counsel and advisors (all such persons and entities being referred to hereafter as "**Indemnified Persons**") from and against any and all actions, suits, proceedings, claims, losses, damages, liabilities or expenses of any kind or nature whatsoever (excluding indirect or consequential damages and claims for lost profits) which may be incurred by or asserted against any Indemnified Person (collectively, "**Claims**") as a result of or arising out of or in any way related to the Interim Facility or this Term Sheet and, upon demand, to pay and reimburse any Indemnified Person for any reasonable legal or other expenses incurred in connection with investigating, defending or preparing to defend any such action, suit, proceeding or claim; *provided*, *however*, the Borrower and other Credit Parties shall not be obligated to indemnify pursuant to this paragraph any Indemnified Person against any loss, claim, damage, expense or liability (x) to the extent it resulted from the gross negligence, wilful misconduct or bad faith of any Indemnified Person as finally determined by a court of competent jurisdiction, or (y) to the extent arising from any dispute solely among Indemnified Persons other than any Claims arising out of any act or omission on the part of the Borrower or the other Credit Parties. None of the Interim Agent, any Interim Lender, the Indemnified Persons, nor the Credit Parties shall be responsible or liable to any other person for consequential or punitive damages.

Notwithstanding anything to the contrary herein, the indemnities granted under this Term Sheet shall survive any termination of the Interim Facility.

29. **TAXES:** All payments by the Borrower and any other Credit Parties under this Term Sheet to the Interim Agent or the Interim Lenders, including any payments

required to be made from and after the exercise of any remedies available to the Interim Lenders upon an Event of Default, shall be made free and clear of, and without reduction for or on account of, any present or future taxes, levies, imposts, duties, charges, fees, deductions or withholdings of any kind or nature whatsoever or any interest or penalties payable with respect thereto now or in the future imposed, levied, collected, withheld or assessed by any Governmental Authority country or any political subdivision of any country (collectively "**Taxes**"); provided, however, that if any Taxes are required by Applicable Law to be withheld ("**Withholding Taxes**") from any amount payable to an Interim Lender under this Term Sheet, the amount so payable to such Interim Lender shall be increased by an amount necessary to yield to such Interim Lender on a net basis after payment of all Withholding Taxes, the amount payable under this Term Sheet at the rate or in the amount specified herein and the Borrower shall provide evidence satisfactory to such Interim Lender that the Taxes have been so withheld and remitted.

If the Credit Parties pay an additional amount to an Interim Lender to account for any deduction or withholding, such Interim Lender shall, at the sole cost and expense of the Credit Parties, reasonably cooperate with the applicable Credit Parties to obtain a refund of the amounts so withheld and paid to such Interim Lender. Any refund of an additional amount so received by an Interim Lender, without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund which the Interim Lender determines in its sole discretion will leave it, after such payment, in no better or worse position than it would have been if no additional amounts had been paid to it), net of all out of pocket expenses of such Interim Lender, shall be paid over by such Interim Lender to the applicable Credit Parties promptly. If reasonably requested by the Credit Parties, the Interim Lender shall apply to the relevant Governmental Authority to obtain a waiver from such withholding requirement, and the Interim Lender shall reasonably cooperate, at the sole cost and expense of the Credit Parties, with the applicable Credit Parties and assist such Credit Parties to minimize the amount of deductions or withholdings required. The Credit Parties, upon the request of the Interim Lender, shall repay any portion of the amount repaid by the Interim Lender pursuant to this Section 29 (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that the Interim Lender is required to repay such portion of the refund to such Governmental Authority. This Section 29 shall not be construed to require the Interim Lender to make available its tax returns (or any other information relating to its Taxes that it deems confidential) to any Credit Party or any other Person. No Interim Lender shall, by virtue of anything in this Term Sheet or any other Credit Document be under any obligation to arrange its tax affairs in any particular manner so as to claim any refund on behalf of the Credit Parties.

30. **FURTHER ASSURANCES:**

The Credit Parties shall, at their expense, from time to time do, execute and deliver, or will cause to be done, executed and delivered, all such further acts, documents (including, without limitation, certificates, declarations, affidavits, reports and opinions) and things as the Interim Agent and the

Interim Lenders may reasonably request for the purpose of giving effect to this Term Sheet.

| | | |
|---|---|---|
| 31. | **ENTIRE AGREEMENT; CONFLICT:** | This Term Sheet, including the schedules hereto and any other Credit Documents delivered in connection with this Term Sheet, constitute the entire agreement between the parties relating to the subject matter hereof. |
| 32. | **AMENDMENTS, WAIVERS, ETC.:** | No waiver or delay on the part of the Interim Agent or any Interim Lender in exercising any right or privilege hereunder will operate as a waiver hereof or thereof unless made in writing (including by e-mail) by the Interim Agent on behalf of the Interim Lenders and delivered in accordance with the terms of this Term Sheet, and then such waiver shall be effective only in the specific instance and for the specific purpose given. |
| 33. | **ASSIGNMENT:** | An Interim Lender may assign this Term Sheet and its rights and obligations hereunder, in whole or in part, to any Person or Persons. Neither this Term Sheet nor any right or obligation hereunder may be assigned by any Credit Party. |
| | | If at any time either (i) an Event of Default has occurred hereunder and is continuing or (ii) the Drake Lender is in default of its obligations hereunder (after notice and a five (5) Business Day period to cure), then the Basepoint Lender shall have the right on two (2) Business Days' written notice to purchase by assignment at par plus (x) accrued and unpaid interest and (y) any applicable Exit Fees all Advances owing to the Drake Borrower hereunder. |
| | | If at any time either (i) the Basepoint Lender is in default of its obligations hereunder (after notice and a five (5) Business Day period to cure) or (ii) the terms of this Agreement are amended, modified, revised or supplemented in a manner materially and economically adverse to the Drake Lender, then the Drake Lender have the right on two (2) Business Days' written notice to require that the Basepoint Lender purchase by assignment at par plus (x) accrued and unpaid interest and (y) any applicable Exit Fees all Advances owing to the Drake Borrower hereunder |
| 34. | **CREDIT BIDDING:** | In any sale of any Credit Party's Collateral, the Interim Lender Majority shall be permitted, in their sole and absolute discretion, to credit bid up to the full amount of the then outstanding Interim Financing Obligations. Such credit bid may be applied at the Interim Lender Majority's sole discretion as against the acquisition of any one or more of the Borrower or any Guarantor or their respective assets. No rule of marshalling shall apply in connection with any credit bid. |
| 35. | **SEVERABILITY:** | Any provision in this Term Sheet which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction. |

| | | |
|---|---|---|
| 36. | **NO THIRD PARTY BENEFICIARY:** | No person, other than the Credit Parties, the Interim Agent, the Interim Lenders and the Indemnified Persons, is entitled to rely upon this Term Sheet and the parties expressly agree that this Term Sheet does not confer rights upon any other party. |
| 37. | **COUNTERPARTS AND SIGNATURES:** | This Term Sheet may be executed in any number of counterparts and by electronic transmission including "pdf email", each of which when executed and delivered shall be deemed to be an original, and all of which when taken together shall constitute one and the same instrument. |
| 38. | **NOTICES:** | Any notice, request or other communication hereunder to any of the parties shall be in writing and be well and sufficiently given if delivered personally or sent email to such Person at its address set out on its signature page hereof, with a copy to counsel. Any such notice, request or other communication hereunder shall be concurrently sent to the Monitor and its counsel. |
| | | Any such notice shall be deemed to be given and received when received, unless received after 5:00 p.m. Eastern Time or on a day other than a Business Day, in which case the notice shall be deemed to be received the next Business Day. |
| 39. | **GOVERNING LAW AND JURISDICTION:** | This Term Sheet shall be governed by, and construed in accordance with, the laws of the Province of British Columbia and the federal laws of Canada applicable therein. Without prejudice to the ability of the Interim Agent and the Interim Lenders to enforce this Term Sheet in any other proper jurisdiction, the Credit Parties irrevocably submit and attorn to the non-exclusive jurisdiction of the Court. |
| 40. | **JOINT & SEVERAL:** | The obligations of the Credit Parties hereunder are joint and several. |
| 41. | **LOAN DOCUMENTS** | The Guarantee and any other required loan documentation will be based on the Existing Credit Agreement and related loan documents, with such changes as are customary in connection with debtor in possession financings. |
| 42. | **EXPENSE ALLOCATION:** | All costs and expenses of the Credit Parties associated with the Restructuring Proceedings shall be divided amongst the Credit Parties as follows: 25% of such costs and expenses shall be attributed to the CTAX Group and 75% of such costs and expenses shall be attributed to the Credit Parties other than the CTAX Group. |
| 42. | **EXTENSION OF FORBEARANCE:** | The forbearance currently in place (the "**Existing Forbearance**") with respect to any defaults related to the failure of any Credit Party to timely pay interest as and when due in respect of any debt of the CTAX Group or any debt of the Borrower (but not any debt of LT Holdco, LLC) shall remain in full force and effect and be continued at all times so long as any Event of Default has not occurred and is continuing hereunder. Upon the occurrence and during the continuance of any Event of Default hereunder, the Existing Forbearance shall automatically terminate and be of no further force and effect, with any lenders or parties to the Existing Forbearance |

permitted to immediately exercise any and all rights in remedies in respect of the forbeared defaults (and any other defaults or events of default).

**IN WITNESS HEREOF**, the parties hereby execute this Term Sheet as at the date first above mentioned.

**Borrower**

**NPI Holdco, LLC**

Address:
Attention:
Email:

Per: _____
Name: Peter Kravitz
Title: C.R.O.
I have authority to bind the corporation.

**GUARANTORS**

**NextPoint Financial, Inc.**

Per: _____

Name: Peter Kravitz

Title: CRO

I have authority to bind the corporation.

**LT Holdco, LLC**

Per: _____

Name: Peter Kravitz

Title: CRO

I have authority to bind the corporation.

**LT Intermediate Holdco, LLC**

Per: _____

Name: Peter Kravitz

Title: CRO

I have authority to bind the corporation.

**SiempreTax+ LLC**

Per: _____

Name: Peter Kravitz

Title: CRO

I have authority to bind the corporation.

**JTH Tax LLC**

Per: _____

Name: Peter Kravitz

Title: CRO

I have authority to bind the corporation.

**Liberty Credit Repair, LLC**

Per: _____

Name: Peter Kravtz

Title: CRO

I have authority to bind the corporation.


**Wefile LLC**

Per: _____

Name: Peter Kravtz

Title: CRO

I have authority to bind the corporation.


**JTH Court Plaza, LLC**

Per: _____

Name: Peter Kravtz

Title: CRO

I have authority to bind the corporation.


**LTS Properties, LLC**

Per: _____

Name: Peter Kravtz

Title: CRO

I have authority to bind the corporation.


**LTS Software LLC**

Per: _____

Name: Peter Kravtz

Title: CRO

I have authority to bind the corporation.

**JTH Tax Office Properties, LLC**

Per: _____

Name: Peter Kratz

Title: CRO

I have authority to bind the corporation.

**360 Accounting Solutions LLC**

Per: _____

Name: Peter Kratz

Title: CRO

I have authority to bind the corporation.

**JTH Financial, LLC**

Per: _____

Name: Peter Kratz

Title: CRO

I have authority to bind the corporation.

**JTH Properties 1632, LLC**

Per: _____

Name: Peter Kratz

Title: CRO

I have authority to bind the corporation.

**Liberty Tax Holding Corporation**

Per: _____

Name: Peter Kratz

Title: CRO

I have authority to bind the corporation.

**Liberty Tax Service Inc.**

Per: _____

Name: Peter Kurtz

Title: CEO

I have authority to bind the corporation.


**NPLM Holdco LLC**

Per: _____

Name: Peter Kurtz

Title: CEO

I have authority to bind the corporation.


**LoanMe, LLC**

Per: _____

Name: Peter Kurtz

Title: CEO

I have authority to bind the corporation.


**InsightsLogic, LLC**

Per: _____

Name: Peter Kurtz

Title: CEO

I have authority to bind the corporation.

**LM 2014 BP SPE, LLC**

Per: _____

    Name: Peter Kutz

    Title: CEO

    I have authority to bind the corporation.


**LM 2014 BP II SPE, LLC**

Per: _____

    Name: Peter Kutz

    Title: CEO

    I have authority to bind the corporation.


**LM 2014 BP III SPE, LLC**

Per: _____

    Name: Peter Kutz

    Title: CEO

    I have authority to bind the corporation.


**LM 2015 BP I SPE, LLC**

Per: _____

    Name: Peter Kutz

    Title: CEO

    I have authority to bind the corporation.


**LM 2014 HC SPE, LLC**

Per: _____

    Name: Peter Kutz

    Title: CEO

    I have authority to bind the corporation.

**LM 2015 NLP SPE, LLC**

Per: _____

Name: Peter Kravitz

Title: CRO

I have authority to bind the corporation.


**LM 2016 NLP SPE, LLC**

Per: _____

Name: Peter Kravitz

Title: CRO

I have authority to bind the corporation.


**LM 2017 MP I SPE, LLC**

Per: _____

Name: Peter Kravitz

Title: CRO

I have authority to bind the corporation.


**LM Retention Holdings, LLC**

Per: _____

Name: Peter Kravitz

Title: CRO

I have authority to bind the corporation.


**LM 2020 CM I SPE, LLC**

Per: _____

Name: Peter Kravitz

Title: CRO

I have authority to bind the corporation.

**LoanMe Funding, LLC**

Per: _____

Name: Peter Kurtz

Title: CEO

I have authority to bind the corporation.


**LoanMe Trust SBL 2019-1**

Per: _____

Name: Peter Kurtz

Title: CEO

I have authority to bind the corporation.


**CTAX Acquisition LLC**

Per: _____

Name: Peter Kurtz

Title: CEO

I have authority to bind the corporation.


**Community Tax Puerto Rico, LLC**

Per: _____

Name: Peter Kurtz

Title: CEO

I have authority to bind the corporation.

**Community Tax LLC**

Per: _____

Name: Peter Kravitz

Title: CRO

I have authority to bind the corporation.

**ADMINISTRATIVE AGENT AND LENDERS:**

**BP COMMERCIAL FUNDING TRUST,
SERIES SPL-X**,
a statutory series of BP Commercial Funding
Trust, a Delaware statutory trust, for itself and for
no other series of BP Commercial Funding Trust,
in its capacity as Administrative Agent

By: BasePoint Capital II, LLC,
not in its individual capacity but solely as
Administrator of BP Commercial Funding Trust

By: *Michael C Petronio*
Name: Michael Petronio
Title:  Authorized Signatory

**BP   COMMERCIAL    FUNDING    TRUST,
SERIES SPL-X**,
a statutory series of BP Commercial Funding
Trust, a Delaware statutory trust, for itself and for
no other series of BP Commercial Funding Trust,
in its capacity as holder of Revolving Credit
Promissory Note B-1-1

By: BasePoint Capital II, LLC,
not in its individual capacity but solely as
Administrator of BP Commercial Funding Trust

By: *Michael C Petronio*
Name: Michael Petronio
Title:  Authorized Signatory

**BP COMMERCIAL FUNDING TRUST,
SERIES SPL-X**,
a statutory series of BP Commercial Funding
Trust, a Delaware statutory trust, for itself and for
no other series of BP Commercial Funding Trust,
in its capacity as holder of Revolving Credit
Promissory Note B-1-2

By: BasePoint Capital II, LLC,
not in its individual capacity but solely as
Administrator of BP Commercial Funding Trust

By: *Michael C Petronio*
Name: Michael Petronio
Title:  Authorized Signatory

**BP SLL TRUST,
SERIES SPL-III**,
a statutory series of BP SLL Trust, a Delaware
statutory trust, for itself and for no other series of
BP SLL Trust, in its capacity as holder of
Promissory Note B-2 under the BP NP-Liberty
Credit Agreement

By: BasePoint Administrative, LLC,
not in its individual capacity but solely as
Administrator of BP SLL Trust

By: *Michael C Petronio*
Name: Michael Petronio
Title:  Authorized Signatory

**BP COMMERCIAL FUNDING TRUST,**
**SERIES SPL-X**,
a statutory series of BP Commercial Funding
Trust, a Delaware statutory trust, for itself and for
no other series of BP Commercial Funding Trust,
in its capacity as holder of Term Loan Promissory
Note A


By: BasePoint Capital II, LLC,
not in its individual capacity but solely as
Administrator of BP Commercial Funding Trust

By: *Michael C Petronio*
Name: Michael Petronio
Title:  Authorized Signatory

**BP Commercial Funding Trust, Series SPL-X**,
as Interim Agent

Address:
Attention:
Email:

Per: _____

Name:

Title:

I have authority to bind the corporation.

**BP Commercial Funding Trust, Series SPL-X**,
as an Interim Lender

Address:
Attention:
Email:

Per: _____

Name:

Title:

I have authority to bind the corporation.

**Drake Enterprises Limited**,
as an Interim Lender

Address:
Attention:
Email:

Per: _____

Name:

Title:

I have authority to bind the corporation.

**SCHEDULE "A"**
**DEFINED TERMS**

"**Advance**" means an amount of the Interim Facility advanced to the Borrower pursuant to the terms hereof from time to time.

"**Administration Charge**" means a priority charge over the CCAA Applicants' Collateral granted by the Court pursuant to the Initial Order in an aggregate amount not to exceed CDN$1,000,000 to secure the fees and expenses of (i) the legal and financial advisors of the Credit Parties, and (ii) the Monitor and its counsel, in connection with the CCAA Proceedings.

"**Advance Conditions**" has the meaning given thereto in Section 8.

"**Advance Request Certificate**" has the meaning given thereto in Section 6.

"**Amended Initial Order**" has the meaning given thereto in Section 7(d).

"**Applicable Law**" means, in respect of any Person, property, transaction or event, all applicable laws, statutes, rules, by-laws and regulations and all applicable official directives, orders, judgments and decrees of any Governmental Authority having the force of law.

"**Bankruptcy Code**" means title 11 of the *United States Code*.

"**Bankruptcy Court**" has the meaning given thereto in Section 22(t).

"**Bankruptcy Court Order**" has the meaning given thereto in Section 24(g).

"**Borrower**" has the meanings given thereto in Section 1.

"**BP-CTAX Credit Agreement**" means that certain Credit Agreement, dated as of June 29, 2022, by and among CTAX Acquisition LLC, as borrower, Community Tax LLC, and Community Tax Puerto Rico LLC, as subsidiary guarantors, the lenders party thereto, and BP Commercial Funding Trust II, Series SPL-I, as the Administrative Agent, as amended, restated, supplemented or otherwise modified from time to time.

"**Business Day**" means any day other than a Saturday, Sunday or any other day on which banks in Vancouver, British Columbia, or New York, New York are not open for business.

"**CCAA**" has the meaning given thereto in the Recitals.

"**CCAA Proceedings**" has the meaning given thereto in the Recitals.

"**Claims**" has the meaning given thereto in Section 28.

"**CTAX Group**" means CTAX Acquisition LLC, Community Tax Puerto Rico, LLC and Community Tax LLC.

"**Collateral**" means, in respect of a Person, all current or future assets, businesses, undertakings and properties of such Person, real and personal, tangible or intangible, including all proceeds thereof.

"**Court**" has the meaning given thereto in the Recitals.

"**Court Order**" means any CCAA Order or Bankruptcy Court Order and "**Court Orders**" means, collectively, all such orders.

"**Credit Documents**" means this Term Sheet, the Guarantees delivered by the Guarantors, and any other document delivered in connection with or relating to this Term Sheet from time to time.

"**Credit Parties**" means the Borrower and the Guarantors, collectively.

"**Criminal Code Interest**" has meaning given thereto in Section 18(a).

"**Criminal Rate**" has meaning given thereto in Section 18(a).

"**CRO Charge**" means a priority charge over the CCAA Applicants' Collateral granted by the Court pursuant to the Initial Order in favour of the chief restructuring officer of the CCAA Applicants, in an amount not to exceed CDN$500,000.

"**Default**" means an event or circumstance which, after the giving of notice or the passage of time, or both, will result in an Event of Default.

"**DIP Budget**" means the weekly financial projections prepared by the Credit Parties covering the period commencing on the week ended July 28, 2023, and ending on the week ending October 27, 2023, on a weekly basis, which shall be in form and substance acceptable to the Interim Lender Majority, which financial projections may be amended from time to time in accordance with Section 16. For greater certainty, for purposes of this Term Sheet, the DIP Budget shall include all supporting documentation provided in respect thereof to the Interim Lender.

"**Directors' Charge**" means a priority charge over the CCAA Applicants' Collateral granted by the Court pursuant to the Initial Order in favour of the directors and officers of the CCAA Applicants, in an amount not to exceed CDN$500,000.

"**Drake-CTAX Credit Agreement**" means that certain Credit Agreement, dated as of June 29, 2022, by and among CTAX Acquisition LLC, as borrower, Community Tax LLC, and Community Tax Puerto Rico LLC, as subsidiary guarantors, the lenders party thereto, and Drake Enterprises Ltd., as the Administrative Agent, as amended, restated, supplemented or otherwise modified from time to time.

"**Event of Default**" has the meaning given thereto in Section 26.

"**Existing Credit Agreement**" means the Credit Agreement, dated as of July 2, 2021 (as amended by that certain Consent under Revolving Credit Agreement and Amendment No. 1 to Revolving Credit Agreement, Security Agreement, and Perfection Certificate, dated as of July 30, 2021, that certain Consent under Revolving Credit Agreement and Amendment No. 2 to Security Agreement, dated as of August 27, 2021, that certain Consent Under Revolving Credit Agreement and Security Agreement, dated as of September 24, 2021, that certain Consent Under Revolving Credit Agreement and Security Agreement, dated as of October 29, 2021, that certain Consent and Waiver Under Revolving Credit Agreement, dated as of November 15, 2021, that certain Waiver and Amendment No. 2 to Revolving Credit Agreement dated November 23, 2021, and that certain Waiver and Amendment No. 3 to Revolving Credit Agreement dated November 1, 2022 by and among the Borrower, NextPoint Financial Inc., the subsidiary guarantors from time to time party thereto, BP COMMERCIAL FUNDING TRUST as the Administrative Agent and the lenders from time to time party thereto, as amended, restated, supplemented or otherwise modified from time to time.

"**Existing Credit Facilities**" means the facilities governed by the Existing CTAX Facilities and the Existing Credit Agreement.

"**Existing CTAX Facilities**" means the Drake-CTAX Credit Agreement and the BP-CTAX Credit Agreement.

"**Existing Forbearance**" has the meaning given thereto in Section 43.

"**Facility Amount**" has the meaning given thereto in Section 6.

"**Filing Date**" means the date of commencement of the CCAA Proceedings.

"**Franchisee Lender Charge**" has the meaning given thereto in the Initial Order. "**Governmental Authority**" means any federal, provincial, state, municipal, local or other government, governmental or public department, commission, board, bureau, agency or instrumentality, domestic or foreign and any subdivision, agent, commission, board or authority of any of the foregoing.

"**Guarantee**" means a guarantee of the Interim Financing Obligations made by each of the Guarantors in favour of the Interim Lender, in form and substance satisfactory to the Interim Lender.

"**Guarantors**" has the meaning given thereto in Section 4.

"**Indemnified Persons**" has the meaning given thereto in Section 28.

"**Initial DIP Budget**" has the meaning given thereto in Section 16.

"**Initial Order**" has the meaning given thereto in Section 8.

"**Interim Advance**" has the meaning given thereto in Section 9.

"**Interim Facility**" has the meaning given thereto in Section 6.

"**Interim Financing Obligations**" means, collectively, all obligations owing by the Credit Parties pursuant to this Term Sheet and the other Credit Documents, including, without limitation, all principal, interest, fees, costs, expenses, disbursements and Interim Lender Expenses.

"**Interim Lenders**" has the meaning given thereto in Section 3.

"**Interim Lender Majority**" means Interim Lenders holding greater than 50% of the Interim Financing Obligations.

"**Interim Agent's Charge**" has the meaning given thereto in Section 8.

"**Interim Lender Expenses**" has the meaning given thereto in Section 10.

"**Liens**" means (a) all liens, hypothecs, charges, mortgages, deeds of trusts, trusts, deemed trusts (statutory or otherwise), constructive trusts, encumbrances, security interests, and statutory preferences of every kind and nature whatsoever, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset, and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"**Material Contract**" means any contract, license or agreement: (i) to which any Credit Party is a party or is bound; and (ii) which a Credit Party cannot within a commercially reasonable timeframe replace by an alternative and comparable contract with comparable commercial terms.

"**Maturity Date**" has the meaning given thereto in Section 15.

"**Monitor**" has the meaning given thereto in Section 15.

"**Operating Account**" means a bank account of the Borrower designated by the Borrower to receive Advances.

"**Original Currency**" has the meaning given thereto in Section 21.

"**Other Currency**" has the meaning given thereto in Section 21.

"**Outside Date**" means November 30, 2023 or such later date agreed to by both the Credit Parties and the Interim Lenders in writing, in consultation with the Monitor.

"**Permitted Liens**" means (i) the Interim Agent's Charge; (ii) the Franchisee Lender's Charge; (iii) the Directors' Charge; (iv) any charges created under the Amended Initial Order or other Court Order subsequent in priority to the Interim Agent's Charge and approved in writing by the Interim Lender Majority in its sole discretion; (v) validly perfected Liens existing prior to the date hereof; (vi) inchoate statutory Liens arising after the Filing Date in respect of any accounts payable arising after the Filing Date in the ordinary course of business, subject to the obligation to pay all such amounts as and when due; and (vii) the Permitted Priority Liens.

"**Permitted Priority Liens**" means (i) the Administration Charge; (ii) the CRO Charge; and (iii) any amounts payable by a Credit Party for wages, vacation pay, employee deductions, sales tax, excise tax, tax payable pursuant to Part IX of the *Excise Tax Act* (Canada) (net of input credits), income tax and workers compensation claims, in each case solely to the extent such amounts are given priority by Applicable Law and only to the extent that the priority of such amounts has not been subordinated to the Interim Agent's Charge granted by the Court; *provided further* that, for the avoidance of doubt, Permitted Priority Liens shall not include any Liens securing any Credit Party's obligations under the Existing Credit Facilities.

"**Permitted Restructuring Transaction**" means (i) the Stalking Horse Transaction, or (ii) a transaction that otherwise constitutes a "Successful Bid" in accordance with the and pursuant to the SISP.

"**Permitted Variance**" means an adverse variance of not more than: negative 10% in respect of cumulative receipts; positive 10% in respect of cumulative aggregate disbursements, of the actual cash flow against the DIP Budget for any Testing Period.

"**Person**" means an individual, partnership, corporation, business trust, joint stock company, limited liability company, trust, unincorporated association, joint venture, Governmental Authority or other entity of whatever nature.

"**Restructuring Proceedings**" means, collectively, the CCAA Proceedings and the Chapter 15 Proceedings.

"**Restructuring Transaction**" means any restructuring, financing, refinancing, recapitalization, sale, liquidation, workout, plan of arrangement or other material transaction of, or in respect of, all or any of the

Credit Parties or their respective assets and liabilities and includes, without limitation, the Stalking Horse Transaction.

"**RSA**" means the restructuring support agreement dated the date hereof among the Credit Parties, the lenders under the Existing Credit Agreement and the lenders under the Drake-CTAX Credit Agreement.

"**SISP**" means a Sales and Investment Solicitation Process in the form attached to the Stalking Horse Purchase Agreement or as amended in accordance with and pursuant to the terms of the Stalking Horse Purchase Agreement.

"**SOFR**" means a rate equal to the secured overnight financing rate as administered by the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

"**Stalking Horse Purchase Agreement**" means the Stalking Horse Purchase Agreement dated the date hereof among NPI Holdco LLC and certain of its subsidiaries, as vendors, and the lenders under the Existing Credit Agreement, as purchasers.

"**Stalking Horse Transaction**" means the transaction in respect of certain assets and property of the Credit Parties contemplated by the Stalking Horse Purchase Agreement**.**

"**Taxes**" has the meaning given thereto in Section 29.

"**Testing Period**" has the meaning given thereto in Section 16.

"**Updated DIP Budget**" has the meaning given thereto in Section 16.

"**Variance Report**" has the meaning given thereto in Section 16.

"**Withholding Taxes**" has the meaning given thereto in Section 29.

# SCHEDULE "B"
## DIP BUDGET

**SCHEDULE "C"**
**GUARANTORS**

NextPoint Financial, Inc.

LT Holdco, LLC

LT Intermediate Holdco, LLC

SiempreTax+ LLC

JTH Tax LLC

Liberty Credit Repair, LLC

Wefile LLC

JTH Court Plaza, LLC

LTS Properties, LLC

LTS Software LLC

JTH Tax Office Properties, LLC

360 Accounting Solutions LLC

JTH Financial, LLC

JTH Properties 1632, LLC

Liberty Tax Holding Corporation

Liberty Tax Service Inc.

NPLM Holdco LLC

LoanMe, LLC

InsightsLogic, LLC

LM 2014 BP SPE, LLC

LM 2014 BP II SPE, LLC

LM 2014 BP III SPE, LLC

LM 2015 BP I SPE, LLC

LM 2014 HC SPE, LLC

LM 2015 NLP SPE, LLC

LM 2016 NLP SPE, LLC

LM 2017 MP I SPE, LLC

LM Retention Holdings, LLC

LM 2020 CM I SPE, LLC

LoanMe Funding, LLC

LoanMe Trust SBL 2019-1

CTAX Acquisition LLC

Community Tax Puerto Rico, LLC

Community Tax LLC

# EXHIBIT D

## Mutual Release Agreement

## MUTUAL RELEASE AGREEMENT

This Release Agreement (this "<u>Agreement</u>") is made and entered into as of July 25, 2023, by and among:

(a) NextPoint Financial Inc. ("<u>NextPoint Parent</u>"); NPI Holdco LLC ("<u>BP NP Borrower</u>"); LT Holdco, LLC ("<u>BP Liberty Borrower</u>"); LT Intermediate Holdco, LLC; SiempreTax+ LLC; JTH Tax LLC; JTH Financial, LLC; JTH Properties 1632, LLC; JTH Tax Office Properties, LLC; Wefile LLC; Liberty Credit Repair, LLC; LTS Properties, LLC; 360 Accounting Solutions, LLC; JTH Court Plaza, LLC; LTS Software LLC; CTAX Acquisition LLC ("<u>CTAX Borrower</u>"); Community Tax LLC ("<u>CTAX LLC</u>"); Community Tax Puerto Rico LLC ("<u>CTAX Puerto Rico</u>," and together with CTAX Borrower and CTAX LLC, collectively, the "<u>CTAX Entities</u>," and each a "<u>CTAX Entity</u>"); NPLM Holdco LLC; LoanMe, LLC ("<u>LoanMe</u>"); and InsightsLogic LLC (collectively, the "<u>NextPoint Entities</u>" or the "<u>Company</u>");

(b) the undersigned entities constituting all the lenders under the BP NP-Liberty Credit Agreement (as defined below) (such lenders in such capacity, the "<u>Consenting BP NP-Liberty Lenders</u>" and the agent for such lenders, the "<u>BP NP-Liberty Credit Facility Agent</u>");

(c) the undersigned entities constituting all the lenders under the BP CTAX Term Loan Credit Agreement (as defined below) (such lenders in such capacity, the "<u>Consenting BP CTAX Lenders</u>" and the agent for such lenders, in such capacity, the "<u>BP CTAX Credit Facility Agent</u>" and the Consenting BP CTAX Lenders together with the BP NP-Liberty Lenders, the "<u>Consenting BP Lenders</u>"); and

(d) the undersigned entities constituting all the lenders under the Drake CTAX Term Loan Credit Agreement (as defined below) (such lenders in such capacity, the "<u>Consenting Drake CTAX Lenders</u>" and the agent for such lenders, in such capacity, the "<u>Drake CTAX Credit Facility Agent</u>" and the Consenting Drake CTAX Lenders together with the Consenting BP Lenders, the "<u>Consenting Lenders</u>" and the Drake CTAX Credit Facility Agent together with the BP CTAX Credit Facility Agent and the BP NP-Liberty Credit Facility Agent, collectively, the "<u>Credit Facility Agents</u>" and each, a "<u>Credit Facility Agent</u>").

The NextPoint Entities, the Consenting Lenders, and any other Person (as defined in the Bankruptcy Code (as defined below)) that becomes a party hereto in accordance with the terms hereof are referred to herein collectively, as the "<u>Parties</u>" and individually, as a "<u>Party</u>." Capitalized terms used but not defined herein shall have the meaning ascribed to them in the RSA (as defined herein).

## Recitals

WHEREAS, reference is made to that certain Revolving Credit Agreement, dated as of July 2, 2021, by and among BP NP Borrower, BP Liberty Borrower, NextPoint Parent, the

subsidiary guarantors from time to time party thereto, the BP NP-Liberty Credit Facility Agent and the lenders from time to time party thereto (as amended restated, supplemented, or otherwise modified from time to time, the "BP NP-Liberty Credit Agreement");

WHEREAS, reference is made to that certain Credit Agreement dated as of June 29, 2022, among CTAX Borrower, as borrower, CTAX LLC and CTAX Puerto Rico as borrower guarantors, the lenders party thereto from time to time, and the BP CTAX Credit Facility Agent, as administrative agent (as amended, restated, supplemented, or otherwise modified from time to time, the "BP CTAX Term Loan Credit Agreement");

WHEREAS, reference is made to that certain Credit Agreement dated as of June 29, 2022, among CTAX Borrower, as borrower, CTAX LLC and CTAX Puerto Rico as borrower guarantors, the lenders party thereto from time to time, and the Drake CTAX Credit Facility Agent, as administrative agent (as amended, restated, supplemented, or otherwise modified from time to time, the "Drake CTAX Term Loan Credit Agreement");

WHEREAS the Company, the applicable Consenting BP Lenders, and the Credit Facility Agents are party to those certain Forbearance Agreements, dated as of June 30, 2023 (the "Forbearance Agreements");

WHEREAS the Company, the Consenting Lenders, the Credit Facility Agents (including the Consenting Drake CTAX Lenders and Drake CTAX Credit Facility Agent by joinder) are party to that certain Restructuring Support Agreement, dated as of July 25, 2023 (the "RSA"), pursuant to which the Consenting BP Lenders have agreed to (a) provide a $25 million debtor-in-possession financing facility on the terms contained in the term sheet attached to the RSA as Exhibit C (the "DIP Term Sheet"), and (b) a deferral of certain interest obligations that were due on July 1, 2023 under the BP NP-Liberty Credit Agreement and the BP CTAX Term Loan Credit Agreement as documented in the Forbearance Agreements;

WHEREAS, in connection with entry into the RSA, the Parties desire to grant certain releases, all as more fully set forth herein; and

NOW, THEREFORE, in consideration of the above recitals and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the Parties hereby agree as follows:

## Agreement

1.  Release. Subject to and upon the RSA Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed:

(a) each of the Debtors (in their own right, on behalf of their estates and their current and former direct and indirect subsidiaries, and each such entity's and its current and former direct and indirect subsidiaries' current and former directors, officers, managers, predecessors, and successors and assigns, and each of such entity's current and former officers, members, managers, directors, principals, members, employees, agents, independent contractors, representatives, managed accounts or funds, management companies, fund advisors, investment advisors, financial advisors, partners (including both general and limited partners), and

representatives, in each case to the extent permitted by applicable law and solely in such parties capacity as such) (collectively, the "NextPoint Releasing Parties"), hereby unconditionally and irrevocably releases, acquits, absolves, forever discharges and covenants not to sue the Consenting Lenders, and each such entity's current and former affiliates, and each such entity's current and former directors, officers, managers and equityholders (regardless of whether such interests are held directly or indirectly), predecessors, successors and assigns, and direct and indirect subsidiaries, and each of such entity's current and former officers, members, managers, directors, equityholders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, independent contractors, representatives, managed accounts or funds, management companies, fund advisors, investment advisors, financial advisors, and partners (including both general and limited partners) (the "Consenting Lender Released Parties") from any and all acts and omissions of the Consenting Lender Released Parties, and from any and all claims, interests, causes of action, avoidance actions, counterclaims, defenses, setoffs, demands, controversies, suits, judgments, costs, debts, sums of money, accounts, reckonings, bonds, bills, damages, obligations, objections, legal proceedings, equitable proceedings, executions of any nature, type, or description and liabilities whatsoever (including any derivative claims asserted or assertable on behalf of the Debtors, their estates, or such entities' successors or assigns, whether individually or collectively), which the NextPoint Releasing Parties now have, may claim to have or may come to have against the Released Parties through the date of this Agreement, at law or in equity, by statute or common law, in contract or in tort, including, without limitation, (a) any so-called "lender liability" or equitable subordination claims or defenses, (b) any and all "claims" (as defined in the Bankruptcy Code) and causes of action arising under the Bankruptcy Code and (c) any and all offsets, defenses, claims, counterclaims, set off rights, objections, challenges, causes of action, and/or choses in action of any kind or nature whatsoever, whether liquidated or unliquidated, fixed or contingent, known or unknown, suspected or unsuspected, disputed or undisputed, whether arising at law or in equity, including any recharacterization, recoupment, subordination, disallowance, avoidance, challenge, or other claim or cause of action arising under or pursuant to section 105, chapter 5, or section 724(a) of the Bankruptcy Code or under other similar provisions of applicable state, federal, or foreign laws, including without limitation, any right to assert any disgorgement, recovery, and further waives and releases any defense, right of counterclaim, right of setoff, or deduction on the payment of the BP NP-Liberty Credit Agreement, the BP CTAX Term Loan Credit Agreement, or the Drake CTAX Term Loan Credit Agreement, but excluding obligations of the Consenting Lenders under the RSA and the DIP Financing arising after the RSA Effective Date (collectively, the "Consenting Lender Released Claims"). This paragraph is in addition to and shall not in any way limit any other release, covenant not to sue, or waiver by the NextPoint Releasing Parties in favor of the Consenting Lender Released Parties. Notwithstanding the releases and covenants in favor of the Consenting Lender Released Parties contained above in this paragraph, such releases and covenants in favor of the Consenting Lender Released Parties shall be deemed acknowledged and reaffirmed by the Debtors each time there is an advance of funds, extension of credit, or financial accommodation under the DIP Term Sheet. As of the date hereof, there exist no claims or causes of action against the Consenting Lenders with respect to, in connection with, related to, or arising from this DIP Term Sheet or the DIP Financing that may be asserted by the Debtors or, to the Debtors' knowledge, any other person or entity.

(b)     each of the Consenting Lenders, in their own right, on behalf of their current direct and indirect subsidiaries, and, to the extent each of the signatories hereto is legally

authorized to bind such person or entity, each such entity's and its current direct and indirect subsidiaries' current directors, officers, managers, predecessors, and successors and assigns, and each of such entity's current officers, members, managers, directors, principals, members, employees, agents, independent contractors, representatives, managed accounts or funds, management companies, fund advisors, investment advisors, financial advisors, partners (including both general and limited partners), and representatives, in each case to the extent permitted by applicable law or a governing document and solely in such parties capacity as such (collectively, the "<u>Consenting Lender Releasing Parties</u>", and with the NextPoint Releasing Parties, the "<u>Releasing Parties</u>", and each a "<u>Releasing Party</u>") hereby unconditionally and irrevocably releases, acquits, absolves, forever discharges and covenants not to sue NextPoint Parent's current directors and restructuring professionals (collectively, the "<u>NextPoint Released Parties</u>", and collectively with the Consenting Lender Released Parties, the "<u>Released Parties</u>", and each a "<u>Released Party</u>") from any and all acts and omissions of the NextPoint Released Parties, and from any and all claims, interests, causes of action, avoidance actions, counterclaims, defenses, setoffs, demands, controversies, suits, judgments, costs, debts, sums of money, accounts, reckonings, bonds, bills, damages, obligations, objections, legal proceedings, equitable proceedings, executions of any nature, type, or description and liabilities whatsoever, which the Consenting Lender Releasing Parties now have, may claim to have or may come to have against the NextPoint Released Parties through the date of this Agreement, at law or in equity, by statute or common law, in contract or in tort (collectively, the "<u>NextPoint Released Claims</u>", and collectively with the Consenting Party Released Claims, the "<u>Released Claims</u>", and each a "<u>Released Claim</u>"); *provided*, *however*, that no NextPoint Released Party will be released hereunder for any claim, cause of action or similar liability related to any act or omission by such NextPoint Released Party that is determined by final order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence. This paragraph is in addition to and shall not in any way limit any other release, covenant not to sue, or waiver by the Consenting Lender Releasing Parties in favor of the NextPoint Released Parties.

2. <u>Effectiveness</u>. This Agreement (including the releases provided for herein, and the Parties' respective rights and obligations hereunder) shall become automatically effective (and may be enforced by and against each Party hereto) as of the date that all of the following have been completed (the "<u>Effective Date</u>"): (a) each Party hereto has executed and delivered this Agreement, and (b) the RSA has been executed, delivered, and is effective in accordance with its terms.

3. <u>Effect of Release</u>.

(a) Each Releasing Party understands, acknowledges, and agrees that the releases provided for herein are, subject to the limitations contained in <u>Section 1</u>, full and final general releases of all Released Claims, including those that could have been asserted in any legal or equitable proceeding against the Released Parties. Each Releasing Party hereby irrevocably covenants to refrain from, directly or indirectly, asserting or prosecuting, or assisting or otherwise aiding any other person in asserting or prosecuting, any Released Claims against any Released Party. Each Releasing Party further agrees that in the event such Releasing Party should bring a Released Claim against any Released Party this Agreement may be pleaded as a complete defense to such Released Claim; *provided* that nothing contained in this Agreement shall prevent any Releasing Party from providing information that is requested or required pursuant to law, rule,

regulation, court order, or other similar process (including, without limitation, by oral questions, interrogatories, requests for information or documents in legal or regulatory proceedings, subpoena, civil investigative demand, or other similar process).

4.    Reservation of Defenses.  Notwithstanding anything to the contrary set forth herein, each of the Releasing Parties hereby expressly reserves all of its defenses to any Released Claim that may be asserted against any of them by any other Releasing Party, including, but not limited to, any defense that this Agreement releases any such asserted claim or cause of action.

5.    Waiver of Statutory Limitations on Release.  Except as otherwise set forth herein or as prohibited by law or statute, it is the intention of each Releasing Party to extinguish all Released Claims and consistent with such intention, each Releasing Party hereby expressly waives his, her, or its rights to the fullest extent permitted by law, to any benefits of the provisions of Section 1542 of the California Civil Code ("Section 1542") or any other similar state law, federal law, or principle of common law, which may have the effect of limiting the releases set forth herein.  Section 1542 provides:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

Each Releasing Party understands that Section 1542, or a comparable statute, rule, regulation, or order of another jurisdiction, gives such Releasing Party the right not to release existing Causes of Action of which such Releasing Party is not aware, unless such Releasing Party voluntarily chooses to waive this right.  Having been so apprised, each Releasing Party nevertheless hereby voluntarily elects to and does waive the rights described in Section 1542, and all such other comparable statutes, rules, regulations, or orders, and elects to assume all risks for Released Claims that exist, existed, or may hereafter exist in its favor, known or unknown, suspected or unsuspected, arising out of or related to Released Claims or other matters purported to be released pursuant to this Agreement.

6.    Specific Performance.  Each Party recognizes and acknowledges that a breach by such Party of any of its covenants or agreements contained in this Agreement will cause the other Parties to sustain damages for which such other Parties will not have an adequate remedy at law for money damages, and, therefore, such Party agrees that, in the event of any such breach by it, the other Parties shall be able to seek the remedy of specific performance of one or more such breached covenants and agreements and injunctive and certain other equitable relief in addition to any other remedy to which such other Parties is entitled, at law or in equity.

7.    Severability.   Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

8.     Waivers.  No waiver of any of the terms or provisions of this Agreement shall be binding against any Party hereto unless such waiver is in a writing signed by such Party.

9.     Amendments.  No modification, amendment or supplement to, or forbearance or consent under or with respect to, this Agreement (including any provision hereof, or any rights or obligations hereunder or arising in connection herewith) shall be effective without the prior written consent of each affected Party.

10.     No Assignment.  This Agreement shall be binding upon the Parties and inure to the sole benefit of the Parties (including, for the avoidance of doubt, any Released Parties who are not Parties).  No Party hereto may assign any of its obligations under this Agreement without the prior written consent of all affected Parties.  Any assignment in violation of this Section 5 shall be null and void *ab initio*.

11.     Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of New York, without giving effect to principles of choice of law.  Any action, suit, or proceeding arising out of or related to this Agreement shall be brought and maintained exclusively in the state and federal courts in New York, and each Party irrevocably and unconditionally:  (a) submits to the personal jurisdiction of those courts for purposes of, and waives any defense of venue or inconvenient forum in, any such action, suit, or proceeding in those courts; (b) expressly waives any requirement for the posting of a bond by a party bringing such action, suit, or proceeding; (c) consents to process being served in any such action, suit, or proceeding by mailing, certified mail, return receipt requested, a copy thereof to such party at the address in effect for notices set forth on the signature pages hereto, and agrees that such service shall constitute good and sufficient service of process and notice thereof; *provided* that nothing in clause (c) hereof shall affect or limit any right to serve process in any other manner permitted by law, and (d) WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY SUCH ACTION, SUIT, OR PROCEEDING.

12.     Entire Agreement.  This Agreement constitutes the entire agreement among the Parties with respect to the subject matter of this Agreement and supersedes all prior agreements, arrangements, or understandings, oral or written, among the Parties with respect to the subject matter of this Agreement.

13.     Counterparts.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, and each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

14.     No Admission of Liability.  Nothing in this Agreement shall be deemed an admission of liability by any Party with respect to any of the Released Claims.

15.     Reliance and Authority.

(a)     NextPoint Entities.  With respect to any provision of this Agreement that requires or contemplates the approval, agreement, consent, or waiver of the NextPoint Entities,

each Party shall be entitled to rely on written confirmation (including by e-mail) from counsel to the NextPoint Entities that the NextPoint Entities have approved, agreed, consent to, or waived a particular matter.

(b)　　Consenting BP Lenders.  With respect to any provision of this Agreement that requires or contemplates the approval, agreement, consent, or waiver of any of the Consenting BP Lenders, each Party shall be entitled to rely on written confirmation (including by e-mail) from the applicable Credit Facility Agent or counsel to the Consenting BP Lenders that the Required Consenting BP Lenders have approved, agreed, consent to, or waived a particular matter.

(c)　　Consenting Drake CTAX Lenders.  With respect to any provision of this Agreement that requires or contemplates the approval, agreement, consent, or waiver of any of the Consenting Drake CTAX Lenders, each Party shall be entitled to rely on written confirmation (including by e-mail) from the Drake Credit Facility Agent or counsel to the Consenting Drake CTAX Lenders that the Required Consenting Drake CTAX Lenders have approved, agreed, consent to, or waived a particular matter.

16.　　Settlement Discussions.  This Agreement is part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties.  Nothing in this Agreement shall be deemed an admission of any kind.  Pursuant to Federal Rule of Evidence 408 and any Canadian law equivalent, any applicable state rules of evidence, and any other applicable law, foreign or domestic, this Agreement, and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than to prove the existence of this Agreement or in a proceeding to enforce the terms of this Agreement.

*[Remainder of page intentionally left blank.]*

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacities as officers of the undersigned and not in any other capacity, as of the date first set forth above.

**NEXTPOINT ENTITIES:**
**NEXTPOINT FINANCIAL INC.**
**NPI HOLDCO LLC**
**LT HOLDCO, LLC**
**NPLM HOLDCO LLC**
**LT HOLDCO, LLC**
**JTH TAX LLC**
**LT INTERMEDIATE HOLDCO, LLC**
**SIEMPRE TAX+ LLC**
**JTH FINANCIAL, LLC**
**JTH PROPERTIES 1632, LLC**
**LTS PROPERTIES, LLC**
**360 ACCOUNTING SOLUTIONS LLC**
**JTH COURT PLAZA, LLC**
**JTH TAX OFFICE PROPERTIES, LLC**
**LIBERTY CREDIT REPAIR, LLC**
**LOANME, LLC**
**INSIGHTSLOGIC, LLC**
**LTS SOFTWARE LLC**
**WEFILE LLC**
**CTAX ACQUISITION LLC**
**COMMUNITY TAX LLC**
**COMMUNITY TAX PUERTO RICO LLC**

By: _____
Name: Peter Kravitz
Title:   Chief Restructuring Officer

*[Signature Page to the Release Agreement]*

**CONSENTING BP NP-LIBERTY LENDERS:**

**BP COMMERCIAL FUNDING TRUST, SERIES SPL-X,**
a statutory series of BP Commercial Funding Trust, a Delaware statutory trust, for itself and for no other series of BP Commercial Funding Trust, in its capacity as BP NP-Liberty Credit Facility Agent

By: BasePoint Capital II, LLC,
not in its individual capacity but solely as Administrator of BP Commercial Funding Trust

By: *Michael C Petronio*
Name: Michael Petronio
Title:  Authorized Signatory

**BP COMMERCIAL FUNDING TRUST, SERIES SPL-X,**
a statutory series of BP Commercial Funding Trust, a Delaware statutory trust, for itself and for no other series of BP Commercial Funding Trust, in its capacity as holder of Revolving Credit Promissory Note B-1-1 under the BP NP-Liberty Credit Agreement

By: BasePoint Capital II, LLC,
not in its individual capacity but solely as Administrator of BP Commercial Funding Trust

By: *Michael C Petronio*
Name: Michael Petronio
Title:  Authorized Signatory

**BP COMMERCIAL FUNDING TRUST, SERIES SPL-X,**
a statutory series of BP Commercial Funding Trust, a Delaware statutory trust, for itself and for no other series of BP Commercial Funding Trust, in its capacity as holder of Revolving Credit Promissory Note B-1-2 under the BP NP-Liberty Credit Agreement

By: BasePoint Capital II, LLC,
not in its individual capacity but solely as Administrator of BP Commercial Funding Trust

By: *Michael C Petronio*
Name: Michael Petronio
Title:  Authorized Signatory

**BP SLL TRUST, SERIES SPL-III,**
a statutory series of BP SLL Trust, a Delaware statutory trust, for itself and for no other series of BP SLL Trust, in its capacity as holder of Promissory Note B-2 under the BP NP-Liberty Credit Agreement

By: BasePoint Administrative, LLC,
not in its individual capacity but solely as Administrator of BP SLL Trust

By: *Michael C Petronio*
Name: Michael Petronio
Title:  Authorized Signatory

**BP COMMERCIAL FUNDING TRUST,
SERIES SPL-X,**
a statutory series of BP Commercial Funding
Trust, a Delaware statutory trust, for itself and
for no other series of BP Commercial
Funding Trust, in its capacity as holder of
Term Loan Promissory Note A under the BP
NP-Liberty Credit Agreement


By: BasePoint Capital II, LLC,
not in its individual capacity but solely as
Administrator of BP Commercial Funding
Trust

By: *Michael C Petronio*
Name: Michael Petronio
Title:   Authorized Signatory

**CONSENTING BP CTAX LENDERS:**

**BP COMMERCIAL FUNDING TRUST II, SERIES SPL-I**,
a statutory series of BP Commercial Funding Trust II, a
Delaware series trust, for itself and for no other series of BP
Commercial Funding Trust II

By: BasePoint Capital II, LLC,
not in its individual capacity but solely as
Administrator of BP Commercial Funding Trust II

By: *Michael C Petronio*
Name: Michael Petronio
Title:   Authorized Signatory

**CONSENTING DRAKE CTAX LENDERS:**

**DRAKE ENTERPRISES LTD.**,
as the Drake CTAX Lender

By: _Jamie Stiles_____
Name: Jamie Stiles
Title:   Chief Executive Officer

<u>**EXHIBIT E**</u>

**Form of Stalking Horse Purchase Agreement**

PURCHASE AGREEMENT

NEXTPOINT FINANCIAL INC.

as NextPoint Parent

-and-

NPI HOLDCO LLC AND CERTAIN OF ITS SUBSIDIARIES (as set forth herein)

each as a Vendor and collectively, as the Vendors

-and-

THE LENDERS UNDER THE BP NP-LIBERTY CREDIT AGREEMENT (as defined herein)

each as a Purchaser and collectively, as the Purchasers

# TABLE OF CONTENTS

**Page**

**ARTICLE 1** INTERPRETATION ....................................................................................2
    1.1    Definitions...............................................................................................2
    1.2    Statutes.................................................................................................12
    1.3    Headings, Table of Contents, etc. ......................................................13
    1.4    Gender and Number ............................................................................13
    1.5    Currency..............................................................................................13
    1.6    Certain Phrases...................................................................................13
    1.7    Invalidity of Provisions......................................................................13
    1.8    Knowledge ..........................................................................................13
    1.9    Entire Agreement................................................................................14
    1.10   Waiver, Amendment ...........................................................................14
    1.11   Governing Law; Jurisdiction and Venue ............................................14
    1.12   Incorporation of Disclosure Letter, Schedules and Exhibits .............14
    1.13   Accounting Terms...............................................................................14
    1.14   Non-Business Days..............................................................................15
    1.15   Computation of Time Periods .............................................................15

**ARTICLE 2** PURCHASE AND SALE........................................................................15
    2.1    Agreement to Purchase and Sell ........................................................15
    2.2    Assignment of Contracts.....................................................................16
    2.3    Excluded Assets..................................................................................16
    2.4    Assumed Liabilities ............................................................................17
    2.5    Excluded Liabilities ............................................................................17
    2.6    Pre-Closing Reorganization ................................................................18

**ARTICLE 3** PURCHASE PRICE AND RELATED MATTERS....................................18
    3.1    Purchase Price .....................................................................................18
    3.2    Allocation of Purchase Price...............................................................19

**ARTICLE 4** REPRESENTATIONS AND WARRANTIES OF THE VENDORS ...................20
    4.1    Due Authorization and Enforceability of Obligations ..........................20
    4.2    Existence and Good Standing .............................................................20
    4.3    Sophisticated Parties ..........................................................................20
    4.4    Absence of Conflicts..........................................................................20
    4.5    Approvals and Consents .....................................................................21
    4.6    No Actions ..........................................................................................21
    4.7    Subsidiaries.........................................................................................21
    4.8    Title to Assets ....................................................................................21
    4.9    Taxes...................................................................................................22

**ARTICLE 5** REPRESENTATIONS AND WARRANTIES OF THE PURCHASERS.............23
    5.1    Due Authorization and Enforceability of Obligations ..........................23
    5.2    Existence and Good Standing .............................................................23
    5.3    Sophisticated Party.............................................................................23
    5.4    Absence of Conflicts..........................................................................24

ACTIVE\1601524128.8

| | | |
|---|---|---|
| 5.5 | Approvals and Consents | 24 |
| 5.6 | No Actions | 24 |
| 5.7 | Accredited Investor | 24 |
| 5.8 | Financial Ability | 25 |
| 5.9 | Credit Bid | 25 |
| 5.10 | Investment Canada Act | 25 |
| 5.11 | No Taxable Canadian Property | 25 |

**ARTICLE 6 CONDITIONS** ........25

| | | |
|---|---|---|
| 6.1 | Conditions for the Benefit of the Purchasers and the Vendors | 25 |
| 6.2 | Conditions for the Benefit of the Purchasers | 26 |
| 6.3 | Conditions for the Benefit of the Vendors | 27 |
| 6.4 | Waiver of Conditions | 28 |

**ARTICLE 7 ADDITIONAL AGREEMENTS OF THE PARTIES** ........28

| | | |
|---|---|---|
| 7.1 | Access to Information | 28 |
| 7.2 | Approvals and Consents | 29 |
| 7.3 | Covenants Relating to this Agreement | 30 |
| 7.4 | Tax Matters | 32 |
| 7.5 | Certain Payments or Instruments Received from Third Persons | 34 |
| 7.6 | Release by the Purchasers | 34 |
| 7.7 | Release by the Vendors | 34 |

**ARTICLE 8 INSOLVENCY PROVISIONS** ........35

| | | |
|---|---|---|
| 8.1 | Court Orders and Related Matters | 35 |

**ARTICLE 9 TERMINATION** ........36

| | | |
|---|---|---|
| 9.1 | Termination | 36 |
| 9.2 | Effect of Termination | 38 |
| 9.3 | Termination Fee and Expense Reimbursement | 38 |

**ARTICLE 10 CLOSING** ........39

| | | |
|---|---|---|
| 10.1 | Location and Time of the Closing | 39 |
| 10.2 | Vendors' Deliveries at Closing | 39 |
| 10.3 | Purchasers' Deliveries at Closing | 39 |
| 10.4 | Monitor | 40 |
| 10.5 | Further Assurances | 40 |

**ARTICLE 11 GENERAL MATTERS** ........40

| | | |
|---|---|---|
| 11.1 | Confidentiality | 40 |
| 11.2 | Public Notices | 41 |
| 11.3 | Injunctive Relief | 42 |
| 11.4 | Survival | 42 |
| 11.5 | Non-Recourse | 43 |
| 11.6 | Assignment; Binding Effect | 43 |
| 11.7 | Notices | 43 |
| 11.8 | Counterparts; Electronic Signatures | 46 |
| 11.9 | Language | 46 |

ACTIVE\1601524128.8

**<u>Disclosure Letter, Schedules and Exhibits</u>**

Disclosure Letter
Schedule A – Purchased CTAX Assets
Schedule B – Purchased LT Assets
Exhibit 1 – Form of Vesting Order

ACTIVE\1601524128.8

# PURCHASE AGREEMENT

**THIS AGREEMENT** is made as of July 25, 2023

**AMONG:**

NextPoint Financial Inc. ("**NextPoint Parent**")

-and-

NPI Holdco LLC ("**HoldCo**"); LT Holdco, LLC ("**LT Holdco**"); LT Intermediate Holdco, LLC ("**LT Intermediate Holdco**"); SiempreTax+ LLC ("**Siempre**"); JTH Tax LLC ("**JTH Tax**"); JTH Financial, LLC; JTH Properties 1632, LLC; JTH Tax Office Properties, LLC; Wefile LLC ("**Wefile**"); Liberty Credit Repair, LLC; LTS Properties, LLC; 360 Accounting Solutions, LLC; JTH Court Plaza, LLC; LTS Software LLC; CTAX Acquisition LLC; Community Tax LLC ("**CTAX LLC**"); and Community Tax Puerto Rico LLC ("**CTAX Puerto Rico**," and together with CTAX Acquisition LLC and CTAX LLC, collectively, the "**CTAX Entities**," and each a "**CTAX Entity**") (each, a "**Vendor**" and collectively, the "**Vendors**");

-and-

the undersigned entities as lenders under the BP NP-Liberty Credit Agreement (as defined below) (such lenders in such capacity, each, a "**Purchaser**" and collectively, the "**Purchasers**").

## RECITALS:

A.     Pursuant to the Restructuring Support Agreement dated as of the date hereof, by and among NextPoint Parent and its Subsidiaries (including each Vendor) (collectively, the "**Applicants**"), the Purchasers and any other parties signatory thereto from time to time (as amended, supplemented, or otherwise modified from time to time, the "**Support Agreement**"), the parties have negotiated the terms of a SISP to be implemented in proceedings (the "**CCAA Proceedings**") under the CCAA before the Supreme Court of British Columbia (the "**CCAA Court**").

B.     In accordance with the Support Agreement, the Applicants will seek recognition of applicable Orders in the CCAA Proceedings in ancillary insolvency proceedings under Chapter 15 of Title 11 of the United States Code (the "**U.S. Proceedings**") in the U.S. Bankruptcy Court.

C.     The Purchasers are lenders under that certain Revolving Credit Agreement, dated as of July 2, 2021, by and among Holdco, LT Holdco, NextPoint Parent, the subsidiary guarantors from time to time party thereto, the agent for the Purchasers and the lenders from time to time party thereto (as amended restated, supplemented, or otherwise modified from time to time, the "**BP NP-Liberty Credit Agreement**").

D.  The Purchasers have agreed to act as a "stalking horse" bidder and, if selected or deemed as having submitted the Successful Bid in accordance with the terms of the SISP, to purchase the Purchased Interests and the Purchased Assets and assume the Assumed Liabilities from the Vendors, pursuant to and in accordance with the terms of the SISP and subject to and in accordance with the terms and conditions of this Agreement.

**NOW THEREFORE**, the Parties agree as follows:

**ARTICLE 1**
**INTERPRETATION**

## 1.1  Definitions

"**Acquired Entity**" means LT Holdco or, if the Purchasers make the election described in Section 2.1(a)(i), LT Intermediate Holdco, as applicable.

"**Affiliate**" means, with respect to any specified Person, any other Person which, directly or indirectly, through one or more intermediaries controls, or is controlled by, or is under common control with, such specified Person (for the purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise). For greater certainty, an Affiliate of a Person shall include such Person's investment funds and managed accounts and any funds managed or directed by the same investment advisor.

"**Affiliated Group**" means any affiliated group as defined in Section 1504 of the Code that has filed a consolidated return for U.S. federal income tax purposes (or any consolidated, combined or unitary group under state, local or non-U.S. Applicable Law).

"**Agreement**" means this purchase agreement and all attachments, including the Disclosure Letter and Exhibits, in each case as the same may be supplemented, amended, restated or replaced from time to time, and the expressions "hereof", "herein", "hereto", "hereunder", "hereby" and similar expressions refer to this transaction agreement and all attached Exhibits, and unless otherwise indicated, references to Articles, Sections, the Disclosure Letter and Exhibits are to Articles, Sections, the Disclosure Letter and Exhibits in this transaction agreement.

"**Alternative Restructuring Proposal**" means any bona fide written proposal for the sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, liquidation, tender offer, recapitalization, plan of reorganization, share exchange, business combination, or similar transaction involving any one or more NextPoint Entity, one or more NextPoint Entity's material assets, or the debt, equity, or other interests in any one or more NextPoint Entity that is an alternative to or otherwise inconsistent with either or both of the LT Acquisition and the CTAX Acquisition and any amendment to or variation of any such inquiry, proposal, offer, expression of interest, bid, term sheet, discussion, or agreement, and is with a counterparty other than the Purchasers or any Affiliate of any Purchaser.

2

"**Antitrust Approvals**" means any approval, clearance, filing or expiration or termination of a waiting period pursuant to which a transaction would be deemed to be unconditionally approved in relation to the transactions contemplated hereby under any Antitrust Law of any country or jurisdiction that the Purchasers agree, acting reasonably, is required.

"**Antitrust Laws**" means all Applicable Laws, including any antitrust, competition or trade regulation laws (including the HSR Act), that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization, restraint of trade or lessening or preventing competition through merger or acquisition.

"**Applicable Law**" means any transnational, domestic or foreign, federal, provincial, territorial, state, local or municipal (or any subdivision of any of them) law (including common law and civil law), statute, ordinance, rule, regulation, restriction, limit, by-law (zoning or otherwise), judgment, order, direction or any consent, exemption, Transaction Regulatory Approval, or any other legal requirements of, or agreements with, any Governmental Authority, that applies in whole or in part to the transactions contemplated by this Agreement, the NextPoint Entities, the Purchasers, the Business, or any of the Purchased Interests, the Purchased Assets or the Assumed Liabilities.

"**Applicants**" has the meaning given to such term in Recital A.

"**Assignment Order**" means an order or orders of the CCAA Court pursuant to Section 11.3 and other applicable provisions of the CCAA, in form and substance acceptable to the Purchasers, acting reasonably, authorizing and approving the assignment of any Contract included in the Purchased Assets for which a Consent and Approval has not been obtained and preventing any counterparty to the Contract from exercising any right or remedy under the Contract by reason of any defaults arising from the CCAA Proceedings or the insolvency of the Vendors.

"**Assumed Liabilities**" has the meaning given to such term in Section 2.4.

"**BP NP-Liberty Credit Agreement**" has the meaning given to such term in Recital C.

"**Break-Up Fee**" has the meaning given to such term in Section 9.3(a)(i).

"**Business**" means the financial services businesses carried on by the Compromised LT Entities and the CTAX Entities, as applicable, as of the date hereof and as of immediately prior to the Closing.

"**Business Day**" means any day, other than a Saturday or Sunday, on which the principal commercial banks in Vancouver, British Columbia and Houston, Texas are open for commercial banking business during normal banking hours.

"**Causes of Action**" means any action, claim, cross claim, third party claim, damage, judgment, cause of action, controversy, demand, right, action, suit, obligation, liability, debt, account, defense, offset, power, privilege, license, lien, indemnity, interest, guaranty, or franchise of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or

3

unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, matured or unmatured, suspected or unsuspected, in contract or in tort, at law or in equity, or pursuant to any other theory of law or otherwise, of the applicable Acquired Entity and its Subsidiaries against any Person, in each case based in whole or in part on any act or omission, transaction, dealing or other occurrence existing or taking place on or prior to the Closing Time.

"**CCAA**" means the *Companies' Creditors Arrangement Act* (Canada).

"**CCAA Court**" has the meaning given to such term in Recital A.

"**CCAA Proceedings**" has the meaning given to such term in Recital A.

"**Closing**" means the completion of the LT Acquisition and/or the CTAX Acquisition, as applicable.

"**Closing Cash Payment**" means an amount to be determined with the Vendors which will be sufficient to pay any outstanding Priority Payables.

"**Closing Date**" means a date no later than five (5) Business Days after the conditions set forth in Article 6 to such Closing have been satisfied or waived, other than the conditions set forth in Article 6 that by their terms are to be satisfied or waived (to the extent permitted by Applicable Law) at such Closing, but subject to the satisfaction or waiver (to the extent permitted by Applicable Law) of such condition at such Closing; provided that, if there is to be a Closing hereunder, then the Closing Date for such Closing shall be no later than the Outside Date.

"**Closing Documents**" means all contracts, agreements, certificates and instruments required by this Agreement to be delivered at or before the Closing.

"**Closing Time**" means 12:01 a.m. (Vancouver time) on the Closing Date or such other time on the Closing Date as the Parties agree in writing that the Closing Time shall take place.

"**Code**" means the United States Internal Revenue Code of 1986, as amended.

"**Compromised LT Entities**" means, collectively, Siempre, JTH Tax, Wefile and such other Vendors that are Subsidiaries of the Acquired Entity as the Purchasers may designate by notice in writing delivered to the Vendors not less than three (3) Business Days prior to the Closing Date of the LT Acquisition, and "**Compromised LT Entity**" means any one of them; provided that "Compromised LT Entities" shall not include any Subsidiary that the Purchasers elect to remove as a Compromised LT Entity by notice in writing delivered to the Vendors not less than three (3) Business Days prior to the Closing Date of the LT Acquisition.

"**Confidential Information**" means non-public, confidential, personal or proprietary information which is furnished to the Purchasers or any of their Affiliates by the NextPoint Entities or any of the NextPoint Entities' representatives, including information about identifiable individuals, any information relating to the NextPoint Entities, or any customer or supplier of the NextPoint Entities, but does not include information that (a) is or becomes generally available to the public other than as a result of disclosure by any Purchaser or its representatives in breach of this Agreement, (b) is received by a Purchaser from an independent

4

third party that, to the knowledge of such Purchaser, obtained it lawfully and was under no duty of confidentiality or (c) is independently developed or acquired by a Purchaser, its Affiliates or their respective representatives without reference to any Confidential Information.

"**Consents and Approvals**" means the consents, approvals, notifications or waivers from, and filings with, third parties (including any Governmental Authority) as may be required to complete the LT Acquisition or the CTAX Acquisition, as applicable, in form and substance satisfactory to the Purchasers, acting reasonably.

"**Contracts**" means contracts, licences, leases, agreements, obligations, promises, undertakings, understandings, arrangements, documents, commitments, entitlements or engagements.

"**CTAX Acquisition**" means the sale and purchase of the Purchased CTAX Assets pursuant to this Agreement at the applicable Closing Time, and all other transactions contemplated by this Agreement that are to occur contemporaneously with the sale and purchase of the Purchased CTAX Assets.

"**CTAX Acquisition Credit Bid Amount**" has the meaning given to such term in Section 3.1(a)(ii).

"**CTAX Entity**" and "**CTAX Entities**" have the meanings given to such terms in the preamble to this Agreement.

"**CTAX LLC**" has the meaning given to such term in the preamble to this Agreement.

"**CTAX Puerto Rico**" has the meaning given to such term in the preamble to this Agreement.

"**CTAX Second Lien Debt**" means debt which is secured by a second priority lien on assets securing the Drake Credit Agreement and which is not documented by the BP CTAX Term Loan Credit Agreement, as such term is defined in the Support Agreement.

"**Cure Costs**" means amounts that must be paid, if any, in connection with the assignment and assumption of the Purchased Assets, including costs to cure any monetary defaults thereunder that are required to be cured as a condition of such assignment, subject to the CCAA as applicable, together with such other reasonable costs required to obtain any Consent and Approval, up to a maximum of $[50,000] in the aggregate.

"**DIP Financing**" means the debtor-in-possession financing facility made available to the NextPoint Entities by the Purchasers pursuant to the DIP Term Sheet.

"**DIP Term Sheet**" means the Interim Financing Term Sheet between, among others, the NextPoint Entities party thereto and the Purchasers, dated as of the date hereof, as such term sheet may be amended, restated, supplemented and/or otherwise modified in accordance with the terms thereof.

ACTIVE\1601524128.8

"**Disclosure Letter**" means the disclosure letter dated the date hereof regarding this Agreement.

"**Drake Credit Agreement**" means the Credit Agreement, dated as of June 29, 2022, by and among CTAX Acquisition LLC, the subsidiary guarantors from time to time party thereto, Drake Enterprises Ltd. as administrative agent and the lenders from time to time party thereto, as may be amended restated, supplemented, or otherwise modified from time to time.

"**Encumbrance**" means any security interest (whether contractual, statutory or otherwise), lien, prior claim, charge, hypothec, reservation of ownership, pledge, encumbrance, mortgage, trust (including any statutory, deemed or constructive trust), option or adverse claim or encumbrance of any nature or kind.

"**Equity Interests**" means any capital share, capital stock, partnership, membership, joint venture or other ownership or equity interest, participation or securities (whether voting or nonvoting, whether preferred, common or otherwise, and including share appreciation, contingent interest or similar rights) of a Person.

"**ETA**" means the *Excise Tax Act* (Canada).

"**Excluded Assets**" has the meaning given to such term in Section 2.3.

"**Excluded Contracts**" means contracts of the Compromised LT Entities or the CTAX Entities, as applicable, as specified on Schedule 2.2(c) of the Disclosure Letter.

"**Excluded Liabilities**" has the meaning given to such term in Section 2.5.

"**Expense Reimbursement**" has the meaning given to such term in Section 9.3(a)(ii).

"**Final Order**" means with respect to any order or judgment of the CCAA Court or the U.S. Bankruptcy Court, or any other court of competent jurisdiction, with respect to the subject matter addressed in the CCAA Proceedings or the U.S. Proceedings or the docket of any court of competent jurisdiction, that such order or judgement has not been vacated, set aside, reversed, stayed, modified or amended, and as to which the applicable periods to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired and no appeal, leave to appeal, or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken or filed, or as to which any appeal has been taken or any petition for certiorari or leave to appeal that has been timely filed has been withdrawn or resolved in a manner acceptable to the Vendors and the Purchasers, each acting reasonably, by the highest court to which the order or judgment was appealed or from which leave to appeal or certiorari was sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice; *provided, however*, that the possibility that a motion under Rule 60 of the United States Federal Rules of Civil Procedure, or any analogous rule under the U.S. Bankruptcy Code, may be filed relating to such order shall not cause such order to not be a Final Order.

"**Fundamental Representations and Warranties**" means the representations and warranties of the Vendors included in Sections 4.1 [*Due Authorization and Enforceability of*

*Obligations*], <u>4.2</u> [*Existence and Good Standing*], <u>4.4</u> [*Absence of Conflicts*], <u>4.5</u> [*Approvals and Consents*] and <u>4.8</u> [*Title to Assets*].

"**Governmental Authority**" means any government, regulatory authority, governmental department, agency, commission, bureau, official, minister, Crown corporation, court, board, tribunal or dispute settlement panel or other law, rule or regulation-making organization or entity (i) having or purporting to have jurisdiction on behalf of any nation, province, territory or state or any other geographic or political subdivision of any of them, or (ii) exercising, or entitled or purporting to exercise any administrative, executive, judicial, legislative, policy, regulatory or taxing authority or power.

"**GST/HST**" means all goods and services tax and harmonized sales tax imposed under Part IX of the ETA or any other statute in any jurisdiction of Canada.

"**HSR Act**" means the U.S. Hart-Scott-Rodino Antitrust Improvements Act of 1976.

"**Holdco**" has the meaning given to such term in the preamble to this Agreement.

"**IFRS**" means International Financial Reporting Standards as issued by the International Accounting Standards Board.

"**Initial CCAA Order**" means an initial order of the CCAA Court pursuant to the CCAA commencing the CCAA Proceedings, as amended, restated, supplemented and/or modified from time to time, to be sought promptly after the date hereof.

"**Insolvency Orders**" means the SISP Order, the Vesting Order, the SISP Recognition Order, and the Vesting Recognition Order.

"**Investment Canada Act**" means the *Investment Canada Act* (Canada), R.S.C., 1985, c. 28 (1st Supp).

"**JTH Tax**" has the meaning given to such term in the preamble to this Agreement.

"**Liberty Term Loan**" means the term loan debt borrowed by LT Holdco and guaranteed by certain of the other NextPoint Entities which is documented by the BP NP-Liberty Credit Agreement, as such term is defined in the Support Agreement.

"**LoanMe Entities**" means, collectively, NPLM Holdco LLC, MMS Servicing LLC, LoanMe, LLC, LoanMe Funding, LLC, LoanMe Stores LLC, LM Retention Holdings, LLC, LM BP Holdings, LLC, InsightsLogic LLC, LM 2020 CM I SPE, LLC, LoanMe Trust Prime 2018-1 and LoanMe Trust SBL 2019-1 and each of their respective predecessors and successors.

"**LT Acquisition**" means the sale and purchase of the Purchased Interests and the Purchased LT Assets pursuant to this Agreement at the applicable Closing Time, and all other transactions contemplated by this Agreement that are to occur contemporaneously with the sale and purchase of the Purchased Interests and the Purchased LT Assets.

ACTIVE\1601524128.8

"**LT Acquisition Credit Bid Amount**" has the meaning given to such term in Section 3.1(a)(i).

"**LT Holdco**" has the meaning given to such term in the preamble to this Agreement.

"**LT Intermediate Holdco**" has the meaning given to such term in the preamble to this Agreement.

"**Material Adverse Effect**" means any change, effect, event, occurrence, state of facts or development that has had, or would reasonably be expected to have, individually or in the aggregate, a material adverse effect on (i) the business, assets, liabilities, financial conditions or results of operations of the Acquired Entity and its Subsidiaries (including the Compromised LT Entities), taken as a whole, in the case of the LT Acquisition, or the CTAX Entities, taken as a whole, in the case of the CTAX Acquisition, or (ii) prevents the ability of the applicable Vendors to perform their obligations under, or to consummate the transactions contemplated by, this Agreement with respect to the LT Acquisition or the CTAX Acquisition, as applicable; provided, in the case of the foregoing clause (i), no change, effect, event, occurrence, state of facts or development resulting from the following shall constitute a Material Adverse Effect or be taken into account in determining whether a Material Adverse Effect has occurred, is occurring or would be occurring: (a) general economic or business conditions; (b) Canada, the U.S. or foreign economies, or financial, banking or securities markets in general, or other general business, banking, financial or economic conditions (including (i) any disruption in any of the foregoing markets, (ii) any change in the currency exchange rates or (iii) any decline or rise in the price of any security, commodity, contract or index); (c) acts of God or other calamities (including plagues or outbreaks of epidemics or pandemics (including the novel coronavirus)), national or international political or social conditions, including the engagement and/or escalation by the U.S. or Canada in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the U.S. or Canada or any of their territories, possessions or diplomatic or consular offices or upon any military installation, equipment or personnel of the U.S. or Canada; (d) the identity of the Purchasers or their Affiliates; (e) conditions affecting generally the industry in which the applicable NextPoint Entities participate; (f) the public announcement of, entry into or pendency of, actions required or contemplated by or performance of obligations under, this Agreement or the transactions contemplated by this Agreement, or the identity of the Parties, including any termination of, reduction in or similar adverse impact on relationships, contractual or otherwise, with any customers, suppliers, financing sources, licensors, licensees, distributors, partners, employees or others having relationships with the NextPoint Entities; (g) changes in Applicable Laws or the interpretation thereof; (h) any change in IFRS or other accounting requirements or principles; (i) national or international political, labor or social conditions; (j) the failure of the applicable NextPoint Entities to meet or achieve the results set forth in any internal projections (but not the underlying facts giving rise to such failure unless such facts are otherwise excluded pursuant to the clauses contained in this definition); or (k) any material and uncured breach by Purchaser of this Agreement, or any change resulting from compliance with the terms of, or any actions taken (or not taken) by any Party pursuant to or in accordance with, this Agreement; provided that the exceptions set forth in clauses (a), (b), (c), (e), (g), (h) or (i) shall not apply to the extent that such event is disproportionately adverse to the applicable NextPoint Entities, taken as a whole, as

8

compared to other companies in the industries in which the applicable NextPoint Entities operate.

"**Monitor**" means FTI Consulting Canada Inc., as Court-appointed monitor of the NextPoint Entities in the CCAA Proceedings pursuant to the Initial CCAA Order and not in its personal capacity.

"**Monitor's Certificate**" means the certificate delivered to the Purchasers and filed with the CCAA Court by the Monitor certifying that the Monitor has received written confirmation in form and substance satisfactory to the Monitor from the Vendors and the Purchasers that all conditions to the applicable Closing have been satisfied or waived by the applicable Parties and the LT Acquisition and/or the CTAX Acquisition, as applicable, has been completed.

"**NextPoint Entities**" has the meaning given to such term in the Support Agreement.

"**NextPoint Parent**" has the meaning given to such term in the preamble to this Agreement.

"**Order**" means any order of the Court made in the CCAA Proceedings, any order of the U.S. Court made in the U.S. Proceedings, or any order, directive, judgment, decree, injunction, decision, ruling, award or writ of any Governmental Authority.

"**Outside Date**" has the meaning given to such term in the Support Agreement.

"**Parties**" means the Vendors and the Purchasers, collectively, and "**Party**" means either the Vendors or the Purchasers, as the context requires.

"**Permitted Encumbrances**" means the Encumbrances listed in Schedule 1.1(b).

"**Person**" means includes an individual, partnership, firm, joint venture, venture capital fund, limited liability company, unlimited liability company, association, trust, entity, corporation, unincorporated association, or organization, syndicate, committee, court appointed representative, the government of a country or any political subdivision thereof, or any agency, board, tribunal, commission, bureau, instrumentality, or department of such government or political subdivision, or any other entity, howsoever designated or constituted, including any Taxing Authority, and the trustees, executors, administrators, or other legal representatives of an individual, and for greater certainty includes any Governmental Authority.

"**Post-Filing Costs**" means any amounts owing or incurred and not paid under any Contracts included in the Purchased LT Assets or the Purchased CTAX Assets, as applicable, arising on account of goods delivered and services rendered from and after the commencement of the CCAA Proceedings to but excluding the Closing Date that are permitted to be paid pursuant to the Initial CCAA Order.

"**Pre-Closing Reorganization**" has the meaning given to such term in Section 2.6.

"**Pre-Closing Tax Period**" means all taxable periods ending on or before the Closing Date.

ACTIVE\1601524128.8

"**Priority Payables**" means any Encumbrances on the Purchased Assets that rank prior to the interests of the Purchasers' security interest in the Purchased Assets, and are not otherwise an Assumed Liability, in an aggregate amount not exceeding $500,000 (the purchase of a tail directors' and officers' liability insurance policy shall be considered a Priority Payable).

"**Purchase Price**" has the meaning given to such term in Section 3.1(a).

"**Purchased Assets**" means, collectively, the Purchased LT Assets and the Purchased CTAX Assets.

"**Purchased CTAX Assets**" means all of the right, title and interest of the CTAX Entities in, to and under, or relating to, the assets, property and undertaking, owned or used or held by each of the CTAX Entities for use in, or relating to its respective Business, of whatsoever nature or kind and wherever situated, including the assets set forth in Schedule B, but excluding any Excluded Assets.

"**Purchased Entities**" means the Acquired Entity and its Subsidiaries (other than the Compromised LT Entities) and any Subsidiary of Vendors that is a Purchased Asset.

"**Purchased Interests**" has the meaning given to such term in Section 2.1(a)(i).

"**Purchased LT Assets**" means all of the right, title and interest of the Compromised LT Entities in, to and under, or relating to, the assets, property and undertaking, owned or used or held by each of the Compromised LT Entities for use in, or relating to its respective Business, of whatsoever nature or kind and wherever situated, including the assets set forth in Schedule C, but excluding any Excluded Assets.

"**Purchaser**" and "**Purchasers**" have the meanings given to such terms in the preamble to this Agreement.

"**Released Claims**" means all claims, demands, complaints, grievances, actions, applications, suits, causes of action, Orders, charges, indictments, prosecutions, informations or other similar processes, assessments or reassessments, judgments, debts, liabilities, expenses, costs, damages or losses, contingent or otherwise, whether liquidated or unliquidated, matured or unmatured, disputed or undisputed, contractual, legal or equitable, including loss of value, professional fees, including "claims" as defined in the CCAA or the U.S. Bankruptcy Code and including fees and disbursements of legal counsel on a full indemnity basis, and all costs incurred in investigating or pursuing any of the foregoing or any proceeding relating to any of the foregoing.

"**Siempre**" has the meaning given to such term in the preamble to this Agreement.

"**SISP**" means the Sale and Investment Solicitation Process substantially in the form as appended as Exhibit B of the Support Agreement or otherwise in form and substance satisfactory to the Vendors and the Purchasers, each acting reasonably.

"**SISP Order**" means an order of the CCAA Court that, among other things, approves the SISP and related matters, substantially in the form as contained in Exhibit B of the Restructuring

Term Sheet (as such term is defined in the Support Agreement), or as otherwise acceptable to the Vendors and the Purchasers, each acting reasonably.

"**SISP Recognition Order**" means the Order of the U.S. Bankruptcy Court entered in the U.S. Proceedings recognizing and giving effect to the SISP Order, which order shall be in form and substance acceptable to the Vendors and the Purchasers, each acting reasonably.

"**Straddle Period**" means any taxable period that includes (but does not end on) the Closing Date.

"**Subsidiary**" means, with respect to any Person, each Person that is controlled by the first Person (for the purposes of this definition, "control", as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise).

"**Successful Bid**" has the meaning given to such term in the SISP.

"**Support Agreement**" has the meaning given to such term in <u>Recital A</u>.

"**Tax**" and "**Taxes**" means taxes, duties, fees, premiums, assessments, imposts, levies and other charges of any kind whatsoever (including withholding on amounts paid to or by any Person) imposed by any Taxing Authority, including all interest, penalties, fines, additions to tax or other additional amounts imposed by any Taxing Authority in respect thereof, and including those levied on, or measured by, or referred to as, income, gross receipts, profits, capital, transfer, land transfer, sales, goods and services, harmonized sales, use, value-added, excise, stamp, withholding, business, franchising, escheat, unclaimed property, estimated, property, development, occupancy, employer health, payroll, employment, health, disability, severance, unemployment, social services, education and social security taxes, all surtaxes, all customs duties and import and export taxes, countervail and anti-dumping, all license, franchise and registration fees and all employment insurance, health insurance and other government pension plan premiums or contributions, and including those payable or creditable in respect of, arising out of or under any COVID-19 economic support.

"**Tax Act**" means the *Income Tax Act (Canada)* and shall also include a reference to any applicable and corresponding provisions under the income tax laws of a province or territory of Canada, as applicable.

"**Tax Return**" means any return, declaration, report, statement, information statement, form, election, amendment, claim for refund, schedule or attachment thereto or other document filed or required to be filed with a Taxing Authority with respect to Taxes.

"**Taxing Authority**" means His Majesty the King in right of Canada, His Majesty the King in right of any province or territory of Canada, the Canada Revenue Agency, any similar revenue or taxing authority of Canada and each and every province or territory of Canada and any political subdivision thereof, the United States Internal Revenue Service, any similar revenue or taxing authority of the U.S. and each and every state and locality of the U.S., and any

Canadian, U.S. or other Governmental Authority exercising taxing authority or power, and "Taxing Authority" means any one of the Taxing Authorities.

"**Transaction Regulatory Approvals**" means any material licenses, permits or approvals required from any Governmental Authority or under any Applicable Laws relating to the business and operations of the applicable NextPoint Entities that would be required to be obtained in order to permit the Vendors and the Purchasers to complete the transactions contemplated by this Agreement and the Support Agreement, including but not limited to, and in each case to the extent it has been agreed to in accordance this Agreement that such approval shall be obtained, the Antitrust Approvals.

"**Transfer Taxes**" means all transfer, documentary, sales, use, stamp, registration, customs duties, import and export taxes, surtaxes, value added, GST/HST, provincial sales/retail Taxes, conveyance fees, security interest filing or recording fee and any other similar Taxes (including any real property transfer Tax and any other similar Tax), any governmental assessment, and any related penalties and interest.

"**U.S.**" means the United States of America.

"**U.S. Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101 et seq, as amended.

"**U.S. Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware, overseeing the U.S. Proceedings.

"**U.S. Proceedings**" has the meaning given to such term in <u>Recital B</u>.

"**Vendor**" and "**Vendors**" have the meanings given to such terms in the preamble to this Agreement.

"**Vesting Order**" means an order of the CCAA Court substantially in the form of Exhibit 1 hereto (or as otherwise acceptable to the Vendors and the Purchasers, each acting reasonably).

"**Vesting Recognition Order**" means an order of the U.S. Bankruptcy Court entered in the U.S. Proceedings in form and substance acceptable to the Purchasers, acting reasonably, which shall, among other things, recognize and give effect to the Vesting Order and otherwise approve this Agreement and the transactions contemplated hereby.

"**Wefile**" has the meaning given to such term in the preamble to this Agreement.

## 1.2    Statutes

Except as otherwise provided in this Agreement, any reference in this Agreement to a statute refers to such statute and all rules and regulations made under it, as it or they may have been or may from time to time be amended, re-enacted or replaced.

ACTIVE\1601524128.8

### 1.3 Headings, Table of Contents, etc.

The provision of a table of contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenient reference only and do not affect the interpretation of this Agreement. The recitals to this Agreement are an integral part of this Agreement.

### 1.4 Gender and Number

In this Agreement, unless the context otherwise requires, words importing the singular include the plural and *vice versa*, and words importing gender include all genders.

### 1.5 Currency

Except where otherwise expressly provided, all amounts in this Agreement are stated and shall be paid in U.S. dollars. References to "$" are to U.S. dollars. References to "C$" are to Canadian dollars.

### 1.6 Certain Phrases

In this Agreement (i) the words "including", "includes" and "include" and any derivatives of such words mean "including (or includes or include) without limitation" and (ii) the words "the aggregate of", "the total of", "the sum of", or a phrase of similar meaning means "the aggregate (or total or sum), without duplication, of". The expression "Article", "Section" and other subdivision followed by a number, mean and refer to the specified Article, Section or other subdivision of this Agreement.

### 1.7 Invalidity of Provisions

Each of the provisions contained in this Agreement is distinct and severable and a declaration of invalidity or unenforceability of any such provision or part thereof by a court of competent jurisdiction shall not affect the validity or enforceability of any other provision hereof so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon (i) such a determination of invalidity or unenforceability or (ii) any change in Applicable Law or other action by any Governmental Authority which materially detracts from the legal or economic rights or benefits, or materially increases the obligations, of any Party or any of its Affiliates under this Agreement, the Parties shall negotiate to modify this Agreement in good faith so as to effect the original intent of the Parties as closely as possible in an acceptable manner so that the transactions contemplated by this Agreement be consummated as originally contemplated to the fullest extent possible.

### 1.8 Knowledge

Any reference to the knowledge of (i) a Vendor, means the actual knowledge, after reasonable inquiry, of Scott Terrell, and (ii) a Purchaser, means the actual knowledge, after reasonable inquiry, of [Eric Schneider].

## 1.9    Entire Agreement

This Agreement, the Disclosure Letter, the Support Agreement and the agreements and other documents required to be delivered pursuant to this Agreement or the Support Agreement, constitute the entire agreement among the Parties, and set out all the covenants, promises, warranties, representations, conditions and agreements among the Parties in connection with the subject matter of this Agreement, and supersede all prior agreements, understandings, negotiations and discussions, whether oral or written, pre-contractual or otherwise. There are no covenants, promises, warranties, representations, conditions, understandings or other agreements, whether oral or written, pre-contractual or otherwise, express, implied or collateral among the Parties in connection with the subject matter of this Agreement, except as specifically set forth in this Agreement or the Support Agreement and any document required to be delivered pursuant to this Agreement or the Support Agreement.

## 1.10    Waiver, Amendment

Except as expressly provided in this Agreement, no amendment or waiver of this Agreement shall be binding unless executed in writing by all Parties hereto. No waiver of any provision of this Agreement shall constitute a waiver of any other provision nor shall any waiver of any provision of this Agreement constitute a continuing waiver unless otherwise expressly provided.

## 1.11    Governing Law; Jurisdiction and Venue

This Agreement, the rights and obligations of the Parties under this Agreement, and any claim or controversy directly or indirectly based upon or arising out of this Agreement or the transactions contemplated by this Agreement (whether based on contract, tort or any other theory), including all matters of construction, validity and performance, shall in all respects be governed by, and interpreted, construed and determined in accordance with, the laws of the Province of British Columbia and the federal laws of Canada applicable therein, without regard to the conflicts of law principles thereof. The Parties consent to the jurisdiction and venue of the CCAA Court for the resolution of any such disputes arising under this Agreement. Each Party agrees that service of process on such Party as provided in <u>Section 11.7</u> shall be deemed effective service of process on such Party.

## 1.12    Incorporation of Disclosure Letter, Schedules and Exhibits

The Disclosure Letter and any schedule or exhibit attached thereto, and any schedule or exhibit attached to this Agreement, is an integral part of this Agreement.

## 1.13    Accounting Terms

All accounting terms used in this Agreement are to be interpreted in accordance with IFRS unless otherwise specified.

ACTIVE\1601524128.8

### 1.14 Non-Business Days

Whenever payments are to be made or an action is to be taken on a day which is not a Business Day, such payment will be made or such action will be taken on or not later than the next succeeding Business Day.

### 1.15 Computation of Time Periods

If any action may be taken within, or any right or obligation is to expire at the end of, a period of days under this Agreement, then the first day of the period is not counted, but the day of its expiry is counted.

**ARTICLE 2**
**PURCHASE AND SALE**

### 2.1 Agreement to Purchase and Sell

(a) Upon and subject to the terms and conditions of this Agreement, at the Closing and effective as of the Closing Time, and subject to, as applicable, the completion of the Pre-Closing Reorganization required to be completed prior to the Closing Time, the Vendors hereby agree to sell, assign and transfer to the Purchasers and the Purchasers agree to purchase from the Vendors, all of the Vendors' right, title and interest in and to:

    (i) all of the Equity Interests of LT Holdco or, if the Purchasers so elect by notice in writing delivered to the Vendors not less than ten (10) Business Days prior to the Closing Date of the LT Acquisition, all of the Equity Interests of LT Intermediate Holdco (which Equity Interests of LT Intermediate Holdco shall, for greater certainty, in the event of such election be acquired in lieu of the Equity Interests of LT Holdco) (as applicable, the "**Purchased Interests**");

    (ii) the Purchased LT Assets; and

    (iii) the Purchased CTAX Assets,

in each case free and clear of all Encumbrances other than the Permitted Encumbrances. Upon and subject to the terms and conditions of this Agreement and the SISP, this Agreement may be the Successful Bid (as determined pursuant to the SISP) with respect to solely the LT Acquisition or the CTAX Acquisition, or with respect to both the LT Acquisition and the CTAX Acquisition.

(b) At any time prior to the applicable Closing, the Purchasers may remove any property, asset, right or Contract as a Purchased Asset, upon notification to the Vendors in writing together with the applicable amended Schedule reflecting such removal; provided, however, that there shall be no reduction in the Purchase Price as a result of such removal.

15

**2.2     Assignment of Contracts**

(a)     Subject to the terms and conditions of this Agreement, at the applicable Closing Time, the Vendors shall assign to the Purchasers all of the Vendors' rights, benefits and interests in and to any Contracts included in the Purchased LT Assets or the Purchased CTAX Assets, as applicable, and the Purchasers shall, on the terms and subject to the conditions set forth in such Contracts, assume the obligations and liabilities of the Vendors under such Contracts at, and arising after, the Closing Time (including Cure Costs but excluding Post-Filing Costs). Notwithstanding the foregoing, this Agreement and any document delivered under this Agreement shall not constitute an assignment or an attempted assignment of any Purchased Asset contemplated to be assigned to the Purchasers under this Agreement that is not assignable without the Consent and Approval of a third party unless (i) such Consent and Approval has been obtained or (ii) the assignment has been ordered by the CCAA Court.

(b)     Prior to the application for the Vesting Order, the Vendors shall use their commercially reasonable efforts to obtain any Consent and Approval necessary for the assignment of any Contracts included in the Purchased Assets to the Purchasers. No Vendor shall agree to pay any amount, provide other consideration or otherwise grant any accommodation in connection with obtaining such Consent and Approval without Purchasers' prior written consent. The Purchasers shall provide their reasonable cooperation to assist the Vendors in obtaining any such Consents and Approvals.

(c)     To the extent any Consent and Approval necessary for the assignment of any Contract included in the Purchased Assets to the Purchasers is not obtained prior to the application for the Vesting Order, the Vendors shall bring an application to the CCAA Court for approval of the Assignment Order and, if required, to the U.S. Bankruptcy Court for recognition.

**2.3     Excluded Assets**

Notwithstanding any provision of this Agreement to the contrary, as of the Closing, the Purchased Assets shall not include any of the following assets of the Vendors or their respective Subsidiaries or any other assets as set forth on <u>Schedule 2.3</u> of the Disclosure Letter, which Schedule may be modified as agreed upon by the Vendors and the Purchasers, each acting reasonably, at least three (3) days prior to the applicable Closing (collectively, the "**Excluded Assets**"):

(a)     the Tax records and returns, and books and records pertaining thereto and other documents, in each case, to the extent related to any of the Excluded Liabilities or Taxes paid by NextPoint Parent or any Vendor, provided that the Purchasers may take copies of all Tax records and books and records pertaining to such records (as redacted, if applicable) to the extent necessary or useful for the carrying on of the Business that has been acquired by the Purchasers after the applicable Closing, including the filing of any Tax Return;

16

(b)     the Excluded Contracts;

(c)     all communications, information or records, written or oral, that are in any way related to (i) the transactions contemplated by this Agreement, (ii) the sale of the Purchased Interests or the Purchased Assets, (iii) any Excluded Asset or (iv) any Excluded Liability;

(d)     the equity interests of each entity set forth on <u>Schedule 2.3(d)</u>, which Schedule may be modified as agreed upon by the Vendors and the Purchasers, each acting reasonably, at least three (3) days prior to the applicable Closing;

(e)     escrowed cash (i) in the amount of $600,000 for wind down, and (ii) for professional fee retainers held in the segregated escrow bank account set forth in the DIP Term Sheet;

(f)     personal information that cannot be transferred without violating law; and

(g)     claims and/or causes of actions solely and directly related to Excluded Assets or the Excluded Liabilities.

**2.4     Assumed Liabilities**

The Purchasers shall assume and perform, discharge and pay when due the following obligations and liabilities of the Vendors (the "**Assumed Liabilities**") on and after the Closing Date:

(a)     all debts, liabilities and obligations under the Contracts (to the extent assigned or transferred to the Purchasers on such Closing) for the period from and after the applicable Closing Date and all Cure Costs (other than Post-Filing Costs);

(b)     all Taxes to be borne by the Purchasers pursuant to <u>Section 7.4</u>;

(c)     all debts, liabilities and obligations arising from ownership and use of the Purchased Assets transferred to the Purchasers on such Closing for the period from and after the Closing Date; and

(d)     the Liberty Term Loan.

**2.5     Excluded Liabilities**

Except as expressly assumed pursuant to or specifically contemplated by <u>Section 2.4</u>, the Purchasers shall not assume and shall not be liable, directly or indirectly, or otherwise responsible for any claims, debts, obligations, or liabilities of the Vendors or any predecessors of the Vendors, of any kind or nature, including, for the avoidance of doubt, any Taxes to be borne by the Vendors pursuant to <u>Section 7.4</u> (collectively, the "**Excluded Liabilities**").  For the avoidance of any doubt, any CTAX Second Lien Debt is an Excluded Liability.

17

**2.6     Pre-Closing Reorganization**

In the event that the Purchasers elect to acquire the Equity Interests of LT Intermediate Holdco in accordance with <u>Section 2.1(a)(i)</u> then, on or prior to the Closing Date for the LT Acquisition, the Vendors shall effect a pre-closing reorganization (the "**Pre-Closing Reorganization**") to transfer all of the Equity Interests of the Compromised LT Entities to LT Holdco.

**ARTICLE 3**
**PURCHASE PRICE AND RELATED MATTERS**

**3.1     Purchase Price**

(a)     The purchase price (the "**Purchase Price**") payable by the Purchasers shall be:

   (i)     $[75,000,000] (the "**LT Acquisition Credit Bid Amount**") for the Purchased Interest and the Purchased LT Assets;

   (ii)     an amount equal to the outstanding obligations owing pursuant to the DIP Financing, including the principal amount of such claims and interest and fees accrued as of the Closing Date for the CTAX Acquisition, up to a maximum of $[25,000,000] (the "**CTAX Acquisition Credit Bid Amount**") for the Purchased CTAX Assets;

   (iii)     the Closing Cash Payment; and

   (iv)     the assumption of the Assumed Liabilities as set forth herein.

(b)     Each Purchaser shall satisfy the obligations pursuant to <u>Section 3.1</u> and the Purchase Price as follows:

   (i)     at the Closing Time for the LT Acquisition:

      (A)     in respect of the LT Acquisition Credit Bid Amount, by causing the release of the applicable NextPoint Entities from amounts outstanding and obligations owing pursuant to any and all Revolving Credit Loans (as such term is defined in the BP NP-Liberty Credit Agreement) outstanding under the BP NP-Liberty Credit Agreement, including the principal amount of such claims and interest and fees accrued as of the Closing Date for the LT Acquisition, and any other documents or agreements entered into therewith, in an aggregate amount equal to the LT Acquisition Credit Bid Amount; and

      (B)     by the assumption by the Purchasers of the Assumed Liabilities associated with the Purchased LT Assets; and

   (ii)     at the Closing Time for the CTAX Acquisition:

(A)     in respect of the CTAX Acquisition Credit Bid Amount, by causing the release of the applicable NextPoint Entities from amounts outstanding and obligations owing pursuant to the DIP Financing, including the principal amount of such claims and interest and fees accrued as of the Closing Date for the CTAX Acquisition, in an aggregate amount equal to the CTAX Acquisition Credit Bid Amount; and

(B)     by the assumption by the Purchasers of the Assumed Liabilities associated with the Purchased CTAX Assets.

(c)     The Purchasers and their Affiliates, on the one hand, and the Vendors, and any of their Affiliates, on the other hand, shall be entitled to deduct and withhold from the Purchase Price or other amounts otherwise payable pursuant to this Agreement such amounts as such Person is required to deduct and withhold under Applicable Law, provided, however, that the Purchasers and their Affiliates shall not make any such deduction or withholding pursuant to Section 1445 of the Code, as long as at Closing, the Vendors shall have delivered to the Purchasers certification required by Section 10.2(e). Before making any such deduction or withholding, the withholding agent shall use commercially reasonable efforts to provide the Person in respect of which deduction or withholding is proposed to be made reasonable advance written notice of the intention to make such deduction or withholding, and the withholding agent shall cooperate with any reasonable request from such Person to obtain reduction of or relief from such deduction or withholding to the extent permitted by Applicable Law. To the extent that amounts are so deducted and withheld and remitted to the appropriate Taxing Authority, such amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding was made.

## 3.2    Allocation of Purchase Price

The Vendors and the Purchasers agree that the allocation of the Purchase Price among the Purchased Interests and each of the classes of the Purchased Assets of each of the Vendors shall be determined by the Purchasers, acting reasonably, on a date no later than five (5) Business Days before the applicable Closing Date. Each of the Vendors and the Purchasers shall report the sale and purchase of the Purchased Interests and the Purchased Assets for all tax purposes in a manner consistent with such allocation, and will complete all tax returns, designations and elections in a manner consistent with such allocation and otherwise follow such allocation for all tax purposes on and subsequent to each Closing Date and may not take any position inconsistent with such allocation.   Purchasers shall take into account Vendors' reasonable comments regarding such allocation.

ACTIVE\1601524128.8

# ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF THE VENDORS

Each of the Vendors represents and warrants, severally and not jointly, and only as to itself, to the Purchasers as follows, and acknowledge that the Purchasers are relying upon the following representations and warranties in connection with their purchase of the Purchased Interests and the Purchased Assets:

## 4.1    Due Authorization and Enforceability of Obligations

This Agreement has been duly authorized, executed and delivered by it, and, subject to the granting of the SISP Order and the SISP Recognition Order, this Agreement constitutes the legal, valid and binding obligation of it, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

## 4.2    Existence and Good Standing

It is validly existing and in good standing under the laws of the jurisdiction of its incorporation or organization and, subject to the granting of the SISP Order and the SISP Recognition Order, (i) has all requisite power and authority to execute and deliver this Agreement and (ii) has taken all requisite corporate or other action necessary for it to execute and deliver this Agreement and to perform its obligations hereunder and consummate the transaction contemplated hereunder.

## 4.3    Sophisticated Parties

It (i) is a sophisticated party with sufficient knowledge and experience to evaluate properly the terms and conditions of this Agreement, (ii) has conducted its own analysis and made its own decision to enter into this Agreement and has obtained such independent advice in this regard as it deemed appropriate, and (iii) has not relied on such analysis or decision of any Person other than its own independent advisors.

## 4.4    Absence of Conflicts

Subject to the granting of the SISP Order and the SISP Recognition Order, the execution and delivery of this Agreement by the Vendor and the completion by the Vendor of its obligations hereunder and the consummation of the transactions contemplated herein do not and will not violate or conflict with any Applicable Law, or any of its properties or assets (subject to the receipt of any Transaction Regulatory Approvals), and will not result (with due notice or the passage of time or both) in a violation, conflict or breach of, or constitute a default under, or require any consent to be obtained under its certificate of incorporation, articles, by-laws or other constituent documents. Subject to the granting of the SISP Order and the SISP Recognition Order, and the receipt of any Transaction Regulatory Approvals, the execution, delivery and performance by the Vendor does not and will not: (a) violate any provision of law, rule, or regulation applicable to it or its charter or by-laws (or other similar governing documents) or those of any of its Subsidiaries; (b) except for the BP NP-Liberty Credit Agreement, conflict

20

with, result in a breach of, or constitute (with or without notice or lapse of time or both) a default under any material agreement to which the Vendor is a party or any debt for borrowed money to which it is a party that, in any case, is not remedied, cured or waived, or (c) violate any Order, statute, rule, or regulation.

**4.5     Approvals and Consents**

The execution and delivery of this Agreement by the Vendor, the completion by the Vendor of its obligations hereunder and the consummation by the Vendor of the transactions contemplated herein, do not and will not require any consent or approval or other action, with or by, any Governmental Authority, other than the Insolvency Orders and as contemplated by the SISP Order and the Transaction Regulatory Approvals.

**4.6     No Actions**

Other than the CCAA Proceedings and the U.S. Proceedings, there is not pending or, to the Vendor's knowledge, threatened in writing against the Vendor or any of its properties, nor has the Vendor received any written notice in respect of, any claim, litigation, action, suit, arbitration, investigation or other proceeding before any Governmental Authority or legislative body that, would prevent it from executing and delivering this Agreement, performing its obligations hereunder, and consummating the transactions and agreements contemplated by this Agreement.

**4.7     Subsidiaries**

Schedule 4.7 sets forth a complete and correct list of the name and jurisdiction of organization of each Vendor and each of the direct and indirect Subsidiaries of each of LT Holdco and LT Intermediate Holdco. All the outstanding Equity Interests of LT Holdco are owned by Holdco, all the outstanding Equity Interests of LT Intermediate Holdco are owned by LT Holdco, and all of the outstanding Equity Interests of their respective Subsidiaries set forth in Schedule 4.7 are owned by LT Holdco or LT Intermediate Holdco, as applicable, or by one or more of their respective Subsidiaries. All such Equity Interests of LT Intermediate Holdco, LT Holdco and their respective Subsidiaries are owned free and clear of all pledges, claims, liens, charges, options, security interests, licenses or other encumbrances of any kind or nature whatsoever (other than Permitted Encumbrances), except for transfer restrictions imposed by applicable securities laws, and, except as would not be material to the applicable Vendors, taken as a whole, are duly authorized, validly issued, fully paid and nonassessable and not subject to any pre-emptive rights. Except for the Equity Interests in the Subsidiaries listed on Schedule 4.7, neither LT Holdco nor LT Intermediate Holdco owns, directly or indirectly, any Equity Interests in, any Person.

**4.8     Title to Assets**

Except as disclosed in the Disclosure Letter:

(a)      each Vendor has good and valid title to all of the Purchased Assets and the Purchased Interests owned by it, and subject to the Vesting Order and the Vesting

21

Recognition Order, will convey good and valid title, free and clear of all Encumbrances other than Permitted Encumbrances; and

(b)     at the Closing, the Acquired Entity and its Subsidiaries will have good and valid title to all of their owned assets, free and clear of all Encumbrances other than Permitted Encumbrances.

## 4.9     Taxes

(a)     Each of the Vendors with respect to the Purchased Assets and the Business and each of the Purchased Entities has duly and timely filed all Tax Returns required to be filed by or with respect to it under applicable Laws, and all such Tax Returns are true, complete and correct in all respects and have been prepared in compliance with all applicable Laws.

(b)     Each of the Vendors with respect to the Purchased Assets and the Business and each of the Purchased Entities has timely paid all Taxes, including all installments on account of Taxes for the current year, due and owing by it (whether or not such Taxes are related to, shown on or required to be shown on any Tax Return), and has timely withheld or deducted and paid over to the appropriate Taxing Authority all Taxes which it is required to withhold or deduct from amounts paid or owing or deemed paid or owing or benefits given to any employee, stockholder, creditor or other Third Party, including for services performed outside the city, state, province or country where any employee is based.

(c)     None of the Vendors with respect to the Purchased Assets and the Business nor any of the Purchased Entities has (i) waived any statute of limitations with respect to any Taxes or agreed to any extension of time for filing any Tax Return or (ii) consented to any extension of time with respect to any Tax assessment or deficiency, which waiver or extension of time is currently outstanding.

(d)     No Tax audits or assessments or administrative or judicial claims are pending or are threatened in writing with respect to the Purchased Assets, the Business, or any of the Purchased Entities, and there are no matters under discussion, audit or appeal with any Taxing Authority with respect to Taxes of any Purchased Entity.

(e)     There are no Encumbrances on any of the Purchased Assets or any assets of any Purchased Entity that arose in connection with any failure (or alleged failure) to pay any Tax.

(f)     No claim has ever been made by a Taxing Authority in a jurisdiction where the Vendors or Purchased Entities do not file Tax Returns that the Vendors or any of the Purchased Entities is or may be subject to taxation by that jurisdiction, which claim has not been resolved, and none of the Purchased Entities has a taxable presence or nexus other than in the jurisdictions in which it currently files Tax Returns.

22

(g)     None of the Purchased Entities (i) has been a member of an Affiliated Group, (ii) has any liability or obligation for the Taxes of any Person other than itself under Section 1.1502-6 of the Treasury Regulations (or any similar provision of U.S. state or local or non-U.S. Law), as a transferee or successor, by Contract or otherwise, or (iii) is party to or bound by or has any obligations under any Tax allocation, Tax sharing, Tax indemnification or other similar Contract (other than any such Contract entered into in the ordinary course and the principal purpose of which is not the allocation or sharing of Taxes).

(h)     No Purchased Entity has engaged in any "listed transaction" within the meaning of Sections 6111 and 6112 of the Code or any similar provisions of U.S. state or local or non-U.S. Law or any "tax shelter" within the meaning of Section 6662 of the Code or the Treasury Regulations promulgated thereunder (or any similar provision of applicable U.S. state or local or non-U.S. Law).

(i)     Each Purchased Entity is, and has been since its formation, properly classified as a disregarded entity for U.S. federal income tax and applicable state and local tax purposes.

# ARTICLE 5
# REPRESENTATIONS AND WARRANTIES OF THE PURCHASERS

Each Purchaser represents and warrants, severally and not jointly, and only as to itself, to the NextPoint Parent and the Vendors as follows, and acknowledges that the NextPoint Parent and the Vendors are relying upon the following representations and warranties in connection with the sale of the Purchased Interests and the Purchased Assets:

## 5.1     Due Authorization and Enforceability of Obligations

This Agreement has been duly authorized, executed and delivered by such Purchaser, and, assuming the due authorization, execution and delivery by it, this Agreement constitutes the legal, valid and binding obligation of it, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

## 5.2     Existence and Good Standing

Such Purchaser is validly existing and in good standing under the laws of the jurisdiction of its incorporation or organization and has all requisite power and authority to execute and deliver this Agreement and to perform its obligations hereunder and consummate the transactions contemplated by this Agreement.

## 5.3     Sophisticated Party

Such Purchaser (i) is a sophisticated party with sufficient knowledge and experience to evaluate properly the terms and conditions of this Agreement, (ii) has conducted its own analysis and made its own decision to enter into this Agreement and has obtained such independent

ACTIVE\1601524128.8

advice in this regard as it deemed appropriate, and (iii) has not relied on such analysis or decision of any Person other than its own independent advisors.

**5.4 Absence of Conflicts**

The execution and delivery of this Agreement by such Purchaser and the completion by such Purchaser of its obligations hereunder and the consummation of the transactions contemplated herein do not and will not violate or conflict with any Applicable Law, or any of its properties or assets, (subject to the receipt of any Transaction Regulatory Approvals) and will not result (with due notice or the passage of time or both) in a violation, conflict or breach of, or constitute a default under, or require any consent to be obtained under its certificate of incorporation, articles, by-laws or other constituent documents.

**5.5 Approvals and Consents**

The execution and delivery of this Agreement by the Purchaser, the completion by such Purchaser of its obligations hereunder and the consummation by such Purchaser of the transactions contemplated herein, do not and will not require any consent or approval or other action, with or by, any Governmental Authority, other than as contemplated by any Order and the Transaction Regulatory Approvals.

**5.6 No Actions**

There is not, as of the date hereof, pending or, to such Purchaser's knowledge, threatened against it or any of its properties, nor has such Purchaser received notice in respect of, any claim, potential claim, litigation, action, suit, arbitration, investigation or other proceeding before any Governmental Authority or legislative body that, would prevent it from executing and delivering this Agreement, performing its obligations hereunder and consummating the transactions and agreements contemplated by this Agreement.

**5.7 Accredited Investor**

Such Purchaser is an "accredited investor", as such term is defined in National Instrument 45-106 - *Prospectus Exemptions* and in Rule 501 of Regulation D under the United States Securities Act of 1933 (the "**Securities Act**") and it was not created or used solely to purchase or hold securities as an accredited investor as described in paragraph (m) of the definition of "accredited investor" in National Instrument 45-106 - *Prospectus Exemptions* and acknowledges that the Purchased Interests will be subject to resale restrictions under applicable securities laws. The Purchased Interests are being acquired by such Purchaser for its own account, and not with a view to, or for the offer or sale in connection with, any public distribution or sale of the Purchased Interests or any interest in them. Such Purchaser has sufficient knowledge and experience in financial and business matters to be capable of evaluating the merits and risks of its acquisition of the Purchased Interests, and such Purchaser is capable of bearing the economic risks of such acquisition. Such Purchaser acknowledges that the Purchased Interests are not registered under the Securities Act, any state securities law, regulation or rule or any applicable foreign securities law, regulation or rule, and agrees that the Purchased Interests may not be sold, transferred, offered for sale, pledged, hypothecated or otherwise disposed of except pursuant to a

registered offering in compliance with, or in a transaction exempt from, the registration requirements of the Securities Act and any other applicable state and foreign securities laws.

**5.8    Financial Ability**

Such Purchaser has and will have at all relevant times, the financial ability and sufficient funds to perform all of its obligations under this Agreement, and the availability of such funds will not be subject to the consent, approval or authorization of any Person or the availability of any financing.

**5.9    Credit Bid**

Such Purchaser has executed, on or prior to the date hereof, the requisite instruction letters to fully authorize the Purchasers, and the Purchaser is duly authorized, to, among other things, deliver the consideration set forth in Sections 3.1(a)(i) and 3.1(a)(ii), as applicable, in connection with the consummation of the applicable Closing hereunder.

**5.10    Investment Canada Act**

Such Purchaser is a "trade agreement investor" within the meaning of the Investment Canada Act.

**5.11    No Taxable Canadian Property**

None of the Purchased Interests or Purchased Assets is "taxable Canadian property" as defined in the Tax Act.

**ARTICLE 6**
**CONDITIONS**

**6.1    Conditions for the Benefit of the Purchasers and the Vendors**

The respective obligations of each Purchaser and each Vendor to consummate the LT Acquisition and the CTAX Acquisition, as applicable, contemplated by this Agreement are subject to the satisfaction of, or compliance with, at or prior to the applicable Closing Time, each of the following conditions:

(a)    *No Law* – no provision of any Applicable Law and no judgment, injunction or Order shall have been enacted, announced, issued or entered by any Governmental Authority of competent jurisdiction that prevents, restrains, enjoins, renders illegal or otherwise prohibits the consummation of the LT Acquisition or the CTAX Acquisition, as applicable;

(b)    *Final Orders* – each of the SISP Order and the Vesting Order shall have been issued and entered and shall be a Final Order;

(c) *Final U.S. Order* – each of the SISP Recognition Order and Vesting Recognition Order shall have been issued and entered by the U.S. Bankruptcy Court and shall be a Final Order; and

(d) *Transaction Regulatory Approvals* – the Vendors and the Purchasers shall have received all required Transaction Regulatory Approvals, and all required Transaction Regulatory Approvals shall be in full force and effect, except for Transaction Regulatory Approvals that need not be in full force and effect prior to Closing.

The Parties acknowledge that the foregoing conditions are for the mutual benefit of each Purchaser and each Vendor. The Parties acknowledge, for the avoidance of doubt, that it shall not be a condition to completion of the LT Acquisition that the CTAX Acquisition shall have been completed prior to or concurrently therewith.

## 6.2 Conditions for the Benefit of the Purchasers

The obligation of any Purchaser to consummate the LT Acquisition and the CTAX Acquisition, as applicable, is subject to the satisfaction of, or compliance with, or waiver (to the extent permitted by Applicable Law) by any Purchaser of, at or prior to the applicable Closing Time, each of the following conditions (each of which is acknowledged to be for the exclusive benefit of each Purchaser):

(a) *Performance of Covenants* – the covenants contained in this Agreement required to be performed or complied with by the Vendors at or prior to the Closing Time shall have been performed or complied with in all material respects as at the Closing Time;

(b) *Truth of Representations and Warranties* – (i) the Fundamental Representations and Warranties of the Vendors shall be true and correct in all respects (other than de minimis inaccuracies) as of the date hereof and as of the applicable Closing Date, as if made at and as of such date (except for representations and warranties made as of specified date, the accuracy of which shall be determined as of such specified date) and (ii) all other representations and warranties of the Vendors contained in Article 4 shall be true and correct in all respects as of the date hereof and as of the applicable Closing Date, as if made at and as of such date (except for representations and warranties made as of specified date, the accuracy of which shall be determined as of such specified date) except where the failure to be so true and correct would not, in the aggregate, have a Material Adverse Effect (and, for this purpose, any reference to "material", "Material Adverse Effect" or other concepts of materiality in such representation and warranties shall be ignored);

(c) *Officer's Certificates* – the Purchasers shall have received a certificate confirming the satisfaction of the conditions contained in Sections 6.2(a) (*Performance of Covenants*), 6.2(b) (*Truth of Representations and Warranties*) and 6.2(d) (*No Material Adverse Effect*), signed for and on behalf of the Vendors without personal liability by an executive officer of each of the applicable Vendors or

26

other Persons acceptable to the Purchasers, in each case in form and substance reasonably satisfactory to the Purchasers;

(d) *No Material Adverse Effect* – since the date hereof, no Material Adverse Effect shall have occurred;

(e) *Vendors' Deliverables* – the Vendors shall have delivered to the Purchasers all of the deliverables contained in <u>Section 10.2</u> in form and substance reasonably satisfactory to the Purchasers;

(f) *Vesting Order Approval* – the Vesting Order shall have been granted by the applicable date set forth in Section 4(b)(iv) of the Support Agreement;

(g) *CTAX Acquisition* – in respect of the Closing of the CTAX Acquisition only, the LT Acquisition shall have been determined to constitute a Successful Bid pursuant to the SISP; and

(h) *Pre-Closing Reorganization* – the applicable Vendors shall have completed the Pre-Closing Reorganization that is required to be completed prior to such Closing, in form and substance reasonably acceptable to the Purchasers.

For the avoidance of doubt, the Closing of the CTAX Acquisition and the determination that the CTAX Acquisition constitutes a Successful Bid pursuant to the SISP shall not be conditions to the obligation of the Purchasers to consummate the LT Acquisition.

**6.3      Conditions for the Benefit of the Vendors**

The obligation of the Vendors to consummate the LT Acquisition and the CTAX Acquisition, as applicable, is subject to the satisfaction of, or compliance with, or waiver where applicable by any Vendor on behalf of the Vendors, at or prior to the applicable Closing Time, each of the following conditions (each of which is acknowledged to be for the exclusive benefit of the Vendors):

(a) *Truth of Representations and Warranties* – the representations and warranties of the Purchasers contained in <u>Article 5</u> will be true and correct in all respects (other than de minimis inaccuracies) as of the date hereof and as of the applicable Closing Date as if made at and as of such date (except for representations and warranties made as of specified date, the accuracy of which shall be determined as of such specified date) except where the failure to be so true and correct would not reasonably be expected to have a material and adverse effect on the Purchasers' ability to consummate the transactions contemplated by this Agreement;

(b) *Performance of Covenants* – the covenants contained in this Agreement required to be performed or complied with by the Purchasers at or prior to the Closing Time shall have been performed or complied with in all material respects as at the Closing Time;

(c) *Officer's Certificate* – the Vendors shall have received a certificate confirming the satisfaction of the conditions contained in Sections 6.3(a) and 6.3(b) signed for and on behalf of each Purchaser without personal liability by an authorized signatory of the Purchaser or other Persons acceptable to the Vendors, acting in a commercially reasonable manner, in each case, in form and substance satisfactory to the Vendors, acting in a commercially reasonable manner;

(d) *Support Agreement* – the Support Agreement shall not have been terminated by any party thereto; and

(e) *Purchaser Deliverables* – the Purchasers shall have delivered to the Vendors all of the deliverables contained in Section 10.3 in form and substance satisfactory to the Vendors, acting in a commercially reasonable manner.

## 6.4 Waiver of Conditions

Any condition in Sections 6.1, 6.2 or 6.3 may be waived by any Purchaser on behalf of the Purchasers or NextPoint Parent on behalf of the Vendors, as applicable, in whole or in part, without prejudice to any of their respective rights of termination in the event of non-fulfillment of any other condition in whole or in part. Any such waiver shall be binding on the Purchasers or the Vendors, as applicable, only if made in writing.

## ARTICLE 7
## ADDITIONAL AGREEMENTS OF THE PARTIES

## 7.1 Access to Information

(a) From the date hereof until the earlier of (x) the Closing Time of the latest to occur of the LT Acquisition and the CTAX Acquisition and (y) the termination of this Agreement pursuant to Article 9, the Vendors shall give to the Purchasers' and their accountants, legal advisers, consultants, financial advisors and other representatives engaged in the transactions contemplated by this Agreement during normal business hours reasonable access to its premises and to all of the books and records relating to the Business, the Vendors, the Assumed Liabilities and the employees, and shall furnish them with all such information relating to the Business, the Vendors, the Assumed Liabilities and the employees of the Business as the Purchasers or such representatives may reasonably request in connection with the transactions contemplated by this Agreement; provided that such access shall be conducted at the Purchasers' expense, in accordance with Applicable Law and under supervision of the Vendors' personnel and in such a manner as to maintain confidentiality, and the Vendors will not be required to provide access to or copies of any such books and records if (a) the provision thereof would cause the Vendors or the NextPoint Parent to be in contravention of any Applicable Law or (b) making such information available would (1) result in the loss of any lawyer-client or other legal privilege, or (2) cause the Vendors or the NextPoint Parent to be found in contravention of any Applicable Law, or contravene any agreement (including any confidentiality agreement to which the Vendors, the

NextPoint Parent, or any of their respective Affiliates are a party); <u>provided</u>, that with respect to the foregoing clauses (a) and (b), the Vendors shall use commercially reasonable efforts to find a suitable alternative to disclose information in such a way that such disclosure does not contravene any such Applicable Law or agreement or jeopardize such privilege. The Vendors shall use commercially reasonable efforts to also deliver to the Purchasers authorizations to the Vendors and their applicable Subsidiaries necessary to permit the Purchasers to obtain information in respect of such NextPoint Entities from the files of such Governmental Authorities.

(b)  For a period of seven (7) years following the Closing, the Purchasers shall make all books and records of the Acquired Entity and its Subsidiaries reasonably available to the Monitor and any trustee in bankruptcy of any of the NextPoint Entities upon at least five (5) Business Days prior notice and shall, at such party's expense, permit any of the foregoing Persons to take copies thereof as they may determine to be necessary or useful to accomplish their respective roles; provided that the Purchasers shall not be obligated to make such books and records available to the extent that doing so would (a) violate Applicable Law, (b) jeopardize the protection of a solicitor-client privilege, or (c) unreasonably and materially interfere with the ongoing business and operations of the Purchasers, the Acquired Entity and their respective Affiliates, as determined by the Purchasers, acting reasonably; <u>provided</u>, that with respect to the foregoing clauses (a), (b), and (c), the Purchasers shall use commercially reasonable efforts to find a suitable alternative to disclose information in such a way that such disclosure does not contravene any such Applicable Law, jeopardize such privilege, or unreasonably and materially interfere with such ongoing business and operations.

**7.2  Approvals and Consents**

(a)  The Vendors shall be responsible for the payment of any filing fees required to be paid in connection with any filing made in respect of the Antitrust Approvals.

(b)  The Parties shall use commercially reasonable efforts to apply for an obtain any Transaction Regulatory Approvals as soon as reasonably practicable and no later than the time limits imposed by Applicable Laws, in accordance with <u>Section 7.2(c)</u>, in each case at the sole cost and expense of the Vendors.

(c)  The Parties shall use commercially reasonable efforts to apply for and obtain the Transaction Regulatory Approvals and shall co-operate with one another in connection with obtaining such approvals. Without limiting the generality of the foregoing, the Parties shall: (i) give each other reasonable advance notice of all meetings or other oral communications with any Governmental Authority relating to the Transaction Regulatory Approvals and provide as soon as practicable but in any case, if any, within the required time, any additional submissions, information and/or documents requested by any Governmental Authority necessary, proper or advisable to obtain the Transaction Regulatory Approvals; (ii) not participate independently in any such meeting or other oral communication without first

giving the other Party (or their outside counsel) an opportunity to attend and participate in such meeting or other oral communication, unless otherwise required or requested by such Governmental Authority; (iii) if any Governmental Authority initiates an oral communication regarding the Transaction Regulatory Approvals, promptly notify the other Party of the substance of such communication; (iv) subject to Applicable Laws relating to the exchange of information, provide each other with a reasonable advance opportunity to review and comment upon and consider in good faith the views of the other in connection with all written communications (including any filings, notifications, submissions, analyses, presentations, memoranda, briefs, arguments, opinions and proposals) made or submitted by or on behalf of a Party with a Governmental Authority regarding the Transaction Regulatory Approvals; and (v) promptly provide each other with copies of all written communications to or from any Governmental Authority relating to the Transaction Regulatory Approvals.

(d)     Each of the Parties may, as advisable and necessary, reasonably designate any competitively or commercially sensitive material provided to the other under this <u>Section 7.2</u> as "Outside Counsel Only Material", provided that the disclosing Party also provides a redacted version to the receiving Party. Such materials and the information contained therein shall be given only to the outside legal counsel of the recipient and, subject to any additional agreements between the Parties, will not be disclosed by such outside legal counsel to employees, officers or directors of the recipient unless express written permission is obtained in advance from the source of the materials or its legal counsel.

(e)     The obligations of the Parties to use commercially reasonable efforts to obtain the Transaction Regulatory Approvals does not require the Purchasers (or any Affiliate thereof) to initiate, commence, contest or resist any commenced, threatened, or foreseeable proceeding that would reasonably be expected to seek to prevent, materially impede or materially delay the consummation of the transactions contemplated by this Agreement, or to offer, accept or agree to: (i) the sale, divestiture, licensing, or disposition of any part of the businesses or assets of the Purchasers or their Affiliates or of the Purchased Interests, the Purchased LT Assets or the Purchased CTAX Assets; (ii) the termination of any existing contractual rights, relationships and obligations, or entry into, or amendment of, any such contractual arrangements; (iii) the taking of any action that, after consummation of the transactions contemplated by this Agreement, would limit the freedom of action of, or impose any other requirement on the Purchasers with respect to the operation of their or their Affiliates' businesses or assets, or that of the Purchased Interests, the Purchased LT Assets or the Purchased CTAX Assets; or (iv) any other remedial action in order to obtain the Transaction Regulatory Approvals.

**7.3     Covenants Relating to this Agreement**

(a)     Each of the Parties shall perform all obligations required to be performed by the applicable Party under this Agreement, co-operate with the other Parties in

connection therewith and do all such other acts and things as may be necessary or desirable in order to consummate and make effective, as soon as reasonably practicable and prior to the Outside Date, the transactions contemplated by this Agreement and, without limiting the generality of the foregoing, from the date hereof until the earlier of (x) the Closing Date of the latest to occur of the LT Acquisition and the CTAX Acquisition and (y) the termination of this Agreement pursuant to Article 9, each Party shall and, where appropriate, shall cause each of its Affiliates to:

(i) negotiate in good faith and use its commercially reasonable efforts to take or cause to be taken all actions and to do, or cause to be done, all things necessary, proper or advisable to satisfy the conditions precedent to the obligations of such Party hereunder (including, where applicable, negotiating in good faith with the applicable Governmental Authorities and/or third Persons in connection therewith), and to cause the fulfillment at the earliest practicable date of all of the conditions precedent to the other Party's obligations to consummate the transactions contemplated hereby; and

(ii) not take any action, or refrain from taking any action, or permit any action to be taken or not taken, which would reasonably be expected to prevent, materially delay or otherwise impede the consummation of the transactions contemplated by this Agreement.

(b) From the date hereof until the Closing Date, the Purchasers hereby agree, and hereby agree to cause their representatives to, keep the Vendors informed on a reasonably current basis, and no less frequently than on a weekly basis through teleconference or other meeting, and as reasonably requested by the Vendors or the Monitor, as to the Purchasers' progress in terms of the satisfaction of the conditions precedent contained herein.

(c) From the date hereof until the Closing Date of the latest to occur of the LT Acquisition and the CTAX Acquisition, the Vendors (other than, following the Closing Date of the LT Acquisition, any Acquired Entity) hereby agree, and hereby agrees to cause their representatives to, keep the Purchasers informed, as reasonably requested by the Purchasers or the Monitor, as to the Vendors' progress in terms of the satisfaction of the conditions precedent contained herein.

(d) The Vendors and the Purchasers agree to execute and deliver such other documents, certificates, agreements and other writings, and to take such other actions to consummate or implement as soon as reasonably practicable, the transactions contemplated by this Agreement.

(e) From the date hereof until the earlier of (x) the Closing Date of the latest to occur of the LT Acquisition and the CTAX Acquisition and (y) the termination of this Agreement pursuant to Article 9, the Vendors (other than, following the Closing Date of the LT Acquisition, any Acquired Entity) hereby agree, and hereby agrees

to cause its representatives to, promptly notify the Purchasers of (i) any event, condition, or development that has resulted in the inaccuracy in a material respect or material breach of any representation or warranty, covenant or agreement contained in this Agreement, or (ii) any Material Adverse Effect occurring from and after the date hereof prior to such Closing Date.

(f)    The Vendors and the Purchasers agree to use commercially reasonable efforts to timely prepare and file all documentation and pursue all steps reasonably necessary to obtain any material third-party consents and approvals as may be required in connection with the transaction contemplated by this Agreement.

**7.4    Tax Matters**

(a)    The Purchasers and the Vendors agree to furnish or cause to be furnished to each other, as promptly as practicable, such information and assistance relating to the Purchased Interests, the Purchased Assets and the Assumed Liabilities as is reasonably necessary for the preparation and filing of any Tax Return, claim for refund or other required filings relating to Tax matters, for the preparation for and proof of facts during any Tax audit, for the preparation for any Tax protest, for the prosecution of any suit or other proceedings relating to Tax matters and for the answer to any governmental or regulatory inquiry relating to Tax matters; *provided* that Purchasers shall not be required to provide any Vendors any Tax Return or portion thereof (including any work papers or related documentation) of Purchasers or its Affiliates. The Purchasers and the Vendors also agree to furnish or cause to be furnished to each other, as promptly as practicable, such information and assistance relating to the Purchased Interests, the Purchased Assets and the Assumed Liabilities as is reasonably necessary for the Purchasers to acquire them in a tax efficient manner for both Vendors and the Purchasers.

(b)    The Purchasers and the Vendors shall each be responsible for the preparation of their own Tax Returns required to be filed under Applicable Law in respect of the purchase of the Purchased Interests and the Purchased Assets.

(c)    The Purchasers shall be responsible for and shall pay, or cause to be paid, any Transfer Tax in respect of the purchase and sale of the Purchased Interests and the Purchased Assets under this Agreement (other than any Transfer Taxes that are not required to be paid under the CCAA, the U.S. Bankruptcy Code, or any other applicable law) and such Transfer Tax shall be remitted to the appropriate Governmental Authority as provided for under Applicable Law (except any Transfer Tax which, under Applicable Law, is collectible by the Vendors, in which case such Transfer Tax shall be collected by the applicable Vendor and remitted by the Vendor to the appropriate Governmental Authority as provided for under the Applicable Law but, for the avoidance of doubt, the Purchasers shall remain economically responsible for and shall pay to or reimburse, or cause to be paid or reimbursed, as the case may be, the Vendors for any such Transfer Tax). For the avoidance of doubt any Transfer Taxes in connection with the Pre-Closing Reorganization are not covered by this Section 7.4(c) and shall be borne by the

Purchasers. The Vendors and the Purchasers shall reasonably cooperate to mitigate and/or eliminate the amount of Transfer Taxes resulting from the transactions contemplated herein (provided, for the avoidance of doubt, this shall not require the parties to structure the transactions in a manner eligible for the benefits of Section 1146(a) of the United States Bankruptcy Code).

(d)     The Purchasers shall be responsible for preparing and filing all necessary Tax Returns or other documents with respect to such Transfer Taxes; provided, however, that in the event any such Tax Return requires execution by any Vendor, the Purchasers shall deliver it to such Vendor not less than ten (10) Business Days before the due date thereof, and the Vendors shall reasonably promptly execute such Tax Return and return it to the Purchasers.

(e)     Purchasers shall prepare or cause to be prepared and file or cause to be filed all Tax Returns of the Purchased Entities that have not been filed as of the Closing Date.  Purchasers shall provide drafts of each such Tax Return that relates solely to the Pre-Closing Tax Period and requested by Vendors in writing to Vendors for the Vendors' review and comment and shall consider in good faith all reasonable comments made in writing by the Vendors within a reasonable time period prior to the due date for filing such Tax Return. The Vendors shall pay to the Purchasers the amount of the Taxes with respect to such Tax Returns for which the Vendors are responsible under Section 7.4(g) within five (5) days of filing the applicable Tax Return to which such Taxes relate.

(f)     For any Straddle Period, Taxes shall be attributable to the portion of such period ending on the Closing Date in an amount equal to: (i) in the case of any gross receipts, income, payroll, employment or similar Taxes, the portion of such Taxes allocable to the portion of the Straddle Period ending on or before the Closing Date, as determined on the basis of the deemed closing of the books and records of the Purchased Entity at the end of the Closing Date (unless otherwise required by applicable Tax law) and (ii) in the case of any Taxes other than those described in clause (i), the Taxes for the entire Straddle Period multiplied by a fraction the numerator of which is the number of days in the Straddle Period from the beginning of the Straddle Period through and including the Closing Date and the denominator of which is the number of days in the entire Straddle Period.

(g)     The Vendors shall be responsible for (i) all Taxes (or the non-payment thereof) of any Vendor and (ii) all Taxes (or the non-payment thereof) of or imposed on the Purchased Entities for any Pre-Closing Tax Period and the portion through the end of the Closing Date for any Straddle Period.

(h)     Vendors shall promptly notify Purchasers in writing of any proposed assessment or the commencement of any Tax audit or administrative or judicial proceeding or of any demand or claim with respect to Taxes with respect to the Purchased Assets, the Business, or any Purchased Entity. Buyer shall control and shall have the right to discharge, settle, or otherwise dispose of, at its own expense, all tax contests or proceedings.

ACTIVE\1601524128.8

**7.5**     **Certain Payments or Instruments Received from Third Persons**

(a)     To the extent that, after the Closing Date: (a) the Purchasers or any of their Affiliates receives any payment or instrument that is for the account of the Vendors (other than any Vendor that is an Acquired Entity or a Subsidiary of an Acquired Entity) according to the terms of any Closing Document, the Purchasers shall, and shall cause their Affiliates to, promptly deliver such amount or instrument to the applicable Vendor; or (b) any of the Vendors (other than any Vendor that is an Acquired Entity or a Subsidiary of an Acquired Entity) or any of their Affiliates receives any payment or instrument that is for the account of the Purchasers, any Acquired Entity or a Subsidiary of an Acquired Entity according to the terms of any Closing Document or that relates to the Business, such Vendor shall promptly deliver such amount or instrument to the Purchaser.

(b)     All amounts due and payable under this <u>Section 7.5</u> shall be due and payable by the applicable Party in immediately available funds, by wire transfer to the account designated in writing by the relevant Party. Notwithstanding the foregoing, each Party hereby undertakes to use its commercially reasonable efforts to direct or forward all bills, invoices or like instruments to the appropriate Party.

**7.6**     **Release by the Purchasers**

Except in connection with any obligations of the Vendors or the Monitor contained in this Agreement or any Closing Documents, effective as of the Closing, each Purchaser hereby releases and forever discharges the Vendors, the Monitor and their respective Affiliates (excluding the LoanMe Entities), and each of their respective successors and assigns, and all officers, directors, partners, members, shareholders, limited partners, employees, agents, financial and legal advisors of each of them, from any and all actual or potential Released Claims which such Person had, has or may have in the future to the extent relating to the Purchased Interests, the Purchased Assets or the Assumed Liabilities, save and except for Released Claims arising out of fraud or willful misconduct.

**7.7**     **Release by the Vendors**

Except in connection with any obligations of each Purchaser and the Monitor contained in this Agreement or any Closing Documents, effective as of the Closing, the Vendors hereby release and forever discharge each Purchaser, the Monitor and their respective Affiliates (including the Acquired Entities), and each of their respective successors and assigns, and all officers, directors, partners, members, shareholders, limited partners, employees, agents, financial and legal advisors of each of them, from any and all actual or potential Released Claims which such Person had, has or may have in the future to the extent relating to the Purchased Interests, the Purchased Assets, the Assumed Liabilities, the Excluded Assets or the Excluded Liabilities, save and except for Released Claims arising out of fraud or willful misconduct.

ACTIVE\1601524128.8

## ARTICLE 8
## INSOLVENCY PROVISIONS

**8.1    Court Orders and Related Matters**

(a)    From and after the date of this Agreement and until the Closing Date of the latest to occur of the LT Acquisition and the CTAX Acquisition, the Vendors (other than, following the Closing Date of the LT Acquisition, any Acquired Entity) shall deliver to the Purchasers drafts of any and all pleadings, motions, notices, statements, applications, schedules, reports, and other papers to be filed or submitted by any NextPoint Entity in connection with or related to this Agreement, including with respect to the SISP Order, the Vesting Order, the Vesting Recognition Order, and the SISP Recognition Order, for the Purchasers' prior review at least three (3) days in advance of service and filing of such materials (or where circumstances make it impracticable to allow for three (3) days' review, with as much opportunity for review and comment as is practically possible in the circumstances). The Vendors (other than, following the Closing Date of the LT Acquisition, any Acquired Entity) acknowledge and agree (i) that any such pleadings, motions, notices, statements, applications, schedules, reports, or other papers shall be in form and substance satisfactory to the Purchasers, acting reasonably, and (ii) to consult and cooperate with the Purchasers regarding any discovery, examinations and hearing in respect of any of the foregoing, including the submission of any evidence, including witnesses testimony, in connection with such hearing.

(b)    Notice of the motions seeking the issuance of the Vesting Order, the Vesting Recognition Order, the SISP Order, and the SISP Recognition Order shall be served by the Vendors on all Persons required to receive notice under Applicable Law and the requirements of the CCAA, the CCAA Court, the U.S. Bankruptcy Code, the U.S. Bankruptcy Court and any other Person determined necessary by the Vendors or the Purchasers, acting reasonably.

(c)    Notwithstanding any other provision herein, it is expressly acknowledged and agreed that in the event that (i) the SISP Order has not been issued and entered by the CCAA Court by August 4, 2023 or such later date agreed to in writing by the Purchasers in their sole discretion; (ii) the SISP Recognition Order, if any, has not been issued and entered by the U.S. Bankruptcy Court within two (2) Business Days of the SISP Order being entered by the CCAA Court or such later date agreed to in writing by the Purchasers in their sole discretion; (iii) the Vesting Order has not been issued and entered by the CCAA Court by the applicable date set forth in Section 4(b)(iv) of the Support Agreement or such later date agreed to in writing by the Purchasers in their sole discretion; or (iv) the Vesting Recognition Order has not been issued and entered by the U.S. Bankruptcy Court within fourteen (14) days after the Vesting Order being entered by the CCAA Court or such later date agreed to in writing by the Purchasers in their sole discretion, the Purchasers may terminate this Agreement; <u>provided</u> that in each case, such deadlines are subject to court availability.

(d)     If the Vesting Order or the Vesting Recognition Order, as applicable, relating to this Agreement is appealed or a motion for leave to appeal, rehearing, reargument or reconsideration is filed with respect thereto, the Vendors (other than, following the Closing Date of the LT Acquisition, any Acquired Entity)  agree to take all action as may be commercially reasonable and appropriate to defend against such appeal, petition or motion.

(e)     The Vendors acknowledge and agree, that the Vesting Order and the Vesting Recognition Order shall provide that, on the applicable Closing Date and concurrently with the applicable Closing, the Purchased Interests and the Purchased Assets, as applicable, shall be transferred to the Purchasers free and clear of all Encumbrances, other than Permitted Encumbrances.

### ARTICLE 9
### TERMINATION

**9.1     Termination**

This Agreement may be terminated at any time prior to Closing as follows:

(a)     by mutual written consent of the Vendors and the Purchasers (for greater certainty, with respect to the LT Acquisition or the CTAX Acquisition individually, or with respect to the entire Agreement);

(b)     by the Purchasers or the Vendors, if this Agreement is not the Successful Bid (as determined pursuant to, the SISP) with respect to the LT Acquisition;

(c)     by the Purchasers or the Vendors, if Closing has not occurred on or before the Outside Date, provided that the terminating Party is not then in breach of any representation, warranty, covenant or other agreement in this Agreement and such breach resulted in the failure of the Closing to occur by the Outside Date;

(d)     by the Purchasers, upon the appointment of a receiver, trustee in bankruptcy or similar official in respect of any Vendor or any of the property of any Vendor, other than with the prior written consent of the Purchaser;

(e)     by the Purchasers, pursuant to Section 8.1(c);

(f)     by the Purchasers or the Vendors, upon the termination, dismissal or conversion of the CCAA Proceedings and the U.S. Proceedings;

(g)     by the Purchasers or the Vendors, upon denial of the SISP Order, the Vesting Order, the SISP Recognition Order or the Vesting Recognition Order (or if any such order is stayed, vacated or varied without the consent of the Purchasers);

(h)     by the Purchasers or the Vendors, if a court of competent jurisdiction, including the CCAA Court or the U.S. Bankruptcy Court, or other Governmental Authority has issued an Order or taken any other action that permanently restrains, enjoins

36

or otherwise prohibits the consummation of Closing and such Order or action has become a Final Order;

(i)     by the Vendors, if there has been a violation or breach by the Purchasers of any covenant, representation or warranty which would prevent the satisfaction of the conditions set forth in <u>Section 6.3(a)</u> or <u>Section 6.3(b)</u> and such violation or breach has not been waived by the Vendors or cured upon the earlier of (i) ten (10) Business Days after written notice thereof from the Vendors and (ii) the Outside Date, unless the Vendors are in violation or breach of their obligations under this Agreement which would prevent the satisfaction of the conditions set forth in <u>Section 6.2(a)</u> or <u>Section 6.2(b)</u>;

(j)     by the Purchasers, if there has been a violation or breach by the Vendors of any covenant, representation or warranty which would prevent the satisfaction of the conditions set forth in <u>Section 6.2(a)</u> or <u>Section 6.2(b)</u> and such violation or breach has not been waived by the Purchasers or cured upon the earlier of (i) ten (10) Business Days after written notice thereof from the Purchasers and (ii) the Outside Date, unless the Purchasers are in violation or breach of their obligations under this Agreement which would prevent the satisfaction of the conditions set forth in <u>Section 6.2(a)</u> or <u>Section 6.2(b)</u>;

(k)     by the Purchasers or the Vendors, if the Support Agreement is terminated pursuant to the terms thereof; and

(l)     by the Purchasers, if there has been a default under the DIP Financing.

The Party desiring to terminate this Agreement pursuant to this <u>Section 9.1</u> (other than pursuant to <u>Section 9.1(a)</u>) shall give written notice of such termination to the other Party or Parties, as applicable, specifying in reasonable detail the basis for such Party's exercise of its termination rights.

In addition to the foregoing termination rights set forth in this <u>Section 9.1</u>, in the event that this Agreement is not the Successful Bid (as determined pursuant to the SISP) with respect to the CTAX Acquisition only, then the Purchasers or the Vendors may, by written notice of termination given to the other Party or Parties, as applicable, terminate all further obligations and liabilities of the Parties hereunder solely in relation to the CTAX Acquisition. In the event of such termination, this Agreement shall be deemed to be amended to remove all such obligations and liabilities; provided, however, that all other provisions of this Agreement shall continue in full force and affect unamended and no such amendment shall relieve any Party of any liability for any willful breach by it of this Agreement prior to such amendment.

In the event that this Agreement is terminated with respect to the LT Acquisition or the CTAX Acquisition individually pursuant to <u>Section 9.1(a)</u>, then this Agreement shall be deemed to be amended to remove all such obligations and liabilities with respect to the LT Acquisition or the CTAX Acquisition, as applicable, only; provided, however, that all other provisions of this Agreement shall continue in full force and affect unamended and no such amendment shall

relieve any Party of any liability for any breach by it of this Agreement prior to such amendment or fraud.

**9.2    Effect of Termination**

In the event of termination of this Agreement pursuant to Section 9.1, this Agreement shall become void and of no further force or effect without liability of any Party to any other Party to this Agreement except that (a) Article 1, this Section 9.2, Section 9.3, Section 11.3, Section 11.5, Section 11.6, Section 11.7 and Section 11.8 shall survive and (b) no termination of this Agreement shall relieve any Party of any liability for any breach by it of this Agreement prior to such termination or fraud.

**9.3    Termination Fee and Expense Reimbursement**

(a)    Upon CCAA Court approval of an Alternative Restructuring Proposal that is not provided by the Purchasers or any of their Affiliates in accordance with the terms of the SISP Order, or upon the NextPoint Entities' termination of the Support Agreement pursuant to Section 8(b)(iii) thereof a fee in cash equal to, in the aggregate, the Vendors shall pay from the proceeds of such transaction to the Purchasers concurrently with the consummation of an Alternative Restructuring Proposal to the Purchasers:

(i)    $700,000 (such amount, the "**Break-Up Fee**"); plus

(ii)    an expense reimbursement for the Purchasers' reasonable and documented, legal and other costs incurred in connection with the transactions contemplated by this Agreement (the "**Expense Reimbursement**").

(b)    For the avoidance of doubt, and notwithstanding anything to the contrary set forth in this Section 9.3, under no circumstances shall the Vendors be obligated to pay the Break-Up Fee or the Expense Reimbursement more than once.

(c)    The Vendors acknowledge (i) that the Purchasers have made a substantial investment of management time and incurred substantial out-of-pocket expenses in connection with the negotiation and execution of this Agreement, their due diligence of the Business and the NextPoint Entities, and their effort to consummate the transactions contemplated hereby, and (ii) that the Parties' efforts have substantially benefited the Vendors and the bankruptcy estates of the NextPoint Entities through the submission of the offer that is reflected in this Agreement, that will serve as a minimum bid on which other potential interested bidders can rely, thus increasing the likelihood that the price at which the applicable NextPoint Entities or their assets are sold will reflect their true worth. The Parties hereby acknowledge that the amounts payable pursuant to this Section 9.3 are commercially reasonable and necessary to induce the Purchasers to enter into this Agreement and consummate the transactions contemplated hereby. For the avoidance of doubt, the covenants set forth in this Section 9.3 are continuing obligations and survive termination of this Agreement.

38

# ARTICLE 10
# CLOSING

## 10.1 Location and Time of the Closing

Each Closing shall take place at the applicable Closing Time on the Closing Date at the offices of Osler, Hoskin & Harcourt LLP, 155 West Hastings Street, Suite 1700, The Guinness Tower, Vancouver, British Columbia, V6E 2E9, or at such other location as may be agreed upon by the Parties.

## 10.2 Vendors' Deliveries at Closing

At each Closing, the Vendors shall deliver to the Purchasers the following:

(a)     a true copy of each of the Vesting Order, the SISP Order, the Vesting Recognition Order, the SISP Recognition Order, each of which shall be final;

(b)     an executed copy of the Monitor's Certificate;

(c)     a certificate of a senior officer or director of each Vendor in form and substance reasonably satisfactory to the Purchasers: (a) certifying that the board of directors of the Vendor, has adopted resolutions (in a form attached to such certificate) authorizing the execution, delivery and performance of this Agreement and the transactions contemplated herein, as applicable, which resolutions are in full force and effect and have not been superseded, amended or modified as of the applicable Closing Date; and (b) certifying as to the incumbency and signatures of the officers and directors of the Vendor;

(d)     the certificates contemplated by Section 6.2(c); and

(e)     an affidavit, signed under penalties of perjury, stating that the applicable company is not and has not been at any time during the period specified in Section 897(c)(1)(A)(ii) of the Code a United States real property holding corporation, dated as of the Closing Date and in form and substance reasonably satisfactory to the Purchasers and as required under Treasury Regulation Section 1.897-2(h) so that the Purchasers are exempt from withholding any portion of the Purchase Price thereunder, together with proof reasonably satisfactory to the Purchasers that the applicable Vendor has provided notice of such affidavit to the IRS in accordance with Treasury Regulation Section 1.897-2(h)(2).

## 10.3 Purchasers' Deliveries at Closing

At each Closing, the Purchasers shall deliver to the Vendors:

(a)     the applicable payment contemplated by Section 3.1;

(b)     a certificate of an authorized signatory of each Purchaser (in such capacity and without personal liability), in form and substance reasonably satisfactory to the

Vendors: (a) certifying that the board of directors, member(s) or manager(s), as applicable, of the administrator of the Purchaser has adopted resolutions (in a form attached to such certificate) authorizing the execution, delivery and performance of this Agreement and the transactions contemplated herein, as applicable, which resolutions are in full force and effect and have not been superseded, amended or modified as of the Closing Date; and (b) certifying as to the incumbency and signature of the authorized signatory of or on behalf of the Purchaser executing this Agreement and the other transaction documents contemplated herein, as applicable;

(c)     the certificate contemplated by Section 6.3(c); and

(d)     all other documents required to be delivered by the Purchasers on or prior to the Closing Date pursuant to this Agreement or Applicable Law or as reasonably requested by the Vendors in good faith.

## 10.4    Monitor

When the conditions to the applicable Closing set out in Article 6 have been satisfied and/or waived by the Vendors or the Purchasers, as applicable, the Vendors or the Purchasers, or their respective counsel, shall each deliver to the Monitor written confirmation that all conditions to such Closing have been satisfied or waived. Upon receipt of such written confirmation, the Monitor shall: (i) issue forthwith its Monitor's Certificate in accordance with the Vesting Order; and (ii) file as soon as practicable a copy of the Monitor's Certificate with the CCAA Court (and shall provide a true copy of such filed certificate to the Vendors and the Purchasers). The Parties hereby acknowledge and agree that the Monitor will be entitled to file the Monitor's Certificate with the CCAA Court without independent investigation upon receiving written confirmation from the Vendors and the Purchasers that all conditions to Closing have been satisfied or waived, and the Monitor will have no liability to the Vendors or the Purchasers or any other Person as a result of filing the Monitor's Certificate.

## 10.5    Further Assurances

As reasonably required by a Party in order to effectuate the transactions contemplated by this Agreement, the Purchasers and the Vendors shall execute and deliver at (and after) the Closing such other documents, and shall take such other actions, as are necessary or appropriate, to implement and make effective the transactions contemplated by this Agreement.

## ARTICLE 11
## GENERAL MATTERS

## 11.1    Confidentiality

After the Closing Time, the Vendors (other than any Vendor that is an Acquired Entity or a Subsidiary of an Acquired Entity) shall and shall cause their Affiliates to, maintain the confidentiality of all confidential information relating to the Business, the applicable Purchased Assets, the Acquired Entity and each Subsidiary of the Acquired Entity (but does not include information that is or becomes generally available to the public other than as a result of

disclosure by the Vendors or their representatives in breach of this Agreement), including the Confidential Information, except any disclosure of such information and records as may be required by Applicable Law or permitted by Purchasers in writing. If the Vendors, or any of their respective representatives, becomes legally compelled by deposition, interrogatory, request for documents, subpoena, civil investigative demand, or similar judicial or administrative process, to disclose any such information, such party shall, provide the Purchasers with reasonably prompt prior oral or written notice of such requirement (including any report, statement, testimony or other submission to such Governmental Authority) to the extent legally permissible and reasonably practicable, and cooperate with the Purchasers, at the Purchasers' expense, to obtain a protective order or similar remedy to cause such information not to be disclosed; provided that in the event that such protective order or other similar remedy is not obtained, the Vendors shall, or shall cause their Affiliate or representative to, furnish only that portion of such information that has been legally compelled, and shall, or shall cause such Affiliate or representative to, exercise its commercially reasonable efforts to obtain assurance that confidential treatment will be accorded such disclosed information. The Vendors (other than any Vendor that is an Acquired Entity or a Subsidiary of an Acquired Entity) shall instruct their Affiliates and representatives having access to such information of such obligation of confidentiality and shall be responsible for any breach of the terms of this <u>Section 11.1</u> by any of their Affiliates or representatives.

**11.2    Public Notices**

No press release or other announcement concerning the transactions contemplated by this Agreement shall be made by the Vendors or the Purchasers, or any of their respective Affiliates, without the prior consent of the other Party (such consent not to be unreasonably withheld, conditioned or delayed); provided, however, that subject to the last sentence of this <u>Section 11.2</u>, any Party may, without such consent, make such disclosure if the same is required by Applicable Law (including the CCAA Proceedings and the U.S. Proceedings) or by any stock exchange on which any of the securities of such Party or any of its Affiliates are listed, or by any insolvency or other court or securities commission, or other similar Governmental Authority having jurisdiction over such Party or any of its Affiliates, and, if such disclosure is required, the Party making such disclosure shall use commercially reasonable efforts to give prior oral or written notice to the other Party to the extent legally permissible and reasonably practicable, and if such prior notice is not legally permissible or reasonably practicable, to give such notice reasonably promptly following the making of such disclosure. Notwithstanding the foregoing: (i) this Agreement may be filed by (A) the Vendors with the CCAA Court and the U.S. Bankruptcy Court; and (B) NextPoint Parent on its profile on <u>www.sedar.com</u>; and (ii) the transactions contemplated in this Agreement may be disclosed by the Vendors to the CCAA Court and the U.S. Bankruptcy Court, subject to redacting confidential or sensitive information as permitted by Applicable Law. The Parties further agree that:

(a)    the Monitor may prepare and file reports and other documents with the CCAA Court and the U.S. Bankruptcy Court containing references to the transactions contemplated by this Agreement and the terms of such transactions;

(b)    the Vendors, the Purchasers and their respective professional advisors may prepare and file such reports and other documents with the CCAA Court and the U.S. Bankruptcy Court containing references to the transactions contemplated by

ACTIVE\1601524128.8

this Agreement and the terms of such transactions as may reasonably be necessary to complete the transactions contemplated by this Agreement or to comply with their obligations in connection therewith; and

(c) the Purchasers and their respective Affiliates may make announcements regarding the transactions contemplated by this Agreement to their existing and prospective investors provided that the information contained in such announcements is consistent with information that has been filed with the CCAA Court and the U.S. Bankruptcy Court or otherwise contained in a press release or other public filing permitted by this Section 11.2.

The Parties shall be afforded an opportunity to review and comment on such materials prior to their filing. The Parties may issue a joint press release announcing the execution and delivery of this Agreement, in form and substance mutually agreed to them.

## 11.3    Injunctive Relief

(a) The Parties agree that irreparable harm would occur for which money damages would not be an adequate remedy at law in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the Parties shall be entitled to seek specific performance, injunctive and other equitable relief to prevent breaches or threatened breaches of this Agreement, and to enforce compliance with the terms of this Agreement, without any requirement for the securing or posting of any bond in connection with the obtaining of any such specific performance, injunctive or other equitable relief, this being in addition to any other remedy to which the Parties may be entitled at law or in equity.

(b) Each Party hereby agrees not to raise any objections to the availability of the equitable remedies provided for herein and the Parties further agree that by seeking the remedies provided for in this Section 11.3, a Party shall not in any respect waive its right to seek any other form of relief that may be available to a Party under this Agreement.

(c) Notwithstanding anything herein to the contrary herein, under no circumstances shall a Party be permitted or entitled to receive both monetary damages and specific performance and election to pursue one shall be deemed to be an irrevocable waiver of the other.

## 11.4    Survival

None of the representations, warranties, covenants (except the covenants in Article 2, Article 3, Article 11 and Sections 7.1(b), 7.2(a), 7.4, 7.5, 7.6, 7.7, and 10.5, to the extent they are to be performed after any Closing) of any of the Parties set forth in this Agreement, in any Closing Document to be executed and delivered by any of the Parties (except any covenants included in such Closing Documents, which, by their terms, survive the applicable Closing) or in any other agreement, document or certificate delivered pursuant to or in connection with this Agreement or the transactions contemplated hereby shall survive the Closing.

42

**11.5    Non-Recourse**

No past, present or future director, officer, employee, incorporator, member, partner, securityholder, Affiliate, agent, lawyer or representative of the respective Parties, in such capacity, shall have any liability for any obligations or liabilities of the Purchasers or the Vendors, as applicable, under this Agreement, or for any Causes of Action based on, in respect of or by reason of the transactions contemplated hereby.

**11.6    Assignment; Binding Effect**

No Party may assign its right or benefits under this Agreement without the consent of each of the other Parties, except that without such consent the Purchasers may, upon prior notice to the Vendors: (a) assign this Agreement, or any or all of its rights and obligations hereunder, to one or more of their Affiliates; or (b) direct that title to all or some of the Purchased Interests or the Purchased Assets be transferred to, and the corresponding Assumed Liabilities be assumed by, one or more of their Affiliates; provided that no such assignment or direction shall relieve the Purchasers of their obligations hereunder. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective permitted successors and permitted assigns. Nothing in this Agreement shall create or be deemed to create any third Person beneficiary rights in any Person not a Party to this Agreement.

**11.7    Notices**

Any notice, request, demand or other communication required or permitted to be given to a Party pursuant to the provisions of this Agreement will be in writing and will be effective and deemed given under this Agreement on the earliest of: (a) the date of personal delivery; (b) the date of transmission by email, with confirmed transmission and receipt (if sent during normal business hours of the recipient, if not, then on the next Business Day); (c) two (2) days after deposit with a nationally-recognized courier or overnight service such as Federal Express; or (d) five (5) days after mailing via certified mail, return receipt requested. All notices not delivered personally or by email will be sent with postage and other charges prepaid and properly addressed to the Party to be notified at the address set forth for such Party:

(a)     If to the Purchasers at:

BP Commercial Funding Trust, Series SPL-X, a statutory series of BP Commercial Funding Trust, a Delaware statutory trust, for itself and for no other series of BP Commercial Funding Trust
c/o BasePoint Capital LLC
75 Rockefeller Plaza, 25th Floor
New York, NY 10019
Attention: Michael Petronio
Email: mpetronio@basepointcapital.com

With a copy to:

BasePoint Capital LLC

75 Rockefeller Plaza, 25th Floor
New York, NY 10019
Attention: General Counsel
Email: BPG-LegalNotices@basepointcapital.com

With a copy to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention: Brian Schartz, P.C.
(brian.schartz@kirkland.com) and Allyson B. Smith
(allyson.smith@kirkland.com)

and

300 N. LaSalle
Chicago, Illinois 60654
Attention: Gabriela Zamfir Hensley
(gabriela.hensley@kirkland.com)

and

Osler, Hoskin & Harcourt LLP
155 West Hastings Street
Suite 1700, The Guinness Tower
Vancouver, British Columbia
V6E 2E9
Canada
Attention: Mary Buttery, KC (mbuttery@osler.com)

and

100 King Street West
1 First Canadian Place
Suite 6200, P.O. Box 50
Toronto, Ontario
M5X 1B8
Canada
Attention: Marc Wasserman (mwasserman@osler.com) and David Rosenblat
(drosenblat@osler.com)

With a copy to:

Tom Powell and Paul Bishop
FTI Consulting Canada Inc.

701 West Georgia Street
Suite 1450, PO Box 10089
Vancouver, BC V7Y 1B6
Email: tom.powell@fticonsulting.com; paul.bishop@fticonsulting.com

With a copy to:

Kibben Jackson and Fergus McDonnell
Fasken Martineau Dumoulin LLP
2900 – 550 Burrard Street
Vancouver, British Columbia, V6C 0A3
Email: kjackson@fasken.com; fmcdonnell@fasken.com

(b)     If to the Vendors at:

DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York 10020-1104
United States of America
Attention: Rachel Ehrlich Albanese and Jamila Justine Willis
Email: rachel.albanese@us.dlapiper.com; jamila.willis@us.dlapiper.com

and

DLA Piper (Canada) LLP
Suite 2800, Park Place
666 Burrard St.
Vancouver, British Columbia
V6C 2Z7
Canada
Attention: Colin Brousson and Russel Drew
Email: colin.brousson@dlapiper.com; russel.drew@dlapiper.com

With a copy to the Monitor, and if to the Monitor, at:

Tom Powell and Paul Bishop
FTI Consulting Canada Inc.
701 West Georgia Street
Suite 1450, PO Box 10089
Vancouver, BC V7Y 1B6
Email: tom.powell@fticonsulting.com; paul.bishop@fticonsulting.com

With a copy to:

Kibben Jackson and Fergus McDonnell

Fasken Martineau Dumoulin LLP

2900 – 550 Burrard Street

Vancouver, British Columbia, V6C 0A3

Email: kjackson@fasken.com; fmcdonnell@fasken.com

Any Party may change its address for service from time to time by notice given in accordance with the foregoing and any subsequent notice shall be sent to such Party at its changed address.

**11.8    Counterparts; Electronic Signatures**

This Agreement may be signed in counterparts and each of such counterparts shall constitute an original document and such counterparts, taken together, shall constitute one and the same instrument. Execution of this Agreement may be made by electronic signature which, for all purposes, shall be deemed to be an original signature.

**11.9    Language**

The Parties have expressly required that this Agreement and all documents and notices relating hereto be drafted in English.

*[Signature pages to follow]*

**IN WITNESS WHEREOF** the Parties have executed this Agreement as of the date first written above.

**NEXTPOINT PARENT:**

**NEXTPOINT FINANCIAL, INC.**

**VENDORS:**

**NPI HOLDCO LLC**
**LT HOLDCO, LLC**
**JTH TAX LLC**
**LT INTERMEDIATE HOLDCO, LLC**
**SIEMPRE TAX+ LLC**
**JTH FINANCIAL, LLC**
**JTH PROPERTIES 1632, LLC**
**JTH TAX OFFICE PROPERTIES, LLC**
**WEFILE LLC**
**LIBERTY CREDIT REPAIR, LLC**
**LTS PROPERTIES, LLC**
**360 ACCOUNTING SOLUTIONS LLC**
**JTH COURT PLAZA, LLC**
**LTS SOFTWARE LLC**
**CTAX ACQUISITION LLC**
**COMMUNITY TAX LLC**
**COMMUNITY TAX PUERTO RICO LLC**

By:_____
Name:
Title:

**PURCHASERS:**

**BP COMMERCIAL FUNDING TRUST, SERIES SPL-X**,
a statutory series of BP Commercial Funding Trust, a Delaware statutory trust, for itself and for no other series of BP Commercial Funding Trust[, in its capacity as holder of Revolving Credit Promissory Note A under the BP NP-Liberty Credit Agreement]

By: BasePoint Capital II, LLC,
not in its individual capacity but solely as Administrator of BP Commercial Funding Trust

By: _____
Name: Michael Petronio
Title: Authorized Signatory

**BP COMMERCIAL FUNDING TRUST, SERIES SPL-X**,
a statutory series of BP Commercial Funding Trust, a Delaware statutory trust, for itself and for no other series of BP Commercial Funding Trust[, in its capacity as holder of Revolving Credit Promissory Note B-1 under the BP NP-Liberty Credit Agreement]

By: BasePoint Capital II, LLC,
not in its individual capacity but solely as Administrator of BP Commercial Funding Trust

By: _____
Name: Michael Petronio
Title: Authorized Signatory

**BP COMMERCIAL FUNDING TRUST, SERIES SPL-X**,
a statutory series of BP Commercial Funding Trust, a Delaware statutory trust, for itself and for no other series of BP Commercial Funding Trust[, in its capacity as holder of Revolving Credit Promissory Note B-2 under the BP NP-Liberty Credit Agreement]

By: BasePoint Capital II, LLC,
not in its individual capacity but solely as Administrator of BP Commercial Funding Trust

By: _____
Name: Michael Petronio
Title: Authorized Signatory

**BP COMMERCIAL FUNDING TRUST, SERIES SPL-X**,
a statutory series of BP Commercial Funding Trust, a Delaware statutory trust, for itself and for no other series of BP Commercial Funding Trust[, in its capacity as holder of Term Loan Promissory Note A under the BP NP-Liberty Credit Agreement]

By: BasePoint Capital II, LLC,
not in its individual capacity but solely as Administrator of BP Commercial Funding Trust

By: _____
Name: Michael Petronio
Title: Authorized Signatory

**BP COMMERCIAL FUNDING TRUST, SERIES SPL-X**,
a statutory series of BP Commercial Trust, a Delaware statutory trust, for itself and for no other series of BP Commercial Funding Trust[, in its capacity as holder of Term Loan Promissory Note B under the BP NP-Liberty Credit Agreement]

By: BasePoint Capital II, LLC, not in its individual capacity but solely as Administrator of BP Commercial Funding Trust

By: _____
Name: Michael Petronio
Title: Authorized Signatory

# __Disclosure Letter__

# EXHIBIT F

## Form of Joinder Agreement

This Joinder Agreement to the Restructuring Support Agreement, dated as of July 25, 2023 (as amended, supplemented, or otherwise modified from time to time, the "**Agreement**"), between (i) NextPoint Financial Inc.; NPI Holdco LLC.; LT Holdco, LLC; LT Intermediate Holdco, LLC; SiempreTax+ LLC; JTH Tax LLC; JTH Financial, LLC; JTH Properties 1632, LLC; JTH Tax Office Properties, LLC; Wefile LLC; Liberty Credit Repair, LLC; LTS Properties, LLC; 360 Accounting Solutions, LLC; JTH Court Plaza, LLC; LTS Software LLC; CTAX Acquisition LLC; Community Tax LLC; Community Tax Puerto Rico LLC; NPLM Holdco LLC; and LoanMe, LLC; and (ii) the Consenting BP Lenders (as defined therein) is executed and delivered by _____ (the "**Joining Party**") as of _____, 2023. Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Agreement.

1.   **Agreement to Be Bound**. The Joining Party hereby agrees to be bound by all of the terms of, and have all the rights and benefits under, the Agreement, a copy of which is attached to this Joinder Agreement as Exhibit 1 (as the same has been or may be hereafter amended, restated, or otherwise modified from time to time in accordance with the provisions hereof). The Joining Party shall hereafter be deemed to be a "Supporting Creditor," and "Party" for all purposes under the Agreement and with respect to any and all Claims held by such Joining Party.

2.   **Representations and Warranties**. With respect to the aggregate principal amount of the Claims set forth below its name on the signature page hereto, the Joining Party hereby makes the representations and warranties of a Supporting Creditor, as applicable, as set forth in Section 11 of the Agreement to each other Party to the Agreement.

3.   **Governing Law**. This Joinder Agreement shall be governed by and construed in accordance with the internal laws of the Province of British Columbia and the federal laws of Canada applicable therein, without regard to any conflict of law provisions which would require the application of the law of any other jurisdiction.

*[Signature page follows]*

**[JOINING PARTY]**

By: _____
Name:
Title:
Notice Address:




Principal Amount of [the applicable Credit Facility] Claims:  $_____
Principal Amount of Other Claims:  $_____
Interests:  _____


Acknowledged:

**NEXTPOINT ENTITIES:**

**[●]**


_____
Name:
Title:

# EXHIBIT 1

## Restructuring Support Agreement

# EXHIBIT C

## Sale and Investment Solicitation Process

## Sale and Investment Solicitation Process

1. On [●], 2023, the Supreme Court of British Columbia (the "**Court**") granted an order (the "**SISP Order**") that, among other things, (a) authorized the NextPoint Entities to implement a sale and investment solicitation process ("**SISP**") in accordance with the terms hereof, (b) approved the Support Agreement, (c) authorized and directed ● to enter into the Stalking Horse Purchase Agreement, and (d) approved the Break-Up Fee. Capitalized terms that are not defined herein have the meanings ascribed thereto in the Amended & Restated Initial Order granted by the Court in the NextPoint Entities' proceedings under the *Companies' Creditors Arrangement Act* on [●], 2023, as amended, restated or supplemented from time to time, or the SISP Order, as applicable.

2. This SISP sets out the manner in which (i) binding bids for executable transaction alternatives that are superior to the sale transaction to be provided for in the Stalking Horse Purchase Agreement involving the shares and/or the business and assets of the NextPoint Entities will be solicited from interested parties, (ii) any such bids received will be addressed, (iii) any Successful Bid (as defined below) will be selected, and (iv) Court approval of any Successful Bid will be sought. Such transaction alternatives may include, among other things, a sale of some or all of the NextPoint Entities shares, assets and/or business and/or an investment in the NextPoint Entities, each of which shall be subject to all terms set forth in this SISP.

3. The SISP shall be conducted by the NextPoint Entities under the oversight of FTI Consulting Canada Inc., in its capacity as court-appointed monitor (the "**Monitor**").

4. Parties who wish to have their bids considered shall participate in the SISP in accordance with the terms herein.

5. The SISP will be conducted such that the NextPoint Entities will (under the oversight of the Monitor):

    a) prepare marketing materials and a process letter;
    b) prepare and provide applicable parties with access to a data room containing diligence information;
    c) solicit interest from parties to enter into non-disclosure agreements (parties shall only obtain access to the data room and be permitted to participate in the SISP if they execute a non-disclosure agreement that is in form and substance satisfactory to the NextPoint Entities); and
    d) request that such parties (other than the Stalking Horse Bidder or its designee) submit (i) a letter of intent to bid that identifies the potential bidder (which, for the avoidance of doubt, may be a purchaser or an investor) and a general description of the assets and/or business(es) of the NextPoint Entities that would be the subject of the bid and that reflects a reasonable prospect of culminating in a Qualified Bid (as defined below), as determined by the NextPoint Entities in consultation with the Monitor and the Consenting BP NP-Liberty Lenders (as defined in the Support Agreement) (subject to the confidentiality requirements set forth in Section 14

below) (a "**LOI**") by the LOI Deadline (as defined below) and, if applicable, (ii) a binding offer meeting at least the requirements set forth in Section 7 below, as determined by the NextPoint Entities in consultation with the Monitor (a "**Qualified Bid**") by the Qualified Bid Deadline (as defined below).

6. The SISP shall be conducted subject to the terms hereof and the following key milestones:
   a) Court approval of SISP and authorizing the applicable NextPoint Entities to enter into the Stalking Horse Purchase Agreement, and commencement by NextPoint Entities of solicitation process – August 4, 2023, subject to Court availability;
   b) Deadline to submit LOI – 11:59 p.m. Eastern Daylight Time on September 4, 2023 (the "**LOI Deadline**");
   c) Deadline to submit a Qualified Bid – 11:59 p.m. Eastern Daylight Time on September 25, 2023 (the "**Qualified Bid Deadline**");
   d) Deadline to determine whether a bid is a Qualified Bid and, if applicable, to notify those parties who submitted a Qualified Bid of the Auction (as defined below) – 5:00 p.m. Eastern Daylight Time on September 26, 2023;
   e) The NextPoint Entities to hold Auction (if applicable) – 10:00 a.m. Eastern Daylight Time on September 27, 2023; and
   f) Implementation Order (as defined below) hearing:
      o (if no LOI is submitted) – by no later than September 15, 2023, subject to Court availability.
      o (if there is no Auction) – by no later than October 6, 2023, subject to Court availability.
      o (if there is an Auction) – by no later than 9 days after completion of the Auction, subject to Court availability.

7. In order to constitute a Qualified Bid, a bid must comply with the following:

   a. it provides for (i) the payment in full in cash on closing of the DIP Financing (as defined in the Support Agreement), the Expense Reimbursement, and the Break-up Fee, plus cash consideration equal to at least $1,000,000; (ii) the payment in full in cash on closing of the BP NP-Liberty Claims (as defined in the Support Agreement), along with any related interest, fees or other obligations, or the assumption of the BP NP-Liberty Claims (or portion thereof) on terms satisfactory to the Consenting BP NP-Liberty Lenders in their sole discretion; (iii) the payment in full in cash on closing the sum of all amounts secured by each Intercompany Charge in favour of each Intercompany Lender that is not acquired pursuant to the bid; and (iv) the payment in full in cash on closing of any claims ranking in priority to the claims set forth in subparagraphs (i) - (iii), including any claims secured by Court-ordered charges, unless otherwise agreed to by the applicable holders thereof in their sole discretion.
   b. it provides a detailed sources and uses schedule that identifies, with specificity, the amount of cash consideration (the "**Cash Consideration Value**") and any assumptions that could reduce the net consideration payable.

    c.  it is reasonably capable of being consummated within 30 days after completion of the Auction if selected as the Successful Bid;

    d.  it contains:

        i.  duly executed binding transaction document(s);

        ii.  the legal name and identity (including jurisdiction of existence) and contact information of the bidder, full disclosure of its direct and indirect principals, and the name(s) of its controlling equityholder(s);

        iii.  a redline to the Stalking Horse Purchase Agreement, unless the bid is in the form of a plan of arrangement, in which case copies of the plan of arrangement and all documentation that is contemplated to be executed in connection therewith shall be provided;

        iv.  evidence of authorization and approval from the bidder's board of directors (or comparable governing body) and, if necessary to complete the transaction, the bidder's equityholder(s);

        v.  disclosure of any connections or agreements with the NextPoint Entities or any of its affiliates, any known, potential, prospective bidder, or any officer, manager, director, or known equity security holder of the NextPoint Entities or any of its affiliates; and

        vi.  such other information reasonably requested by the NextPoint Entities or the Monitor;

    e.  it includes a letter stating that the bid is submitted in good faith, is binding and is irrevocable until the selection of the Successful Bid; provided, however, that if such bid is selected as the Successful Bid, it shall remain irrevocable until the closing of the Successful Bid;

    f.  it provides written evidence of a bidder's ability to fully fund and consummate the transaction and satisfy its obligations under the transaction documents, including binding equity/debt commitment letters and/or guarantees covering the full value of all cash consideration and the additional items (in scope and amount) covered by the guarantees provided by affiliates of the Purchaser in connection with the Stalking Horse Purchase Agreement;

    g.  it does not include any request for or entitlement to any break fee, expense reimbursement or similar type of payment;

    h.  it is not conditional upon:

        i.  approval from the bidder's board of directors (or comparable governing body) or equityholder(s);

        ii.  the outcome of any due diligence by the bidder; or

        iii.  the bidder obtaining financing;

    i.  it includes an acknowledgment and representation that the bidder has had an opportunity to conduct any and all required due diligence prior to making its bid;

    j.  it specifies any regulatory or other third-party approvals the party anticipates would be required to complete the transaction (including the anticipated timing necessary to obtain such approvals);

    k.  it includes full details of the bidder's intended treatment of the NextPoint Entities' employees under the proposed bid;

    l.  it is accompanied by a cash deposit (the "**Deposit**") by wire transfer of immediately available funds equal to 10% of the Cash Consideration Value, which Deposit shall

       be retained by the Monitor in a non-interest bearing trust account in accordance with this SISP;

   m.  a statement that the bidder will bear its own costs and expenses (including legal and advisor fees) in connection with the proposed transaction, and by submitting its bid is agreeing to refrain from and waive any assertion or request for reimbursement on any basis; and

   n.  it is received by the Qualified Bid Deadline.

8. The NextPoint Entities, in consultation with the Monitor, may waive compliance with any one or more of the requirements specified in Section 7 above and deem a non-compliant bid to be a Qualified Bid, provided that the NextPoint Entities shall not waive compliance with the requirements specified in Subsections 7(a), (b), (d), (e), (f), (g), (i) or (l) without the prior written consent of the Stalking Horse Bidder and Consenting BP NP-Liberty Lenders.

9. Notwithstanding the requirements specified in Section 7 above, the transaction contemplated by the Stalking Horse Purchase Agreement (the "**Stalking Horse Transaction**"), is deemed to be a Qualified Bid, provided that, for greater certainty, no Deposit shall be required to be submitted in connection with the Stalking Horse Transaction.

10. If one or more Qualified Bids (other than the Stalking Horse Transaction) has been received by the NextPoint Entities on or before the Qualified Bid Deadline, the NextPoint Entities may proceed with an auction process to determine the successful bid(s) (the "**Auction**"), which Auction shall be administered in accordance with Schedule "A" hereto. The successful bid(s) selected within the Auction shall constitute the "**Successful Bid**". Forthwith upon determining to proceed with an Auction, the NextPoint Entities shall provide written notice to each party that submitted a Qualified Bid (including the Stalking Horse Transaction), along with copies of all Qualified Bids and a statement by the NextPoint Entities specifying which Qualified Bid is the leading bid.

11. If, by the LOI Deadline no LOI has been received, then the SISP shall be deemed to be terminated and the Stalking Horse Transaction shall be the Successful Bid and shall be consummated in accordance with and subject to the terms of the Support Agreement and the Stalking Horse Purchase Agreement. If no Qualified Bid (other than the Stalking Horse Transaction) has been received by the NextPoint Entities on or before the Qualified Bid Deadline, then the Stalking Horse Transaction shall be the Successful Bid and shall be consummated in accordance with and subject to the terms of the Support Agreement and the Stalking Horse Purchase Agreement.

12. Following selection of a Successful Bid, the NextPoint Entities, with the assistance of its advisors, shall seek to finalize any remaining necessary definitive agreement(s) with respect to the Successful Bid in accordance with the key milestones set out in Section 6. Once the necessary definitive agreement(s) with respect to a Successful Bid have been finalized, as determined by the NextPoint Entities, in consultation with the Monitor, the NextPoint Entities shall apply to the Court for an order or orders approving such Successful

Bid and/or the mechanics to authorize the NextPoint Entities to complete the transactions contemplated thereby, as applicable, and authorizing the NextPoint Entities to (i) enter into any and all necessary agreements and related documentation with respect to the Successful Bid, (ii) undertake such other actions as may be necessary to give effect to such Successful Bid, and (iii) implement the transaction(s) contemplated in such Successful Bid (each, an "**Implementation Order**").

13. All Deposits shall be retained by the Monitor in a non-interest bearing trust account. If a Successful Bid is selected and an Implementation Order authorizing the consummation of the transaction contemplated thereunder is granted, any Deposit paid in connection with such Successful Bid will be non-refundable and shall, upon closing of the transaction contemplated by such Successful Bid, be applied to the cash consideration to be paid in connection with such Successful Bid or be dealt with as otherwise set out in the definitive agreement(s) entered into in connection with such Successful Bid. Any Deposit delivered with a Qualified Bid that is not selected as a Successful Bid, will be returned to the applicable bidder as soon as reasonably practicable (but not later than ten (10) business days) after the date upon which the Successful Bid is approved pursuant to an Implementation Order or such earlier date as may be determined by the NextPoint Entities, in consultation with the Monitor.

14. The NextPoint Entities shall provide information in respect of the SISP to the Consenting BP NP-Liberty Lenders on a confidential basis, including (A) copies of any LOI and any bid received, including any Qualified Bid, no later than one (1) calendar day following receipt thereof by the NextPoint Entities or their advisors, and (B) such other information as reasonably requested by the Consenting BP NP-Liberty Lenders or their legal counsel or financial advisors or as necessary to keep the Consenting BP NP-Liberty Lenders informed no later than two (2) calendar days after any such request or any material change to the proposed terms of any bid received, including any Qualified Bid, as to the terms of any bid, including any Qualified Bid, (including any changes to the proposed terms thereof) and the status and substance of discussions related thereto.

15. Any amendments to this SISP may only be made by: (a) the NextPoint Entities with the written consent of the Monitor and after consultation with the Consenting BP NP-Liberty Lenders, provided that the NextPoint Entities shall not amend Subsections 7(a), (b), (d), (e), (f), (g), (i) or (l) or Section 13 without the prior written consent of the Stalking Horse Bidder and the Consenting BP NP-Liberty Lenders.

## SCHEDULE "A": AUCTION PROCEDURES

1. **Auction.** If the NextPoint Entities receive at least one Qualified Bid (other than the Stalking Horse Transaction), the NextPoint Entities will conduct and administer the Auction in accordance with the terms of the SISP. Instructions to participate in the Auction, which will take place via video conferencing, will be provided to Qualified Parties (as defined below) not less than 24 hours prior to the Auction.

2. **Participation.** Only parties that provided a Qualified Bid by the Qualified Bid Deadline, including the Stalking Horse Transaction (collectively, the "**Qualified Parties**"), shall be eligible to participate in the Auction. No later than 5:00 p.m. Eastern Daylight Time on the day prior to the Auction, each Qualified Party (other than the Stalking Horse Bidder) must inform the NextPoint Entities whether it intends to participate in the Auction. The NextPoint Entities will promptly thereafter inform in writing each Qualified Party who has expressed its intent to participate in the Auction of the identity of all other Qualified Parties that have indicated their intent to participate in the Auction. If no Qualified Party provides such expression of intent, the Stalking Horse Transaction shall be the Successful Bid.

3. **Auction Procedures.** The Auction shall be governed by the following procedures:

 a. **Attendance.** Only the NextPoint Entities, the Qualified Parties, the Monitor and each of their respective advisors will be entitled to attend the Auction, and only the Qualified Parties will be entitled to make any subsequent Overbids (as defined below) at the Auction;

 b. **Minimum Overbid.** The Auction shall begin with the Qualified Bid that represents the highest or otherwise best Qualified Bid as determined by the NextPoint Entities, in consultation with the Monitor (the "**Initial Bid**"), and any bid made at the Auction by a Qualified Party subsequent to the NextPoint Entities' announcement of the Initial Bid (each, an "**Overbid**"), must proceed in minimum additional cash increments of $[●];

 c. **Bidding Disclosure.** The Auction shall be conducted such that all bids will be made and received in one group video-conference, on an open basis, and all Qualified Parties will be entitled to be present for all bidding with the understanding that the true identity of each Qualified Party will be fully disclosed to all other Qualified Parties and that all material terms of each subsequent bid will be fully disclosed to all other Qualified Parties throughout the entire Auction; provided, however, that the NextPoint Entities, in their discretion, may establish separate video conference rooms to permit interim discussions between the NextPoint Entities and individual Qualified Parties with the understanding that all formal bids will be delivered in one group video conference, on an open basis;

 d. **Bidding Conclusion.** The Auction shall continue in one or more rounds and will conclude after each participating Qualified Party has had the

opportunity to submit one or more additional bids with full knowledge and written confirmation of the then-existing highest bid(s); and

e.  **No Post-Auction Bids**. No bids will be considered for any purpose after the Auction has concluded.

4.      **Selection.** Before the conclusion of the Auction, the NextPoint Entities, in consultation with the Monitor, will: (a) review each Qualified Bid, considering the factors set out in Section 7 of the SISP and, among other things, (i) the amount of consideration being offered and, if applicable, the proposed form, composition and allocation of same, (ii) the value of any assumption of liabilities or waiver of liabilities not otherwise accounted for in prong (i) above; (iii) the likelihood of the Qualified Party's ability to close a transaction by thirty (30) days after completion of the Auction and the timing thereof (including factors such as the transaction structure and execution risk, including conditions to, timing of, and certainty of closing; termination provisions; availability of financing and financial wherewithal to meet all commitments; and required governmental or other approvals), (iv) the likelihood of the Court's approval of the Successful Bid, and (v) any other factors the NextPoint Entities may, consistent with its fiduciary duties, reasonably deem relevant; and (b) identify the highest or otherwise best bid received at the Auction (the "**Successful Bid**" and the Qualified Party making such bid, the "**Successful Party**").

5.      **Acknowledgement.** The Successful Party shall complete and execute all agreements, contracts, instruments or other documents evidencing and containing the terms and conditions upon which the Successful Bid was made within one business day of the Successful Bid being selected as such, unless extended by the NextPoint Entities in their sole discretion, subject to the milestones set forth in Section 6 of the SISP.