**Exhibit D**

**Redline of Transaction Agreement**

Purchaser Draft 10-16-2023

# TRANSACTION AGREEMENT[1]

## NEXTPOINT FINANCIAL INC. AND CERTAIN OF ITS SUBSIDIARIES (as set forth herein)

**each as a NextPoint Entity and collectively, as the NextPoint Entities**

**-and-**

## THE LENDERS UNDER THE BP NP-LIBERTY CREDIT AGREEMENT (as defined herein)

**each as a Purchaser and collectively, as the Purchasers**

---

[1] THIS DRAFT OF THE TRANSACTION AGREEMENT IS SUBJECT TO ONGOING NEGOTIATION AND REVISION BY THE PARTIES.

# TABLE OF CONTENTS

**Page**

**ARTICLE 1** INTERPRETATION ..................................................................... 2
    1.1    Definitions ..................................................................................... 2
    1.2    Statutes .......................................................................................... 12
    1.3    Headings, Table of Contents, etc. ................................................. 12
    1.4    Gender and Number ....................................................................... 12
    1.5    Currency ......................................................................................... 12
    1.6    Certain Phrases .............................................................................. 12
    1.7    Invalidity of Provisions ................................................................. ~~13~~12
    1.8    Knowledge ..................................................................................... 13
    1.9    Entire Agreement ........................................................................... 13
    1.10   Waiver, Amendment ...................................................................... 13
    1.11   Governing Law; Jurisdiction and Venue ....................................... ~~14~~13
    1.12   Incorporation of Disclosure Letter, Schedules and Exhibits ........ 14
    1.13   Accounting Terms .......................................................................... 14
    1.14   Non-Business Days ........................................................................ 14
    1.15   Computation of Time Periods ........................................................ 14

**ARTICLE 2** PURCHASE AND SALE ........................................................... 14
    2.1    Agreement to Purchase and Sell .................................................... 14
    2.2    Excluded Assets ............................................................................. ~~15~~14
    2.3    Assumed Liabilities ....................................................................... 15
    2.4    Excluded Liabilities ....................................................................... 16
    2.5    Transfer of Excluded Liabilities to Residual Co. .......................... 16
    2.6    Transfer of Excluded Assets to Residual Co. ................................ ~~17~~16
    2.7    Pre-Closing and Closing Reorganization ...................................... 17

**ARTICLE 3** PURCHASE PRICE AND RELATED MATTERS ..................... ~~18~~17
    3.1    Purchase Price ................................................................................ ~~18~~17
    3.2    Payment of Certain Liabilities ....................................................... ~~19~~18

**ARTICLE 4** REPRESENTATIONS AND WARRANTIES OF THE NEXTPOINT
ENTITIES ........................................................................................................ ~~19~~18
    4.1    Due Authorization and Enforceability of Obligations ................... 19
    4.2    Existence and Good Standing ......................................................... 19
    4.3    Sophisticated Parties ...................................................................... 19
    4.4    Absence of Conflicts ...................................................................... ~~20~~19
    4.5    Approvals and Consents ................................................................. 20
    4.6    No Actions ...................................................................................... 20
    4.7    Subsidiaries .................................................................................... ~~21~~20
    4.8    No Stop Order ................................................................................. 21
    4.9    Title to Assets ................................................................................ 21
    4.10   Taxes .............................................................................................. 21
    4.11   Sanctioned Person .......................................................................... 23
    4.12   Sanctions Laws .............................................................................. 23

4.13    Anti-Money Laundering Laws; Anti-Corruption Laws ........................... ~~23~~24
4.14    Data Security ..................................................................................... ~~23~~24
~~4.15    Capitalization~~ ................................................................................. 24

**ARTICLE 5** REPRESENTATIONS AND WARRANTIES OF THE PURCHASERS ..... 24
5.1    Due Authorization and Enforceability of Obligations ........................ ~~24~~25
5.2    Existence and Good Standing ............................................................ 25
5.3    Sophisticated Party ........................................................................... 25
5.4    Absence of Conflicts ........................................................................ 25
5.5    Approvals and Consents .................................................................... 25
5.6    No Actions ........................................................................................ ~~25~~26
5.7    Accredited Investor .......................................................................... 26
5.8    Financial Ability .............................................................................. 26
5.9    Purchase Price .................................................................................. 26
5.10   Investment Canada Act ..................................................................... 26

**ARTICLE 6** CONDITIONS .......................................................................... ~~26~~27
6.1    Conditions for the Benefit of the Purchasers and the NextPoint Entities .... ~~26~~27
6.2    Conditions for the Benefit of the Purchasers ..................................... 27
6.3    Conditions for the Benefit of the NextPoint Entities .......................... 29
6.4    Waiver of Conditions ........................................................................ ~~29~~30

**ARTICLE 7** ADDITIONAL AGREEMENTS OF THE PARTIES .......................... 30
7.1    Access to Information ........................................................................ 30
7.2    Approvals and Consents .................................................................... 31
7.3    Covenants Relating to this Agreement ............................................... 32
7.4    Tax Matters ...................................................................................... ~~33~~34
7.5    Release by the Purchasers ................................................................. ~~34~~36
7.6    Release by the NextPoint Entities ..................................................... ~~34~~36

**ARTICLE 8** INSOLVENCY PROVISIONS ...................................................... ~~35~~36
8.1    Court Orders and Related Matters ..................................................... ~~35~~36

**ARTICLE 9** TERMINATION ........................................................................ ~~36~~37
9.1    Termination ...................................................................................... ~~36~~37
9.2    Effect of Termination ....................................................................... ~~37~~38

**ARTICLE 10** CLOSING .............................................................................. ~~37~~39
10.1   Location and Time of the Closing ...................................................... ~~37~~39
10.2   NextPoint Entities' Deliveries at Closing .......................................... ~~37~~39
10.3   Purchasers' Deliveries at Closing ...................................................... ~~38~~39
10.4   Monitor ............................................................................................ ~~38~~40
10.5   Simultaneous Transactions ............................................................... ~~39~~40
10.6   Further Assurances ........................................................................... ~~39~~40

**ARTICLE 11** GENERAL MATTERS ............................................................. ~~39~~41
11.1   Confidentiality ................................................................................. ~~39~~41
11.2   Public Notices .................................................................................. ~~40~~41
11.3   Injunctive Relief .............................................................................. ~~41~~42
11.4   Survival ........................................................................................... ~~41~~43

11.5   Non-Recourse ....................................................................................... 4143
11.6   Assignment; Binding Effect ................................................................. 4143
11.7   Notices ................................................................................................. 4243
11.8   Counterparts; Electronic Signatures .................................................... 4446
11.9   Language .............................................................................................. 4546

**Disclosure Letter, Schedules and Exhibits**

Disclosure Letter
Exhibit 1 – Form of Vesting Order

# TRANSACTION AGREEMENT

**THIS AGREEMENT** is made as of October [●]27, 2023

**AMONG:**

NextPoint Financial Inc. ("**NextPoint Parent**")

-and-

NPI Holdco LLC ("**HoldCo**"); LT Holdco, LLC ("**LT Holdco**"); LT Intermediate Holdco, LLC; SiempreTax+ LLC; JTH Tax LLC; JTH Financial, LLC; JTH Properties 1632, LLC; JTH Tax Office Properties, LLC; Wefile LLC; Liberty Credit Repair, LLC; LTS Properties, LLC; 360 Accounting Solutions, LLC; Liberty Tax Holding Corporation; Liberty Tax Service Inc.; JTH Court Plaza, LLC; LTS Software LLC; CTAX Acquisition LLC ("**CTAX Acquisition**"); Community Tax LLC; and Community Tax Puerto Rico LLC[21] (collectively with NextPoint Parent, the "**NextPoint Entities**" and each, a "**NextPoint Entity**");

-and-

the undersigned entities as lenders under the BP NP-Liberty Credit Agreement (as defined below) (such lenders in such capacity, each, a "**Purchaser**" and collectively, the "**Purchasers**").

**RECITALS:**

A.     Pursuant to the Restructuring Support Agreement dated as of July 25, 2023, by and among NextPoint Parent and its Subsidiaries (including each NextPoint Entity) (collectively, the "**Applicants**"), the Purchasers and any other parties signatory thereto from time to time (as amended, supplemented, or otherwise modified from time to time, the "**Support Agreement**"), the parties negotiated the terms of a Sale and Investment Solicitation Process (the "**SISP**") that was implemented in proceedings (the "**CCAA Proceedings**") under the CCAA before the Supreme Court of British Columbia (the "**CCAA Court**").

B.     In accordance with the Support Agreement, the Applicants commenced ancillary insolvency proceedings under Chapter 15 of Title 11 of the United States Code (the "**U.S. Proceedings**") in the U.S. Bankruptcy Court.

C.     The Purchasers are lenders under that certain Revolving Credit Agreement, dated as of July 2, 2021, by and among Holdco, LT Holdco, NextPoint Parent, the subsidiary guarantors from time to time party thereto, the agent for the Purchasers and the lenders

---

[21] The following NextPoint Entities may be referred to as the "CTAX Entities", or each as a "CTAX Entity": CTAX Acquisition LLC, Community Tax LLC and Community Tax Puerto Rico LLC.

ACTIVE\1601524128.8

from time to time party thereto (as amended restated, supplemented, or otherwise modified from time to time, the "**BP NP-Liberty Credit Agreement**").

D.    In accordance with the Support Agreement, the Purchasers acted as a "stalking horse" bidder and were deemed to have submitted the Successful Bid in accordance with the terms of the SISP.

E.    The Parties are entering into this Agreement to give effect to the acquisition by the Purchasers of the Purchased Interests from Holdco, and Holdco has agreed to sell the Purchased Interests to the Purchasers, and the Purchasers further wish to indirectly assume from the Acquired Entities the Assumed Liabilities, subject to and in accordance with the terms and conditions of this Agreement

**NOW THEREFORE**, the Parties agree as follows:

<div align="center">

**ARTICLE 1**
**INTERPRETATION**

</div>

**1.1    Definitions**

"**Acquired Entities**" means, subject to the Implementation Steps, collectively, each of the NextPoint Entities other than NextPoint Parent and Holdco, and "**Acquired Entity**" means any one of them.

"**Affiliate**" means, with respect to any specified Person, any other Person which, directly or indirectly, through one or more intermediaries controls, or is controlled by, or is under common control with, such specified Person (for the purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise). For greater certainty, an Affiliate of a Person shall include such Person's investment funds and managed accounts and any funds managed or directed by the same investment advisor.

"**Affiliated Group**" means any affiliated group as defined in Section 1504 of the Code that has filed a consolidated return for U.S. federal income tax purposes (or any consolidated, combined or unitary group under state, local or non-U.S. Applicable Law).

"**Agreement**" means this transaction agreement and all attachments, including the Disclosure Letter and Exhibits, in each case as the same may be supplemented, amended, restated or replaced from time to time, and the expressions "hereof", "herein", "hereto", "hereunder", "hereby" and similar expressions refer to this transaction agreement and all attached Exhibits, and unless otherwise indicated, references to Articles, Sections, the Disclosure Letter and Exhibits are to Articles, Sections, the Disclosure Letter and Exhibits in this transaction agreement.

"**Antitrust Approvals**" means any approval, clearance, filing or expiration or termination of a waiting period pursuant to which a transaction would be deemed to be

<div align="center">2</div>

unconditionally approved in relation to the transactions contemplated hereby under any Antitrust Law of any country or jurisdiction that the Purchasers agree, acting reasonably, is required.

"**Antitrust Laws**" means all Applicable Laws, including any antitrust, competition or trade regulation laws (including the HSR Act), that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization, restraint of trade or lessening or preventing competition through merger or acquisition.

"**Applicable Law**" means any transnational, domestic or foreign, federal, provincial, territorial, state, local or municipal (or any subdivision of any of them) law (including common law and civil law), statute, ordinance, rule, regulation, restriction, limit, by-law (zoning or otherwise), judgment, order, direction or any consent, exemption, Transaction Regulatory Approval, or any other legal requirements of, or agreements with, any Governmental Authority, that applies in whole or in part to the transactions contemplated by this Agreement, the NextPoint Entities, the Purchasers, the Business, or any of the Purchased Interests or the Assumed Liabilities.

"**Applicants**" has the meaning given to such term in <u>Recital A</u>.

"**Assumed Liabilities**" has the meaning given to such term in <u>Section 2.3</u>.

"**BP CTAX Second Lien Credit Agreement**" means the Credit Agreement, dated as of June 29, 2022, by and among CTAX Acquisition LLC, the subsidiary guarantors from time to time party thereto, BP Commercial Funding Trust II, Series SPL-I as administrative agent and the lenders from time to time party thereto, as may be amended restated, supplemented, or otherwise modified from time to time.

"**BP NP-Liberty Credit Agreement**" has the meaning given to such term in <u>Recital C</u>.

"**Business**" means the financial services businesses carried on by the NextPoint Entities as of the date hereof and as of immediately prior to the Closing.

"**Business Day**" means any day, other than a Saturday or Sunday, on which the principal commercial banks in Vancouver, British Columbia and Houston, Texas are open for commercial banking business during normal banking hours.

"**Causes of Action**" means any action, claim, cross claim, third party claim, damage, judgment, cause of action, controversy, demand, right, action, suit, obligation, liability, debt, account, defense, offset, power, privilege, license, lien, indemnity, interest, guaranty, or franchise of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, matured or unmatured, suspected or unsuspected, in contract or in tort, at law or in equity, or pursuant to any other theory of law or otherwise, of the NextPoint Entities against any Person, in each case based in whole or in part on any act or omission, transaction, dealing or other occurrence existing or taking place on or prior to the Closing Time.

"**CCAA**" means the *Companies' Creditors Arrangement Act* (Canada).

"**CCAA Court**" has the meaning given to such term in <u>Recital A</u>.

"**CCAA Proceedings**" has the meaning given to such term in <u>Recital A</u>.

"**Closing**" means the completion of the sale and purchase of the Purchased Interests pursuant to this Agreement at the Closing Time, and all other transactions contemplated by this Agreement that are to occur contemporaneously with the sale and purchase of the Purchased Interests.

"**Closing Cash Payment**" means [an amount to be determined with the NextPoint Entities that will be sufficient to pay any outstanding Priority Payables].

"**Closing Date**" means, unless the Parties otherwise agree in writing, a date no later than five (5) Business Days after the conditions set forth in <u>Article 6</u> have been satisfied or waived, other than the conditions set forth in <u>Article 6</u> that by their terms are to be satisfied or waived (to the extent permitted by Applicable Law) at the Closing, but subject to the satisfaction or waiver (to the extent permitted by Applicable Law) of such condition at the Closing; provided that, if there is to be a Closing hereunder, then the Closing Date shall be no later than the Outside Date.

"**Closing Documents**" means all contracts, agreements, certificates and instruments required by this Agreement to be delivered at or before the Closing.

"**Closing Time**" means 12:01 a.m. (Vancouver time) on the Closing Date or such other time on the Closing Date as the Parties agree in writing that the Closing Time shall take place.

"**Code**" means the United States Internal Revenue Code of 1986, as amended.

"**Continuing Contract**" means a contract, arrangement, or other agreement (oral or written) to which any of the Acquired Entities is party for which a notice of disclaimer pursuant to Section 32 of the CCAA has not been sent by any of the NextPoint Entities.

"**Contracts**" means contracts, licences, leases, agreements, obligations, promises, undertakings, understandings, arrangements, documents, commitments, entitlements or engagements.

"**Credit Bid Amount**" has the meaning given to such term in <u>Section 3.1(a)(ii)</u>.

"**CRO**" means Province, LLC, Province Fiduciary Services, LLC, and for greater certainty, Peter Kravitz acting as chief restructuring officer to the NextPoint Entities pursuant to the Initial CCAA Order.

"**CTAX Acquisition**" has the meaning given to such term in the preamble to this Agreement.

"**CTAX Credit Bid Amount**" has the meaning given to such term in <u>Section 3.1(a)(ii)</u>.

"**CTAX First Lien Debt**" means debt which is secured by a first priority lien on assets securing the Drake Credit Agreement.

"**CTAX Second Lien Debt**" means, collectively, debt which is secured by a second priority lien on assets securing each of the BP CTAX Second Lien Credit Agreement and the Frontier Second Lien Credit Agreement.

["**Data Security Requirements**" means, collectively, all of the following to the extent relating to the access, collection, use, processing, storage, disclosure, destruction, or disposal of any personal, sensitive, or confidential information or data (whether in electronic or any other form or medium) or data privacy, security, or security breach notification requirements applicable to any NextPoint Entity, to the conduct of the business of the NextPoint Entities, or to any of the IT Systems: (i) any NextPoint Entity's own written rules, policies, and procedures; (ii) all Applicable Laws; (iii) industry standards applicable to the industries in which any NextPoint Entity operated (including PCI-DSS); and (iv) contracts and agreements into which any NextPoint Entity has entered or by which it is otherwise bound.]

"**DIP Financing**" means the debtor-in-possession financing facility made available to the NextPoint Entities by the Purchasers pursuant to the DIP Term Sheet.

"**DIP Term Sheet**" means the Interim Financing Term Sheet between, among others, the NextPoint Entities party thereto and the Purchasers, dated as of July 25, 2023, as such term sheet may be amended, restated, supplemented and/or otherwise modified in accordance with the terms thereof.

"**Disclosure Letter**" means the disclosure letter dated the date hereof regarding this Agreement.

"**Drake Credit Agreement**" means the Credit Agreement, dated as of June 29, 2022, by and among CTAX Acquisition LLC, the subsidiary guarantors from time to time party thereto, Drake Enterprises Ltd. as administrative agent and the lenders from time to time party thereto, as may be amended restated, supplemented, or otherwise modified from time to time.

"**Encumbrance**" means any security interest (whether contractual, statutory or otherwise), lien, prior claim, charge, hypothec, reservation of ownership, pledge, encumbrance, mortgage, trust (including any statutory, deemed or constructive trust), option or adverse claim or encumbrance of any nature or kind.

"**Equity Interests**" means any capital share, capital stock, partnership, membership, joint venture or other ownership or equity interest, participation or securities (whether voting or nonvoting, whether preferred, common or otherwise, and including share appreciation, contingent interest or similar rights) of a Person.

"**ETA**" means the *Excise Tax Act* (Canada).

"**Excluded Assets**" has the meaning given to such term in <u>Section 2.2</u>.

"**Excluded Contracts**" means contracts of the NextPoint Entities as specified on Schedule 2.2(eb) of the Disclosure Letter, which the Purchaser may modify at any time up to three (3) Business Days prior to the Closing Date.

"**Excluded Liabilities**" has the meaning given to such term in Section 2.4.

"**Final Order**" means with respect to any order or judgment of the CCAA Court or the U.S. Bankruptcy Court, or any other court of competent jurisdiction, with respect to the subject matter addressed in the CCAA Proceedings or the U.S. Proceedings or the docket of any court of competent jurisdiction, that such order or judgement has not been vacated, set aside, reversed, stayed, modified or amended, and as to which the applicable periods to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired and no appeal, leave to appeal, or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken or filed, or as to which any appeal has been taken or any petition for certiorari or leave to appeal that has been timely filed has been withdrawn or resolved in a manner acceptable to the NextPoint Entities and the Purchasers, each acting reasonably, by the highest court to which the order or judgment was appealed or from which leave to appeal or certiorari was sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice; *provided, however*, that the possibility that a motion under Rule 60 of the United States Federal Rules of Civil Procedure, or any analogous rule under the U.S. Bankruptcy Code, may be filed relating to such order shall not cause such order to not be a Final Order.

"**Frontier Second Lien Credit Agreement**" means the Credit Agreement, dated as of June 29, 2022, by and among CTAX Acquisition LLC, the subsidiary guarantors from time to time party thereto, Frontier Capital Group, Ltd. as administrative agent and the lenders from time to time party thereto, as may be amended restated, supplemented, or otherwise modified from time to time.

"**Fundamental Representations and Warranties**" means the representations and warranties of the NextPoint Entities included in Sections 4.1 [*Due Authorization and Enforceability of Obligations*], 4.2 [*Existence and Good Standing*], 4.4 [*Absence of Conflicts*], 4.5 [*Approvals and Consents*], 4.7 [*Subsidiaries*] and 4.9 [*Title to Assets*][ and Section 4.15 [*Capitalization*]].

"**Governmental Authority**" means any government, regulatory authority, governmental department, agency, commission, bureau, official, minister, Crown corporation, court, board, tribunal or dispute settlement panel or other law, rule or regulation-making organization or entity (i) having or purporting to have jurisdiction on behalf of any nation, province, territory or state or any other geographic or political subdivision of any of them, or (ii) exercising, or entitled or purporting to exercise any administrative, executive, judicial, legislative, policy, regulatory or taxing authority or power.

"**GST/HST**" means all goods and services tax and harmonized sales tax imposed under Part IX of the ETA or any other statute in any jurisdiction of Canada.

"**Holdco**" has the meaning given to such term in the preamble to this Agreement.

"**HSR Act**" means the U.S. Hart-Scott-Rodino Antitrust Improvements Act of 1976.

"**IFRS**" means International Financial Reporting Standards as issued by the International Accounting Standards Board.

"**Implementation Steps**" has the meaning given to such term in <u>Section 2.7(b)</u>.

"**Initial CCAA Order**" means the initial order of the CCAA Court pursuant to the CCAA commencing the CCAA Proceedings, as amended, restated, supplemented and/or modified from time to time.

"**Investment Canada Act**" means the *Investment Canada Act* (Canada), R.S.C., 1985, c. 28 (1st Supp).

"**IT Systems**" means all (i) computer, computer systems, servers, hardware, telecommunications and network equipment firmware, middleware, networks, servers, workstations, routers, hubs, switches, data communication equipment and lines, telecommunications equipment and lines, and all other information technology equipment, and (ii) related off-the-shelf, commercially available software and customized software developed for the NextPoint Entities, in each case owned, leased, licensed or subscribed to by the NextPoint Entities.

"**Liberty Term Loan**" means the term loan debt borrowed by LT Holdco and guaranteed by certain of the other NextPoint Entities which is documented by the BP NP-Liberty Credit Agreement, as such term is defined in the Support Agreement.

"**LoanMe Entities**" means, collectively, NPLM Holdco LLC, MMS Servicing LLC, LoanMe, LLC, LoanMe Funding, LLC, LoanMe Stores LLC, LM Retention Holdings, LLC, LM BP Holdings, LLC, InsightsLogic LLC, LM 2020 CM I SPE, LLC, LoanMe Trust Prime 2018-1 and LoanMe Trust SBL 2019-1 and each of their respective predecessors and successors.

"**LT Credit Bid Amount**" has the meaning given to such term in <u>Section 3.1(a)(i)</u>.

"**LT Holdco**" has the meaning given to such term in the preamble to this Agreement.

"**Material Adverse Effect**" means any change, effect, event, occurrence, state of facts or development that has had, or would reasonably be expected to have, individually or in the aggregate, a material adverse effect on (i) the business, assets, liabilities, financial conditions or results of operations of the NextPoint Entities, taken as a whole, or (ii) prevents the ability of the NextPoint Entities to perform their obligations under, or to consummate the transactions contemplated by, this Agreement; <u>provided</u>, in the case of the foregoing clause (i), no change, effect, event, occurrence, state of facts or development resulting from the following shall constitute a Material Adverse Effect or be taken into account in determining whether a Material Adverse Effect has occurred, is occurring or would be occurring: (a) general economic or business conditions; (b) Canada, the U.S. or foreign economies, or financial, banking or securities markets in general, or other general business, banking, financial or economic conditions (including (i) any disruption in any of the foregoing markets, (ii) any change in the currency exchange rates or (iii) any decline or rise in the price of any security, commodity,

contract or index); (c) acts of God or other calamities (including plagues or outbreaks of epidemics or pandemics (including the novel coronavirus)), national or international political or social conditions, including the engagement and/or escalation by the U.S. or Canada in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the U.S. or Canada or any of their territories, possessions or diplomatic or consular offices or upon any military installation, equipment or personnel of the U.S. or Canada; (d) the identity of the Purchasers or their Affiliates; (e) conditions affecting generally the industry in which the NextPoint Entities participate; (f) the public announcement of, entry into or pendency of, actions required or contemplated by or performance of obligations under, this Agreement or the transactions contemplated by this Agreement, or the identity of the Parties, including any termination of, reduction in or similar adverse impact on relationships, contractual or otherwise, with any customers, suppliers, financing sources, licensors, licensees, distributors, partners, employees or others having relationships with the NextPoint Entities; (g) changes in Applicable Laws or the interpretation thereof; (h) any change in IFRS or other accounting requirements or principles; (i) national or international political, labor or social conditions; (j) the failure of the NextPoint Entities to meet or achieve the results set forth in any internal projections (but not the underlying facts giving rise to such failure unless such facts are otherwise excluded pursuant to the clauses contained in this definition); or (k) any material and uncured breach by the Purchasers of this Agreement, or any change resulting from compliance with the terms of, or any actions taken (or not taken) by any Party pursuant to or in accordance with, this Agreement; provided that the exceptions set forth in clauses (a), (b), (c), (e), (g), (h) or (i) shall not apply to the extent that such event is disproportionately adverse to the NextPoint Entities, taken as a whole, as compared to other companies in the industries in which the NextPoint Entities operate.

"**Monitor**" means FTI Consulting Canada Inc., as Court-appointed monitor of the NextPoint Entities in the CCAA Proceedings pursuant to the Initial CCAA Order and not in its personal capacity.

"**Monitor's Certificate**" means the certificate delivered to the Purchasers and filed with the CCAA Court by the Monitor certifying that the Monitor has received written confirmation in form and substance satisfactory to the Monitor from the NextPoint Entities and the Purchasers that all conditions to the Closing have been satisfied or waived by the applicable Parties and the transactions contemplated by this Agreement have been completed.

"**NextPoint Entities Equity Interests**" h~~as~~ the meaning given to such term in ~~Section 4.15~~.

"**NextPoint Entity**" and "**NextPoint Entities**" have the meaning given to such terms in the preamble to this Agreement.

"**NextPoint Parent**" has the meaning given to such term in the preamble to this Agreement.

"**Order**" means any order of the Court made in the CCAA Proceedings, any order of the U.S. Court made in the U.S. Proceedings, or any order, directive, judgment, decree, injunction, decision, ruling, award or writ of any Governmental Authority.

"**Outside Date**" has the meaning given to such term in the Support Agreement.

"**Parties**" means the NextPoint Entities and the Purchasers, collectively, and "**Party**" means either the NextPoint Entities or the Purchasers, as the context requires.

"**Permitted Encumbrances**" means the Encumbrances listed in Schedule 1.1(b) of the Disclosure Letter, including for the avoidance of doubt, all registrations relating to the Liberty Term Loan.

"**Person**" means includes an individual, partnership, firm, joint venture, venture capital fund, limited liability company, unlimited liability company, association, trust, entity, corporation, unincorporated association, or organization, syndicate, committee, court appointed representative, the government of a country or any political subdivision thereof, or any agency, board, tribunal, commission, bureau, instrumentality, or department of such government or political subdivision, or any other entity, howsoever designated or constituted, including any Taxing Authority, and the trustees, executors, administrators, or other legal representatives of an individual, and for greater certainty includes any Governmental Authority.

"**Priority Payables**" means any Encumbrances on the assets of the NextPoint Entities that rank prior to the interests of the Purchasers' security interest in the assets of the NextPoint Entities, and are not otherwise an Assumed Liability, in an aggregate amount not exceeding $500,000 (the purchase of a tail directors' and officers' liability insurance policy shall be considered a Priority Payable).

"**Purchase Price**" has the meaning given to such term in Section 3.1(a).

"**Purchased Interests**" has the meaning given to such term in Section 2.1.

"**Purchaser**" and "**Purchasers**" have the meanings given to such terms in the preamble to this Agreement.

"**Released Claims**" means all claims, demands, complaints, grievances, actions, applications, suits, causes of action, Orders, charges, indictments, prosecutions, informations or other similar processes, assessments or reassessments, judgments, debts, liabilities, expenses, costs, damages or losses, contingent or otherwise, whether liquidated or unliquidated, matured or unmatured, disputed or undisputed, contractual, legal or equitable, including loss of value, professional fees, including "claims" as defined in the CCAA or the U.S. Bankruptcy Code and including fees and disbursements of legal counsel on a full indemnity basis, and all costs incurred in investigating or pursuing any of the foregoing or any proceeding relating to any of the foregoing.

"**Residual Co.**" means an entity or entities to be formed by NextPoint Parent in Canada and/or the United States, in each case, in form satisfactory to the Purchasers, acting reasonably, prior to the Closing and each of which shall have no issued and outstanding shares; provided,

that no such entity shall be a flow through entity for Canadian or U.S. tax purposes unless approved in writing by the Purchasers.

"**Sanctioned Country**" means any country or territory to the extent that such country or territory itself is the subject of any comprehensive sanctions, or any country or territory whose government is the subject of Sanctions Laws or that is otherwise the subject of broad restrictions under Sanctions Laws.

"**Sanctioned Person**" means (a) any Person identified in any Sanctions Law-related list of designated Persons maintained by the Government of Canada or other Sanctions Laws authorities, (b) any Person located, incorporated, or resident in a Sanctioned Country, or (c) any Person directly or indirectly owned or controlled by, or acting for the benefit or on behalf of, a Person described in clause (a) or (b) to the extent the owned or controlled Person is itself subject to the restrictions or prohibitions as the Person described in clause (a) or (b).

"**Sanctions Laws**" means economic and financial sanctions laws administered, enacted or enforced from time to time by the Government of Canada, U.S., European Union, United Kingdom, or United Nations Security Council.

["**Security Incident**" means any (i) material breach of security, successful phishing incident, ransomware or malware attack affecting any IT System or the confidential or proprietary data of any NextPoint Entity, or (ii) incident in which personal data was accessed, disclosed, destroyed, processed, used, or exfiltrated in an unauthorized manner (whether any of the foregoing was possessed or controlled by such NextPoint Entity or by another Person on behalf of such NextPoint Entity).]

"**SISP**" has the meaning given to such term in the recitals to this Agreement.

"**SISP Order**" means an order of the CCAA Court that, among other things, approves the SISP and related matters.

"**SISP Recognition Order**" means the Order of the U.S. Bankruptcy Court entered in the U.S. Proceedings recognizing and giving effect to the SISP Order.

"**Subsidiary**" means, with respect to any Person, each Person that is controlled by the first Person (for the purposes of this definition, "control", as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise).

"**Successful Bid**" has the meaning given to such term in the SISP.

"**Support Agreement**" has the meaning given to such term in Recital A.

"**Tax**" and "**Taxes**" means taxes, duties, fees, premiums, assessments, imposts, levies and other charges of any kind whatsoever (including withholding on amounts paid to or by any Person) imposed by any Taxing Authority, including all interest, penalties, fines, additions to tax

or other additional amounts imposed by any Taxing Authority in respect thereof, and including those levied on, or measured by, or referred to as, income, gross receipts, profits, capital, transfer, land transfer, sales, goods and services, harmonized sales, use, value-added, excise, stamp, withholding, business, franchising, escheat, unclaimed property, estimated, property, development, occupancy, employer health, payroll, employment, health, disability, severance, unemployment, social services, education and social security taxes, all surtaxes, all customs duties and import and export taxes, countervail and anti-dumping, all license, franchise and registration fees and all employment insurance, health insurance and other government pension plan premiums or contributions, and including those payable or creditable in respect of, arising out of or under any COVID-19 economic support.

"**Tax Act**" means the *Income Tax Act* (Canada) and shall also include a reference to any applicable and ~~correspnding~~corresponding provisions under the income tax laws or a province or territory of Canada, as applicable.

"**Tax Return**" means any return, declaration, report, statement, information statement, form, election, amendment, claim for refund, schedule or attachment thereto or other document filed or required to be filed with a Taxing Authority with respect to Taxes.

"**Taxing Authority**" means His Majesty the King in right of Canada, His Majesty the King in right of any province or territory of Canada, the Canada Revenue Agency, any similar revenue or taxing authority of Canada and each and every province or territory of Canada and any political subdivision thereof, the United States Internal Revenue Service, any similar revenue or taxing authority of the U.S. and each and every state and locality of the U.S., and any Canadian, U.S. or other Governmental Authority exercising taxing authority or power, and "Taxing Authority" means any one of the Taxing Authorities.

"**Transaction Regulatory Approvals**" means any material licenses, permits or approvals required from any Governmental Authority or under any Applicable Laws relating to the business and operations of the NextPoint Entities that would be required to be obtained in order to permit the NextPoint Entities and the Purchasers to complete the transactions contemplated by this Agreement and the Support Agreement, including but not limited to, and in each case to the extent it has been agreed to in accordance this Agreement that such approval shall be obtained, the Antitrust Approvals.

"**Transfer Taxes**" means all transfer, documentary, sales, use, stamp, registration, customs duties, import and export taxes, surtaxes, value added, GST/HST, provincial sales/retail Taxes, conveyance fees, security interest filing or recording fee and any other similar Taxes (including any real property transfer Tax and any other similar Tax), any governmental assessment, and any related penalties and interest.

"**U.S.**" means the United States of America.

"**U.S. Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101 et seq, as amended.

"**U.S. Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware, overseeing the U.S. Proceedings.

"**U.S. Proceedings**" has the meaning given to such term in <u>Recital B</u>.

"**Vesting Order**" means an order of the CCAA Court <u>entered in the CCAA Proceedings</u> substantially in the form of Exhibit 1 hereto (or as otherwise acceptable to the NextPoint Entities and the Purchasers, each acting reasonably).

"**Vesting Recognition Order**" means an order of the U.S. Bankruptcy Court entered in the U.S. Proceedings in form and substance acceptable to the Purchasers, acting reasonably, which shall, among other things, recognize and give effect to the Vesting Order and otherwise approve this Agreement and the transactions contemplated hereby.

## 1.2    Statutes

Except as otherwise provided in this Agreement, any reference in this Agreement to a statute refers to such statute and all rules and regulations made under it, as it or they may have been or may from time to time be amended, re-enacted or replaced.

## 1.3    Headings, Table of Contents, etc.

The provision of a table of contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenient reference only and do not affect the interpretation of this Agreement. The recitals to this Agreement are an integral part of this Agreement.

## 1.4    Gender and Number

In this Agreement, unless the context otherwise requires, words importing the singular include the plural and *vice versa*, and words importing gender include all genders.

## 1.5    Currency

Except where otherwise expressly provided, all amounts in this Agreement are stated and shall be paid in U.S. dollars. References to "$" are to U.S. dollars. References to "C$" are to Canadian dollars.

## 1.6    Certain Phrases

In this Agreement (i) the words "including", "includes" and "include" and any derivatives of such words mean "including (or includes or include) without limitation" and (ii) the words "the aggregate of", "the total of", "the sum of", or a phrase of similar meaning means "the aggregate (or total or sum), without duplication, of". The expression "Article", "Section" and other subdivision followed by a number, mean and refer to the specified Article, Section or other subdivision of this Agreement.

**1.7    Invalidity of Provisions**

Each of the provisions contained in this Agreement is distinct and severable and a declaration of invalidity or unenforceability of any such provision or part thereof by a court of competent jurisdiction shall not affect the validity or enforceability of any other provision hereof so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon (i) such a determination of invalidity or unenforceability or (ii) any change in Applicable Law or other action by any Governmental Authority which materially detracts from the legal or economic rights or benefits, or materially increases the obligations, of any Party or any of its Affiliates under this Agreement, the Parties shall negotiate to modify this Agreement in good faith so as to effect the original intent of the Parties as closely as possible in an acceptable manner so that the transactions contemplated by this Agreement be consummated as originally contemplated to the fullest extent possible.

**1.8    Knowledge**

Any reference to the knowledge of (i) a NextPoint Entity, means the actual knowledge, after reasonable inquiry, of Scott Terrell (who, for the sake of clarity and avoidance of doubt, shall have no personal liability or obligations regarding such knowledge), and (ii) a Purchaser, means the actual knowledge, after reasonable inquiry, of Eric Schneider (who, for the sake of clarity and avoidance of doubt, shall have no personal liability or obligations regarding such knowledge).

**1.9    Entire Agreement**

This Agreement, the Disclosure Letter, the Support Agreement and the agreements and other documents required to be delivered pursuant to this Agreement or the Support Agreement, constitute the entire agreement among the Parties, and set out all the covenants, promises, warranties, representations, conditions and agreements among the Parties in connection with the subject matter of this Agreement, and supersede all prior agreements, understandings, negotiations and discussions, whether oral or written, pre-contractual or otherwise. There are no covenants, promises, warranties, representations, conditions, understandings or other agreements, whether oral or written, pre-contractual or otherwise, express, implied or collateral among the Parties in connection with the subject matter of this Agreement, except as specifically set forth in this Agreement or the Support Agreement and any document required to be delivered pursuant to this Agreement or the Support Agreement.

**1.10    Waiver, Amendment**

Except as expressly provided in this Agreement, no amendment or waiver of this Agreement shall be binding unless executed in writing by all Parties hereto. No waiver of any provision of this Agreement shall constitute a waiver of any other provision nor shall any waiver of any provision of this Agreement constitute a continuing waiver unless otherwise expressly provided. The NextPoint Entities agree to make such amendments to this Agreement as are reasonably requested by the Purchasers from time to time to give effect to the transactions

contemplated herein, provided that such amendments do not change the value of the Purchase Price and are not materially prejudicial to the interests of any creditor of the NextPoint Entities.

**1.11    Governing Law; Jurisdiction and Venue**

This Agreement, the rights and obligations of the Parties under this Agreement, and any claim or controversy directly or indirectly based upon or arising out of this Agreement or the transactions contemplated by this Agreement (whether based on contract, tort or any other theory), including all matters of construction, validity and performance, shall in all respects be governed by, and interpreted, construed and determined in accordance with, the laws of the Province of British Columbia and the federal laws of Canada applicable therein, without regard to the conflicts of law principles thereof. The Parties consent to the jurisdiction and venue of the CCAA Court for the resolution of any such disputes arising under this Agreement. Each Party agrees that service of process on such Party as provided in Section 11.7 shall be deemed effective service of process on such Party.

**1.12    Incorporation of Disclosure Letter, Schedules and Exhibits**

The Disclosure Letter and any schedule or exhibit attached thereto, and any schedule or exhibit attached to this Agreement, is an integral part of this Agreement.

**1.13    Accounting Terms**

All accounting terms used in this Agreement are to be interpreted in accordance with IFRS unless otherwise specified.

**1.14    Non-Business Days**

Whenever payments are to be made or an action is to be taken on a day which is not a Business Day, such payment will be made or such action will be taken on or not later than the next succeeding Business Day.

**1.15    Computation of Time Periods**

If any action may be taken within, or any right or obligation is to expire at the end of, a period of days under this Agreement, then the first day of the period is not counted, but the day of its expiry is counted.

<div align="center">

**ARTICLE 2**
**PURCHASE AND SALE**

</div>

**2.1    Agreement to Purchase and Sell**

Upon and subject to the terms and conditions of this Agreement, at the Closing and effective as of the Closing Time, and subject to the completion of the Implementation Steps required to be completed prior to the Closing Time, the Purchasers shall purchase from Holdco, and Holdco shall sell to the Purchasers, free and clear of all Encumbrances, all of the Equity Interests in the

<div align="center">14</div>

capital of CTAX Acquisition and LT Holdco (collectively, the "**Purchased Interests**") pursuant to the ~~Implementation Steps and, pursuant to the~~ Vesting Order and the Implementation Steps.

## 2.2    Excluded Assets

Notwithstanding any provision of this Agreement to the contrary, as of the Closing, the assets of the Acquired Entities shall not include any of the following assets or any other assets as set forth on <u>Schedule 2.2</u> of the Disclosure Letter, which Schedule may be modified as agreed upon by the NextPoint Entities and the Purchasers, each acting reasonably, at least three (3) days prior to the Closing (collectively, the "**Excluded Assets**"):

(a)    the Tax Returns, and books and records pertaining thereto and other documents, in each case, to the extent related solely to any of the Excluded Liabilities, provided that the applicable Acquired Entities may take copies of all Tax Returns and books and records pertaining thereto (as redacted, if applicable) to the extent necessary or useful for the carrying on of the Business after the Closing, including the filing of any Tax Return; provided, however, that Residual Co. shall retain the original of any of the records required to be provided to the applicable Acquired Entity hereunder (and provide the applicable Acquired Entity with a copy thereof) to the extent that Residual Co. is required to do so under Applicable Law;

(b)    the Excluded Contracts;

(c)    all communications, information or records, written or oral, that are in any way related to (i) the transactions contemplated by this Agreement, (ii) the sale of the Purchased Interests, (iii) any Excluded Asset or (iv) any Excluded Liability;

(d)    the Equity Interests of each entity set forth on <u>Schedule 2.2(d)</u> of the Disclosure Letter, which Schedule may be modified as agreed upon by the NextPoint Entities and the Purchasers, each acting reasonably, at least three (3) days prior to the Closing;

(e)    escrowed cash (i) in the amount of $600,000 for wind down, and (ii) for professional fee retainers held in the segregated escrow bank account set forth in the DIP Term Sheet; provided that any unused portion of such escrowed cash, after payment or reservation for all wind down expenses and professional fee retainers, as determined by the Monitor, shall be transferred by the Monitor or the CRO, as applicable, to the Acquired Entities after the Closing;

(f)    claims and/or causes of actions solely and directly related to Excluded Assets or the Excluded Liabilities; and

(g)    any rights that accrue to Residual Co. under the transaction documents.

## 2.3    Assumed Liabilities

[Subject to the Implementation Steps and pursuant to this Agreement and the Vesting Order, as of the Closing Time, the obligations and liabilities of the Acquired Entities shall

consist of only the items specifically set forth below, as applicable (collectively, the "**Assumed Liabilities**"); provided, for the avoidance of doubt the Assumed Liabilities of any Acquired Entity pursuant to this Section 2.3 shall continue to be liabilities of the applicable Acquired Entity as of the Closing:

(a)     all debts, liabilities and obligations under the Continuing Contracts that are not Excluded Contracts, for the period from and after the Closing;

(b)     all Taxes to be borne by ~~the~~ Acquired Entities pursuant to Section 7.4;

(c)     all non-delinquent current liabilities incurred after the commencement of the CCAA Proceedings that are existing on the Closing Date, being (i) accounts payable invoiced within ~~14~~30 days of Closing Date and (ii) accrued but uninvoiced accounts payable; and

(d)     the Liberty Term Loan.~~]~~

**2.4    Excluded Liabilities**

Except as expressly assumed pursuant to or specifically contemplated by Section 2.3, all claims and all debts, obligations, and liabilities of the Acquired Entities or any predecessors of the Acquired Entities, of any kind or nature, shall be assigned and become the sole obligation of the applicable Residual Co. pursuant to the terms of the Vesting Order and this Agreement and, as of the Closing, the Acquired Entities shall not have any obligation, duty, or liability of any kind whatsoever, except as expressly assumed pursuant to Section 2.3, whether accrued, contingent, known or unknown, express or implied, primary or secondary, direct or indirect, liquidated, unliquidated, absolute, accrued, contingent or otherwise, and whether due or to become due, and such liabilities or obligations shall be the sole responsibility of the applicable Residual Co. (collectively, the "**Excluded Liabilities**"). All intercompany obligations and balances which do not continue as Assumed Liabilities pursuant to the Implementation Steps shall be Excluded Liabilities. For the avoidance of any doubt, any CTAX Second Lien Debt is an Excluded Liability.

**2.5    Transfer of Excluded Liabilities to Residual Co.**

On the Closing Date, pursuant to the terms of the Vesting Order, the Acquired Entities shall assign and transfer the Excluded Liabilities to the applicable Residual Co. (with Excluded Liabilities with respect to any Acquired Entity organized in Canada being assigned to the Residual Co. organized in Canada and any Excluded Liabilities with respect to any Acquired Entity organized in the United States being assigned to the Residual Co. organized in the United States), and such Residual Co. shall assume the applicable Excluded Liabilities. All of the Excluded Liabilities shall be discharged from the Acquired Entities as of the Closing, pursuant to the Vesting Order.

**2.6    Transfer of Excluded Assets to Residual Co.**

On the Closing Date, pursuant to the terms of the Vesting Order and, where applicable, in consideration for Residual Co. assuming the Excluded Liabilities pursuant to Section 2.5 from an

Acquired Entity, the Acquired Entities shall assign and transfer the Excluded Assets to the applicable Residual Co. (with Excluded Assets with respect to any Acquired Entity organized in Canada being assigned to the Residual Co. organized in Canada and any Excluded Assets with respect to any Acquired Entity organized in the United States being assigned to the Residual Co. organized in the United States), and the Excluded Assets shall be vested in the applicable Residual Co. pursuant to the Vesting Order.

**2.7    Pre-Closing and Closing Reorganization**

(a)    The specific mechanism for implementing the Closing, payment of the Closing Cash Payment and the Credit Bid Amount, and the structure of the transactions contemplated by this Agreement shall be structured in a tax efficient manner mutually agreed upon by the Parties, each acting reasonably.

(b)    On or prior to the Closing Date, the NextPoint Entities shall effect the transaction steps and pre-closing reorganization (collectively, the "**Implementation Steps**") to be agreed upon by the NextPoint Entities and the Purchasers, each acting reasonably, at least five (5) days prior to the Closing Date; provided that in no event will the Implementation Steps be materially prejudicial to the interests of any creditor of the NextPoint Entities. Without limiting the generality of the foregoing, the Implementation Steps may include, without limitation, resolving intercompany obligations, the formation of new entities required to implement the transactions contemplated by this Agreement in a tax efficient manner and transfers of Equity Interests in the Acquired Entities.

(c)    The Implementation Steps shall occur, and be deemed to have occurred in the order and manner to be set out therein.

**ARTICLE 3**
**PURCHASE PRICE AND RELATED MATTERS**

**3.1    Purchase Price**

(a)    The purchase price (the "**Purchase Price**") payable by the Purchasers for the Purchased Interests shall be equal to the sum of:

(i)    $144,590,000 (the "**LT Credit Bid Amount**");

(ii)    $52,000,000 (the "**CTAX Credit Bid Amount**" and together with the LT Credit Bid Amount, collectively, the "**Credit Bid Amount**");

(iii)    the Closing Cash Payment; and

(iv)    the amount of the Assumed Liabilities as set forth herein.

(b)    The Purchasers shall satisfy the obligations pursuant to <u>Section 3.1</u> and the Purchase Price at the Closing Time as follows:

(i)     by causing the release of the applicable NextPoint Entities from (A) $~~18,000,000~~14,000,000 of the amounts outstanding under the DIP Financing and (B) obligations owing pursuant to any and all Revolving Credit Loans (as such term is defined in the BP NP-Liberty Credit Agreement) outstanding under the BP NP-Liberty Credit Agreement, including the principal amount of such claims and interest and fees accrued as of the Closing Date, and any other documents or agreements entered into therewith, in an aggregate amount equal to the LT Credit Bid Amount;

(ii)    by causing the release of the applicable NextPoint Entities from (A) $7,000,000 of the amounts outstanding and obligations owing pursuant to the DIP Financing and (B) the CTAX First Lien Debt, including the principal amount of such claims and interest and fees accrued as of the Closing Date, in an aggregate amount equal to the CTAX Credit Bid Amount; any

(iii)   by payment of the Closing Cash Payment to NextPoint Parent.

(c)     The Purchasers and their Affiliates, on the one hand, and the NextPoint Entities, and any of their Affiliates, on the other hand, shall be entitled to deduct and withhold from the Purchase Price or other amounts otherwise payable pursuant to this Agreement such amounts as such Person is required to deduct and withhold under Applicable Law, provided, however, that the Purchasers and their Affiliates shall not make any such deduction or withholding pursuant to Section 1445 of the Code, as long as at Closing, the NextPoint Entities shall have delivered to the Purchasers certification required by Section 10.2(e). Before making any such deduction or withholding, the withholding agent shall use commercially reasonable efforts to provide the Person in respect of which deduction or withholding is proposed to be made reasonable advance written notice of the intention to make such deduction or withholding, and the withholding agent shall cooperate with any reasonable request from such Person to obtain reduction of or relief from such deduction or withholding to the extent permitted by Applicable Law. To the extent that amounts are so deducted and withheld and remitted to the appropriate Taxing Authority, such amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding was made.

## 3.2     Payment of Certain Liabilities

On the Closing Date, upon payment of the Closing Cash Payment to NextPoint Parent, the NextPoint Entities shall satisfy, in accordance with the Implementation Steps, the Priority Payables as required to be paid on Closing in the Vesting Order using such amount such that the Priority Payables shall be satisfied in full in connection with the Closing.

**ARTICLE 4**
**REPRESENTATIONS AND WARRANTIES OF THE NEXTPOINT ENTITIES**

Each of the NextPoint Entities represents and warrants, severally and not jointly, and only as to itself, to the Purchasers as follows, and acknowledge that the Purchasers are relying upon the following representations and warranties in connection with their purchase of the Purchased Interests:

**4.1    Due Authorization and Enforceability of Obligations**

This Agreement has been duly authorized, executed and delivered by it, and this Agreement, subject to Court approval of this Agreement and granting of the Vesting Order and Vesting Recognition Order, constitutes the legal, valid and binding obligation of it, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

**4.2    Existence and Good Standing**

It is validly existing and in good standing under the laws of the jurisdiction of its incorporation or organization and, subject to Court approval of this Agreement and granting of the Vesting Order and Vesting Recognition Order, (i) has all requisite power and authority to execute and deliver this Agreement and (ii) has taken all requisite corporate or other action necessary for it to execute and deliver this Agreement and to perform its obligations hereunder and consummate the transaction contemplated hereunder.

**4.3    Sophisticated Parties**

~~It~~Each NextPoint Entity (i) is a sophisticated party with sufficient knowledge and experience to evaluate properly the terms and conditions of this Agreement, (ii) has conducted its own analysis and made its own decision to enter into this Agreement and has obtained such independent advice in this regard as it deemed appropriate, and (iii) has not relied on such analysis or decision of any Person other than its own independent advisors.

**4.4    Absence of Conflicts**

(a)    Subject to Court approval of this Agreement and granting of the Vesting Order and Vesting Recognition Order, the execution and delivery of this Agreement by ~~the~~each NextPoint Entity and the completion by ~~the~~each NextPoint Entity of its obligations hereunder and the consummation of the transactions contemplated herein do not and will not violate or conflict with any Applicable Law, or any of its properties or assets (subject to the receipt of any Transaction Regulatory Approvals), and will not result (with due notice or the passage of time or both) ~~[~~in a violation, conflict or breach of, or constitute a default under, or require any consent to be obtained under its certificate of incorporation, articles, by-laws or other constituent documents~~]~~. Subject to Court approval of this Agreement and granting of the Vesting Order and Vesting Recognition Order and the receipt of any Transaction Regulatory Approvals, the execution, delivery and performance

19

by ~~the~~each NextPoint Entity does not and will not: (a) violate any provision of law, rule, or regulation applicable to it or its charter or by-laws (or other similar governing documents) or those of any of its Subsidiaries; (b) except for the BP NP-Liberty Credit Agreement, conflict with, result in a breach of, or constitute (with or without notice or lapse of time or both) a default under any material agreement to which ~~the~~a NextPoint Entity is a party or any debt for borrowed money to which it is a party that, in any case, is not remedied, cured or waived, or (c) violate any Order, statute, rule, or regulation.

(b)    Except as set forth in ~~Schedule 4.4 of the Disclosure Letter and subject to the granting of~~ the Vesting Order and the Vesting Recognition Order, the transactions set forth in this Agreement do not give rise to any contractual or other legal rights to any Person that is not a Party to this Agreement, except to the extent that such rights will not: (i) detract from the legal and/or economic benefits to be provided to the Purchasers hereunder; or (ii) increase the obligations of, or create obligations of, the Purchasers.

**4.5    Approvals and Consents**

The execution and delivery of this Agreement by ~~the~~each NextPoint Entity, the completion by ~~the~~each NextPoint Entity of its obligations hereunder and the consummation by ~~the~~each NextPoint Entity of the transactions contemplated herein, do not and will not require any consent or approval or other action, with or by, any Governmental Authority, other than (a) Court approval of this Agreement, the Vesting Order and the Vesting Recognition Order and (b) the Transaction Regulatory Approvals.

**4.6    No Actions**

Other than the CCAA Proceedings and the U.S. Proceedings, there is not pending or, to the NextPoint ~~Entity's~~Parent's knowledge, threatened in writing against ~~the~~a NextPoint Entity or any of its properties, nor has ~~the~~a NextPoint Entity received any written notice in respect of, any claim, litigation, action, suit, arbitration, investigation or other proceeding before any Governmental Authority or legislative body that, would prevent it from executing and delivering this Agreement, performing its obligations hereunder, and consummating the transactions and agreements contemplated by this Agreement.

**4.7    Subsidiaries**

Schedule 4.7 of the Disclosure Letter sets forth a complete and correct list of the name and jurisdiction of organization of each NextPoint Entity. All the outstanding Equity Interests of the Acquired Entities (other than CTAX Acquisition or LT Holdco) are owned by CTAX Acquisition or LT Holdco, as applicable, or by one or more of their direct or indirect Subsidiaries as set forth in Schedule 4.7 of the Disclosure Letter. ~~All~~Subject to the Vesting Order and the Vesting Recognition Order, all such Equity Interests of the Acquired Entities are owned free and clear of all pledges, claims, liens, charges, options, security interests, licenses or other encumbrances of any kind or nature whatsoever (other than Permitted Encumbrances), except for transfer restrictions imposed by applicable securities laws, and, except as would not be material

to the NextPoint Entities, taken as a whole, are duly authorized, validly issued, fully paid and nonassessable and not subject to any pre-emptive rights. Except for the Equity Interests in the Subsidiaries listed on Schedule 4.7 of the Disclosure Letter, none of the NextPoint Entities owns, directly or indirectly, any Equity Interests in, any Person.

## 4.8    No Stop Order

Except as disclosed in Schedule 4.8 of the Disclosure Letter, and for greater certainty, except for the Cease Trade Order issued against the NextPoint Parent and the NextPoint Parent's subsequent delisting from the stock exchange, as of the time of entering into this Agreement, no order halting or suspending trading in securities of the ~~NextPoint~~Acquired Entities has been issued to and is outstanding against any of the NextPoint Entities, and, to ~~any~~the NextPoint ~~Entity's~~Parent's knowledge, no investigations or proceedings for such purpose are pending or threatened.

## 4.9    Title to Assets

~~[Except as disclosed in Schedule 4.9 of the Disclosure Letter,~~ Holdco has good and valid title to the Purchased Interests and each Acquired Entity has good and valid title to all of the assets (except for any Excluded Assets) owned by it which, ~~subject to the granting of~~as set forth in the Vesting Order and the Vesting Recognition Order, shall be free and clear of all Encumbrances other than Permitted Encumbrances.~~]~~

## 4.10    Taxes

(a)    No NextPoint Entity has engaged in a transaction subject to the reporting requirements under section 237.3 or the notification requirements under section 237.4 of the Tax Act.

(b)    Each Acquired Entity (other than a corporation incorporated in a Canadian jurisdiction) is, and has been since its formation, properly classified as a disregarded entity for U.S. federal income tax and applicable state and local tax purposes. Accordingly, for U.S. federal income tax and applicable state and local tax purposes, Holdco will be treated as selling (and the Purchasers will be treated as purchasing) the assets (other than the Excluded Assets) of the Acquired Entities that are classified as disregarded entities.

(c)    Except as disclosed in Schedule 4.10(c) of the Disclosure Letter, none of the Acquired Entities that is a corporation incorporated in a Canadian jurisdiction has acquired property or services from, or disposed of property or provided services to, a person with whom it does not deal at arm's length (within the meaning of the Tax Act) for an amount that is other than the fair market value of such property or services, nor been deemed to have done so for purposes of the Tax Act. Each of the Acquired Entities that is a corporation incorporated in a Canadian jurisdiction has made or obtained records or documents that satisfy the requirements of paragraphs 247(4)(a) to (c) of the Tax Act in respect of any transactions for

property or services with a person with whom it does not deal at arm's length (within the meaning of the Tax Act).

(d)    (a) Each To the knowledge of any of the NextPoint Entities has duly and timely filed, all Tax Returns required to be filed by or with respect to it each Acquired Entity under Applicable Laws have been duly and timely filed, and all such Tax Returns are true, complete and correct in all respects and have been prepared in compliance with all Applicable Laws.

(e)    (b) Each To the knowledge of any of the NextPoint Entities has timely paid, all Taxes, including all installments on account of Taxes for the current year, due and owing by it each Acquired Entity (whether or not such Taxes are related to, shown on or required to be shown on any Tax Return), and has timely withheld or deducted and paid over to the appropriate Taxing Authority all have been timely paid. All Taxes which it each Acquired Entity is required to withhold or deduct from amounts paid or owing or deemed paid or owing or benefits given to any employee, stockholder, creditor or other third party, including for services performed outside the city, state, province or country where any employee is based, have been timely withheld or deducted and paid over to the appropriate Taxing Authority.

(f)    (c) None To the knowledge of any of the NextPoint Entities has (i) waived any, no statute of limitations with respect to any Taxes or agreed to any of the Acquired Entities has been waived, no extension of time for filing any Tax Return or (ii) consented to any of the Acquired Entities has been agreed to, and no extension of time with respect to any Tax assessment or deficiency with respect to the Acquired Entities has been consented to, which waiver or extension of time is currently outstanding.

(g)    (d) No To the knowledge of any of the NextPoint Entities, no Tax audits or assessments or administrative or judicial claims are pending or are threatened in writing with respect to the NextPoint Acquired Entities, and there are no matters under discussion, audit or appeal with any Taxing Authority with respect to Taxes of any of the NextPoint Acquired Entities.

(h)    (e)  There are no Encumbrances on any assets or securities of any NextPoint Acquired Entity that arose in connection with any failure (or, to the knowledge of any of the NextPoint Entities, alleged failure, where such failure was alleged in writing) to pay[, collect or remit] any Tax.

(f) No claim has ever been made by a Taxing Authority in a jurisdiction where the NextPoint Entities do not file Tax Returns that any of the NextPoint Entities is or may be subject to taxation by that jurisdiction, which claim has not been resolved, and none of the NextPoint Entities has a taxable presence or nexus other than in the jurisdictions in which it currently files Tax Returns.

(i)    To the knowledge of any of the NextPoint Entities, no claim has ever been made by a Taxing Authority in a jurisdiction where no Tax Returns with respect to the Acquired Entities have been filed that any of the Acquired Entities is or may be subject to taxation by that jurisdiction, which claim has not been resolved, and none of the Acquired Entities has a taxable presence or nexus other than in the jurisdictions in which Tax Returns with respect to such Acquired Entity are currently be filed.

(j)    (g) None To the knowledge of any of the NextPoint Entities, no Acquired Entity (i) has been a member of an Affiliated Group, (ii) has any liability or obligation for the Taxes of any Person other than itself under Section 1.1502-6 of the Treasury Regulations (or any similar provision of applicable U.S. state or local or non-U.S. law Law), as a transferee or successor, by Contract or otherwise, or (iii) is party to or bound by or has any obligations under any Tax allocation, Tax sharing, Tax indemnification or other similar Contract (other than any such Contract entered into in the ordinary course and the principal purpose of which is not the allocation or sharing of Taxes).

(k)    (h) No To the knowledge of any of the NextPoint Entities, no Acquired Entity has engaged in any "listed transaction" within the meaning of Sections 6111 and 6112 of the Code or any similar provisions of provision of applicable U.S. state or local or non-U.S. Applicable Law or any "tax shelter" within the meaning of Section 6662 of the Code or the Treasury Regulations promulgated thereunder (or any similar provision of applicable U.S. state or local or non-U.S. Law).

(l)    To the knowledge of any of the NextPoint Entities, each Acquired Entity has properly (i) collected and remitted any sale and similar Taxes due for sales made to its customers and (ii) for all sales that are exempt from sales and similar Taxes and that were made without charging or remitting sales or similar Taxes, received and retained any appropriate tax exemption certificates and other documentation qualifying such sale as exempt.

(m)    No Acquired Entity (or the Purchasers as a result of the transactions contemplated hereby) will be required to include any item of income in, or exclude any item of deduction from, taxable income for any taxable period (or portion thereof) beginning after the Closing Date as a result of any (i) change in method of accounting for a taxable period ending on or prior to the Closing Date; (ii) "closing agreement" as described in Section 7121 of the Code (or any similar provision of applicable U.S. state or local or non-U.S. Law); (iii) deferred intercompany gain or any excess loss account described in Treasury Regulation under Code Section 1502 (or any similar provision of applicable U.S. state or local or non-U.S. Law); (iv) installment sale made prior to the Closing Date; (v) prepaid amount or deferred revenue received or accrued on or prior to the Closing Date outside of the ordinary course of the business; or (vi) use of an improper method of accounting for a taxable period on or prior to the Closing Date.

(n)    To the knowledge of any of the NextPoint Entities, each Acquired Entity is in compliance with all Applicable Laws in respect of abandoned or unclaimed property or escheat and has paid, remitted or delivered to each jurisdiction all amounts in respect of unclaimed or abandoned property required by any Applicable Laws to be paid, remitted or delivered to that jurisdiction.

(i) No NextPoint Entity has engaged in a transaction subject to the reporting requirements under section 237.3 or the notification requirements under section 237.4 of the Tax Act.

(j) Each NextPoint Entity (other than a corporation incorporated in a Canadian jurisdiction) is, and has been since its formation, properly classified as a disregarded entity for U.S. federal income tax and applicable state and local tax purposes.

(k) None of the Acquired Entities that is a corporation incorporated in a Canadian jurisidcation has acquired property or services from, or disposed of property or provided services to, a person with whom it does not deal at arm's length (within the meaning of the Tax Act) for an amount that is other than the fair market value of such property or services, nor been deemed to have done so for purposes of the Tax Act. Each of the Acquired Entities that is a corporation incorporated in a Canadian jurisidcation has made or obtained records or documents that satisfy the requirements of paragraphs 247(4)(a) to (c) of the Tax Act in respect of any transactions for property or services with a person with whom it does not deal at arm's length (within the meaning of the Tax Act).]

**4.11    Sanctioned Person**

None of the NextPoint Entities, nor any of their respective officers, directors, employees or agents, is a Sanctioned Person.

**4.12    Sanctions Laws**

None of the NextPoint Entities has (a) assets located in, or otherwise directly or, to the knowledge of any of the NextPoint Entities, indirectly, derives revenues from or engages in, investments, dealings, activities, or transactions in or with, any Sanctioned Country in violation of Sanctions Laws; or (b) directly or, to the knowledge of any of the NextPoint Entities, indirectly, derives revenues from or engages in investments, dealings, activities, or transactions with, any Sanctioned Person in violation of Sanctions Laws.

**4.13    Anti-Money Laundering Laws; Anti-Corruption Laws**

(a)    The operations of the NextPoint Entities are and have been at all times conducted in compliance with, in all respects, (i) the U.S. Currency and Foreign Transactions Reporting Act of 1970, the PCMLTFA (as defined below), the Money Laundering Control Act of 1986 (18 U.S.C. §§ 1956-1957), the PATRIOT Act (as defined below), the Bank Secrecy Act (31 U.S.C. §§5311-5332), and any other applicable laws related to money laundering or terrorism financing ("**Anti-Money**

**Laundering Laws**"), (ii) the U.S. Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder, and any other applicable laws or regulations concerning or relating to bribery or corruption ("**Anti-Corruption Laws**") and (iii) Sanctions Laws.

(b)     No action, suit, investigation or legal proceeding by or before any Governmental Authority or any arbitrator involving the NextPoint Entities or any officer, director, employee or agent thereof, or any informal or formal investigation by any NextPoint Entity or its legal or other representatives involving the foregoing, with respect to Anti-Money Laundering Laws, Anti-Corruption Laws or Sanctions Laws is pending, or to the knowledge of any of the NextPoint Entities, threatened.

(c) Each NextPoint Entity has instituted and maintains policies and procedures designed to ensure compliance by each NextPoint Entity and its directors, officers, employees, and agents with Anti-Corruption Laws, Anti-Money Laundering Laws, and Sanctions Laws.

**4.14    [Data Security**

(a)     Each of the NextPoint Entities has taken reasonable steps to safeguard the internal and external integrity and security of the IT Systems owned or used by or for such NextPoint Entity and the data that such IT Systems contain (including the data of their customers).

(b)     Since Except as set forth on Schedule 4.14 to the Disclosure Letter, to the knowledge of NextPoint Parent, since January 1, 2021, none of the NextPoint Entities has suffered a Security Incident, or any material loss of data, material disruption or material damage to its operations.

(c)     Each of the NextPoint Entities is, and has been, in compliance with applicable Data Security Requirements in all material respects. Since January 1, 2021, none of the NextPoint Entities has received any written notice or complaint from any third party (including any of its employees or agents) or any Governmental Authority (i) alleging breach of or seeking to investigate compliance with any applicable Data Security Requirement, or (ii) relating to a Security Incident.]

**4.15 [Capitalization**

Schedule 4.15 sets forth a true and correct list of the issued and outstanding Equity Interests of each Acquired Entity (the "**NextPoint Entities Equity Interests**"). The NextPoint Entities Equity Interests have been duly authorized, validly issued, fully-paid and non-assessable (if applicable). The NextPoint Entities Equity Interests are held, directly or indirectly, by Holdco, free and clear of any liens and restrictions on transfer (other than restrictions on transfer under Applicable Laws), were offered, issued, sold and delivered in compliance with all Applicable Laws governing the issuance of securities and were not issued in violation of (or subject to) any preemptive rights (including any preemptive rights set forth in the organizational documents of the NextPoint Entities), rights of first refusal or offer or other similar rights. There are no declared or accrued but unpaid dividends with respect to any of the NextPoint Entities Equity

25

Interests. There are no (i) outstanding obligations of the Acquired Entities (contingent or otherwise) to repurchase or otherwise acquire or retire any of applicable NextPoint Entities Equity Interests or (ii) voting trusts, proxies or other agreements with respect to any NextPoint Entities Equity Interests. Except as set forth on Schedule 4.15, the NextPoint Entities do not own or control, directly or indirectly, any Equity Interests in or interest convertible into or exchangeable or exercisable for Equity Interests in or have any obligation to invest in or purchase any Equity Interests of any Person.]

# ARTICLE 5
# REPRESENTATIONS AND WARRANTIES OF THE PURCHASERS

Each Purchaser represents and warrants, severally and not jointly, and only as to itself, to the NextPoint Parent and the NextPoint Entities as follows, and acknowledges that the NextPoint Parent and the NextPoint Entities are relying upon the following representations and warranties in connection with the sale of the Purchased Interests:

## 5.1    Due Authorization and Enforceability of Obligations

This Agreement has been duly authorized, executed and delivered by such Purchaser, and, assuming the due authorization, execution and delivery by it, this Agreement constitutes the legal, valid and binding obligation of it, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

## 5.2    Existence and Good Standing

Such Purchaser is validly existing and in good standing under the laws of the jurisdiction of its incorporation or organization and has all requisite power and authority to execute and deliver this Agreement and to perform its obligations hereunder and consummate the transactions contemplated by this Agreement.

## 5.3    Sophisticated Party

Such Purchaser (i) is a sophisticated party with sufficient knowledge and experience to evaluate properly the terms and conditions of this Agreement, (ii) has conducted its own analysis and made its own decision to enter into this Agreement and has obtained such independent advice in this regard as it deemed appropriate, and (iii) has not relied on such analysis or decision of any Person other than its own independent advisors.

## 5.4    Absence of Conflicts

The execution and delivery of this Agreement by such Purchaser and the completion by such Purchaser of its obligations hereunder and the consummation of the transactions contemplated herein do not and will not violate or conflict with any Applicable Law, or any of its properties or assets, (subject to the receipt of any Transaction Regulatory Approvals) and will not result (with due notice or the passage of time or both) in a violation, conflict or breach of, or

constitute a default under, or require any consent to be obtained under its certificate of incorporation, articles, by-laws or other constituent documents.

## 5.5    Approvals and Consents

The execution and delivery of this Agreement by the Purchaser, the completion by such Purchaser of its obligations hereunder and the consummation by such Purchaser of the transactions contemplated herein, do not and will not require any consent or approval or other action, with or by, any Governmental Authority, other than as contemplated by any Order and the Transaction Regulatory Approvals.

## 5.6    No Actions

There is not, as of the date hereof, pending or, to such Purchaser's knowledge, threatened against it or any of its properties, nor has such Purchaser received notice in respect of, any claim, potential claim, litigation, action, suit, arbitration, investigation or other proceeding before any Governmental Authority or legislative body that, would prevent it from executing and delivering this Agreement, performing its obligations hereunder and consummating the transactions and agreements contemplated by this Agreement.

## 5.7    Accredited Investor

Such Purchaser is an "accredited investor", as such term is defined in National Instrument 45-106 - *Prospectus Exemptions* and in Rule 501 of Regulation D under the United States Securities Act of 1933 (the "**Securities Act**") and it was not created or used solely to purchase or hold securities as an accredited investor as described in paragraph (m) of the definition of "accredited investor" in National Instrument 45-106 - *Prospectus Exemptions* and acknowledges that the Purchased Interests will be subject to resale restrictions under applicable securities laws. The Purchased Interests are being acquired by such Purchaser for its own account, and not with a view to, or for the offer or sale in connection with, any public distribution or sale of the Purchased Interests or any interest in them. Such Purchaser has sufficient knowledge and experience in financial and business matters to be capable of evaluating the merits and risks of its acquisition of the Purchased Interests, and such Purchaser is capable of bearing the economic risks of such acquisition. Such Purchaser acknowledges that the Purchased Interests are not registered under the Securities Act, any state securities law, regulation or rule or any applicable foreign securities law, regulation or rule, and agrees that the Purchased Interests may not be sold, transferred, offered for sale, pledged, hypothecated or otherwise disposed of except pursuant to a registered offering in compliance with, or in a transaction exempt from, the registration requirements of the Securities Act and any other applicable state and foreign securities laws.

## 5.8    Financial Ability

Such Purchaser has and will have at all relevant times, the financial ability and sufficient funds to perform all of its obligations under this Agreement, and the availability of such funds will not be subject to the consent, approval or authorization of any Person or the availability of any financing.

**5.9** **Purchase Price**

Each Purchaser has executed, on or prior to the date hereof, the requisite instruction letters to fully authorize the Purchasers, and each Purchaser is duly authorized, to, among other things, deliver the consideration set forth in Sections 3.1(a) and 3.1(b), as applicable, in connection with the consummation of the Closing hereunder.

**5.10** **Investment Canada Act**

Such Purchaser is a "trade agreement investor" within the meaning of the Investment Canada Act.

<div align="center">

**ARTICLE 6**
**CONDITIONS**

</div>

**6.1** **Conditions for the Benefit of the Purchasers and the NextPoint Entities**

The respective obligations of each Purchaser and each NextPoint Entity to consummate the transactions contemplated by this Agreement are subject to the satisfaction of, or compliance with, at or prior to the Closing Time, each of the following conditions:

(a)    *No Law* – no provision of any Applicable Law and no judgment, injunction or Order shall have been enacted, announced, issued or entered by any Governmental Authority of competent jurisdiction that prevents, restrains, enjoins, renders illegal or otherwise prohibits to consummation of the purchase of the Purchased Interests or any of the other transactions pursuant to this Agreement;

(b)    *Final Orders* – the Vesting Order shall have been issued and entered and shall be a Final Order;

(c)    *Final U.S. Order* – the Vesting Recognition Order shall have been issued and entered by the U.S. Bankruptcy Court and shall be a Final Order; and

(d)    *Transaction Regulatory Approvals* – the NextPoint Entities and the Purchasers shall have received all required Transaction Regulatory Approvals, and all required Transaction Regulatory Approvals shall be in full force and effect, except for Transaction Regulatory Approvals that need not be in full force and effect prior to Closing.

The Parties acknowledge that the foregoing conditions are for the mutual benefit of each Purchaser and each NextPoint Entity.

**6.2** **Conditions for the Benefit of the Purchasers**

The obligation of any Purchaser to consummate the transactions contemplated by this Agreement is subject to the satisfaction of, or compliance with, or waiver (to the extent permitted by Applicable Law) by any Purchaser of, at or prior to the Closing Time, each of the

<div align="center">28</div>

following conditions (each of which is acknowledged to be for the exclusive benefit of each Purchaser):

(a) *Performance of Covenants* – the covenants contained in this Agreement required to be performed or complied with by the NextPoint Entities at or prior to the Closing Time shall have been performed or complied with in all material respects as at the Closing Time;

(b) *Truth of Representations and Warranties* – (i) the Fundamental Representations and Warranties of the NextPoint Entities shall be true and correct in all respects (other than de minimis inaccuracies) as of the date hereof and as of the Closing Date, as if made at and as of such date (except for representations and warranties made as of specified date, the accuracy of which shall be determined as of such specified date) and (ii) all other representations and warranties of the NextPoint Entities contained in Article 4 shall be true and correct in all respects as of the date hereof and as of the Closing Date, as if made at and as of such date (except for representations and warranties made as of specified date, the accuracy of which shall be determined as of such specified date) except where the failure to be so true and correct would not, in the aggregate, have a Material Adverse Effect (and, for this purpose, any reference to "material", "Material Adverse Effect" or other concepts of materiality in such representation and warranties shall be ignored);

(c) *Officer's Certificates* – the Purchasers shall have received a certificate confirming the satisfaction of the conditions contained in Sections 6.2(a) (*Performance of Covenants*), 6.2(b) (*Truth of Representations and Warranties*) and 6.2(d) (*No Material Adverse Effect*), signed for and on behalf of the NextPoint Entities without personal liability by an executive officer of each of the applicable NextPoint Entities or other Persons acceptable to the Purchasers, in each case in form and substance reasonably satisfactory to the Purchasers;

(d) *No Material Adverse Effect* – since the date hereof, no Material Adverse Effect shall have occurred;

(e) *NextPoint Entities' Deliverables* – the NextPoint Entities shall have delivered to the Purchasers all of the deliverables contained in Section 10.2 in form and substance reasonably satisfactory to the Purchasers;

(f) *Vesting Order Approval* – the Vesting Order shall have been granted by the applicable date set forth in Section 4(b)(iv) of the Support Agreement;

(g) *Implementation Steps* – the NextPoint Entities shall have completed the Implementation Steps that are required to be completed prior to Closing, in form and substance reasonably acceptable to the Purchasers;

(h) *[Employees* – each of the employees of NextPoint Parent and Holdco, as applicable, shall have entered into a new employment agreement with an Acquired Entity or have been provided with written notice of the transfer of their

29

employment to an Acquired Entity, in each case as the Purchasers shall direct and in form and substance satisfactory to the Purchasers;

(i) *Benefit Plans* – each benefit plan, arrangement, agreement or program of NextPoint Parent or Holdco, as applicable, pursuant to which benefits are provided to employees of NextPoint Parent or Holdco, as applicable, shall have been transferred to the applicable Acquired Entity, or such applicable Acquired Entity shall have adopted or otherwise implemented benefit plans, arrangements, agreements or programs providing benefits to such employees, in each case as the Purchasers shall direct and in form and substance satisfactory to the Purchasers;

(j) *Insurance* – each policy of insurance of NextPoint Parent or Holdco, as applicable, shall have been assigned to the applicable Acquired Entity, or such applicable Acquired Entity shall have obtained insurance policies providing substantially similar coverage, in each case as the Purchasers shall direct and in form and substance satisfactory to the Purchasers; and

(k) *Bank Accounts* – the NextPoint Entities shall have delivered to the Purchasers evidence that no cash is held in the bank accounts of NextPoint Parent or HoldCo as of the Closing.

## 6.3    Conditions for the Benefit of the NextPoint Entities

The obligation of the NextPoint Entities to consummate the transactions contemplated by this Agreement is subject to the satisfaction of, or compliance with, or waiver where applicable by any NextPoint Entity on behalf of the NextPoint Entities, at or prior to the Closing Time, each of the following conditions (each of which is acknowledged to be for the exclusive benefit of the NextPoint Entities):

(a) *Truth of Representations and Warranties* – the representations and warranties of the Purchasers contained in Article 5 will be true and correct in all respects (other than de minimis inaccuracies) as of the date hereof and as of the Closing Date as if made at and as of such date (except for representations and warranties made as of specified date, the accuracy of which shall be determined as of such specified date) except where the failure to be so true and correct would not reasonably be expected to have a material and adverse effect on the Purchasers' ability to consummate the transactions contemplated by this Agreement;

(b) *Performance of Covenants* – the covenants contained in this Agreement required to be performed or complied with by the Purchasers at or prior to the Closing Time shall have been performed or complied with in all material respects as at the Closing Time;

(c) *Officer's Certificate* – the NextPoint Entities shall have received a certificate confirming the satisfaction of the conditions contained in Sections 6.3(a) and 6.3(b) signed for and on behalf of each Purchaser without personal liability by an authorized signatory of the Purchaser or other Persons acceptable to the NextPoint Entities, acting in a commercially reasonable manner, in each case, in form and

substance satisfactory to the NextPoint Entities, acting in a commercially reasonable manner;

(d) *Support Agreement* – the Support Agreement shall not have been terminated by any party thereto; and

(e) *Purchaser Deliverables* – the Purchasers shall have delivered to the NextPoint Entities all of the deliverables contained in Section 10.3 in form and substance satisfactory to the NextPoint Entities, acting in a commercially reasonable manner.

**6.4    Waiver of Conditions**

Any condition in Sections 6.1, 6.2 or 6.3 may be waived by any Purchaser on behalf of the Purchasers or NextPoint Parent on behalf of the NextPoint Entities, as applicable, in whole or in part, without prejudice to any of their respective rights of termination in the event of non-fulfillment of any other condition in whole or in part. Any such waiver shall be binding on the Purchasers or the NextPoint Entities, as applicable, only if made in writing.

**ARTICLE 7**
**ADDITIONAL AGREEMENTS OF THE PARTIES**

**7.1    Access to Information**

(a) From the date hereof until the earlier of (x) the Closing Time and (y) the termination of this Agreement pursuant to Article 9, the NextPoint Entities shall give to the Purchasers' and their accountants, legal advisers, consultants, financial advisors and other representatives engaged in the transactions contemplated by this Agreement during normal business hours reasonable access to its premises and to electronic access to all of the books and records relating to the Business, the NextPoint Entities, the Assumed Liabilities and the employees, and shall furnish them with all such information relating to the Business, the NextPoint Entities, the Assumed Liabilities and the employees of the Business as the Purchasers or such representatives may reasonably request in connection with the transactions contemplated by this Agreement and the Purchasers' due diligence review of the NextPoint Entities; provided that any such access shall be conducted at the Purchasers' expense, in accordance with Applicable Law and, in the case of access to the premises of the NextPoint Entities, under supervision of the NextPoint Entities' personnel and in such a manner as to maintain confidentiality, and the NextPoint Entities will not be required to provide access to or copies of any such books and records if (a) the provision thereof would cause the NextPoint Entities or the NextPoint Parent to be in contravention of any Applicable Law or (b) making such information available would (1) result in the loss of any lawyer-client or other legal privilege, or (2) cause the NextPoint Entities or the NextPoint Parent to be found in contravention of any Applicable Law, or contravene any agreement (including any confidentiality agreement to which the NextPoint Entities, the NextPoint Parent, or any of their respective

31

Affiliates are a party); provided, that with respect to the foregoing clauses (a) and (b), the NextPoint Entities shall use commercially reasonable efforts to find a suitable alternative to disclose information in such a way that such disclosure does not contravene any such Applicable Law or agreement or jeopardize such privilege. The NextPoint Entities shall use commercially reasonable efforts to also deliver to the Purchasers authorizations to the NextPoint Entities and their applicable Subsidiaries necessary to permit the Purchasers to obtain information in respect of such NextPoint Entities from the files of such Governmental Authorities.

(b)     For a period of seven (7) years following the Closing, the Acquired Entities and the Purchasers shall make all books and records of the Acquired Entities reasonably available to the Monitor and any trustee in bankruptcy of any of the NextPoint Entities upon at least five (5) Business Days prior notice and shall, at such Person's expense, permit any of the foregoing Persons to take copies thereof as they may determine to be necessary or useful to accomplish their respective roles; provided that the Acquired Entities and the Purchasers shall not be obligated to make such books and records available to the extent that doing so would (a) violate Applicable Law, (b) jeopardize the protection of a solicitor-client privilege, or (c) unreasonably and materially interfere with the ongoing business and operations of the Purchasers, the Acquired Entities and their respective Affiliates, as determined by the Purchasers, acting reasonably; provided, that with respect to the foregoing clauses (a), (b), and (c), the Purchasers shall use commercially reasonable efforts to find a suitable alternative to disclose information in such a way that such disclosure does not contravene any such Applicable Law, jeopardize such privilege, or unreasonably and materially interfere with such ongoing business and operations.

**7.2    Approvals and Consents**

(a)     The NextPoint Entities shall be responsible for the payment of any filing fees required to be paid in connection with any filing made in respect of the Antitrust Approvals.

(b)     The Parties shall use commercially reasonable efforts to apply for an obtain any Transaction Regulatory Approvals as soon as reasonably practicable and no later than the time limits imposed by Applicable Laws, in accordance with Section 7.2(c), in each case at the sole cost and expense of the NextPoint Entities.

(c)     The Parties shall use commercially reasonable efforts to apply for and obtain the Transaction Regulatory Approvals and shall co-operate with one another in connection with obtaining such approvals. Without limiting the generality of the foregoing, the Parties shall: (i) give each other reasonable advance notice of all meetings or other oral communications with any Governmental Authority relating to the Transaction Regulatory Approvals and provide as soon as practicable but in any case, if any, within the required time, any additional submissions, information and/or documents requested by any Governmental Authority necessary, proper or

advisable to obtain the Transaction Regulatory Approvals; (ii) not participate independently in any such meeting or other oral communication without first giving the other Party (or their outside counsel) an opportunity to attend and participate in such meeting or other oral communication, unless otherwise required or requested by such Governmental Authority; (iii) if any Governmental Authority initiates an oral communication regarding the Transaction Regulatory Approvals, promptly notify the other Party of the substance of such communication; (iv) subject to Applicable Laws relating to the exchange of information, provide each other with a reasonable advance opportunity to review and comment upon and consider in good faith the views of the other in connection with all written communications (including any filings, notifications, submissions, analyses, presentations, memoranda, briefs, arguments, opinions and proposals) made or submitted by or on behalf of a Party with a Governmental Authority regarding the Transaction Regulatory Approvals; and (v) promptly provide each other with copies of all written communications to or from any Governmental Authority relating to the Transaction Regulatory Approvals.

(d)     Each of the Parties may, as advisable and necessary, reasonably designate any competitively or commercially sensitive material provided to the other under this Section 7.2 as "Outside Counsel Only Material", provided that the disclosing Party also provides a redacted version to the receiving Party. Such materials and the information contained therein shall be given only to the outside legal counsel of the recipient and, subject to any additional agreements between the Parties, will not be disclosed by such outside legal counsel to employees, officers or directors of the recipient unless express written permission is obtained in advance from the source of the materials or its legal counsel.

(e)     The obligations of the Parties to use commercially reasonable efforts to obtain the Transaction Regulatory Approvals does not require the Purchasers (or any Affiliate thereof) to initiate, commence, contest or resist any commenced, threatened, or foreseeable proceeding that would reasonably be expected to seek to prevent, materially impede or materially delay the consummation of the transactions contemplated by this Agreement, or to offer, accept or agree to: (i) the sale, divestiture, licensing, or disposition of any part of the businesses or assets of the Purchasers or their Affiliates or of the Purchased Interests or the assets of the NextPoint Entities; (ii) the termination of any existing contractual rights, relationships and obligations, or entry into, or amendment of, any such contractual arrangements; (iii) the taking of any action that, after consummation of the transactions contemplated by this Agreement, would limit the freedom of action of, or impose any other requirement on the Purchasers or the NextPoint Entities with respect to the operation of their or their Affiliates' businesses or assets; or (iv) any other remedial action in order to obtain the Transaction Regulatory Approvals.

**7.3    Covenants Relating to this Agreement**

(a)    Each of the Parties shall perform all obligations required to be performed by the applicable Party under this Agreement, co-operate with the other Parties in connection therewith and do all such other acts and things as may be necessary or desirable in order to consummate and make effective, as soon as reasonably practicable and prior to the Outside Date, the transactions contemplated by this Agreement and, without limiting the generality of the foregoing, from the date hereof until the earlier of (x) the Closing Date and (y) the termination of this Agreement pursuant to Article 9, each Party shall and, where appropriate, shall cause each of its Affiliates to:

(i)    negotiate in good faith and use its commercially reasonable efforts to take or cause to be taken all actions and to do, or cause to be done, all things necessary, proper or advisable to satisfy the conditions precedent to the obligations of such Party hereunder (including, where applicable, negotiating in good faith with the applicable Governmental Authorities and/or third Persons in connection therewith), and to cause the fulfillment at the earliest practicable date of all of the conditions precedent to the other Party's obligations to consummate the transactions contemplated hereby; and

(ii)    not take any action, or refrain from taking any action, or permit any action to be taken or not taken, which would reasonably be expected to prevent, materially delay or otherwise impede the consummation of the transactions contemplated by this Agreement.

(b)    From the date hereof until the Closing Date, the Purchasers hereby agree, and hereby agree to cause their representatives to, keep the NextPoint Entities informed on a reasonably current basis, and no less frequently than on a weekly basis through teleconference or other meeting, and as reasonably requested by the NextPoint Entities or the Monitor, as to the Purchasers' progress in terms of the satisfaction of the conditions precedent contained herein.

(c)    From the date hereof until the Closing, the NextPoint Entities hereby agree, and hereby agrees to cause their representatives to, keep the Purchasers informed, as reasonably requested by the Purchasers or the Monitor, as to the NextPoint Entities' progress in terms of the satisfaction of the conditions precedent contained herein.

(d)    The NextPoint Entities and the Purchasers agree to execute and deliver such other documents, certificates, agreements and other writings, and to take such other actions to consummate or implement as soon as reasonably practicable, the transactions contemplated by this Agreement.

(e)    From the date hereof until the earlier of (x) the Closing Date and (y) the termination of this Agreement pursuant to Article 9, the NextPoint Entities hereby

agree, and hereby agrees to cause its representatives to, promptly notify the Purchasers of (i) any event, condition, or development that has resulted in the inaccuracy in a material respect or material breach of any representation or warranty, covenant or agreement contained in this Agreement, or (ii) any Material Adverse Effect occurring from and after the date hereof prior to the Closing Date.

(f)     The NextPoint Entities and the Purchasers agree to use commercially reasonable efforts to timely prepare and file all documentation and pursue all steps reasonably necessary to obtain any material third-party consents and approvals as may be required in connection with the transaction contemplated by this Agreement.

**7.4     Tax Matters**

(a)     [The NextPoint Entities agree to furnish or cause to be furnished to the Purchasers, as promptly as practicable, such information and assistance relating to the ~~NextPoint~~Acquired Entities and the Assumed Liabilities as is reasonably necessary for the preparation and filing of any Tax Return, claim for refund or other required filings relating to Tax matters, for the preparation for and proof of facts during any Tax audit, for the preparation for any Tax protest, for the prosecution of any suit or other proceedings relating to Tax matters and for the answer to any governmental or regulatory inquiry relating to Tax matters. The NextPoint Entities also agree to furnish or cause to be furnished to the Purchasers, as promptly as practicable, such information and assistance relating to the ~~NextPoint~~Acquired Entities and the Assumed Liabilities as is reasonably necessary for the Purchasers to acquire the Acquired Entities in a tax efficient manner for the Purchasers.]

(b)     The Purchasers shall be responsible for and shall pay, or cause to be paid, any Transfer Tax in respect of the purchase and sale of the Purchased Interests under this Agreement (other than any Transfer Taxes that are not required to be paid under the CCAA, the U.S. Bankruptcy Code, or any other ~~applicable law~~Applicable Law) and such Transfer Tax shall be remitted to the appropriate Governmental Authority as provided for under Applicable Law (except any Transfer Tax which, under Applicable Law, is collectible by the NextPoint Entities, in which case such Transfer Tax shall be collected by the applicable NextPoint Entity and remitted by the NextPoint Entity to the appropriate Governmental Authority as provided for under the Applicable Law but, for the avoidance of doubt, the Purchasers shall remain economically responsible for and shall pay to or reimburse, or cause to be paid or reimbursed, as the case may be, the NextPoint Entities for any such Transfer Tax). For the avoidance of doubt any Transfer Taxes in connection with the Implementation Steps are not covered by this Section 7.4(a) and shall be borne by the Purchasers. The NextPoint Entities and the Purchasers shall reasonably cooperate to mitigate and/or eliminate the amount of Transfer Taxes resulting from the transactions contemplated herein (provided, for the avoidance of doubt, this shall not require the parties to structure

the transactions in a manner eligible for the benefits of Section 1146(a) of the United States Bankruptcy Code).

(c)     The Purchasers shall be responsible for preparing and filing all necessary (i) Tax Returns or other documents with respect to such Transfer Taxes and (ii) all other Tax Returns required to be filed by the Acquired Entities on or after the Closing Date; provided, however, that in the event any such Tax Return requires execution by any NextPoint Entity, the Purchasers shall deliver it to such NextPoint Entity not less than ten (10) Business Days before the due date thereof, and the NextPoint Entities shall reasonably promptly execute such Tax Return and return it to the Purchasers.

(d)     [The NextPoint Entities shall promptly notify Purchasers in writing of any proposed assessment or the commencement of any Tax audit or administrative or judicial proceeding or of any demand or claim with respect to Taxes with respect to the Purchased Interests, Acquired Entities, ~~the Business,~~ or any NextPoint Entity. ~~The~~At the option of the Purchasers, the Purchasers shall control and shall have the right to discharge, settle, or otherwise dispose of, at its own expense, all tax contests or proceedings in respect of (i) the Purchased Interests, (ii) the Acquired Entities ~~or the Business.]~~, or (iii) any NextPoint Entity to the extent such contests or proceedings would have an effect on an Acquired Entity or the business of an Acquired Entity.

(e)     [If, at any time after the Effective Time, a Party determines, or becomes aware that an "advisor" (as is defined for purposes of section 237.3 or section 237.4 of the Tax Act) has determined, that the transactions contemplated by this Agreement are or would be subject to the reporting requirements under section 237.3 or the notification requirements under section 237.4 of the Tax Act (in this ~~Section 7.4~~Section 7.4(e), the "**Disclosure Requirements**"), the Party will promptly inform the other Party of its intent, or its advisor's intent, to comply with the Disclosure Requirements and the Parties will cooperate in good faith to determine the applicability of such Disclosure Requirements. In the event that, following such cooperation, it is ultimately determined that any Party is required to file any applicable information, return, notification and/or disclosure in accordance with the Disclosure Requirements (in this ~~Section 7.4~~Section 7.4(e), in each case, a "**Mandatory Disclosure**"), each Party required to file a Mandatory Disclosure (in this ~~Section 7.4~~Section 7.4(e), a "**Disclosing Party**") shall submit to the other Party a draft of such Mandatory Disclosure at least 30 days before the date on which such Mandatory Disclosure is required by Applicable Law to be filed, and such other Party shall have the right to make reasonable comments or changes on such draft by communicating such comments or changes in writing to the Disclosing Party at least 15 days before the date on which such Mandatory Disclosure is required by Applicable Law to be filed. The Disclosing Party shall consider in good faith any such comments or changes proposed by the other Party and shall incorporate such comments or changes which the Disclosing Party determines are reasonable and in accordance with Applicable Law.]

36

(f)     From the date hereof until the Closing, with respect to each Acquired Entity, the NextPoint Entities shall not make or change any income or other material Tax election, change or adopt any income or other material accounting policies or practices (including any Tax accounting methods, policies, or practices), file any amended income or other material Tax Return, enter into any closing agreement in respect of any Taxes, settle any income or other material Tax claim, assessment or other audit or Tax action, surrender any right to claim a refund of material Taxes, consent to any extension or waiver of the limitation period applicable to any Tax claim or assessment, incur any material liability for Taxes outside the ordinary course of business, fail to pay any Tax that becomes due and payable (including any estimated Tax payments), prepare or file any income or other material Tax Return in a manner inconsistent with past practice, or take any other similar action relating to the filing of any Tax Return or the payment of any Tax, in each case, other than as required by Applicable Law.

## 7.5     Release by the Purchasers

Except in connection with any obligations of the NextPoint Entities or the Monitor contained in this Agreement or any Closing Documents, effective as of the Closing, each Purchaser hereby releases and forever discharges the NextPoint Entities, the CRO, the Monitor and their respective Affiliates (excluding the LoanMe Entities), and each of their respective successors and assigns, and all officers, directors, partners, members, shareholders, limited partners, employees, agents, financial and legal advisors of each of them, from any and all actual or potential Released Claims which such Person had, has or may have in the future to the extent relating to the Purchased Interests or the Assumed Liabilities, save and except for Released Claims arising out of fraud or willful misconduct.

## 7.6     Release by the NextPoint Entities

Except in connection with any obligations of each Purchaser and the Monitor contained in this Agreement or any Closing Documents, effective as of the Closing, the NextPoint Entities hereby release and forever discharge each Purchaser, the CRO, the Monitor and their respective Affiliates, and each of their respective successors and assigns, and all officers, directors, partners, members, shareholders, limited partners, employees, agents, financial and legal advisors of each of them, from any and all actual or potential Released Claims which such Person had, has or may have in the future to the extent relating to the Purchased Interests, the Assumed Liabilities, the Excluded Assets or the Excluded Liabilities, save and except for Released Claims arising out of fraud or willful misconduct.

## ARTICLE 8
## INSOLVENCY PROVISIONS

## 8.1     Court Orders and Related Matters

(a)     From and after the date of this Agreement and until the Closing Date, the NextPoint Entities shall deliver to the Purchasers drafts of any and all pleadings, motions, notices, statements, applications, schedules, reports, and other papers to

be filed or submitted by any NextPoint Entity in connection with or related to this Agreement, including with respect to the SISP Order, the Vesting Order, the Vesting Recognition Order, and the SISP Recognition Order, for the Purchasers' prior review at least three (3) days in advance of service and filing of such materials (or where circumstances make it impracticable to allow for three (3) days' review, with as much opportunity for review and comment as is practically possible in the circumstances). The NextPoint Entities acknowledge and agree (i) that any such pleadings, motions, notices, statements, applications, schedules, reports, or other papers shall be in form and substance satisfactory to the Purchasers, acting reasonably, and (ii) to consult and cooperate with the Purchasers regarding any discovery, examinations and hearing in respect of any of the foregoing, including the submission of any evidence, including witnesses testimony, in connection with such hearing.

(b)    Notice of the motions seeking the issuance of the Vesting Order and the Vesting Recognition Order shall be served by the NextPoint Entities on all Persons required to receive notice under Applicable Law and the requirements of the CCAA, the CCAA Court, the U.S. Bankruptcy Code, the U.S. Bankruptcy Court and any other Person determined necessary by the NextPoint Entities or the Purchasers, acting reasonably.

(c)    Notwithstanding any other provision herein, it is expressly acknowledged and agreed that in the event that (i) the Vesting Order has not been issued and entered by the CCAA Court by the applicable date set forth in Section 4(b)(iv) of the Support Agreement or such later date agreed to in writing by the Purchasers in their sole discretion; or (ii) the Vesting Recognition Order has not been issued and entered by the U.S. Bankruptcy Court within fourteen (14) days after the Vesting Order being entered by the CCAA Court or such later date agreed to in writing by the Purchasers in their sole discretion, the Purchasers may terminate this Agreement; provided that in each case, such deadlines are subject to court availability.

(d)    If the Vesting Order or the Vesting Recognition Order, as applicable, relating to this Agreement is appealed or a motion for leave to appeal, rehearing, reargument or reconsideration is filed with respect thereto, the NextPoint Entities agree to take all action as may be commercially reasonable and appropriate to defend against such appeal, petition or motion.

(e)    The NextPoint Entities acknowledge and agree, that the Vesting Order and the Vesting Recognition Order shall provide that, on the Closing Date and concurrently with the Closing, the Purchased Interests shall be transferred to the Purchasers free and clear of all Encumbrances, other than Permitted Encumbrances.

**ARTICLE 9**
**TERMINATION**

**9.1    Termination**

This Agreement may be terminated at any time prior to Closing as follows:

(a)    by mutual written consent of the NextPoint Entities and the Purchasers;

(b)    by the Purchasers or the NextPoint Entities, if Closing has not occurred on or before the Outside Date, provided that the terminating Party is not then in breach of any representation, warranty, covenant or other agreement in this Agreement and a breach by the non-terminating Party resulted in the failure of the Closing to occur by the Outside Date;

(c)    by the Purchasers, upon the appointment of a receiver, trustee in bankruptcy or similar official in respect of any NextPoint Entity or any of the property of any NextPoint Entity, other than with the prior written consent of the Purchaser;

(d)    by the Purchasers, pursuant to Section 8.1(c);

(e)    by the Purchasers or the NextPoint Entities, upon the termination, dismissal or conversion of the CCAA Proceedings and the U.S. Proceedings;

(f)    by the Purchasers or the NextPoint Entities, upon denial of the Vesting Order or the Vesting Recognition Order (or if any such order is stayed, vacated or varied without the consent of the Purchasers);

(g)    by the Purchasers or the NextPoint Entities, if a court of competent jurisdiction, including the CCAA Court or the U.S. Bankruptcy Court, or other Governmental Authority has issued an Order or taken any other action that permanently restrains, enjoins or otherwise prohibits the consummation of Closing and such Order or action has become a Final Order;

(h)    by the NextPoint Entities, if there has been a violation or breach by the Purchasers of any covenant, representation or warranty which would prevent the satisfaction of the conditions set forth in Section 6.3(a) or Section 6.3(b) and such violation or breach has not been waived by the NextPoint Entities or cured upon the earlier of (i) ten (10) Business Days after written notice thereof from the NextPoint Entities and (ii) the Outside Date, unless the NextPoint Entities are in violation or breach of their obligations under this Agreement which would prevent the satisfaction of the conditions set forth in Section 6.2(a) or Section 6.2(b);

(i)    by the Purchasers, if there has been a violation or breach by the NextPoint Entities of any covenant, representation or warranty which would prevent the satisfaction of the conditions set forth in Section 6.2(a) or Section 6.2(b) and such violation or breach has not been waived by the Purchasers or cured upon the earlier of (i) ten (10) Business Days after written notice thereof from the Purchasers and (ii) the

Outside Date, unless the Purchasers are in violation or breach of their obligations under this Agreement which would prevent the satisfaction of the conditions set forth in <u>Section 6.2(a)</u> or <u>Section 6.2(b)</u>;

(j)     by the Purchasers or the NextPoint Entities, if the Support Agreement is terminated pursuant to the terms thereof; and

(k)     by the Purchasers, if there has been a default under the DIP Financing.

The Party desiring to terminate this Agreement pursuant to this <u>Section 9.1</u> (other than pursuant to <u>Section 9.1(a)</u>) shall give written notice of such termination to the other Party or Parties, as applicable, specifying in reasonable detail the basis for such Party's exercise of its termination rights.

**9.2     Effect of Termination**

In the event of termination of this Agreement pursuant to <u>Section 9.1</u>, this Agreement shall become void and of no further force or effect without liability of any Party to any other Party to this Agreement except that (a) <u>Article 1</u>, this <u>Section 9.2</u>, <u>Section 11.3</u>, <u>Section 11.5</u>, <u>Section 11.6</u>, <u>Section 11.7</u> and <u>Section 11.8</u> shall survive and (b) no termination of this Agreement shall relieve any Party of any liability for any breach by it of this Agreement prior to such termination or fraud.

<div align="center">

**ARTICLE 10**
**CLOSING**

</div>

**10.1     Location and Time of the Closing**

Closing shall take place at the Closing Time on the Closing Date at the offices of Osler, Hoskin & Harcourt LLP, Suite 3000, Bentall Four, 1055 Dunsmuir Street, Vancouver, British Columbia, V7X 1K8, or at such other location as may be agreed upon by the Parties.

**10.2     NextPoint Entities' Deliveries at Closing**

At the Closing, the NextPoint Entities shall deliver to the Purchasers the following:

(a)     a true copy of each of the Vesting Order, the SISP Order, the Vesting Recognition Order, the SISP Recognition Order, each of which shall be final;

(b)     an executed copy of the Monitor's Certificate;

(c)     a certificate of the CRO in form and substance reasonably satisfactory to the Purchasers: (a) certifying that the board of directors of the NextPoint Entity, has adopted resolutions (in a form attached to such certificate) authorizing the execution, delivery and performance of this Agreement and the transactions contemplated herein, as applicable, which resolutions are in full force and effect and have not been superseded, amended or modified as of the Closing Date; and

<div align="center">40</div>

(b) certifying as to the incumbency and signatures of the officers and directors of the NextPoint Entity;

(d) the certificates contemplated by Section 6.2(c); and

(e) an affidavit, signed under penalties of perjury, stating that the applicable company is not and has not been at any time during the period specified in Section 897(c)(1)(A)(ii) of the Code a "United States real property holding corporation," dated as of the Closing Date and in form and substance reasonably satisfactory to the Purchasers and as required under Treasury Regulation Section 1.897-2(h) so that the Purchasers are exempt from withholding any portion of the Purchase Price thereunder, together with proof reasonably satisfactory to the Purchasers that the applicable NextPoint Entity has provided notice of such affidavit to the IRS in accordance with Treasury Regulation Section 1.897-2(h)(2).

**10.3    Purchasers' Deliveries at Closing**

At the Closing, the Purchasers shall deliver to the NextPoint Entities:

(a) the applicable payment contemplated by Section 3.1;

(b) a certificate of an authorized signatory of each Purchaser (in such capacity and without personal liability), in form and substance reasonably satisfactory to the NextPoint Entities: (a) certifying that the board of directors, member(s) or manager(s), as applicable, of the administrator of the Purchaser has adopted resolutions (in a form attached to such certificate) authorizing the execution, delivery and performance of this Agreement and the transactions contemplated herein, as applicable, which resolutions are in full force and effect and have not been superseded, amended or modified as of the Closing Date; and (b) certifying as to the incumbency and signature of the authorized signatory of or on behalf of the Purchaser executing this Agreement and the other transaction documents contemplated herein, as applicable;

(c) the certificate contemplated by Section 6.3(c); and

(d) all other documents required to be delivered by the Purchasers on or prior to the Closing Date pursuant to this Agreement or Applicable Law or as reasonably requested by the NextPoint Entities in good faith.

**10.4    Monitor**

When the conditions to the Closing set out in Article 6 have been satisfied and/or waived by the NextPoint Entities or the Purchasers, as applicable, the NextPoint Entities or the Purchasers, or their respective counsel, shall each deliver to the Monitor written confirmation that all conditions to Closing have been satisfied or waived. Upon receipt of such written confirmation, the Monitor shall: (i) issue forthwith its Monitor's Certificate in accordance with the Vesting Order; and (ii) file as soon as practicable a copy of the Monitor's Certificate with the CCAA Court (and shall provide a true copy of such filed certificate to the NextPoint Entities and

the Purchasers). The Parties hereby acknowledge and agree that the Monitor will be entitled to file the Monitor's Certificate with the CCAA Court without independent investigation upon receiving written confirmation from the NextPoint Entities and the Purchasers that all conditions to Closing have been satisfied or waived, and the Monitor will have no liability to the NextPoint Entities or the Purchasers or any other Person as a result of filing the Monitor's Certificate.

## 10.5    Simultaneous Transactions

All actions taken and transactions consummated at the Closing shall be deemed to have occurred in the manner and sequence contemplated by the Implementation Steps and set forth in the Vesting Order, as applicable (subject to the terms of any escrow agreement or arrangement among the Parties relating to the Closing), and no such transaction shall be considered consummated unless all are consummated.

## 10.6    Further Assurances

As reasonably required by a Party in order to effectuate the transactions contemplated by this Agreement, the Purchasers and the NextPoint Entities shall execute and deliver at (and after) the Closing such other documents, and shall take such other actions, as are necessary or appropriate, to implement and make effective the transactions contemplated by this Agreement.

## ARTICLE 11
## GENERAL MATTERS

## 11.1    Confidentiality

[After the Closing Time, each of NextPoint Parent and Holdco shall, and shall cause its Affiliates to, maintain the confidentiality of all confidential information relating to the Business and each Acquired Entity (but does not include information that is or becomes generally available to the public other than as a result of disclosure by NextPoint Parent, Holdco or their representatives in breach of this Agreement), except any disclosure of such information and records as may be required by Applicable Law, the CCAA Proceedings, the U.S. Proceedings, or permitted by Purchasers in writing. If NextPoint Parent or Holdco, or any of their representatives, becomes legally compelled by deposition, interrogatory, request for documents, subpoena, civil investigative demand, or similar judicial or administrative process, to disclose any such information, such party shall, provide the Purchasers with reasonably prompt prior oral or written notice of such requirement (including any report, statement, testimony or other submission to such Governmental Authority) to the extent legally permissible and reasonably practicable, and cooperate with the Purchasers, at the Purchasers' expense, to obtain a protective order or similar remedy to cause such information not to be disclosed; provided that in the event that such protective order or other similar remedy is not obtained, NextPoint Parent or Holdco, as applicable, shall, or shall cause its Affiliate or representative to, furnish only that portion of such information that has been legally compelled, and shall, or shall cause such Affiliate or representative to, exercise its commercially reasonable efforts to obtain assurance that confidential treatment will be accorded such disclosed information. NextPoint Parent and Holdco shall instruct their Affiliates and representatives having access to such information of such

~~obligation of confidentiality and shall be responsible for any breach of the terms of this Section 11.1 by any of their Affiliates or representatives.]~~

## 11.2    Public Notices

No press release or other announcement concerning the transactions contemplated by this Agreement shall be made by the NextPoint Entities or the Purchasers, or any of their respective Affiliates, without the prior consent of the other Party (such consent not to be unreasonably withheld, conditioned or delayed by the NextPoint Entities and, in the case of the Purchasers, in the Purchasers' sole discretion); provided, however, that subject to the last sentence of this Section 11.2, any Party may, without such consent, make such disclosure if the same is required by Applicable Law (including the CCAA Proceedings and the U.S. Proceedings) or by any stock exchange on which any of the securities of such Party or any of its Affiliates are listed, or by any insolvency or other court or securities commission, or other similar Governmental Authority having jurisdiction over such Party or any of its Affiliates, and, if such disclosure is required, the Party making such disclosure shall use commercially reasonable efforts to give prior oral or written notice to the other Party to the extent legally permissible and reasonably practicable, and if such prior notice is not legally permissible or reasonably practicable, to give such notice reasonably promptly following the making of such disclosure. Notwithstanding the foregoing: (i) this Agreement may be filed by (A) the NextPoint Entities with the CCAA Court and the U.S. Bankruptcy Court; and (B) NextPoint Parent on its profile on www.sedar.com; and (ii) the transactions contemplated in this Agreement may be disclosed by the NextPoint Entities to the CCAA Court and the U.S. Bankruptcy Court, subject to redacting confidential or sensitive information as permitted by Applicable Law. The Parties further agree that:

(a)    the Monitor may prepare and file reports and other documents with the CCAA Court and the U.S. Bankruptcy Court containing references to the transactions contemplated by this Agreement and the terms of such transactions;

(b)    the NextPoint Entities, the Purchasers and their respective professional advisors may prepare and file such reports and other documents with the CCAA Court and the U.S. Bankruptcy Court containing references to the transactions contemplated by this Agreement and the terms of such transactions as may reasonably be necessary to complete the transactions contemplated by this Agreement or to comply with their obligations in connection therewith; and

(c)    the Purchasers and their respective Affiliates may make announcements regarding the transactions contemplated by this Agreement to their existing and prospective investors provided that the information contained in such announcements is consistent with information that has been filed with the CCAA Court and the U.S. Bankruptcy Court or otherwise contained in a press release or other public filing permitted by this Section 11.2.

The Parties shall be afforded an opportunity to review and comment on such materials prior to their filing. The Parties may issue a joint press release announcing the execution and delivery of this Agreement, in form and substance mutually agreed to them.

**11.3    Injunctive Relief**

(a)    The Parties agree that irreparable harm would occur for which money damages would not be an adequate remedy at law in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the Parties shall be entitled to seek specific performance, injunctive and other equitable relief to prevent breaches or threatened breaches of this Agreement, and to enforce compliance with the terms of this Agreement, without any requirement for the securing or posting of any bond in connection with the obtaining of any such specific performance, injunctive or other equitable relief, this being in addition to any other remedy to which the Parties may be entitled at law or in equity.

(b)    Each Party hereby agrees not to raise any objections to the availability of the equitable remedies provided for herein and the Parties further agree that by seeking the remedies provided for in this Section 11.3, a Party shall not in any respect waive its right to seek any other form of relief that may be available to a Party under this Agreement.

(c)    Notwithstanding anything herein to the contrary herein, under no circumstances shall a Party be permitted or entitled to receive both monetary damages and specific performance and election to pursue one shall be deemed to be an irrevocable waiver of the other.

**11.4    Survival**

None of the representations, warranties, covenants (except the covenants in Article 2, Article 3, Article 11 and Sections 7.1(b), 7.2, 7.3(a), (d) and (f), 7.4, 7.5, 7.6, and 10.6, to the extent they are to be performed after the Closing) of any of the Parties set forth in this Agreement, in any Closing Document to be executed and delivered by any of the Parties (except any covenants included in such Closing Documents, which, by their terms, survive the Closing) or in any other agreement, document or certificate delivered pursuant to or in connection with this Agreement or the transactions contemplated hereby shall survive the Closing.

**11.5    Non-Recourse**

No past, present or future director, officer, employee, incorporator, member, partner, securityholder, Affiliate, agent, lawyer or representative of the respective Parties, in such capacity, shall have any liability for any obligations or liabilities of the Purchasers or the NextPoint Entities, as applicable, under this Agreement, or for any Causes of Action based on, in respect of or by reason of the transactions contemplated hereby.

**11.6    Assignment; Binding Effect**

No Party may assign its right or benefits under this Agreement without the consent of each of the other Parties, except that without such consent the Purchasers may, upon prior notice to the NextPoint Entities: (a) assign this Agreement, or any or all of its rights and obligations hereunder, to one or more of their Affiliates; or (b) direct that title to all or some of the

Purchased Interests be transferred to, and the corresponding Assumed Liabilities be assumed by, one or more of their Affiliates; provided that no such assignment or direction shall relieve the Purchasers of their obligations hereunder. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective permitted successors and permitted assigns. Nothing in this Agreement shall create or be deemed to create any third Person beneficiary rights in any Person not a Party to this Agreement.

**11.7    Notices**

Any notice, request, demand or other communication required or permitted to be given to a Party pursuant to the provisions of this Agreement will be in writing and will be effective and deemed given under this Agreement on the earliest of: (a) the date of personal delivery; (b) the date of transmission by email, with confirmed transmission and receipt (if sent during normal business hours of the recipient, if not, then on the next Business Day); (c) two (2) days after deposit with a nationally-recognized courier or overnight service such as Federal Express; or (d) five (5) days after mailing via certified mail, return receipt requested. All notices not delivered personally or by email will be sent with postage and other charges prepaid and properly addressed to the Party to be notified at the address set forth for such Party:

    (a)    If to the Purchasers or to the Acquired Entities following Closing at:

BP Commercial Funding Trust, Series SPL-X, a statutory series of BP Commercial Funding Trust, a Delaware statutory trust, for itself and for no other series of BP Commercial Funding Trust
c/o BasePoint Capital LLC
75 Rockefeller Plaza, 25th Floor
New York, NY 10019
Attention: Michael Petronio
Email: mpetronio@basepointcapital.com

With a copy to:

BasePoint Capital LLC
75 Rockefeller Plaza, 25th Floor
New York, NY 10019
Attention: General Counsel
Email: BPG-LegalNotices@basepointcapital.com

With a copy to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention: Brian Schartz, P.C.
(brian.schartz@kirkland.com) and Allyson B. Smith
(allyson.smith@kirkland.com)

and

300 N. LaSalle
Chicago, Illinois 60654
Attention: Gabriela Zamfir Hensley
(gabriela.hensley@kirkland.com)

and

Osler, Hoskin & Harcourt LLP
Suite 3000, Bentall Four
1055 Dunsmuir Street
Vancouver, British Columbia
V7X 1K8
Canada
Attention: Mary Buttery, KC (mbuttery@osler.com)

and

100 King Street West
1 First Canadian Place
Suite 6200, P.O. Box 50
Toronto, Ontario
M5X 1B8
Canada
Attention: Marc Wasserman (mwasserman@osler.com) and David Rosenblat
(drosenblat@osler.com)

With a copy to:

Tom Powell and Paul Bishop
FTI Consulting Canada Inc.
701 West Georgia Street
Suite 1450, PO Box 10089
Vancouver, BC V7Y 1B6
Email: tom.powell@fticonsulting.com; paul.bishop@fticonsulting.com

With a copy to:

Kibben Jackson and Fergus McDonnell
Fasken Martineau Dumoulin LLP
2900 – 550 Burrard Street
Vancouver, British Columbia, V6C 0A3
Email: kjackson@fasken.com; fmcdonnell@fasken.com

(b)    If to the NextPoint Entities (other than the Acquired Entities following Closing) at:

DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York 10020-1104
United States of America
Attention: Rachel Ehrlich Albanese and Jamila Justine Willis
Email: rachel.albanese@us.dlapiper.com; jamila.willis@us.dlapiper.com

and

DLA Piper (Canada) LLP
Suite 2700
1133 Melville St.
Vancouver, British Columbia
V6E 4E5
Canada
Attention: Colin Brousson and Russel Drew
Email: colin.brousson@dlapiper.com; russel.drew@dlapiper.com

With a copy to the Monitor, and if to the Monitor, at:

Tom Powell and Paul Bishop
FTI Consulting Canada Inc.
701 West Georgia Street
Suite 1450, PO Box 10089
Vancouver, BC V7Y 1B6
Email: tom.powell@fticonsulting.com; paul.bishop@fticonsulting.com

With a copy to:

Kibben Jackson and Fergus McDonnell
Fasken Martineau Dumoulin LLP
2900 – 550 Burrard Street
Vancouver, British Columbia, V6C 0A3
Email: kjackson@fasken.com; fmcdonnell@fasken.com

Any Party may change its address for service from time to time by notice given in accordance with the foregoing and any subsequent notice shall be sent to such Party at its changed address.

## 11.8    Counterparts; Electronic Signatures

This Agreement may be signed in counterparts and each of such counterparts shall constitute an original document and such counterparts, taken together, shall constitute one and

47

the same instrument. Execution of this Agreement may be made by electronic signature which, for all purposes, shall be deemed to be an original signature.

**11.9    Language**

The Parties have expressly required that this Agreement and all documents and notices relating hereto be drafted in English.

*[Signature pages to follow]*

**IN WITNESS WHEREOF** the Parties have executed this Agreement as of the date first written above.

<div style="margin-left: 45%;">

**NEXTPOINT PARENT:**

**NEXTPOINT FINANCIAL INC.**

**NEXTPOINT ~~ENTITES~~ENTITIES:**

**NPI HOLDCO LLC**
**LT HOLDCO, LLC**
**JTH TAX LLC**
**LT INTERMEDIATE HOLDCO, LLC**
**SIEMPRE TAX+ LLC**
**JTH FINANCIAL, LLC**
**JTH PROPERTIES 1632, LLC**
**JTH TAX OFFICE PROPERTIES, LLC**
**WEFILE LLC**
**LIBERTY CREDIT REPAIR, LLC**
**LTS PROPERTIES, LLC**
**360 ACCOUNTING SOLUTIONS LLC**
**JTH COURT PLAZA, LLC**
**LTS SOFTWARE LLC**
**LIBERTY TAX HOLDING CORPORATION**
**LIBERTY TAX SERVICE INC.**
**CTAX ACQUISITION LLC**
**COMMUNITY TAX LLC**
**COMMUNITY TAX PUERTO RICO LLC**


By:_____
Name: Scott Terrell
Title:   Chief Executive Officer

</div>

*Signature Page to the Transaction Agreement*

**PURCHASERS:**

**BP COMMERCIAL FUNDING TRUST, SERIES SPL-X**,
a statutory series of BP Commercial Trust, a Delaware statutory trust, for itself and for no other series of BP Commercial Funding Trust, in its capacity as holder of Revolving Credit Promissory Note A under the BP NP-Liberty Credit Agreement

By: BasePoint Capital II, LLC,
not in its individual capacity but solely as Administrator of BP Commercial Funding Trust

By: _____
Name: Michael Petronio
Title:  Authorized Signatory

**BP COMMERCIAL FUNDING TRUST, SERIES SPL-X**,
a statutory series of BP Commercial Funding Trust, a Delaware statutory trust, for itself and for no other series of BP Commercial Funding Trust, in its capacity as holder of Revolving Credit Promissory Note B-1 under the BP NP-Liberty Credit Agreement

By: BasePoint Capital II, LLC,
not in its individual capacity but solely as Administrator of BP Commercial Funding Trust

By: _____
Name: Michael Petronio
Title:  Authorized Signatory

**BP COMMERCIAL FUNDING TRUST, SERIES SPL-X**,
a statutory series of BP Commercial Funding Trust, a Delaware statutory trust, for itself and for no other series of BP Commercial Funding Trust, in its capacity as holder of Revolving Credit Promissory Note B-2 under the BP NP-Liberty Credit Agreement

By: BasePoint Capital II, LLC,
not in its individual capacity but solely as Administrator of BP Commercial Funding Trust

By: _____
Name: Michael Petronio
Title:  Authorized Signatory

**BP COMMERCIAL FUNDING TRUST, SERIES SPL-X**,
a statutory series of BP Commercial Funding Trust, a Delaware statutory trust, for itself and for no other series of BP Commercial Funding Trust, in its capacity as holder of Term Loan Promissory
Note A under the BP NP-Liberty Credit Agreement

By: BasePoint Capital II, LLC,
not in its individual capacity but solely as Administrator of BP Commercial Funding Trust

By: _____
Name: Michael Petronio
Title:  Authorized Signatory

*Signature Page to the Transaction Agreement*

**BP COMMERCIAL FUNDING TRUST, SERIES SPL-X**,
a statutory series of BP Commercial Funding Trust, a Delaware statutory trust, for itself and for no other series of BP Commercial Funding Trust, in its capacity as holder of Term Loan Promissory Note B under the BP NP-Liberty Credit Agreement

By: BasePoint Capital II, LLC, not in its individual capacity but solely as Administrator of BP Commercial Funding Trust

By: _____
Name: Michael Petronio
Title:  Authorized Signatory

*Signature Page to the Transaction Agreement*

**<u>Disclosure Letter</u>**

## DISCLOSURE LETTER

NextPoint Financial Inc.
c/o DLA Piper (Canada) LLP
1133 Melville St.,
Suite 2700,
Vancouver, BC V6E 4E5

**Private and confidential**

BP Commercial Funding Trust, Series SPL-X, a statutory series of BP Commercial Funding Trust, a Delaware statutory trust, for itself and for no other series of BP Commercial Funding Trust
c/o BasePoint Capital LLC
75 Rockefeller Plaza, 25th Floor
New York, NY 10019
Attention: Michael Petronio

October 27, 2023

Dear Sirs/Madams

**TRANSACTION AGREEMENT**

We refer to the transaction agreement (the "**Agreement**") dated on or about the date hereof between NextPoint Financial Inc. ("**NextPoint Parent**"); NPI Holdco LLC ("**HoldCo**"); LT Holdco, LLC ("**LT Holdco**"); LT Intermediate Holdco, LLC ("**LT Intermediate Holdco**"); SiempreTax+ LLC ("**Siempre**"); JTH Tax LLC ("**JTH Tax**"); JTH Financial, LLC; JTH Properties 1632, LLC; JTH Office Properties, LLC; Wefile LLC ("**Wefile**"); Liberty Credit Repair, LLC; LTS Properties, LLC; 360 Accounting Solutions, LLC; Liberty Tax Holding Corporation; Liberty Tax Service Inc.; JTH Court Plaza, LLC; LTS Software LLC; CTAX Acquisition LLC; Community Tax LLC; and Community Tax Puerto Rico LLC (collectively with NextPoint Parent, the "**NextPoint Entities**") and each, a "**NextPoint Entity**") and the Purchasers (as defined in the Agreement).

Unless otherwise defined in this Disclosure Letter, capitalized terms used throughout this Disclosure Letter shall have the meaning given to such terms in the Agreement.

## ARTICLE 12 Disclosure Letter and preliminaries

**12.1**  **For the purposes of the Agreement, this Disclosure Letter comprises this letter and the schedules hereto.**

**12.2**  **The information in this Disclosure Letter is qualified in its entirety by reference to specific provisions in the Agreement and is not intended to constitute, and shall not be construed as constituting, representations of the NextPoint Entities, except to the extent provided in the Agreement.  Nothing contained in this Disclosure Letter shall be intended to broaden the scope of any representation, warranty or covenant of the NextPoint Entities contained in the Agreement, except, in each case to the extent provided in the Agreement.**

**12.3**  **No disclosure made in or by virtue of this Disclosure Letter will, in and of itself, be taken as an admission by the NextPoint Entities that they need to be disclosed to comply with or to avoid liability under the terms of the relevant Agreement, or that such matters meet any standard of materiality other than the applicable standard set forth in the Agreement, except in each case, to the extent provided in the Agreement.**

**12.4**  **The schedule numbers in this Disclosure Letter correspond to section numbers in the Agreement. Each item of information disclosed in a schedule of this Disclosure Letter shall be deemed disclosed in any other schedule of this Disclosure Letter if it is reasonably apparent on its face that such item of information is responsive to the disclosure required by such other schedule of this Disclosure Letter.**

**12.5**  **Headings and introductory language have been inserted on the section of this Disclosure Letter for convenience of reference only and will to no extent have the effect of amending or changing the express description of the sections as set forth in this Agreement.**

Please acknowledge receipt of this letter by signing and returning to us the enclosed duplicate of this letter.

Yours faithfully

Duly authorised director on behalf of **NEXTPOINT FINANCIAL INC.**:

By: _____
Name: Scott Terrell
Title:   Chief Executive Officer

*[on duplicate]*

We acknowledge receipt of the above letter.

Duly authorised director on behalf of **BP COMMERCIAL FUNDING TRUST, SERIES SPL-X,** a statutory series of BP Commercial Funding Trust, a Delaware statutory trust, for itself and for no other series of BP Commercial Funding Trust:

By:_____

Name:_____

Title:_____

**Schedule 1.1(b) – Permitted Encumbrances**

1. Judgment and Permanent Injunction entered June 15, 2009, by the Superior Court of the State of California, County of San Francisco, in People of the State of California v. JTH Tax Inc., (d/b/a Liberty Tax Service), Case No. CGC-07-460778
2. Security granted against Building 5 in Virginia Beach related to a corporate credit card with First Horizon.
3. Easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments against any real property interests of the NextPoint Entities which do not, individually or in the aggregate, adversely affect the use or occupancy of such real property as it relates to the operation of the assets of the NextPoint Entities.
4. Applicable zoning laws, building codes, land use restrictions and other similar restrictions imposed by Applicable Law which are not violated by the current use or occupancy of such real property, as applicable.
5. All registrations and other Encumbrances related to the Liberty Term Loan.

**Schedule 2.2 – Excluded Assets**

**Schedule 2.2(b) – Excluded Contracts**

[Disclaimed contracts list has been provided to Osler and the Monitor for review and confirmation. To populate once disclaimed contracts list has been confirmed.]

**Schedule 2.2(d) – Excluded Equity Interests**

| **LoanMe Entities** |
|---|
| 1.   NPLM Holdco LLC |
| 2.   MMS Servicing LLC |
| 3.   LoanMe, LLC |
| 4.   LoanMe Funding, LLC |
| 5.   LM Retention Holdings, LLC |
| 6.   LoanMe Stores, LLC |
| 7.   LM BP Holdings, LLC |
| 8.   InsightsLogic, LLC |
| 9.   LM 2020 CM I SPE, LLC |

**Schedule 4.7 – Subsidiaries**

| Entity | Jurisdiction of Organization | Owner / Membership | Percentage of Ownership |
|---|---|---|---|
| 1. NextPoint Financial Inc. | Canada – British Columbia | -- | -- |
| 2. NPI Holdco LLC | DE | NextPoint Financial Inc. | 100% |
| 3. LT Holdco, LLC | DE | NPI Holdco LLC | 100% |
| 4. LT Intermediate Holdco, LLC | DE | LT Holdco, LLC | 100% |
| 5. SiempreTax+ LLC | VA | LT Intermediate Holdco, LLC | 100% |
| 6. JTH Tax LLC | DE | LT Intermediate Holdco, LLC | 100% |
| 7. Liberty Tax Holding Corporation | Canada - Ontario | JTH Tax LLC | 100% |
| 8. Liberty Tax Service Inc. | Canada - Ontario | JTH Tax LLC<br>Liberty Tax Holding Corporation | 60%<br>40% |
| 9. JTH Financial, LLC | VA | JTH Tax LLC | 100% |
| 10. JTH Properties 1632, LLC | VA | JTH Financial, LLC | 100% |
| 11. Liberty Credit Repair, LLC | VA | JTH Tax LLC | 100% |
| 12. WeFile LLC | VA | JTH Tax LLC | 100% |

| Entity | Jurisdiction of Organization | Owner / Membership | Percentage of Ownership |
|---|---|---|---|
| 13. JTH Tax Office Properties, LLC | VA | JTH Tax LLC | 100% |
| 14. LTS Software LLC | VA | JTH Tax LLC | 100% |
| 15. JTH Court Plaza, LLC | VA | JTH Tax LLC | 100% |
| 16. 360 Accounting Solutions LLC | VA | JTH Tax LLC | 100% |
| 17. LTS Properties, LLC | VA | JTH Tax LLC | 100% |
| 18. CTAX Acquisition LLC | DE | NPI Holdco LLC | 100% |
| 19. Community Tax Puerto Rico LLC | DE | CTAX Acquisition LLC | 100% |
| 20. Community Tax LLC | IL | CTAX Acquisition LLC | 100% |

**Schedule 4.8 – Stop Orders**

None.

**Schedule 4.10 – Taxes**

None.

**Schedule 4.14 – Data Security**

**Scheudle 4.14(b)**

In Q3 of 2022, there was 1 recorded cyber attack registered under the Company's Security Event and Incident Management (SEIM) system. The attack was targeted at one employee, however, it did not result in any loss of personal data, customer data, or access to any of the Company's systems

| Summary report: |
|---|
| **Summary report:**<br>**Litera Compare for Word 11.2.0.54 Document comparison done on**<br>**10/31/2023 7:09:08 PM** |

| | |
|---|---|
| **Style name:** DLAPiper | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:**<br>C:\Users\ns43253\AppData\Local\Litera\Temp\A68944\NextPoint - Transaction<br>Agreement (Purchaser Draft 10-12-2023) [Marked to be filed as Exhibit B<br>10-16-2023].docx | |
| **Modified filename:**<br>C:\Users\ns43253\AppData\Local\Litera\Temp\A68944\NextPoint - Transaction<br>Agreement & Disclosure Letter Execution Version.docx | |
| **Changes:** | |
| Add | 260 |
| Delete | 183 |
| Move From | 10 |
| Move To | 10 |
| Table Insert | 2 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 465 |