**<u>Exhibit B</u>**

**Hearing Transcript**

***In re Just Energy Group Inc.*, Case No. 21-30823, Dec. 1, 2022**

```
                    UNITED STATES BANKRUPTCY COURT
                  SOUTHERN DISTRICT OF TEXAS (HOUSTON)
```

|  |  |  |
|---|---|---|
| | . | |
| IN RE: | . | Case No. 21-30823 |
| | . | Chapter 15 |
| JUST ENERGY GROUP INC. and | . | (Jointly Administered) |
| JUST ENERGY ADVANCED | . | |
| SOLUTIONS CORP., | . | 515 Rusk Avenue |
| | . | Houston, TX  77002 |
| | . | |
| Debtors. | | Wednesday, December 1, 2022 |
| . . . . . . . . . . . . . . . | . | 9:00 a.m. |

```
 TRANSCRIPT OF FOREIGN REPRESENTATIVE'S MOTION FOR ENTRY OF AN
ORDER (I) RECOGNIZING AND ENFORCING (A) THE CCAA SISP APPROVAL
   ORDER AND (B) THE CCAA CLAIMS PROCEDURES ORDER AND (II)
               GRANTING RELATED RELIEF [185];

      FOREIGN REPRESENTATIVE'S MOTION FOR ENTRY OF AN ORDER
        (I) RECOGNIZING AND ENFORCING THE CCAA VESTING ORDER,
  (II) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS'
INTERESTS FREE AND LEAR OF LIENS, CLAIMS, AND ENCUMBRANCES, AND
               (III) GRANTING RELATED RELIEF [211];

   MOTION RECORD TO FORM THE INDIVIDUAL SHARE GROUP AS EQUITY
 SHAREHOLDER COMMITTEE AND OPPOSE THE RECOGNITION ORDER [219];

   MOTION RECORD TO FORM THE INDIVIDUAL SHARE GROUP AS EQUITY
  SHAREHOLDER COMMITTEE AND OPPOSE THE RECOGNITION ORDER FROM
               CCAA PROCEEDINGS [220];

                       (CONTINUED)
            BEFORE THE HONORABLE MARVIN ISGUR
            UNITED STATES BANKRUPTCY COURT JUDGE
```

```
Audio Operator:          Courtroom Personnel

Transcription Company:   Access Transcripts, LLC
                         10110 Youngwood Lane
                         Fishers, IN 46048
                         (855) 873-2223
                         www.accesstranscripts.com

     Proceedings recorded by electronic sound recording,
transcript produced by transcription service.
```

TRANSCRIPT OF (CONTINUED):

MOTION RECORD TO FORM THE INDIVIDUAL SHARE GROUP AS EQUITY
SHAREHOLDER COMMITTEE AND OPPOSE THE RECOGNITION ORDER FROM
CCAA PROCEEDINGS [221];

MOTION RECORD TO FORM THE INDIVIDUAL SHARE GROUP AS EQUITY
SHAREHOLDER COMMITTEE AND OPPOSE THE RECOGNITION ORDER FROM
CCAA PROCEEDINGS [223];

MOTION RECORD TO FORM THE INDIVIDUAL SHARE GROUP AS EQUITY
SHAREHOLDER COMMITTEE AND OPPOSE THE RECOGNITION ORDER FROM THE
CCAA PROCEEDING [225]


APPEARANCES:

| | |
|---|---|
| For the Debtors: | Kirkland & Ellis LLP<br>By:  ALLYSON B. SMITH, ESQ.<br>601 Lexington Avenue<br>New York, NY 10022<br>(212) 446-4800 |
| | Kirkland & Ellis LLP<br>By:  ANNA G. ROTMAN, ESQ.<br>     BRIAN SCHARTZ, ESQ.<br>609 Main Street<br>Houston, TX 77002<br>(713) 836-3600 |
| For Pacific Investment Management Company LLC: | Akin Gump Strauss Hauer & Feld LLP<br>By:  SARAH LINK SCHULTZ, ESQ.<br>2300 N. Field Street, Suite 1800<br>Dallas, TX 75201-2481<br>(214) 969-2800 |
| | Akin Gump Strauss Hauer & Feld LLP<br>By:  ABID QURESHI, ESQ.<br>     DAVID H. BOTTER, ESQ.<br>One Bryant Park<br>New York, NY 10036-1000<br>(212) 872-1000 |
| For FTI Consulting Canada, Inc., solely in its capacity as Monitor: | Porter Hedges LLP<br>By:  JOHN F. HIGGINS, IV, ESQ.<br>     MEGAN N. YOUNG-JOHN, ESQ.<br>1000 Main Street, Suite 3600<br>Houston, TX 77002-6336<br>(713) 226-6000 |

```
TELEPHONIC APPEARANCES:

For the Debtors:              Jackson Walker LLP
                             By:  GENEVIEVE MARIE GRAHAM, ESQ.
                                  MATTHEW D. CAVENAUGH,  ESQ.
                             1401 McKinney Street, Suite 1900
                             Houston, TX 77010
                             (713) 752-4200

                             Kirkland & Ellis LLP
                             By:  BRIAN SCHARTZ, ESQ.
                             609 Main Street
                             Houston, TX 77002
                             (713) 836-3600

                             Kirkland & Ellis, LLP
                             By:  PETER A. CANDEL, ESQ.
                             300 North LaSalle
                             Chicago, IL 60654
                             (312) 862-2000

For Shell Energy North        Norton Rose Fulbright US LLP
America (Canada) Inc.:        By:  RYAN E. MANNS, ESQ.
                             2200 Ross Avenue, Suite 3600
                             Dallas, TX 75201
                             (214) 855-0000

For National Bank of          Chapman and Cutler LLP
Canada:                      By:  STEPHEN R. TETRO II, ESQ.
                             320 South Canal Street, 27th Floor
                             Chicago, IL 60606
                             (312) 845-3859

For the United States         Office of the United States Trustee
Trustee:                     By:  STEPHEN STATHAM, ESQ.
                             515 Rusk Street, Suite 3516
                             Houston, TX 77002
                             (713) 718-4650

Also Present:                 LOUISA WILLIAMS

                             GANESH YADAV
```

1

Case 21-30823 Document 304-1 Filed in TXSB on 12/05/23 Page 5 of 51

1      (Proceedings commence at 9:00 a.m.)

2           THE COURT:  Good morning.  Please be seated.  Good

3 morning.  This is a hearing in the <u>Just Energy Group</u> case.  It

4 is 21-30823.  We're going to start by taking any appearances in

5 the courtroom.  If anyone wishes to appear on the video

6 telephone, please press "five star" one time on your phone.  If

7 you've already made an electronic registration, you don't need

8 to appear again.  If you wish to speak, you will need to press

9 "five star."

10          MS. SMITH:  Yes.  Good morning, Your Honor.  Allyson

11 Smith from Kirkland & Ellis, co-counsel to the debtors.  I'm

12 joined in the courtroom today by my partner, Ms. Anna Rotman,

13 and Mr. Brian Schartz is present on video.

14          THE COURT:  Good morning.

15          MS. ROTMAN:  Good morning, Your Honor.

16          MS. SCHULTZ:  Good morning, Your Honor.  Sarah

17 Schultz, Akin Gump Strauss Hauer & Feld, on behalf of the

18 purchaser.  I'm joined today by my partner, Abid Qureshi, and

19 my partner, David Botter, who's on the video.

20          THE COURT:  Good morning.

21          MS. YOUNG-JOHN:  Good morning, Your Honor.  Megan

22 Young-John and John Higgins of Porter Hedges on behalf of the

23 Canadian monitor.

24          THE COURT:  Good morning.

25          All right.  On the telephone, we have from area code

1  (361) 777-9334, who would that be?

2      MS. WILLIAMS:  My name is Louisa Williams.

3      THE COURT:  Could you tell me your last name again?

4  It's Louisa what?

5      MS. WILLIAMS:  Williams, Your Honor.

6      THE COURT:  How would I spell that?

7      MS. WILLIAMS:  W-I-L-L (audio interference) M-S.

8      THE COURT:  Thank you.  And what is your role in the

9  case?

10     MS. WILLIAMS:  Well, I had damages, and I still got

11 them because I can't afford to repair my house.  I have no

12 water in my house.

13     THE COURT:  All right.

14     MS. WILLIAMS:  That's all.  I'm just interested.  I'm

15 old and disabled.

16     THE COURT:  All right.  I'm going to leave your line

17 open and we'll allow you to introduce any evidence and make

18 arguments as you wish as we move ahead through the day.  Thank

19 you for dialing in, and just stay with us.  Let's see who else

20 wishes to appear.

21     MS. WILLIAMS:  Thank you, Your Honor.

22     THE COURT:  Thank you.

23     From area code (646) 663-3848, who do we have?

24     MR. SCHARTZ:  Hi, Your Honor.  It's Brian Schartz

25 from Kirkland & Ellis.  I keep using different numbers on you,

1    so -- but (audio interference) today.

2           THE COURT:  Mr. Schartz, good morning.

3           I did have a number of shareholders that wrote and

4    filed documents with the Court.  If any of those shareholders

5    wish to appear today, you need to press "five star" one time on

6    your phone.

7       (Pause)

8           THE COURT:  All right.  There are no other appearance

9    so far.  If anyone wishes to speak as the hearing proceeds,

10   feel free to press "five star" at that point.

11          How did you wish to proceed today?

12          MS. SMITH:  Thank you, Your Honor.  Again, Allyson

13   Smith, Kirkland & Ellis, co-counsel to the debtors.  As

14   previewed at the last hearing, we completed the sale process in

15   Canada, and we're here today seeking recognition of the vesting

16   order that was entered by Judge McEwen in the CCAA proceedings

17   last month.  So I'm happy to go through a couple of

18   housekeeping items.  We do have a couple of declarations to

19   submit into evidence.  And then all right if, Your Honor, I'll

20   just go through the argument?

21          THE COURT:  All right.

22          MS. SMITH:  Perfect.  We originally filed our

23   materials on November 3rd with the motion at Docket Number 211.

24   A revised form of order and redline was filed last night at

25   Docket 229, as well as our reply at 227.  As I mentioned, there

 1  are three declarations also on file in support of recognition.

 2  We have Ms. Emily Paplawski from Osler at Docket 213;

 3  Mr. Michael Carter, Chief Financial Officer of Just Energy, at

 4  Docket 212; and Mr. Tony Horton, Executive Chairman of the

 5  Board, at Docket Number 228.

 6       Ms. Paplawski and Mr. Carter are present in the

 7  courtroom today, and Mr. Horton is available on video.  Unless

 8  Your Honor has any questions, we would ask that those be

 9  submitted into evidence.

10       THE COURT:  Does any party object to the admission of

11  the declarations filed at ECF 213, 212, and 228 as substantive

12  evidence at today's hearing?  If so, please speak up or press

13  "five star" on your phone if you're not currently authorized to

14  speak.

15     (No audible response)

16       THE COURT:  There are no objections.  I've reviewed

17  the three declarations before I came out today.  They are each

18  admitted.

19     (ECF Numbers 212, ECF 213, and ECF 228 admitted into

20  evidence)

21       MS. SMITH:  Thank you, Your Honor.  Since we were

22  last before you, we've worked hard to carry out the SISP

23  procedures recognized by this Court in September.  We did

24  provide a detailed overview of that process at the last

25  hearing, so I will not belabor the Court and go through again,

1   but of course happy to touch on any specifics or answer any

2   questions.

3          When we were last here, we had received four

4   notifications of interest and we're moving into the second

5   phase of the SISP, whereby qualified bids were due on October

6   13th.  Ultimately, no qualified bids were received, leaving

7   just the stalking horse transaction as the only viable

8   alternative.  We also previously provided an overview of the

9   terms of that transaction; so, again, I won't repeat, unless of

10  course you'd like me to.

11         In light of the stalking horse transaction being the

12  only actionable going concern transaction, the debtors moved

13  forward with seeking entry of a vesting order in the Canadian

14  proceedings.  A hearing was held on November 2nd at which all

15  parties in interest were properly noticed and provided an

16  opportunity to be heard.  Indeed, there were only two objecting

17  parties, and I'll address each of those further in a moment.

18         On November 3rd, Judge McEwen entered the vesting

19  order; and on November 14th, he issued his endorsement in

20  support thereof.  Which bring us to today, where we are asking

21  this Court to recognize that order and the transaction

22  contemplated thereunder.  It's been a long and hard-fought

23  process, as you are aware.  I think we're going on 20 or 21

24  months now.  But this transaction truly represents the best

25  realization of value for the debtors' creditors and other

1    stakeholders.  It's validated by the extensive marketing

2    efforts and processes to date, and again, is the only

3    transaction available to permit Just Energy to exit these

4    proceedings as a going concern business.

5            The revised order filed last night reflects

6    additional language to address informal comments received from

7    ERCOT and certain Texas taxing authorities.  Happy to walk

8    through those changes, but I'll otherwise pause here before

9    addressing the objections, in case Your Honor has any questions

10   on what I've discussed thus far.

11           THE COURT:  I don't have questions other than I want

12   to be certain that we properly can take note of or admit the

13   findings of fact and conclusions of law that were made by the

14   Canadian court.  I believe that those were filed of record --

15           MS. SMITH:  Yes, at 226.

16           THE COURT:  -- I think at 226, right?

17           MS. SMITH:  Yes, that's correct.

18           THE COURT:  But I don't think they have been offered,

19   and I don't want to proceed with the hearing further until I

20   know what the -- I know officially what the Canadian court did,

21   and why it did it.

22           MS. SMITH:  Sure, Your Honor.  So would you like me

23   to offer that into evidence at this time?

24           THE COURT:  Going to leave that up to you, but I'm

25   just telling you I don't think I can proceed until I understand

 1    -- especially in light of the objections that have been filed

 2    by the shareholders, part of which were that the Canadian court

 3    did not make findings.  And as I understand it, what occurred

 4    is the Canadian court issued a ruling subject to later

 5    findings.  We then drew objections that no findings had been

 6    made, and now findings have been made.  So I think I need to

 7    deal with that, with respect to the objections that were filed,

 8    so that I can properly address them.  The fact that no one is

 9    here is of concern, but I'm not going to ignore the objections.

10         MS. SMITH:  Sure.  So, if no objection from

11    Your Honor, we would submit Docket 226 into evidence.  That's

12    Judge McEwen's endorsement.

13         THE COURT:  Is there any objection to the admission

14    of 226-1?

15       (No audible response)

16         THE COURT:  226-1 is admitted.

17       (ECF Number 226-1 admitted into evidence)

18         THE COURT:  All right.  Go ahead, please.

19         MS. SMITH:  Thank you, Your Honor.  As Judge McEwen

20    in Canada attested to in his endorsement, I believe it was at

21    Paragraph 57, the marketing process here was very extensive.

22    Additionally, at Paragraph 82, Judge McEwen notes, "More

23    importantly" -- and I'm quoting his endorsement -- "the Just

24    Energy Entities' business was marketed for over three years and

25    was widely canvassed during the SISP.  During this entire

1   period, there has not been a single offer in excess of the

2   stalking horse offer.  Further, Mr. Yadav's submissions" --

3   that is one of the shareholders who appeared and objected in

4   the Canadian proceedings and is also named in one of the

5   objections filed on this Court's docket.  "Further, Mr. Yadav's

6   submissions concerning value run contrary to the Just Energy

7   Entities and the monitor's valuation of the company and are

8   unsupported by any other stakeholder."

9           So, again, the marketing process here was very

10  thorough and extensive.  The SISP mirrors those frequently

11  employed by Chapter 11 debtors to encourage competitive

12  bidding, to maximize value.  The lack of recovery to equity

13  holders is not due to the specific structure of the

14  transaction, but rather is a result of the value of the

15  debtors' business as tested and validated through the market.

16  Judge McEwen also attested to that in his endorsement.

17          Secondly, we know due process is important to

18  Your Honor.  It's equally important to us.  All parties in

19  interest were given a full and fair opportunity to be heard at

20  the CCAA hearing.  As Your Honor acknowledged at our last

21  hearing in September, this Court's role in the Chapter 15

22  proceedings is not to question the Canadian court's authority

23  or finding; rather, its role is to ensure that objecting

24  parties had their due rights in Canada.

25          That is the case here.  The Canadian proceedings

1   complied with fundamental standards of fairness and due

2   process.  The shareholders named in the Equity Committee

3   objection filed in this Court, as well as some of the

4   shareholder letters, participated and objected at the CCAA

5   hearing, making the same assertions regarding the debtors'

6   liquidity, that it far exceeds what is contemplated under the

7   current transaction.  The Canadian court overruled that

8   objection, again emphasizing that the submissions concerning

9   value run contrary to both the debtors' and monitor's valuation

10  and are unsupported by any other stakeholder.

11         The objecting shareholders are not challenging the

12  legal merits of the transaction, but rather take issue with

13  their lack of recovery thereunder.  Despite, again, in the last

14  approximately 20 to 21 months that these proceedings have been

15  pending, no other party has brought forth an actionable

16  transaction that would support a recovery to equity holders.

17         Does that address your concerns regarding the

18  Canadian court's findings, Your Honor?

19         THE COURT:  I'm going to wait and see if anyone has

20  any response to that.  May I ask you to address Ms. Williams'

21  objection that she has just raised and -- as she introduced

22  herself, that she had water damage in her home caused by

23  Just Energy.  What does the proposal do with respect to

24  whatever claims she might have as a result of that?

25         MS. SMITH:  Sure, Your Honor.  And apologies.  This

1    is the first that I've been aware of Ms. Williams' claim; but

2    assuming it is an unsecured claim, it would be dealt with and

3    adjudicated through the claims process in Canada, and this

4    transaction does not provide a recovery to unsecured creditors.

5            THE COURT:  And what if it's an insured claim under

6    Texas law?

7            MS. SMITH:  If it is an -- I'm sorry.

8            THE COURT:  Well, let's assume -- I don't know -- but

9    if Just Energy had insurance for its negligence -- and I'm not

10   finding Just Energy was negligent.  I'm making no findings

11   about that.  But if there is insurance to cover negligence, is

12   there anything about this transaction that would stop

13   Ms. Williams or others from proceeding to collect that

14   insurance if it's available?

15           MS. SMITH:  I don't believe so, Your Honor.

16           THE COURT:  You don't believe --

17           MS. SMITH:  I don't believe it would prohibit her

18   from proceeding to collect that.

19           THE COURT:  All right.  Ms. Williams, did you wish to

20   address that, Ms. Williams?

21           MS. WILLIAMS:  Yes, Your Honor.  I do.

22           THE COURT:  Go ahead, please.

23           MS. WILLIAMS:  I believe (audio interference) I've

24   had damage, and I don't have water still, Your Honor.  I just

25   want to know what's going on.  The fact that -- I'm not too

1    savvy about any kind of proceedings that is going on.  I just

2    want to have enough to take care of my water problems here at

3    my home.  I don't have water on, like part of the house, that I

4    -- and that's where like she claims 21 months.

5           And to be honest with you, Your Honor, I'd like for

6    you to tell me.  Just Energy is my electric company, but my

7    electric company didn't have no (audio interference) we had

8    that freeze.  It was not Just Energy.  It was (audio

9    interference) and I don't see why we're going after Just

10   Energy.  At least that's what I understand.  It's supposed to

11   be the main man that decided not to turn the switch on.  People

12   died in the freeze.

13          THE COURT:  So --

14          MS. WILLIAMS:  And I suffered.

15          THE COURT:  Let me tell you what we're doing --

16          MS. WILLIAMS:  I'm sorry, Your Honor.

17          THE COURT:  Let me tell you what we're being asked to

18   do today.  Just Energy has filed bankruptcy in Canada, and the

19   Canadian court has approved a transfer of their assets to

20   another entity, through a pretty complex -- what I'll call a

21   "reverse asset transaction."

22          What we were being asked to do today is to determine

23   that that transaction is consistent with U.S. law.  According

24   to the lawyer who is here representing Just Energy, if they did

25   something at your home that was negligent, and if they have

1   insurance for it, this transaction will not stop you, if you

2   want to go to court to try and collect that insurance.  But I

3   am not in a position to order anyone to come and fix the

4   problem caused during the winter storm at your home.  That will

5   be separate from what we are doing today, and I don't want you

6   misled about that.

7        MS. WILLIAMS:  Thank you, Your Honor.  I appreciate

8   your concern.  I really do.  I just wanted to be heard that

9   there's other people that are hurting.

10       THE COURT:  It was a terrible event for all of us.  I

11  mean, I had --

12       MS. WILLIAMS:  Yes, it was.

13       THE COURT:  I had water damage at my home, as well,

14  although I didn't have Just Energy providing retail electric

15  services to me.  But I had three pipes in my home that burst.

16       MS. WILLIAMS:  Yeah.  Well, my whole -- my whole

17  house was without water until a friend came by and put water on

18  the spigot outside.  My neighbor was giving me water and I was

19  hauling buckets of water, washing dishes (audio interference)

20  and that hurt my hip.  I'm old, Your Honor.  I'm 79 years old

21  -- 69 years old and my hip got hurt. I had to see a doctor for

22  that (audio interference) --

23       THE COURT:  Wait a minute.  Wait a minute.  If you're

24  79, you're older than I am; but if you're 69, you're younger

25  than I am.  Which one is it?

1          MS. WILLIAMS:  No, no.  I'm sorry.  I misspoke.  I
2  misspoke, Your Honor.  It's 69.  I'm going to be 70.
3          THE COURT:  Okay.  Well, I'm older than you are then.
4          MS. WILLIAMS:  I'm (audio interference) on 70.
5          THE COURT:  Okay.
6          MS. WILLIAMS:  Okay.  Well, that's -- I just want to
7  be heard that there's people still hurting.  Now, all the
8  companies -- and it was not Just Energy, people around here in
9  my town -- it's a small town, Odem, Texas.  And they all didn't
10  have no electricity, the whole state of Texas.  It was not the
11  companies, it was the grid that --
12          THE COURT:  Here's what --
13          MS. WILLIAMS:  (Audio interference) --
14          THE COURT:  You know, I'm in Texas, too.  So I'm well
15  aware of that and had no power at my house either.
16          MS. WILLIAMS:  Exactly.  And then my friend wanted to
17  get me the water under my house for (audio interference) I'm
18  living in the mother-in-law quarters that we built for my
19  mother-in-law because it's all handicapped.  But the other side
20  of my house, I can't use it.  There's no water.  No commode
21  water.  No sink water.  Nothing.  And my friend says I can't do
22  the big side of your house, Berty (phonetic) -- because that's
23  my nickname, Berty -- but (audio interference) this other one.
24  And they couldn't find fittings to do the plumbing.  No
25  fittings.  And --

```
 1              THE COURT:  So do you have the water -- is the water
 2    back on now?
 3              MS. WILLIAMS:  On part of my house, but on the large
 4    -- because I've got a big home, Your Honor.  And on one side,
 5    there's mother-in-law quarters that we -- when we bought the
 6    house, we built a mother-in-law quarters because we were
 7    bringing my mother-in-law over.  And that's what we did.  We
 8    built a mother-in-law quarters for my mother-in-law.
 9    Everything is handicapped.  That's the part that my friend gave
10    me water on.
11              But on the other side of my home, I don't have no
12    water whatsoever.  It's one side of the house.  But under that
13    other house, I haven't been able to afford to pay plumbers to
14    come.  They was charging me $2300 to do that.  And I still owe
15    my friend money because he didn't do --
16              THE COURT:  So what I would suggest you do --
17              MS. WILLIAMS:  Sorry, sir?
18              THE COURT:  What I would suggest you do is I want you
19    to call your county office and tell the county that you still
20    don't have water and ask if they have any programs to assist
21    senior citizens in your county with this.  Okay?
22              MS. WILLIAMS:  Yes, sir.
23              THE COURT:  Okay.  So --
24              MS. WILLIAMS:  I do have an attorney representing me,
25    Your Honor.
```

```
 1              THE COURT:  Oh, you do?

 2              MS. WILLIAMS:  Yes, I do.

 3              THE COURT:  Well, that's good.  I would talk to your

 4    attorney, as well, but I think you can go ahead and call the

 5    county and see if they have any program available --

 6              MS. WILLIAMS:  Yeah.

 7              THE COURT:  -- to try and restore your water.  What

 8    county are you in?

 9              MS. WILLIAMS:  San Patricio.

10              THE COURT:  Okay.  Well, why don't you call the San

11    Patricio County judge, and his office may know some way to help

12    you.  It's really not something the bankruptcy court can do,

13    but I'm really glad that you called in this morning.  So thank

14    you for --

15              MS. WILLIAMS:  All right.  Thank you, Your Honor.

16              THE COURT:  Thank you for calling in.

17              MS. WILLIAMS:  I appreciate it.

18              THE COURT:  All right.  Thank you.

19              MS. WILLIAMS:  All right.  I'm going to hang up now.

20              THE COURT:  Alrighty.  Bye-bye.  You take care.

21              MS. WILLIAMS:  Bye-bye, Your Honor.  Thank you so

22    much, Your Honor.

23              THE COURT:  Thank you.

24              Is there any other party that wishes to express

25    either support for or opposition to the request being made by
```

```
 1  Just Energy today, either in the form of the introduction of
 2  evidence or argument?  If so, please approach the podium or
 3  press "five star" one time on your phone.
 4          From (408) 507-7753, who do we have on the telephone?
 5          MR. YADAV:  Your Honor, this is Ganesh Yadav.  I am
 6  representing the shareholders in this group.
 7          THE COURT:  Mr. Yadav, good morning.  Your voice is a
 8  little bit fuzzy.  I don't know if --
 9          MR. YADAV:  Good morning, sir.
10          THE COURT:  -- you want to pick up the phone.  It may
11  be a little easier to hear you that way.  I can make it out,
12  but it is a little fuzzy.
13          MR. YADAV:  Okay.  (Audio interference) my wife's,
14  Your Honor.  Is this okay?
15          THE COURT:  It's still a little fuzzy, but why don't
16  you go ahead --
17          MR. YADAV:  Can you hear me okay?
18          THE COURT:  I'm saying it's still a little fuzzy, but
19  I can understand you.  Why don't you move ahead.  Tell me what
20  you want to say.
21          MR. YADAV:  So, Your Honor, we -- so there were -- I
22  did go to the Canadian proceedings to protect my interest as a
23  -- ownership interest in the Just Energy Entities.  My
24  arguments, actually, they were discounted on technicalities.
25  However, they were heard, but I was just given ten minutes.
```

 1    Honorable Judge did mention that he had gotten
 2  letters.  Subsequently, I did approach all the shareholders and
 3  we did informally form a committee.  And after consulting with
 4  the rest of the group, we filed objections to the recognition
 5  order -- with respect to the recognition order in front of
 6  Your Honor today.  And we would like to argue --
 7  (indiscernible) argue our case in front of Your Honor --
 8    THE COURT:  So today is the day.  Let's do it.  Do
 9  you have any evidence that you wish to introduce in support of
10  your argument?
11    MR. YADAV:  So, Your Honor, the evidence is --
12  evidence is the documents that are filed by Just Energy to SEC,
13  which are essentially its annual report, that it has filed for
14  2022, quarterly reports --
15    THE COURT:  I'm having trouble -- can you go ahead
16  and pick up your phone?  This is really difficult to
17  understand.
18    MR. YADAV:  Okay.  Let me -- can you give me a few
19  minutes to get headphones, Your Honor?
20    THE COURT:  Can you just pick -- you can't pick up
21  the phone?
22    MR. YADAV:  I can.  Let me -- let me pick up the
23  phone.
24    THE COURT:  Okay.
25    MR. YADAV:  Can you hear me, Your Honor?

1          THE COURT:  That is so much better.  Thank you for
2    doing that, sir.  So which evidence do you wish to --
3          MR. YADAV:  Okay.
4          THE COURT:  Tell me the pieces of evidence that you
5    want to introduce today.
6          MR. YADAV:  Well, Your Honor, in terms of evidence,
7    we are actually relying on the documents filed by Just Energy
8    to the SEC, which are its annual report and quarterly reports.
9          THE COURT:  So I need --
10         MR. YADAV:  We are also --
11         THE COURT:  Where do I find those?
12         MR. YADAV:  So in the Document 219, Docket 219, there
13   is a list of references that we have evidence of, Your Honor.
14         THE COURT:  Docket 209 is a letter from Travis
15   Marshall?
16         MR. YADAV:  No.  Docket 219 is our motion record,
17   Your Honor.
18         THE COURT:  Document 209 is a letter from Travis
19   Marshall.
20         MR. YADAV:  219, Your Honor.
21         THE COURT:  219.  Okay.  Sorry.  Okay.  I have 219
22   open.  I'm going to put it up on the screen.  Hold on.  So
23   where are the documents that you want me to look at?
24         MR. YADAV:  We have -- we have (indiscernible)
25   attached all the documents because that was one problem we had

1  with the Canadian judge, that when we attach all the documents,

2  he got lost in all of the documents and couldn't -- so we

3  attached the documents by reference, if that is okay with

4  Your Honor.

5          THE COURT:  So did you send the documents and file

6  them here in Houston?

7          MR. YADAV:  Not -- these are publicly available

8  documents, Your Honor, so I did not -- we did not send copies.

9          THE COURT:  Okay.  I'll let you offer them

10  individually and we'll see what type of objections you draw.

11  Which document do you want me to look at?

12          MR. YADAV:  So, Your Honor, if -- I think -- would it

13  be better for us to go through the points of this motion one by

14  one, and then I can -- I can point you to the reference

15  documents?

16          THE COURT:  No, that would not be better.  I need to

17  know what evidence you're going to be relying on, and you need

18  to identify the evidence, we'll take objections to it, and

19  determine whether to consider it.

20          MR. YADAV:  So in Reference Number 1, there is the

21  Twelfth Report of the monitor, which essentially outlines the

22  cash flows of Just Energy, which essentially is the latest from

23  the FTI Consulting website in the Canadian proceedings.

24          THE COURT:  All right.  Are there objections to the

25  admission of the Twelfth Report of the monitor for the document

 1  where -- I don't yet have it open -- I'm going to try and copy

 2  over the URL that is listed there.

 3           Ms. Rotman.

 4           MS. ROTMAN:  Yes, Your Honor.

 5           THE COURT:  Let me get you to come here, so that he

 6  can see you as well.

 7           MS. ROTMAN:  Thank you, Your Honor.  I also haven't

 8  seen the exact document.  But, based on its description here,

 9  we would object as to relevance.  The point of why we're here

10  today is to confirm the proposed -- or to have you recognize

11  the proposed transaction.  That transaction does not depend on

12  the outline of cash flows as it's described here.

13           And as I understand the shareholders' objection, it

14  seems to be that they believe that there would be a recovery to

15  them, and there would be nothing in the report of the monitor,

16  who supports this transaction, that would indicate that's

17  feasible.  So, again, the objection is based on relevance.

18           THE COURT:  And what is your response, Mr. Yadav?

19           MR. YADAV:  I think the document is relevant,

20  Your Honor, given that what the monitor claims Just Energy have

21  (indiscernible) enterprise which is entirely (indiscernible).

22  It's not -- it's a healthy enterprise, generating cash flows,

23  as under the (indiscernible) CCAA and under the (indiscernible)

24  of this Court.  It has been able to generate substantial cash

25  flows.  It has been able to recover money from ERCOT.  And it

1  has been able to realize values (indiscernible) and that makes

2  it a viable, healthy enterprise which can go to U.S. equity

3  markets and realize value that it has realized (indiscernible)

4  in the past, no so long ago.  And that's -- that -- the values

5  today that we see are mainly because of the company is in

6  bankruptcy.  It is not because it is unhealthy or insolvent.

7  And the monitor's report, as submitted by Just Energy Entities

8  to the monitor, indicates that the cash flows are significantly

9  improving.

10         THE COURT:  All right.  I am not going to admit the

11  document.  I don't believe you've established why it is

12  relevant to what we are doing.  What we are doing here today is

13  not second-guessing the Canadian court.  That is the opposite

14  of what we are supposed to do today.  We are determining

15  whether the orders of the Canadian court should be recognized

16  in the United States, and the argument that you are making as

17  to why this is admissible is that perhaps the judge in Canada

18  could have made a different decision.  But that does not go to

19  whether we should recognize the order, which at this point you

20  have not suggested any reason why those proceedings were in

21  some manner so irregular that they are not entitled to

22  recognition.

23         What is your next piece of evidence?

24         MR. YADAV:  So our next piece of evidence is the CFRA

25  analyst report that I had attached to my motion record to the

Case 23-20982 Document 204-1 Filed in TXSB on 05/23/23 Page 26 of 51
Case 8:22-cv-01098-JWH Document 184-2 Filed 03/01/23 Page 26 of 50

25

 1  Canadian court.  So it establishes that Just Energy is

 2  undervalued, and it also establishes that under similar

 3  conditions it has significant value in the market.  That is

 4  Number 2 under -- under the references, Your Honor.

 5          THE COURT:  Ms. Rotman.

 6          MS. ROTMAN:  The same objection on relevance,

 7  relative to what we are here to do today, which, as the Court

 8  has pointed out, is to simply confirm the appropriateness under

 9  U.S. law of what the Canadian court has already considered and

10  decided.

11          THE COURT:  I'm going to make the same ruling.  I

12  find that, once again, we are not here to second-guess the

13  Canadian court, but rather to determine whether the procedures

14  that it followed are so inconsistent with U.S. law that for

15  some reason we should not recognize them.  This document does

16  not go towards that question.

17          What is your next offer of evidence?

18          MR. YADAV:  Our third reference is their annual

19  report.  There, the value of hedges of Just Energy is

20  described, and that is -- that is used for valuation purposes

21  in terms of determining the value of the enterprise.

22          THE COURT:  So before I ask Ms. Rotman, look, I've

23  ruled twice that what you need to demonstrate is some

24  inadequacy in the Canadian proceeding, not just that you

25  believe that the Canadian court made a wrong decision.  If the

1   Canadian court made a wrong decision, you appeal that through

2   the Canadian courts. I'm not an appellate court.

3         So I'm going to let you -- I'm going to give you

4   another opportunity to offer this and tell me why I should

5   consider something which really is questioning whether the

6   judge made the right decision, a matter of appeal, rather than

7   the test that I'm required to apply. So how is this relevant

8   to the test I need to apply?

9         MR. YADAV: Your Honor, I think the rights of the

10   U.S. equity holders are affected, and that's why the (audio

11   interference) --

12         THE COURT: I'm sorry. I didn't understand you. I

13   literally didn't understand the words. They were just too

14   fuzzy. Just if you'd repeat them, I'll probably be able to

15   understand.

16         MR. YADAV: Oh, yeah. Your Honor, I said the rights

17   of the equity owners that are U.S. citizens are affected, and

18   largely the new entity is going to be a U.S. enterprise. So we

19   have certain objections regarding that.

20         THE COURT: How does that address what I need to

21   decide, though, in terms of whether to confirm the Canadian

22   court's ruling into U.S. law? I mean, you're going -- your

23   argument is that -- and this is really the argument that I read

24   in the letter. For example, you say I should leave this thing

25   open for two years and have the purchaser come back and refund

1  any excess.

2         Well, that may have been a good idea.  It may be

3  something that could be, you know, floated somewhere.  But that

4  has nothing to do with me applying Chapter 15 of the Bankruptcy

5  Code.  And I'm trying to figure out how these go to whether I

6  ought to be applying Chapter 15 of the Bankruptcy Code, which

7  is the recognition of foreign proceedings.  And take me through

8  that.

9         MR. YADAV:  Your Honor, I am not a lawyer.  I am not

10 well-versed in the bankruptcy law for Chapter 15.

11         THE COURT:  Fair enough.  I'm going to then ask --

12 and let me -- the law requires that I try to explain to you,

13 because you're not a lawyer, what you need to do procedurally.

14 And that's why I'm going through that.  It isn't to be critical

15 of what you're doing.  I got it, that you're not a lawyer.  I'm

16 trying to explain to you in lay terms what I need to hear, not

17 because I want to criticize you, but so that you have a better

18 opportunity to win today.

19         And so I've had a couple people over the years

20 misinterpret it, that I was saying, well, you need to do this.

21 And that's not the purpose.  I'm trying to assist you by

22 telling you why your argument is missing the mark.  And I

23 understand these are really complicated legal questions.  I

24 understand why that's hard for a non-lawyer.  I still have to

25 rule, however, on the evidence that's before me.

1    So, Ms. Rotman, we have an offer of Exhibit Number 3.
2  What is your objection, if any?
3    MS. ROTMAN:  We object on relevancy as -- because it
4  is irrelevant to whether the Canadian proceeding was so
5  inconsistent with U.S. law that it shouldn't be recognized by
6  this Court.
7    THE COURT:  Same ruling.
8    Mr. Yadav, go ahead.
9    MR. YADAV:  I think all of our evidence from 4 and 5
10  -- so 4 is in the similar vein, Your Honor.  5 is essentially
11  we are recognizing the dockets filed by the individual
12  shareholders and their objections along with -- along with the
13  motion record that we have filed together.
14    And then -- then we are essentially offering in terms
15  of the applicant's compendium from June 6th in Section 6 there.
16  (Indiscernible) the language where the common shares were going
17  to be transferred.
18    THE COURT:  So I'm hearing an offer of 4, 5, and 6,
19  each together.  We haven't gotten to 7 yet.  What is the
20  response, Ms. Rotman?
21    MS. ROTMAN:  The same objection, relevancy, based on
22  the Court's --
23    THE COURT:  I'll make the same ruling.
24    With respect to Item 7, tell me what that's about.
25    MR. YADAV:  I think 7 is just reference to the CCAA

1  website and all the dockets filed therein, for reference,

2  Your Honor.

3          THE COURT:  Ms. Rotman.

4          MS. ROTMAN:  Same objection.

5          THE COURT:  Overruled.  I think that what the

6  Canadian court did is relevant, and so I am admitting 7.  I'm

7  taking note of what the Canadian court did.

8      (ECF Number 219 Reference 7 admitted into evidence)

9          THE COURT:  Mr. Yadav, now you can make -- any other

10 evidence that you wish to introduce, Mr. Yadav?  I've admitted

11 7.

12         MR. YADAV:  Another -- yeah.  Another evidence is

13 Docket 222 filed as supplemental service, notice of sale

14 recognition hearing to this Court.

15         THE COURT:  Hold on.  222 you said?

16         MR. YADAV:  Yes.  Yes, Your Honor.

17         THE COURT:  The affidavit of service?

18         MR. YADAV:  Yes, Your Honor.  So in this --

19         THE COURT:  Hold on.  Is there any objection to the

20 admission of the affidavit of service?

21         MS. ROTMAN:  No, Your Honor.

22         THE COURT:  222 is admitted.

23     (ECF Number 222 admitted into evidence)

24         THE COURT:  Any other evidence, Mr. Yadav?

25         MR. YADAV:  No, Your Honor.

```
 1              THE COURT:  All right.  Well, let me let you make

 2     your argument, then, as to why we should not recognize what the

 3     Canadian court has done.

 4              MR. YADAV:  Okay.  Your Honor, starting with --

 5     starting with Docket 222, the supplemental service, it provides

 6     an affidavit of service regarding Docket 214, notice of sale

 7     recognition hearing, and it is signed by Omni Agent Solutions.

 8     And if we could see, has my name and email address listed on

 9     it.  However, I have not received any emails from any employees

10     of Omni Agent in the last two weeks, let alone in the time

11     since I have had this email account.

12              THE COURT:  All right.

13              MR. YADAV:  So -- and what we have to do as

14     shareholders is essentially -- so, for us, as I said,

15     (indiscernible) so you have to go monitor the website and look

16     up all these documents on the website to find out what is going

17     on in the notice of recognition hearing here, and that's how we

18     are here today.

19              THE COURT:  Thank you.  Any other argument that you

20     wish to make?

21              MR. YADAV:  Other arguments, essentially, I think --

22     I think, essentially, are more in response to the -- so if

23     Your Honor has gone through our motion, we would like to add to

24     additional arguments after you've read through the response

25     late last night from Just Energy, because we have a few more --
```

1  few more points to make in front of Your Honor.

2        THE COURT:  I'm going to let you make any point you

3  want to make.  Go ahead.

4        MR. YADAV:  Okay.  So I think -- I think -- so,

5  Your Honor, should I go through our motion record?

6        THE COURT:  I'm going to let you -- now that we've

7  closed the evidentiary record, I'm going to let you make any

8  argument that you wish to make on any issue.

9        MR. YADAV:  Okay, Your Honor.  So we are a group of

10 equity owners and we own about 6 percent ownership equity

11 interest in the Just Energy interest -- in Just Entities based

12 on the 48 million shares outstanding.

13       Additionally, some of us are representing their

14 family members' interests, which are not counted here.  And

15 what we are requesting Your Honor is to form -- to ask the U.S.

16 Trustee to form an equity shareholders committee, as we believe

17 we don't have any representation in the capital structure in

18 these proceedings.

19       We did contact the monitor's counsel a few months

20 back in the Canadian proceedings regarding forming an equity

21 committee, but (indiscernible) otherwise (indiscernible) legal

22 counsel.  Most of us are small shareholders and we do not have

23 funds to bankroll counsel in this -- in these proceedings, and

24 that is another reason we are requesting Your Honor to also pay

25 for the counsel in these proceedings for us.

```
 1              So, as evidence, there are a number of dockets filed
 2    by individual shareholders, 218, 217, 215, 209, 208, 206, 205,
 3    204, 203, 202, and we believe these should be read in
 4    conjunction with our motion to avoid repetitions of valuation,
 5    concerns regarding fraud, and other value judgments.
 6              So PIMCO has 28.9 percent stake in JE.  And the
 7    acquisition cost of that is approximately $38 million.  So,
 8    essentially, redemption or cancellation of shares makes no
 9    difference whatsoever to PIMCO as it has ownership in secured,
10    unsecured credit, and equity, so it can change its role as it
11    (indiscernible), right?
12              So what I was suggesting here is, since the argument
13    being made is there is no recovery whatsoever to unsecured
14    credit for the price paid, I -- I was requesting Your Honor to
15    essentially have a two-year test, as we believe the Just Energy
16    entities will be sold within the next two years in a private
17    transaction to a private or public entity.
18              And in this regard, the only losers are going to be
19    small equity owners.  And while these proceedings are going on,
20    we are nowhere in the picture when the sale is taking place.
21              On the SEDI website, the secured loan, unsecured term
22    loan is listed at $77 million, but the true -- the
23    (indiscernible) capital cost is not known.  So for judging the
24    true invested capital and the recovery or the value realization
25    beyond it for the courts to be relevant to ask for that
```

1   information in terms of the true actual invested cost in these

2   -- in the various capital structures.

3           So another -- the most important aspect is the value

4   aspect essentially.  We do not believe there is no value to the

5   unsecured creditors (indiscernible) and the unsecured term loan

6   value has (indiscernible) million face value, but as I showed

7   Your Honor on the SEDI filings, the acquisition cost has been

8   only $77 million.

9           So that's where the two-year test is more relevant,

10  where the true value would be realized.  And if it's claimed in

11  good faith, there should not be any -- any objection to such

12  (indiscernible) that what values are realized and those should

13  be actually, because (indiscernible) made, they should actually

14  -- all of the value realization (indiscernible) holders in such

15  private or public transaction (indiscernible).

16          And the two-year test is appropriate in our mind

17  because if we look at the -- look at the proceedings, how long

18  it has been taking and why it has been taking that long.  So

19  the main liens and (indiscernible) has been essentially the

20  ERCOT adversary case that is under the purview of this Court

21  that is taking place.  So $147 million of that money has been

22  secured.  And then the other (indiscernible) proceeding.

23          What has happened, as a benefit of these blessing of

24  the Court during this time, is the cash flows have been

25  increasing, Just Energy has been able to realize

 1 | (indiscernible) realize the hedges that they have.  These are
 2 | the most lucrative assets that they have.  The value of that
 3 | asset (indiscernible) is $2.4 million.  In 2029 dollars, it is
 4 | $5 million, Your Honor.  And as equity owners, we have rights
 5 | on this future equity.  We have -- we have -- and that is one
 6 | reason we want our equity to be transferred, so that we can
 7 | realize the (indiscernible).  As equity owners, we do not want
 8 | instant gratification.  We want our investment to grow.  And
 9 | that is one reason we want -- we want our equity to be
10 | transferred.
11 |         So, if we look at the real value here,
12 | (indiscernible) unsecured capital, just even invested capital,
13 | not face value, it's a red herring, because the value
14 | realization is substantially higher compared to what has been
15 | invested.
16 |         Just Energy Entities have paid back 88 million of the
17 | 125 million DIP facility.  (Indiscernible) million has been
18 | remaining.  So they are in a very good cash (indiscernible)
19 | position right now.  They are generating cash to the
20 | (indiscernible) $289 million, even after paying the DIP credit
21 | facility by $88 million.  (Indiscernible) $147 million.  $134
22 | million is in process.
23 |         And another thing to note is recently -- so there are
24 | a few coincidental things, but (indiscernible) there were new
25 | dockets filed to (indiscernible) 134 million just in the last

1    couple of days.  I believe these are not coincidences, however.

2    And once (indiscernible) litigation is pending under the

3    authority of this Court, the value will be realized.

4            Another thing is how the transaction is structured.

5    So the -- as a part of this transaction, all equity of the Just

6    Energy today plus -- plus the new equity is going to be

7    transferred to the U.S.  And additionally there is $184 million

8    of preferred equity that will be owned.  PIMCO is going to

9    (indiscernible) for that and convert it into, again, commons

10   shares or equity.

11           And why is all this being done?  Is this all being

12   done to just recover the invested capital?  How is this

13   possible?  They also want to extend a $450 million credit

14   facility.  Okay.  How can anybody sensible can say that this is

15   just to recover the invested capital, and not substantially

16   make value of the invested capital?

17           So we think that there is a significant recovery,

18   almost to the order of two to ten times of the invested

19   capital, by PIMCO, within months of exiting this bankruptcy, if

20   not next day.  And we also believe the Court will not be able

21   to (indiscernible) that, because as soon as the (indiscernible)

22   everything is done, nobody (indiscernible) to the court, the

23   values are -- values are realized by the purchasers, right,

24   leaving the equity owners disenfranchised.

25           We believe that the -- that Just Energy Entities are

1 viable and cash generating healthy enterprises, they are not

2 insolvent.  They have values in their hedges, which are

3 realized into earnings over time and over the years.  This

4 hasn't changed.  This has been in the facts before these

5 proceedings and during these proceedings, and it is going to be

6 a fact even after these proceedings.

7       So in a prior transaction before the (indiscernible)

8 came along, and that is mainly the objection from the

9 (indiscernible) claimants, PIMCO was going to convert the

10 $205 million unsecured credit into equity at $19.255 million.

11 So (indiscernible) apart from -- apart from that the equity was

12 not getting transferred (indiscernible) also not true.  And

13 they were actually also going to transfer 48 million because

14 they (indiscernible) almost 30 percent (indiscernible) million

15 shares.

16       And even what they had contemplated in the

17 transaction was to acquire 70 percent of the fee

18 (indiscernible) 48 million.  But since the commodity claimants

19 objected so furiously, they did not go ahead with that, and

20 structured the transaction more favorably to them.  But the

21 value proposition has not (indiscernible).

22       Another thing that was interesting in these

23 proceedings is when the applicant and the purchaser presented

24 the SISP to the motions judge, they claimed that there were no

25 material differences in the prior plan and the SISP.  However,

1  that is not true.  The material differences were there and they

2  were actually (indiscernible) by the (indiscernible) so they

3  (indiscernible) unsecured credit.  They already own unsecured

4  credit, which they were going to exchange for $19.255 million

5  common shares.  And they decided to give commodity claimants

6  preferred equity, which was same as the previous -- from the

7  previous plan, and they took out the 48 -- changed the language

8  for the common shares, which is the most important aspect for

9  our equity interest, which is to essentially say that there

10  (indiscernible) for no consideration as compared to

11  (indiscernible).

12          And it makes no difference essentially to -- PIMCO to

13  structure the transaction that way, as we laid out, that they

14  are (indiscernible) capital structure, being at the top dollar

15  -- highest of the hierarchy in the (indiscernible) credit, and

16  they can actually still recover their value by being -- by

17  discounting other lower ladder in the capital structure.

18          And this is laid out in the -- on 158, Section 2.4 of

19  Michael Carter's affidavit on June 6, where it clearly states

20  that, for certainty, the common shares transferred and the

21  common shares issued to new Just Energy parent on the effective

22  date, right?

23          So I think we believe the motion judge has erred on

24  multiple counts, both for class claimants, given the fact that

25  the class claimants has to go back and forth to that court in

1  Canada and now here we are as equity owners.

2          So the most important thing is the (indiscernible) of

3  this bankruptcy is that the Just Energy Entities, they're

4  facing a short-term liquidity issue due to (indiscernible) and

5  yes, okay, PIMCO extended $125 million DIP facility.  And then

6  what happened was then we have the unproven, uncertificated

7  class claimants came along.

8          Did the Just Energy Entities know this information

9  beforehand?  Yes, they did.  Was it presented to the Court as

10 such on the first order?  No.  It was presented as a short-term

11 liquidity issue, right?  And this -- what has happened now is

12 completely (indiscernible).  It's completely -- now we have --

13 we have approval from the motion judge in Canada for a full-

14 fledged free and clear sale to PIMCO entity, and this is going

15 to disenfranchise the equity owners of their rights on existing

16 cash flows as well as future equity in the hedges of the Just

17 Energy Entities, thus stripping them of their rights, and -- we

18 are essentially right now begging for our rights here in front

19 of Your Honor.

20          I think the Court should not be facilitating such

21 transaction, especially when (indiscernible) how much value can

22 be realized once -- once the (indiscernible) and how much value

23 will be realized later, specifically within two years.  These

24 two years are more relevant in Just Energy's case because they

25 are actually -- use the blessings of the court to realize value

1   for one and a half years so far.  So -- and most likely from

2   looking -- following these proceedings, our intention is

3   (indiscernible) likely to be one of the defenders or opposing

4   intervenors in the Just Energy Entities (indiscernible) case.

5        Another thing in the prior plan, the (indiscernible)

6   claim that they cannot transfer equity interest in a private

7   entity from a public company.  The costs are going to be too

8   high.  This is not essentially true.  As Your Honor has decided

9   over the Washington Prime Group, Inc. bankruptcy, the equity

10  interests were actually transferred to a private equity, you

11  know, private entity, very successfully.

12       Another thing is, during the September 2020

13  restructuring, the board of directors was completely replaced

14  by PIMCO.  And we believe the -- we believe that PIMCO has

15  insider information from the very beginning and cannot be

16  trusted with the process of SISP.  So it does, in our opinion,

17  set a clear stage of fraud for the (indiscernible) parties.

18  And there's no transparency in the process to the owners.

19       On top of that, all the documents that were submitted

20  by the various bidders, they are hidden under the guise that

21  they reveal sensitive information about the parties involved.

22       So I believe there is significant -- we believe there

23  is significant value in these entities, and -- and every effort

24  has been made to keep all this value to PIMCO.  And various

25  financial engineering and judicial engineering constructs are

1 being used in this restructuring, which essentially ends up

2 disenfranchising the equity owners.

3          And -- and we believe there's lack of transparency in

4 the dealings with respect to this SISP.  There is significant

5 value to be realized, getting out of this bankruptcy as soon as

6 possible, particularly now that the majority of ERCOT money has

7 been recovered and the cost payments -- payments are -- are

8 being handled.

9          So -- so, also going private, there are no

10 requirements with respect to SEC and SEDI regulators.  And --

11 and I have (indiscernible) demonstrative.  We had to actually

12 beg for (indiscernible).  It should have been due two to three

13 weeks back, but they were filed day before yesterday, after we

14 -- even one week after we actually filed our objection in the

15 motion to this court.

16          These are basic rights of equity owners.  People

17 think like this.  I think they are demonstrate -- they do

18 demonstrate bad faith.  They are not -- they are not -- all of

19 this urgency to get away from all of this financial

20 (indiscernible) now that they are in essentially a very good

21 position.  We cannot determine anything else than absence of

22 good faith here.

23          In terms of valuation, as I said, there is

24 significant value in the -- in the annual report under

25 (indiscernible) instruments about $2.4 million, $3.4 billion in

1  today's dollars.  And in 2029, they're (indiscernible)

2  appreciation, they are twice -- twice as valuable.  And the

3  CFRA equity analyst had demonstrated that the -- the Just

4  Energy entities have been tracking (indiscernible) their

5  earnings to the real earnings declared so far.  There have been

6  some variations because of the U.S. GAAP requirements, mark to

7  market accounting, as compared to the Canadian (indiscernible)

8  requirements.  The cash flow that realized as the -- as the  --

9  (indiscernible) was in mark -- in case of U.S. GAAP accounting

10 they are realized then at the time of mark to market filings.

11         So, in Docket 218, Peter Mudie has demonstrated the

12 capitalized value of $730 million for equity alone based on

13 peer comparison, and that essentially is similar today

14 (indiscernible) in October 2028 --

15         THE COURT:  Mr. Yadav, Document 208 is not in

16 evidence.

17         MR. YADAV:  218.  Docket 218.

18         THE COURT:  Docket 200 is not in evidence.

19         MR. YADAV:  218.

20         Ms. SCHULTZ:  218, Your Honor, I think he's saying.

21         THE COURT:  218 is not in evidence.

22         MR. YADAV:  I -- in reference five, okay.  That's --

23 in any case, the -- what Peter has -- has -- has --

24         THE COURT:  No, sir.  You may not talk about a

25 document not in evidence.

1          MR. YADAV:  Okay.  So I will move on.

2          The next point, Your Honor, I -- we believe the

3    motion judge in the CCAA proceedings is setting a very

4    dangerous precedent here with essentially the RVO in this case,

5    the owners' interests are getting disenfranchised.  And we

6    believe that the BMA -- BMO valuation significantly undervalues

7    the company, And the -- the precedent here is essentially

8    dangerous for a viable going concern that can go to public

9    markets and bring significantly more value to the previous

10   owners.

11         THE COURT:  Mr. Yadav, thank you for your argument.

12   Do you have any new arguments that you want to make that you're

13   not going to be repeating what you already told me?

14         MR. YADAV:  So, no, Your Honor, I -- I -- I think

15   that we need the (indiscernible) to protect the rights and

16   interests of us.

17         THE COURT:  Mr. Yadav, thank you, sir.

18         Is there anyone else that wishes to introduce any

19   argument today, or evidence today, in opposition to what the

20   debtors have requested?

21         Mr. Statham, good morning.  Mr. Statham is a

22   representative of the United States Trustee's Office, and the

23   United States Trustee is part of the Department of Justice of

24   the United States.  Mr. Statham.

25         MR. STATHAM:  Thank you, Your Honor.  Steve Statham

1   for the United States Trustee, I may be ahead of the time that

2   you've allocated to speak. I actually wanted to address the

3   committee appointment issue at the appropriate time.

4           THE COURT: No one else wanted to speak, so why don't

5   we move to that now.

6           MR. STATHAM: Thanks, Your Honor.

7           As I view the objections, and -- as to the process,

8   have already been aired and addressed in the Canadian court,

9   and particularly the specific complaints raised today have

10  already been rejected.

11          As the Court has stated, particularly as to, sort of,

12  committee appointments, we're not here to second-guess the

13  Canadian court. Committees, particularly an equity committee,

14  are uniquely a creature of Chapter 11 cases, and there's really

15  no specific provisions in Chapter 15 that mirror Section 1102.

16  So it's our view that a committee appointment at this stage

17  doesn't add anything to the relief that's been sought or the

18  recognition ruling that the Court's empowered to make. So we

19  are opposed to any sort of appointment of a committee at this

20  juncture.

21          THE COURT: Thank you, Mr. Statham.

22          Anyone else?

23          MR. STATHAM: Yes, sir.

24          THE COURT: All right. These are my findings of fact

25  and conclusions of law with respect to the disputed matters

1  that have been raised today.  There are additional findings of

2  fact and conclusions of law that we'll make in writing in the

3  proposed form of order.

4        We are here in a Chapter 15 proceeding.  This is not

5  a Chapter 11 proceeding.  There are substantial differences

6  between the two.  One of them, just highlighted by Mr. Statham,

7  is that there is no equity committee provision within Chapter

8  15.  That is an animal of Chapter 11.  Accordingly, with

9  respect to one of the requests that have been made by Mr. Yadav

10 and by others in his committee group, there is no provision to

11 appoint an equity committee, and I'm not going to appoint one

12 in the absence of statutory authority to do that.

13       When we sit as a court where the main interest

14 proceeding is in Canada, the issue before us is whether to

15 recognize that proceeding.  It is not whether the proceeding

16 was perfect or whether it was appealable or whether somebody

17 might disagree with it.

18       One of the principal issues that might be of concern,

19 when you look at a U.S. court dealing with a Canadian

20 proceeding is whether the Court acted in a manner that was so

21 contrary to the public policies of the United States that it

22 should not be recognized.  Virtually all of the argument that's

23 being made by Mr. Yadav, and by his group, is that if you

24 really try hard and look at an equity waterfall, money would

25 eventually come to equity.  It might come in a couple of years,

1    it might come today.  The waterfall hasn't worked right,

2    according to these arguments that are being made.

3         The problem with the argument is Canada -- the

4    Canadian court, in examining this case, went through the same

5    process that a U.S. court would go through.  It went through

6    whether the marketing had been proper and whether the marketing

7    had produced a market value best as you could accomplish.  It

8    considered and rejected, because it thought they didn't make

9    sense, the arguments being made by the equity committee that,

10   in fact, there was equity.  All of that, from a process point

11   of view, is consistent with U.S. public policy.  There has been

12   no showing that there was anything that occurred in Canada that

13   is inconsistent with U.S. policy.  Essentially, when you read

14   the findings of the Canadian court, the arguments were rejected

15   there, not because it didn't want to follow the waterfall, but

16   because it reached a different factual conclusion about whether

17   there was, in fact, equity in the waterfall.

18        I am not re-visiting whether the Court called the

19   facts right in Canada.  That may be a subject for appeal in

20   Canada, and if so, I am also not getting in the way of any

21   Canadian appeal.  Not our job when the center of main interest

22   is in Canada.  If Mr. Yadav and his group believe the Canadian

23   court made an error, and if they have a right to appeal that,

24   nothing that we do today will get in the way of that.  But

25   there's also nothing that we're going to do today where we get

1   in the way of a properly conducted Canadian proceeding

2   conducted in a manner that, in my view, from reading the

3   findings of fact and conclusions of law and from listening to

4   all the arguments, was conducted in the manner that is not

5   inconsistent with the policies of our country.

6           One of the suggestions made today is that there's a

7   better alternative.  And another is that there was a prior plan

8   filed that was a better alternative.  Those, to me, simply

9   reflect that they were options presented to the Canadian court.

10  As I understand what occurred from the evidence before me, the

11  prior plan was withdrawn when objections were filed, and it was

12  going to turn out not to be approvable by the Canadian court.

13  And here, the idea that we are going to intervene with what the

14  Canadian court did and say that whoever buys this, whether it's

15  somebody currently in the capital structure or someone new, is

16  going to have a cap on whatever they're going to recover in two

17  years, simply means nobody will buy it.  It's not only not a

18  viable solution, we also don't have authority under Chapter 15

19  to impose our view as to what a plan ought to be.  We can

20  reject what the Canadian court did, in theory, if what we've

21  determined is that it was done in a manner inconsistent with

22  our policies, but we can't substitute our judgment for theirs

23  as to what a better alternative would be, nor do I believe in

24  my judgment that, in this case, they did anything wrong.

25          There is an issue that was raised as to whether the

1    certificate of service might have had not -- a document wasn't

2    received by Mr. Yadav.  I find that to be moot.  He's here.

3    And any problem with service is waived.

4            Overall, I reject the arguments made that we should

5    sit as a court of appeals, and revisit and redetermine what the

6    Canadian court did.  It appears to me that it engaged fully in

7    a process that deserves and will now receive recognition under

8    U.S. law.

9            That concludes my additional findings, in addition to

10   what is in the written order.  Go ahead, please.

11           MS. SCHULTZ:  Thank you, Your Honor.  Unless you had

12   anything further for us, I think that was all in the agenda for

13   today.  We just respectfully ask that the order be entered.

14           THE COURT:  All right.  Is there any objection to

15   these?  I know that we have now overruled all the substantive

16   objections to ECF 229.  Is there a problem with the form of

17   order that anybody wishes to voice?

18           MS. SCHULTZ:  The only thing I would flag for Your

19   Honor is we did attach a redline.  I don't know if you want to

20   include that in the entered order.

21           THE COURT:  All right.  With respect to those parties

22   that sent letters to the Court, I want to tell you two things.

23   First, despite the fact I'm ruling against you, I very much

24   appreciate the great amount of effort that went into those

25   communications.  I appreciate Mr. Yadav's respectful

1  presentation that he made today.  I respect how difficult that

2  is for a non-lawyer to do.  It isn't that I don't want people

3  to participate, it's just that the participation doesn't change

4  the outcome today.  I hold the folks that wrote me letters in

5  high regard.  They invested in a company, and they've lost

6  their money, and that is a sad outcome.

7          Second thing I want to tell them is, that if they

8  disagree with what I have done today, that my order is

9  appealable, and the deadline for appealing this order is 14

10  days from today.

11          When are you going to close on the transaction?

12          MS. SCHULTZ:  We have an outside date of December

13  16th, Your Honor.

14          THE COURT:  What's the earliest you're going to close

15  in this transaction?

16          MS. SCHULTZ:  I think we may take almost the full two

17  weeks to December 16.

18          THE COURT:  I'm going to stay my order for ten days

19  from today --

20          MS. SCHULTZ:  Okay.

21          THE COURT:  -- in order to give a -- an opportunity

22  for appeal before it might become equitably moot.  It will be

23  entered this morning.

24          MS. SCHULTZ:  Perfect.  Thank you, Your Honor.

25          THE COURT:  I sent the order to docketing.

1    With respect to the remaining matters on today's

2 docket, the motion for appointment of an equity committee, for

3 the reasons that I've stated, that motion is denied, and we'll

4 make that denied by docket entry.

5    Is there anything else that we need to accomplish

6 today?

7    MS. SCHULTZ:  Not on behalf the debtors, Your Honor.

8    THE COURT:  Anyone else?  All right, thank you.

9    MS. SCHULTZ:  Thank you.

10    THE COURT:  On the ten o'clock docket.

11    (Proceedings concluded at 10:23 a.m.)

12                        *  *  *  *  *

13

14

15

16

17

18

19

20

21

22

23

24

25

# **C E R T I F I C A T I O N**

I, Alicia Jarrett, court-approved transcriber, hereby certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

_____

ALICIA JARRETT, AAERT NO. 428    DATE: December 2, 2022

ACCESS TRANSCRIPTS, LLC